



Deposition of:

# Conf. 30(b)(6) Anthony Campisciano

*August 30, 2016*

In the Matter of:

# Ascentium Capital vs. Adams Tank & Lift

CONFIDENTIAL

Tiffany Alley, A Veritext Company

1075 Peachtree St. NE , Suite 3625

Atlanta, GA, 30309

800.808.4958 | calendar-ga@veritext.com | 770.343.9696

Page 1

```
 1    1              IN THE UNITED STATES DISTRICT COURT

 2    2              FOR THE MIDDLE DISTRICT OF GEORGIA

 3    3                     ALBANY DIVISION

 4    4

           ASCENTIUM CAPITAL, LLC,

 5    5

                   Plaintiff,          Civil Action File No.

 6    6                                1:15-CV-123(LJA)

           vs.

 7    7

           ADAMS TANK & LIFT, INC.;

 8    8    ANDREW J. ADAMS; PHOENIX

           PETROLEUM, LLC; GREAT              CONFIDENTIAL

 9    9    AMERICAN TRAVEL CENTER,

           LLC; FALCON ENTITY, LLC;

10   10

                   Defendants.

11   11

12   12        30(b)(6) DEPOSITION OF ANTHONY CAMPISCIANO

13   13                   August 30, 2016

14   14                10:14 a.m. - 5:31 p.m.

15   15                    Baker Donelson

16   16                3414 Peachtree Road, NE

17   17               Monarch Plaza, Suite 1600

18   18                 Atlanta, Georgia  30326

19   19             Shawn E. Fleck, RPR, CCR #2859

20   20

21   21

22   22

23   23

24   24

25   25
```

Conf. 30(b)(6) Anthony Campisciano          August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 2

1        DESCRIPTION OF EXHIBITS
2   For the Plaintiff:
3   EXHIBIT        DESCRIPTION          PAGE
4   Exhibit 1   Stipulation          8
5   Exhibit 2   Evidence of Insurance      9
6   Exhibit 3   Funding Termination Notice    9
7   (See Page 4 for confidential exhibits)
8
9   For the Defendant:
10  EXHIBIT        DESCRIPTION          PAGE
11  Exhibit 48   Notice of depo of Ascentium    19
12  Exhibit 49   Notice of 30(b)(6) depo     19
13  Exhibit 50   Inspection Report        44
14  Exhibit 51   Equip Inspection Rpt 11/12/15   48
15  Exhibit 52   Asset Inspection Rpt 12/11/15   52
16  Exhibit 53   QuikPro Inspection       53
17  Exhibit 54   Amended Declaration of Campi   68
18  Exhibit 55   Equipment Finance Agreement   84
19  Exhibit 56   Fax 1/24/13 to Maria Negri    92
20  Exhibit 57   Transcript of telephone conf.   95
21  Exhibit 58   Equip. Finance Agreemt 2118557  112
22  Exhibit 59   Fax 1/24/13           115
23  Exhibit 60   Fax 1/24/13 - 16 pgs.       118
24  Exhibit 61   Equip. Fin. Agreemt 2118850   119
25  Exhibit 62   E-mail 6/27/13         128

Page 4

1        DESCRIPTION OF EXHIBITS (cont'd)
2   For the Plaintiff:
3        (MARKED CONFIDENTIAL)
4   Exhibit 4   Credit Approval Presentation    9
5   Exhibit 5   Summary Highlights Report
6     10/7/14          10
7   Exhibit 6   Equipment Finance Agreement
8     2169156          10
9   Exhibit 7   Booked Volume         11

Page 3

1        DESCRIPTION OF EXHIBITS (cont'd)
2   For the Defendants:
3   EXHIBIT        DESCRIPTION          PAGE
4   Exhibit 63   Telephone Conf. #469      130
5   Exhibit 64   E-mail 1/2/15          136
6   Exhibit 65   E-mail 1/12/15 @ 10:38     138
7   Exhibit 66   E-mail 2/24/15         139
8   Exhibit 67   E-mail 3/9/15          140
9   Exhibit 68   E-mail 3/19/15         144
10  Exhibit 69   E-mail 4/7/15         147
11  Exhibit 70   E-mail 4/20/15         148
12  Exhibit 71   E-mail 5/8/15         166
13  (The following Defendants' exhibits were previously
14  marked in Mr. Len Baccarro's deposition, but not
15  attached to this deposition:)
16  Exhibit 23   E-mail 10/3/14         151
17  Exhibit 31   E-mail 4/20/15         154
18  Exhibit 32   E-mail 5/1/15         158
19  Exhibit 33   E-mail 5/1/15 @ 10:32      160
20  Exhibit 37   E-mail 5/1/15 to        162
21          Baccarro
22  Exhibit 38   E-mail 5/7/15         162
23  Exhibit 39   E-mail 6/1/15         163
24  Exhibit 40   E-mail 6/2/15         167
25  Exhibit 46   Text Messages         169

Page 5

1   INDEX TO EXAMINATIONS        PAGE
2   Examination by MR. MCKENZIE:      11

2 (Pages 2 - 5)

Conf. 30(b)(6) Anthony Campisciano      August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

---

Page 6

1 APPEARANCES OF COUNSEL:
2 On behalf of the Plaintiff:
3      KEVIN STINE
4      Attorney at Law
5      BAKER, DONELSON, BEARMAN, CALDWELL &
6      BERKOWITZ, P.C.
7      3414 Peachtree Road, NE, Suite 1600
8      Atlanta, Georgia 30326
9      (404) 223-2207
10 On behalf of the Defendants:
11      COLLIER W. MCKENZIE
12      Attorney at Law
13      JONES CORK, LLP
14      435 2nd Street, Suite 500
15      Macon, GA 31201
16      (478) 745-2821
17
18      (Pursuant to Article 10(B) of the Rules and
19 Regulations of the Georgia Board of Court Reporting,
20 a written disclosure statement was submitted by the
21 court reporter to all counsel present at the
22 proceeding.)
23
24
25

---

Page 7

1 PROCEEDINGS:
2      MR. MCKENZIE: This will be the deposition
3 of Tony Campi taken in the case of Ascentium
4 Capital, LLC versus Adams Tank & Lift, Inc., Andrew
5 Adams, Et Al.; US District Court for the Middle
6 District of Georgia, Civil Action Number
7 1:15-CV-123.
8      This deposition is being taken pursuant to
9 notices and agreement of counsel. This deposition
10 is also being taken for the purposes of discovery,
11 use as evidence as cross-examination, and for any
12 and all other allowable purposes under the Federal
13 Rules of Civil Procedure.
14      If agreeable, all formalities with regard
15 to taking the deposition are waived, and all
16 objections will be reserved, except as to the form
17 of the question and responsiveness of the answer,
18 until next use of the testimony.
19      Is that agreeable?
20      MR. STINE: That's agreeable.
21      MR. MCKENZIE: Okay. Do you want to wait
22 and see about waiving signature?
23      MR. STINE: Yes. At the end of the
24 deposition, I'll speak to Mr. Campi about whether to
25 reserve signature.

---

Page 8

1      MR. MCKENZIE: Great. And then you can
2 swear the witness, and then you can go after.
3 THEREUPON:
4      ANTHONY CAMPISCIANO
5 was called as a witness and, having been first duly
6 sworn, was examined and testified as follows:
7      MR. STINE: As a housekeeping matter, we
8 are here for a 30(b)(6) deposition of the Plaintiff
9 Ascentium Capital. The deposition notice had
10 several subject matters, some of which Plaintiff
11 objected to. Plaintiff's counsel and Defense
12 counsel worked on a stipulation to resolve those
13 objections. The stipulation I have marked as
14 Plaintiff's Exhibit 1.
15      (Plaintiff's Exhibit 1 marked.)
16      MR. STINE: Under this stipulation, subject
17 matter Numbers 5 through 9 of the 30(b)(6)
18 deposition notice will not be addressed today, but
19 rather will be deemed to have been addressed in the
20 previous testimony of Len Baccarro.
21      I won't go through the stipulation any
22 further. The stipulation speaks for itself, and has
23 been made Plaintiff's Exhibit 1.
24      We also have a few documents to produce
25 today, which Mr. McKenzie and I agreed I would

---

Page 9

1 introduce at the beginning of the deposition.
2      (Plaintiff's Exhibit 2 marked.)
3      MR. STINE: Plaintiff's Exhibit 2 is a
4 certificate of property insurance for the Cairo
5 location, indicating that the insured, Phoenix
6 Petroleum, insured the building, the dispensers, and
7 the canopy with Ascentium Capital identified as an
8 additional loss payee, and so I'm making a copy of
9 that as Plaintiff's Exhibit 2. And here's an extra
10 copy for you.
11      MR. MCKENZIE: Thanks.
12      MR. STINE: Next we have a Funding
13 Termination Notice and Demand For Payment, a copy of
14 which I've made Plaintiff's Exhibit 3.
15      (Plaintiff's Exhibit 3 marked.)
16      MR. STINE: This is a notice from Ascentium
17 Capital to Phoenix Petroleum and the three
18 guarantors dated December 2, 2014.
19      (Plaintiff's Exhibit 4 marked
20 confidential.)
21      MR. STINE: Next, we have a credit approval
22 for Phoenix Petroleum. This is a report that's been
23 generated by the Ascentium Capital credit
24 department. Based on the nature of the report, I'm
25 going to mark it confidential under the protective

---

3 (Pages 6 - 9)

Conf. 30(b)(6) Anthony Campisciano

August 30, 2016

Ascentium Capital vs. Adams Tank & Lift

Page 10

1  order that Judge Abramson has entered in this case.
2  And that's Plaintiff's Exhibit 4.
3        (Plaintiff's Exhibit 5 marked
4  confidential.)
5        MR. STINE:  Plaintiff's Exhibit 5 is a site
6  inspection dated October 6, 2014.  We're not certain
7  if this was previously produced, so we're producing
8  it today.
9        (Plaintiff's Exhibit 6 marked
10 confidential.)
11       MR. STINE:  And then there's two documents
12 we're producing today that are not necessarily
13 supplemental productions, but are subject -- they
14 fall within the subject matter of the 30(b)(6)
15 deposition notice.  One of the subject matters of
16 that notice pertain to situations in which a
17 financing transaction was unwound after the funding
18 from Ascentium Capital.  Whether or not -- I believe
19 one of the subject matters addressed those previous
20 situations.
21       And so what we've done is Mr. Campi has
22 come up with a sampling of agreements with other
23 customers where the -- the funding occurred, and
24 then for one reason or another, the customers'
25 transaction with the supplier was cancelled, and the

Page 11

1  deal was unwound, with the funding returned to
2  Ascentium Capital.  And because these agreements are
3  unrelated to the Defendants in this case, I'm going
4  to mark Plaintiff's Exhibit 6 as confidential as
5  well.
6        (Plaintiff's Exhibit 7 marked
7  confidential.)
8        MR. STINE:  And then I have one final one.
9        Another subject matter of the Defense's
10 30(b)(6) deposition notice requested details on the
11 historical business relationship between Ascentium
12 Capital, and Adams Tank & Lift.
13       So Plaintiff's Exhibit 7 is a spreadsheet
14 that Mr. Campi prepared for his deposition today,
15 which basically lists all of the transactions that
16 Ascentium Capital funded, where Adams Tank & Lift
17 was the vendor.
18       And so he'll be referring to this during
19 the course of the deposition.  This is Plaintiff's
20 Exhibit 7.
21       And I have nothing further at this time.
22 Collier, you can proceed with your deposition.
23              EXAMINATION
24 BY MR. MCKENZIE:
25    Q.  All right.

Page 12

1        All right.  Mr. Campi, have you ever given
2  a deposition before?
3     A.  I have not.
4     Q.  You have not?  Okay.
5        Well, for her sake, make sure you speak up
6  loudly and clearly.
7     A.  Uh-huh.
8     Q.  Don't -- try to avoid "uh-huh" and "uh-uh".
9     A.  Okay.
10    Q.  Say "yes", "no".  Try not to nod your head.
11 Try to allow me to finish asking you a question
12 before you start to answer it.
13    A.  Understood.
14    Q.  And if you don't understand a question I
15 ask, make sure you ask me to repeat it or rephrase
16 it, because if you don't, then I'll assume you
17 understood it.  Is that fair?
18    A.  Okay.
19    Q.  All right?
20    A.  Agreeable.
21    Q.  So tell me what all you reviewed in
22 preparation for today's deposition document-wise.
23    A.  I went over the original complaint filed.
24    Q.  Okay.
25    A.  I went over the questions that I thought I

Page 13

1  had to be answering today.  I went over the three
2  contracts with Phoenix Petroleum, all the documents
3  contained having to do with those contracts, the
4  payment histories of each of the accounts, and I
5  read Mr. Baccarro's deposition from a couple of
6  months ago.
7        I had a meeting with Kevin yesterday.  We
8  went over quite a few things.
9     Q.  We don't want to talk about that.
10    A.  Okay.
11    Q.  Okay.  Have you spoken to anyone other than
12 Mr. Stine or Ms. Adkins, who works with Mr. Stine,
13 to prepare for today's deposition?
14    A.  Yes.  Several -- well, my boss, who I
15 report to, Jerry Noon.
16    Q.  Okay.  What did you and Jerry Noon talk
17 about?
18    A.  Just the matter in general, what we think
19 happened, why it happened, and I also spoke with
20 Len, Len Baccarro a couple of times, you know, being
21 that this -- since this case --
22    Q.  Yeah.
23    A.  -- went into effect.
24    Q.  Do you work in the office with Len
25 Baccarro?

4 (Pages 10 - 13)

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 14

1    A. I do not. Len works out of the New Jersey
2  office.
3    Q. Okay.
4    A. The main office of Ascentium is in Houston,
5  and I work out of the New York office on Long
6  Island.
7    Q. Gotcha.
8      And where is Jerry Noon's office?
9    A. In Houston.
10   Q. Houston? Okay.
11   A. It's actually Kingwood, a suburb of
12  Houston.
13   Q. Did -- so what did you and Lenny talk
14  about?
15   A. Well, like I said, I read over his
16  deposition.
17   Q. Uh-huh.
18   A. And I spoke to him on the phone. And I
19  just wanted to touch base with him on his testimony,
20  and confirm with him that everything that I was
21  reading was accurate.
22      We went over some of the questions, and I
23  was satisfied that his deposition was right on
24  point.
25   Q. So what -- what things were you satisfied

Page 15

1  about that were right on point?
2    A. Specifically?
3    Q. Uh-huh.
4    A. His -- what happened with the funding that
5  we did with Adams, and why some of the items were
6  either delayed or canceled.
7      I went over that Gmail account with him,
8  which he indicated to me that was the secondary
9  account, a back-up account, in case our regular
10  company e-mail server ever went down. It was an
11  emergency e-mail that he used, he said, that one
12  time.
13   Q. Okay.
14      So what -- what is it that you -- after
15  talking to Jerry, and Len Baccarro, and others, are
16  those the only people you talked to in preparation
17  for today's deposition other than your attorneys?
18   A. Correct. Maybe one of the collectors way
19  back when, you know, when the accounts first went
20  into default. What they learned. You know.
21   Q. And who would that be?
22   A. Carlos Galvez (phonetic) --
23   Q. Okay.
24   A. -- was the collector on the account, I
25  think, at the time.

Page 16

1    Q. And what, as a collector on the account,
2  what does Carlos do?
3    A. Carlos -- once an account goes -- usually
4  falls 20 days behind, Carlos is one of the lower
5  level collectors, and he'll make the initial phone
6  call, or send an e-mail, or send a collection
7  letter, you know, advising the customer that they're
8  behind, asking them when they're going to pay, et
9  cetera, et cetera. And Carlos would usually handle
10  something up to about 60 days past due.
11   Q. Okay.
12      All right. So what is it that you think
13  happened?
14   A. Well, when I first learned of -- learned of
15  the delinquency, I believe it was October 14, is
16  when the account started to fall into arrears.
17      I learned very quickly after that, and I
18  don't remember how I learned it, but I learned that
19  Ataollah, the personal guarantor on the three
20  Phoenix contracts, had tried to commit suicide
21  unsuccessfully.
22      And I believe at the same time I heard
23  that, we were informed that the seven locations went
24  into receivership. One of the banks that financed
25  the mortgages got them, put into receivership

Page 17

1  involuntarily.
2      And then as I started to -- then I got onto
3  the case. I guess it was maybe October, November,
4  or December of '14.
5    Q. Okay.
6    A. I started to correspond with the receiver
7  and/or the receiver's attorney, trying to get the
8  whole story as to what happened.
9      Out of the seven locations, as I'm sure
10  you're aware, we had two. We had two contracts: At
11  Cairo, and one in Jackson.
12      And as time progressed, I just tried to
13  learn as much as I could as to what was going on.
14  And then I started speaking to the bank that put
15  them into receivership to find out what they were
16  doing on their end.
17   Q. And so how did that relate to Ascentium's
18  interest in either of these project sites? The
19  bank. What the bank was doing?
20   A. Well, when we -- when we learned of the
21  receivership, a little time had gone by, and the
22  payments had stopped. And the first thing we wanted
23  to do, at that time, was to engage a company to go
24  out to the sites, and do a site inspection. We
25  wanted to make sure our collateral was on-site, all

5 (Pages 14 - 17)

Tiffany Alley, A Veritext Company

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 18

1  the items were -- that was supposed to be there were
2  there, and we found out that, at the Jackson
3  facility, there was no collateral.  And the site
4  hadn't been built yet.  I believe it was a barn of
5  some sort, I believe, the report said.
6       Because, from what I understand, they had
7  some problems with getting the CO or the certificate
8  of occupancy from the town, or whatever.  They had
9  trouble getting a variance, or whatever.  So the
10  site, at that time, had not even been started to be
11  built.
12      Q.  Before we get too far into this, I want to
13  go ahead and do this.
14          I'm going to mark as Defendant's Exhibit 48
15  the notice of 30(b)(6) deposition of Ascentium
16  Capital, LLC, and on that, Mr. Stine was explaining
17  a stipulation related to this --
18      A.  Uh-huh.
19      Q.  -- 30(b)(6) notice.
20          So, you know, my understanding is that
21  you'll be testifying as a representative of --
22  30(b)(6) representative of Ascentium Capital as to
23  Items 1 through 4, and then 10 through 14.  Is that
24  your understanding?
25      A.  I wasn't aware of 10 through 14, but -- or

Page 19

1  maybe I just don't remember.
2      Q.  Yeah.
3          MR. STINE:  Here, take a look.
4          MR. MCKENZIE:  Here.  And let's mark it,
5  and then I'll give it to you.  Sorry.
6          (Defendant's Exhibit 48 marked.)
7  BY MR. MCKENZIE:
8      Q.  There we go.
9      A.  Thanks.
10      Q.  Take a look at that, and make sure we're on
11  the same page.
12          MR. STINE:  Have you had a chance to look
13  through?
14          THE WITNESS:  I'm fine with that.  Yes.
15  BY MR. MCKENZIE:
16      Q.  All right.  And then I'm going to mark as
17  Defendant's Exhibit 49 a notice of deposition to
18  you, Tony Campi, individually.
19      A.  Okay.
20          (Defendant's Exhibit 49 marked.)
21  BY MR. MCKENZIE:
22      Q.  And, you know, there will be questions that
23  I ask that you might not be answering as the
24  30(b)(6) representative of Ascentium --
25      A.  Okay.

Page 20

1      Q.  -- but were answering to the best of your
2  knowledge, you know, as to what you, Tony Campi,
3  knows in your individual capacity.
4      A.  Understood.
5      Q.  And that's the purpose of that.
6      A.  Okay.  That's fine.
7      Q.  Okay.
8          All right.  So earlier you spelled your
9  full name for the court reporter; is that correct?
10      A.  Yes.
11      Q.  Just so it's on the record, tell us your
12  full name.
13      A.  Anthony Campisciano, C-A-M-P, as in Peter,
14  I-S-C-I-A-N-O.
15      Q.  And earlier, you indicated you work in
16  Ascentium's New York office?
17      A.  Correct.
18      Q.  Is that -- do you also live in New York?
19      A.  Yes, I do.
20      Q.  Okay.
21          Have you ever been involved in a lawsuit as
22  a party?
23      A.  I have not.
24      Q.  Have you --
25      A.  Well, can I clarify that for a second?

Page 21

1      Q.  Sure.
2      A.  I'm not sure what you mean.  I mean, I
3  handle a lot of lawsuits for Ascentium, but I've
4  never been deposed, and I've never had to go on
5  trial, on the stand, as a witness in a trial.
6      Q.  Okay.
7      A.  I handle all the paperwork like behind the
8  scenes.  Once we file a suit, I try to obtain
9  judgment, try to collect the judgment, try to
10  recover the collateral, get it sold.  That's
11  basically the scope of my work.
12          MR. STINE:  I think he's asking whether
13  Tony Campi has ever been a plaintiff or a defendant
14  in a civil matter.
15      A.  Oh, I'm sorry.  I misunderstood the
16  question.  The answer to that is no.
17      Q.  Okay.
18      A.  Sorry.
19      Q.  My next question was going to be the one
20  that you asked.
21      A.  Okay.
22      Q.  And it sounds like from your response that
23  you are involved in some aspect of litigation on
24  behalf of Ascentium --
25      A.  Correct.

6 (Pages 18 - 21)

Conf. 30(b)(6) Anthony Campisciano                   August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 22

1    Q. -- Capital?
2    A. Correct. I'm sorry. I interrupted you.
3    Q. No, no. That's fine.
4       How -- you know, how often is Ascentium
5  involved in litigation annually?  Is that a regular
6  occurrence or...
7    A. It happens quite often. I would say, on
8  the average, we may file two to three suits a month
9  on loans that have gone bad.
10    Q. And how many loans does Ascentium originate
11  every year?
12    A. I honestly don't know.  Number of
13  loans-wise, I don't know.
14    Q. Okay.
15       Do you know the percentage of loans
16  Ascentium does in the convenience store/gas station
17  market?
18    A. If I had to guess, I would probably say
19  maybe 20 percent.
20    Q. Okay.
21    A. That's an educated guess.
22    Q. What would you say Ascentium's main target
23  market is?
24    A. The convenience store would be one target.
25  We do a lot of financing for the trucking industry.

Page 23

1  Over-the-road truckers, or people that own like --
2  like a Little Debbie route, or a Coke route, or
3  whatever.  You know, we will finance the truck for
4  them personally.
5       We do business in the hospitality industry.
6  We finance furniture for hotels, point-of-sale
7  systems for hotels.  The -- I'm trying to think of
8  the word.  The nursing home business, we do quite a
9  bit of nursing home business, where if they need
10  beds or respirators, or anything having to do with
11  the nursing home, if they need to acquire equipment,
12  we'll finance nursing homes.
13       That's -- those are the main -- probably
14  the main ones.  And then there's a potpourri of a
15  whole bunch of other types of businesses that we'll
16  do.
17    Q. Let's see.  Oh.
18       Have you ever been arrested?
19    A. I have not.
20    Q. Okay.  I think that's all -- yeah, that's
21  all my background questions.
22       Okay.  So why did Ascentium file suit
23  against Andy Adams & Adams Tank?  I mean, why are we
24  here?
25    A. Well, we learned, as the delinquency went

Page 24

1  on, and after we did our site inspections, the
2  Jackson facility, we were told that the fuel
3  dispensers were in storage someplace.  I think it
4  was a company called -- I don't recall the name of
5  the company now.  I'm sorry.
6       But we sent our site inspector out to
7  inspect the pumps at the storage facility.  I think
8  it was Jones Petroleum, if I'm not mistaken.
9       And he took pictures of the pumps.  He
10  recorded the serial numbers.  And when we got the
11  report back, the serial numbers on the dispensers
12  did not match up with the serial numbers that we had
13  on file.
14       And we later learned that those dispensers
15  were financed by Providence Capital.  The same
16  dispensers that we thought we had paid for and that
17  were delivered were actually not -- was actually not
18  our collateral.  It was the collateral of Providence
19  Capital.
20       There's more, if you want me to --
21    Q. Yeah.  Keep going.
22    A. There's another aspect to it.
23       We also learned, during the course of our
24  investigation, that part of the Cairo Number 2 --
25  Cairo Number 2 contract had been canceled at one

Page 25

1  time, and was not to be financed by Ascentium.
2       However, we did pay for the collateral on
3  that second agreement.  On the second Cairo
4  agreement.
5    Q. And so how, in your view, does Andy Adams
6  and Adams Tank fit in the equation?
7    A. Well, in my view, we disbursed $216,000 for
8  the Jackson equipment.
9    Q. Okay.
10    A. And when we learned that Ascentium had zero
11  collateral either at the Jackson facility, which
12  wasn't opened, or at the storage facility, the light
13  bulb went off, well, what was our $216,000 used for?
14       So that's how this whole thing came to
15  light against Andy Adams and Adams Tank.
16    Q. So was it -- was it Ascentium's belief that
17  Andy Adams pocketed $216,000?
18    A. Well, we weren't sure to begin with, but we
19  later learned that, I believe, $100,000 out of that
20  $216,000 Adams Tank gave back to Ataollah or Phoenix
21  Petroleum.
22       And also a part of that $216,000 -- I
23  forgot the amount -- he told us that he had paid for
24  some of the equipment or all of the -- I use the
25  word "equipment".  Collateral.  Same thing.  Some of

7 (Pages 22 - 25)

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 26

1  the collateral or all of the collateral on the Cairo
2  2 agreement.
3       But in our view, we had already paid him
4  for the collateral on the Cairo 2 agreement. So we
5  couldn't understand why he would have taken part of
6  the $216,000, and said that he was paying for
7  invoices from Cairo 2, when we had already funded in
8  full Cairo 2.
9       So we had the issue of $100,000 going back
10  to Ataollah, which we felt that should have come
11  back to us, not given to the customer; and why was
12  this other amount of money -- I don't remember the
13  amount. I'm sorry. I think it was $30,000 or
14  $40,000. Something like that. Why would he use
15  those funds to pay for equipment that we had already
16  paid for?
17       So that's basically how this whole thing
18  came to light regarding us and AT&L, Adams Tank &
19  Lift.
20  Q. So -- okay. So who -- who is it at
21  Ascentium that decides whether to and when to file a
22  lawsuit?
23  A. I discussed it with my boss, Jerry Noon.
24  Q. Okay.
25  A. But Jerry had -- is the ultimate

Page 27

1  decisionmaker.
2  Q. At what point in your investigation, if you
3  recall, did Jerry Noon decide to file a lawsuit
4  against Adams Tank?
5  A. I'm guessing, but I believe it was early in
6  2015. Maybe in the spring of 2015.
7  Q. Why did Ascentium make the decision
8  initially not to file suit against Ataollah
9  Masoodzadehgan?
10  A. Well, from what I can remember, Phoenix was
11  still in receivership. The C-stores or the gas
12  stations were closed. They were not -- they were no
13  longer in operation. And we also had a personal
14  guarantor, Ataollah, which we understood at the time
15  was still in a rehab facility.
16       I believe we may have run -- updated his
17  credit report, and it was not up to snuff. So maybe
18  we figured -- I'm guessing, but maybe we figured at
19  the time we were not going to include him in the
20  lawsuit.
21       I also remembered, once we engaged Kevin's
22  firm way at the beginning, I believe Kevin sent a
23  demand letter to Andy and Adams Tank explaining our
24  position, and asking for our funds back.
25       That was right before the lawsuit was

Page 28

1  filed, I believe.
2  Q. Okay.
3  A. The demand letter.
4  Q. Okay. To your knowledge, does Ascentium
5  have any type of written agreement with Adams Tank
6  or Andy Adams?
7  A. No. To my knowledge, no.
8  Q. Okay. So what is it -- what do you base
9  your belief that Adams Tank should have done
10  something to protect Ascentium's interest? I mean,
11  what do you base that belief on?
12  A. Well, I believe that, pertaining to the
13  Jackson facility, he received $216,000 from us. He
14  knowingly did not deliver the collateral on that
15  contract. And he was, from what I understand,
16  funded on that equipment from Providence.
17       So in my mind, we should have been refunded
18  the entire $216,000 less whatever however many
19  payments Phoenix had made at the time. Because I
20  believe they did pay. I don't know if it was 10 or
21  12 payments. I'd have to go back and look.
22       But we figured that -- we felt that we
23  should get the $216,000 back minus the payments that
24  have been made, because no items were delivered. We
25  were not able to place a lien on any collateral

Page 29

1  that we had paid for.
2  Q. So -- okay. So tell me, what did Ascentium
3  do to protect its own interest in the collateral in
4  these transactions?
5       MR. STINE: Object to the form.
6  BY MR. MCKENZIE:
7  Q. Okay. What steps did Ascentium take to
8  perfect the security interest in the collateral at
9  each of these sites?
10  A. We filed UCC statements. UCC-1 statements.
11  Q. Okay. And at what point in the transaction
12  did you file the UCC statements?
13  A. It was, I believe, within a day or two
14  after we received the commencement agreements signed
15  by Phoenix.
16  Q. Who -- who at Ascentium, or what
17  department, if there's not a specific person, deals
18  with perfecting security interests on collateral?
19  A. I believe it's our documentation
20  department. Once the documents are received, signed
21  by the customer, and the commencement agreement is
22  received, which basically allows us to start the
23  clock ticking, and start billing for the payments,
24  the people that receive all that -- those documents
25  back, I believe, at that time, filed the UCC.

8 (Pages 26 - 29)

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 30

1      Q. So when you fund -- when you pay the
2  customer's borrowed fund, your borrower's borrowed
3  funds to Adams Tank --
4      A. Uh-huh.
5      Q. -- do you believe that that's still money
6  that's controlled by Ascentium?
7      MR. STINE:  Object to the form.
8      A. Am I supposed to answer?
9      Q. Yeah, you can still answer.
10     A. Okay. When you objected, I wasn't sure.
11     MR. STINE:  No, no, no.
12     A. Could you repeat the question, please?
13     Q. Yeah.
14     MR. STINE:  And just for clarification --
15  BY MR. MCKENZIE:
16     Q. And maybe it's a bad question.
17     MR. STINE:  -- after I make an objection,
18  unless I instruct you not to answer --
19     THE WITNESS:  Okay.
20     MR. STINE:  -- anything you're not supposed
21  to answer.  Otherwise, when I'm finished with my
22  objection, you can either answer the question, or he
23  will decide to ask a different question.
24     THE WITNESS:  Understood.
25     MR. STINE:  Okay.

Page 31

1  BY MR. MCKENZIE:
2      Q. All right.  So you were mentioning the
3  commencement agreements --
4      A. Correct.
5      Q. -- earlier?
6      A. Uh-huh.
7      Q. So what is the purpose of a commencement
8  agreement?
9      A. The purpose of a commencement agreement is
10  the customer advising Ascentium that we have the
11  right to begin billing them for the payments on the
12  contracts, even though some or all of the collateral
13  or equipment has still not been received and
14  installed.
15     Q. So does that create some sort of duty on
16  the part of the borrower to still install all that
17  equipment at the site?
18     A. I believe it -- it has to do with the
19  supplier of that.  He's the one responsible for
20  getting the equipment on-site installed, and up and
21  running.
22     Q. Does the supplier sign the commencement
23  agreement?
24     A. No.  The debtor does.  In this case Phoenix
25  Petroleum.

Page 32

1      Q. So how would the supplier be responsible
2  for an obligation under your agreement with the
3  borrower?
4      A. I'm not sure I understand what you're
5  asking.
6      Q. If Adams Tank didn't sign a commencement
7  agreement --
8      A. Right.
9      Q. -- or a loan agreement --
10     A. Right.
11     Q. -- why is Adams Tank obligated to perform
12  any portion of that contract?
13     A. Well, you would assume the customer would
14  advise the supplier, hey, I'm starting to make
15  payments on this agreement now.  Where is my
16  equipment?  When is it coming?  When is it going to
17  be up and running, because I'm paying for something
18  right now that I don't have yet.
19        So I'm assuming that the customer and the
20  supplier would be in communication, and the customer
21  would be pressing the supplier to deliver the goods.
22     Q. So if the customer tells the supplier do
23  not deliver the goods --
24     A. Okay.
25     Q. -- what does -- I mean, what is the

Page 33

1  supplier supposed to do in that situation, according
2  to Ascentium?
3      A. In my belief, the supplier should contact
4  us, advise us that the customer has canceled the
5  order, and he should refund the money that we had
6  already paid him up front, less whatever payments we
7  might have received from the customer up until that
8  time.
9        If he's not supplying equipment, well,
10  where -- why did we pay money?  Where did it go
11  toward?
12     Q. Do -- does Ascentium ever deal with
13  equipment suppliers regarding the specific terms of
14  the finance agreements?
15     A. I'm not sure I understand that either.  I'm
16  sorry.
17     Q. No, that's fine.
18        Does Ascentium discuss the terms of the
19  finance agreement that it has with its borrower?
20  Does it discuss that with the equipment suppliers?
21     A. As far as what the monthly payments are
22  going to be, do you mean?
23     Q. Well, do they discuss what the monthly
24  payments are going to be?
25     A. I'm not sure.  I know that they discuss --

9 (Pages 30 - 33)

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 34

1  the supplier will tell us Customer A, B, or C would
2  like $100,000 worth of this specific equipment.
3  Here are the items they wish to finance.
4      Q. Uh-huh.
5      A. Can you approve the credit? If so -- I'm
6  not sure if they ask at what rate or what the
7  monthly payments will be, but the beginning of the
8  whole process is between the supplier and Ascentium.
9          It's not rare, but in most cases, the
10 supplier -- suppliers, who we deal with, will
11 contact us, and advise us that they have a customer
12 who wishes to get financing.
13         Sometimes we're contacted directly from the
14 customer, and he'll say I already have a supplier
15 picked out, can you finance this equipment for us.
16         So it goes both ways.
17     Q. And so if that occurred in this case, does
18 that change your opinion of Adams Tank's
19 responsibilities or duties you placed on it at
20 Ascentium?
21     A. No.
22         MR. STINE: Object to the form.
23     A. No, not at all.
24     Q. And why is that?
25     A. Well, again, Andy Adams contacted

Page 35

1  Ascentium, and advised us that they had a customer,
2  Phoenix Petroleum, who wished to finance the gas
3  dispensers or whatever; here's the amount; can you
4  approve the credit; please get back to us with the
5  approval; and sent out the documents for signature
6  to Phoenix.
7      Q. So if that was not the case, in this
8  situation, does that change your opinion?
9      A. I'm not sure I understand what you're
10 asking.
11     Q. If that's -- if that's not the case in this
12 situation --
13     A. So what would be the case?
14     Q. Well, let's say the -- if the borrower
15 approached Mr. Baccarro directly, does that change
16 your opinion about the equipment supplier's role in
17 the transaction?
18     A. No, not at all.
19     Q. Okay. And so what I asked earlier was why
20 is that? Why does it not change your opinion?
21     A. It doesn't -- in my opinion, it doesn't
22 matter who contacts Ascentium for the financing.
23         We have a customer that needs financing for
24 specific equipment, we have a supplier who can
25 supply and install that equipment, and we have

Page 36

1  Ascentium who will forward the proceeds to the
2  supplier so the supplier can deliver the items.
3      Q. Okay.
4          Let's see. Did -- do you know if Ascentium
5  conducted any research regarding the -- all the
6  entities owned by Ataollah Masoodzadehgan before
7  attempting to perfect the security interest at the
8  Jackson site?
9      A. Just for the Jackson site specifically?
10     Q. Or Cairo too, but...
11     A. Well, I assume when they did the credit
12 workup on Phoenix --
13     Q. Uh-huh.
14     A. -- part of that credit analysis showed that
15 he had seven locations. I'm not sure if they knew
16 that the Jackson facility had been built yet or not.
17         MR. STINE: You want to refer to the credit
18 --
19         MR. MCKENZIE: Yeah, I'll get those.
20         MR. STINE: -- workup that we produced this
21 morning?
22         MR. MCKENZIE: We can go over this, if you
23 want to.
24     A. The CAP report?
25         MR. STINE: (Nods head affirmatively.)

Page 37

1  BY MR. MCKENZIE:
2      Q. Is this (indicating) --
3      A. Yeah. That's the CAP. That's the credit
4  write-up, basically.
5      Q. All right. That is Plaintiff's Exhibit 4,
6  so we can -- you can walk me through this document.
7      A. Before I do, I must tell you I'm not in the
8  credit area.
9      Q. That's --
10     A. I mean, I've seen these before, but I do
11 not do credit work, and I don't do the workup on a
12 document --
13     Q. Okay.
14     A. -- such as this.
15     Q. But you reviewed those in preparation for
16 today?
17     A. Yes.
18     Q. And informed yourself regarding the credit
19 approval procedures and balances?
20     A. I actually just glanced at this yesterday.
21 I didn't go through it, because I wasn't sure that
22 this was going to be part of today's deposition.
23     Q. Okay. Well, we'll walk through it, and see
24 what you know.
25     A. Okay.

10 (Pages 34 - 37)

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 38

1    Q. All right. So what -- let's go and -- at
2  what point in the transaction is the credit approval
3  presentation prepared?
4    A. When the application for credit is
5  received. It's usually given to Ascentium or
6  Ascentium's credit department by the salesperson.
7    Q. Okay.
8    A. In this case, Len Baccarro.
9    Q. All right. If you look where it says
10 equipment location, it states 2679 Highway 16 West,
11 Jackson, Georgia. Is that correct?
12       Middle of the first section.
13   A. Oh, here it is. That's the -- this is the
14 credit for Jackson. Correct.
15   Q. Okay. Do you know anything about the -- if
16 you go up a little bit where it says "Quality Rating
17 5", do you know what that means?
18   A. I do not.
19   Q. Where it says "Industry Risk 2", do you
20 know what that means?
21   A. I do not.
22   Q. Where it says "Dependency 3", do you know
23 what that means?
24   A. I do not.
25   Q. And then where it says "Equipment Risk 2",

Page 39

1  do you know what that means?
2    A. I do not. I can take a guess as to what
3  some of them mean, if you want me to, but I do not
4  specifically know what that stands for.
5    Q. Yeah. You can guess.
6    A. Well, in my opinion, industry risk, it's
7  probably on a scale of one to five, with one being
8  the best, and five being the worst. So I would
9  guess that a two, being that we do quite a bit of
10 business with these types of Phoenix deals, that
11 would be less of a risk, industry-wise, than, let's
12 say, financing a Tasty Freeze or something in the
13 middle of Idaho.
14       Quality rating, I can't even take a guess.
15 I don't know what dependency is either.
16       "Equipment Risk 2", I would also assume
17 that would be favorable, as opposed to unfavorable,
18 because we do quite a few contracts where there are
19 gas dispensers, such as the Phoenix deal.
20       So we probably have a pretty good comfort
21 level on something Equipment Risk 2 and Industry
22 Risk 2.
23   Q. All right. And then it says "Referral
24 Source Retail". What does that mean?
25   A. I am not sure. I don't know.

Page 40

1        But if I had to guess, I would say that --
2  no, that's not right. I can't guess. I really
3  don't know. I apologize.
4        MR. MCKENZIE: I guess that's all I have
5  for Tony on this, because I don't know if he really
6  knows enough to talk about it. So we might have to
7  address that. I don't think it's worth going
8  through it in detail today.
9  BY MR. MCKENZIE:
10   Q. Let's talk about Plaintiff's Exhibit 3.
11   A. Do you want this back, or is that ours?
12   Q. You can just put it right here
13 (indicating).
14   A. Okay.
15   Q. Let's talk about Plaintiff's Exhibit 3.
16   A. Uh-huh.
17   Q. Wait. I gave you my copy.
18   A. Okay.
19   Q. I'll give you the official one. Sorry.
20       All right. So is this something that you
21 know about?
22   A. I am familiar with this type of letter.
23 Yes.
24   Q. All right. Let's -- at what point in the
25 collection process does -- well, first off, is this

Page 41

1  a standard, like, a form letter?
2    A. Yes, it is.
3    Q. Okay. And at what point in the collection
4  process with Phoenix Petroleum, Ataollah, Falcon
5  Entity, and Great American did this letter come into
6  play?
7    A. Well, it's dated early December, so it
8  appears to be two months after the default date,
9  which I believe is October of 2014, on all three
10 contracts.
11       This letter has to do with the fact that we
12 had already funded 90 percent of the Jackson deal.
13 That's the $216,000 to Adams. And we still had 10
14 percent to fund on that deal to make -- to go up to
15 the $240,000.
16       And this is a notice to the customer, that
17 because of the default on their contract, we were
18 terminating the remaining 10 percent of the Jackson
19 deal, which I believe was $24,000, if my math is
20 correct. And also advising them that the contracts
21 were past due, and it gives the past due amounts.
22   Q. And are these -- just so I -- for the
23 record's sake, are these -- you know, it says
24 payments under EFA 2118850, EFA 2116122, and EFA
25 2118557.

11 (Pages 38 - 41)

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 42

1    A.  Uh-huh.
2    Q.  What -- what do those designations
3  represent?
4    A.  Those are the agreement numbers for each of
5  the three contracts.  Cairo 1, Cairo 2, and Jackson.
6    Q.  Okay.  And is this letter something that
7  goes out after -- earlier, you mentioned a guy named
8  Carlos --
9    A.  Galvez.
10   Q.  -- Galvez?
11   A.  Uh-huh.
12   Q.  Is the initial collector?
13   A.  Correct.
14   Q.  Is this like a next step letter, or is this
15  something Carlos produces?
16   A.  No.  Carlos does not produce this or sends
17  it out.  My boss, Jerry Noon, does, but Carlos,
18  again, once he sees a red flag that there's
19  something going on -- it's not a normal delinquency,
20  let's say, where the customer's having cash flow
21  issues, and is going to be paying a month or two
22  late every month for a while until they get back on
23  their feet.
24      This was a situation where Carlos learned
25  that these -- that Phoenix was put into

Page 43

1  receivership, and that's a red flag for the
2  collector to immediately go to either myself or
3  Jerry, and advise him of this.
4      So Jerry then looks to see where we're at
5  on the funding, and saw that we still had money to
6  pay on the Jackson deal, and said, well, because of
7  the foreclosure, because of the delinquency, because
8  of the receivership, because of the delinquency,
9  we're not going to fund the remaining 10 percent on
10  Jackson.  So that's why the letter would go out to
11  the customer advising them of this.
12   Q.  Gotcha.  All right.  Let's see.
13      Let's look at P-5.
14      Tell me what Plaintiff's Exhibit 5 is.
15   A.  Let's take a look real quick, please.
16      MR. STINE:  Anybody else warm?
17      MR. MCKENZIE:  It's a little warm.
18      MR. STINE:  Let me see what I can do.
19      (Mr. Stine exits.)
20   A.  This appears to be a site inspection that
21  we had ordered right after we found out that
22  Ataollah had tried to commit suicide --
23      (Mr. Stine enters.)
24   A.  -- and the contract was delinquent.  This
25  looks like a site inspection we ordered on the

Page 44

1  Jackson facility, and that's when we first learned
2  that there was an empty lot there that was not a
3  convenience store built or a gas station built.
4  There was nothing basically on-site.
5    Q.  And on what date was that inspection
6  performed?
7    A.  October 6th, 2014.
8    Q.  Okay.  Now, let's look at -- oh, thanks.
9  All right.  This is going to be Exhibit 50.
10      (Defendant's Exhibit 50 marked.)
11   A.  Thanks.
12      MR. MCKENZIE:  Hold on.  I've got one.
13  Never mind.  She only made two copies of these.
14      MR. STINE:  Okay.
15  BY MR. MCKENZIE:
16   Q.  All right.  What is this?
17      MR. STINE:  Let me get it back.
18      MR. MCKENZIE:  That's fine.  Take your
19  time.
20      MR. STINE:  Okay.
21   A.  Okay.  This appears to be another equipment
22  and site inspection report that we had ordered.  The
23  date was February 12th, 2015, and this also
24  concerned the Jackson facility.  I believe this was
25  at the time where we found out that the tanks were

Page 45

1  in storage, and that they were not tanks that we had
2  paid for.  They were paid for by Providence Capital.
3  I -- I'm just trying to look at this.  Hold on one
4  second.  Because I believe there were two within a
5  short period of time.
6      I believe when the inspector went there,
7  part of the building had already been under
8  construction, and I'm not 100 percent sure of that.
9      But when he was let inside by the
10  receivership attorney, a couple of the items on the
11  Jackson invoice from Adams Tank were in the building.
12      If you look toward the top, it says:
13      (Reading) "Equipment was sealed in original
14  shipping boxes."
15      And a little further down toward the
16  beginning:
17      (Reading) "Inspector was unable to verify
18  the equipment.  It's still packaged in the shipping
19  boxes.  Based on the labels, it appears to be a
20  point-of-sale system."
21      So the point-of-sale system, which was one
22  of the items on Adams' invoice, was on-site, still
23  sealed in boxes, because it appears that the store
24  was nowhere near complete or getting ready to open.
25   Q.  What -- was there any type of contradiction

12 (Pages 42 - 45)

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 46

1  or discrepancy between Plaintiff's Exhibit 5 and
2  Defendant's Exhibit 50, as far as what was
3  inspected, that you know of (indicating)?
4      A. Without looking at them, I can't answer
5  your question.
6      Q. Plaintiff's Exhibit 5 is this, that you
7  just looked at.
8      A. Oh, okay.
9      Q. And Defendant's Exhibit 50 is what you have
10  in your hand.
11      A. And the question was?
12      Q. Was there -- is there --
13      A. Discrepancy?
14      Q. Yeah. Is there any kind of discrepancy
15  between those two documents? And the main reason I
16  ask is there's photos attached that I can't see, and
17  I don't know if you've seen the original photos.
18      A. I have not.
19      Q. Okay.
20      A. Well, the inspection done on 10/7/14, which
21  is Exhibit 5, from what I remember seeing, and what
22  it says here:
23      (Reading) "No signage. The building
24  located in the address provided appeared -- "
25      And my eyes are bad, so this is -- it's

Page 47

1  small writing. I'm sorry.
2      (Reading) " -- at the address provided
3  appears to be an unfinished barn or garage of some
4  type of structure."
5      So there was totally nothing going on in
6  October of '14. When the inspector went back, I
7  guess, four months later in February of '15, it
8  appears that -- and again, these are hard to see.
9  But it appears that there was a building there. I'm
10  not sure if it was the barn building or if the store
11  had started to be built.
12      And it appears that the point-of-sale
13  system was inside in boxes, and so was the Veeter
14  Root Tank Monitoring System. Both of those items
15  were inside boxed up, not hooked up, in some sort of
16  building. I don't know, again, like I said, if it
17  was the old barn building, or four months later, if
18  construction had started, and there was a building
19  there.
20      Q. Is it possible that the October inspection
21  was a mistake, and it wasn't the same building?
22      A. No. I would say no.
23      Q. Okay. All right.
24      All right. Now let's talk about -- this is
25  going to be Defendant's Exhibit 51.

Page 48

1      (Defendant's Exhibit 51 marked.)
2  BY MR. MCKENZIE:
3      Q. All right. So tell me what's going on
4  with -- sorry. I'll wait.
5      A. Just give me a second to look at this,
6  please.
7      Q. Yeah. Sure.
8      A. This was an inspection of the dispensers
9  that we thought we had paid for for the Jackson
10  facility. I believe these were the dispensers that
11  were viewed at the storage facility by Jones -- that
12  Jones Petroleum had them in storage at.
13      And they were -- it looked like they were
14  brand new, still wrapped up, never been used, never
15  hooked up to a power source, and when we got this
16  report back, as I had indicated earlier, we were
17  then made aware of the fact that these nine
18  dispensers that we thought we financed or paid for
19  were, in fact, nine dispensers paid for by
20  Providence Capital.
21      Q. And was -- so was this report prepared
22  after Ascentium filed its lawsuit against Adams Tank
23  and Andy Adams?
24      A. I believe it was. I don't remember the
25  date of our complaint.

Page 49

1      Q. So --
2      A. No, I take that back. Maybe it was not.
3  The answer is I'm not sure. This is dated --
4      Q. 11/12.
5      A. 11/12 of '15. I don't remember the date of
6  the complaint. I'm sorry.
7      Q. It appears the complaint was filed July 24,
8  2015. Does that ring a bell?
9      A. That sounds right, I guess. Yes.
10      Q. Okay. So at the time Ascentium filed a
11  complaint against Adams Tank and Andrew Adams, were
12  they not certain what the outcome was with the --
13  whether they were going to get the collateral at the
14  Jackson site?
15      A. I'm sorry. Could you repeat that?
16      Q. Yes.
17      At the time Ascentium filed the lawsuit
18  against Adams Tank and Andrew Adams, does this
19  report indicate that Ascentium was not -- that the
20  issue regarding the collateral at Jackson had not
21  been resolved?
22      A. Well, I just noticed something on the
23  report.
24      Q. Okay.
25      MR. STINE: Let me state something. I

13 (Pages 46 - 49)

Conf. 30(b)(6) Anthony Campisciano

August 30, 2016

Ascentium Capital vs. Adams Tank & Lift

---

**Page 50**

1  think that the report date is the wrong date.
2      A.  Yeah.  I just noticed something.  On the
3  top, it says date order, February 6th, '15.
4          On the bottom right, date of the report,
5  February 12th of '15.
6      Q.  Okay.
7      A.  For some reason, the report date is
8  incorrect, November of '15.
9      Q.  Okay.  Well, that certainly makes more
10  sense.
11      A.  Yes, it does.  It does.
12      MR. STINE:  That date's definitely wrong.
13  I'm 100 percent certain of that.
14  BY MR. MCKENZIE:
15      Q.  All right.  So let's backtrack.
16          Let's assume that you're correct, that the
17  date of this -- this second report was performed on
18  2/12/2015.  Okay?
19      A.  Okay.
20      Q.  All right.
21          So if you look now -- look at 50 and 51
22  side-by-side for me, because those two make more
23  sense to go together.  Here it is (indicating).
24      A.  Okay.
25      Q.  Okay.  So now, what does it appear -- what

---

**Page 51**

1  does it appear happened on February 12th, 2015?
2      A.  Okay.  Now my memory is refreshed.
3          In early February of '15, before the
4  lawsuit was filed, and I even believe before the
5  demand letter to Andy Adams went out, we were
6  dealing with the receiver at that time trying to
7  find out what was going on at this Jackson facility.
8          After we got those pictures back from
9  October '14, we said let's go out there again.
10  Let's see where our collateral is, find out what's
11  at the site, at the Jackson site, and find out
12  what's in the storage facility.
13          So I believe the same inspector, yeah, Bob
14  Goatley, on the same date, went to both the Jackson
15  facility, which was -- I don't know if it was still
16  a barn, or a partially built convenience store,
17  where he saw the point-of-sale system, and the fuel
18  tank monitoring system in boxes, and then he went
19  to, on the same day, the storage facility where
20  Jones was storing the nine dispensers.
21          So we did two site inspections on the same
22  day at the same time, two different locations.
23      Q.  So after receiving these two inspection
24  reports, what was the next step?  What did you do
25  with that information?

---

**Page 52**

1      A.  Well, I must have spoken about it to my
2  boss, Jerry, and I believe that's when we may have
3  engaged Kevin's firm, and advised him of what we
4  found out, and what our next step would be.
5          And I believe -- and I believe that's when
6  Kevin sent the initial letter to Andy Adams.
7      Q.  Okay.
8      A.  I believe.  I'm not 100 percent positive.
9      Q.  Okay.
10          Okay.  So -- all right.  Since we're
11  talking about inspection reports, let's just go with
12  this one.
13          THE WITNESS:  This is going to be ours or
14  what?
15          MR. STINE:  Those stay in the middle pack.
16  BY MR. MCKENZIE:
17      Q.  Right there.
18          All right.  This is going to be Exhibit
19  Number 52.
20          (Defendant's Exhibit 52 marked.)
21  BY MR. MCKENZIE:
22      Q.  It's also an inspection report.  That was
23  produced by Ascentium, initially.
24          MR. STINE:  Let me take a look at that.
25      A.  Uh-huh.

---

**Page 53**

1      Q.  All right.  So I know we're jumping, but I
2  just wanted to go ahead and deal with these before
3  we forgot.
4          So this -- tell me what this asset
5  inspection report relates to.
6      A.  Just give me a second to look at it,
7  please.
8      Q.  For sure.
9      A.  Okay.  Looks like this was an inspection
10  that was done on May 31st, 2013.
11      Q.  Okay.  And --
12      A.  Which would have --
13      Q.  I'm sorry.
14      A.  Which would have been after the Cairo
15  facility was fully funded for both Cairo 1 and Cairo
16  2 contracts.
17      Q.  Okay.  And so what -- did you review this
18  inspection report in doing your investigation to
19  prepare for the lawsuit?
20      A.  I'm sure I did at that time.  I mean, I
21  don't remember specifically, but I'm sure I looked
22  at whatever we had in the file at that time --
23      Q.  Okay.
24      A.  -- in preparation for the lawsuit.
25      Q.  And what does this -- what does this

---

14 (Pages 50 - 53)

Tiffany Alley, A Veritext Company

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 54

1  inspection report tell you as a collection guy?
2      A.  Well, it tells me that, in May 2013, which
3  would have been four months after the initial
4  funding, and maybe two months after the final
5  funding for the Cairo job, the equipment was -- some
6  of it was there.
7          Equipment had not all been received and
8  installed, which leads me to believe that some of it
9  was delivered.
10         It says:
11         (Reading) "Not all the equipment had been
12  received and installed.  Most is underground, and
13  pumps had not been delivered."
14         What it tells me is, a few months after
15  funding, some of the items were there, and some were
16  not, but nothing was installed.  The store was not
17  open yet and open for business.  Nothing was
18  running.
19     Q.  So -- and so who would have ordered this
20  inspection report on May 31, 2013?
21     A.  Probably somebody in our funding
22  department, because we had already started the
23  contracts.  I believe they were a few months in.  We
24  had already funded $150,000 on Cairo 1, and $100,000
25  on Cairo 2.  So we would have wanted to go out to

Page 55

1  the site to see what was going on, and how far along
2  it was, and if everything was in, up and running,
3  and working.  Apparently, it was not at that time.
4      Q.  So what does that -- what response does
5  that initiate?
6      A.  Well, that probably would have -- the first
7  thing we would have looked at is the customer
8  paying, and making their payments, because,
9  remember, we had the commencement agreement.  We had
10  already started the clock ticking.
11         And the account, to the best of my
12  knowledge, at that time, was up-to-date.  Phoenix
13  had been making the payments for a few months.
14         I would guess, although I don't know this
15  for a fact, that Len would have called Andy, or
16  gotten in contact with Andy, and asked him how much
17  longer before this store gets up and running, open
18  for business, and off the ground, because we're four
19  months in, now, since the 90 percent funding, and
20  everything has not been delivered yet, and
21  installed; the store is still not open.
22     Q.  Okay.
23         MR. MCKENZIE:  All right.  This is going to
24  be Exhibit 53.
25         (Defendant's Exhibit 53 marked.)

Page 56

1  BY MR. MCKENZIE:
2      Q.  I'll pass it to Kevin first, so he can look
3  at it.
4      A.  Okay.
5      Q.  This is also an inspection report that was
6  provided to us by Ascentium via discovery responses.
7          Take a look at that, and then let me know
8  when you're ready.
9      A.  Okay.  I will.
10         This appears to be another inspection of
11  the Cairo facility two months after the one that we
12  had just looked at, which I believe was May of '13.
13         So another two months had gone by, and we
14  did another site inspection at Cairo, and from what
15  I could see -- and these are bad copies; a lot of
16  the questions are blacked out, so it's hard to
17  decipher -- but if you look at the one, two, three
18  -- if you look at the fourth page, up on top, it
19  appears that the Carrol 12-door cooler and beer cave
20  had not been on-site yet.  Still in July.  It's on
21  backorder, it reads.
22         It appears that the eight-column gas canopy
23  and four-column diesel canopy were there, installed,
24  and up.
25         And I do not see anything on this report

Page 57

1  about the dispensers, from what I could read.  Like
2  I said, a lot of it is blacked out.
3          I believe at the time we were just
4  checking, maybe, on the canopies and the cooler,
5  which is Cairo 2 only, Cairo Contract Number 2 --
6  that's the one for $100,000.
7      Q.  So in Exhibit 52, what was being checked
8  for in Exhibit 52 if 53 was canopy and cooler?
9      A.  It looks like we were checking on the Cairo
10  Number 1 contract, which was the 10 dispensers, that
11  was two months prior to the one that we just spoke
12  about, which was the cooler and the canopies.
13     Q.  And how do you know that?
14     A.  Well, on the right, on Page 2, it says:
15         (Reading) "Not all the equipment has been
16  received and installed.  Most is underground, and
17  pumps had not been delivered."
18         By pumps, I take that to mean the 10
19  dispensers.
20     Q.  Okay.
21     A.  10 gas dispensers.
22     Q.  Okay.
23     A.  It appears the building was still under
24  construction.
25     Q.  Gotcha.

15 (Pages 54 - 57)

Tiffany Alley, A Veritext Company

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

---

Page 58

1          All right.  Let's see.
2          Is there a protocol or procedure in place,
3   an official procedure for a response that's supposed
4   to occur after learning that you funded the deal,
5   but all the equipment hasn't been installed or
6   delivered?
7       A.  To my knowledge, I'm not aware.  There may
8   be, but I'm not -- I don't know for sure.
9       Q.  What, as the collection guy for Ascentium,
10  what would you like to see happen in response to
11  that?
12      A.  In response to what?  I'm sorry.
13      Q.  In response to learning that you funded a
14  deal, but all the equipment isn't installed.
15      A.  A collector would probably contact the
16  salesperson, in this case Len Baccarro, and advise
17  Len what we learned vis-a-vis the site inspections.
18  Advising Len that, at that time, the contracts are
19  being paid by Phoenix.  They were up-to-date.
20  However, Len, we learned that the store still isn't
21  open.  Even though they're current, making their
22  payments, the store still isn't open.  Could you
23  find out for us what's going on?
24      Q.  Okay.
25          Do you think that Len Baccarro failed to do

Page 59

1   something he should have done in response to
2   learning that information?
3       A.  I honestly don't know.
4       Q.  Okay.  And when you say you don't know,
5   what do you mean?  I mean, I'm just asking for your
6   opinion, and what you think.
7       A.  What I mean is, I don't know whether Len
8   got on the phone with Andy, and asked him what was
9   going on.  I'm assuming he did.  I don't know for a
10  fact that he did.
11          I don't think Len would just ignore the
12  collector's information.  Oh, okay, Phoenix is
13  paying, why do I have to worry about it?  Why do I
14  have to find out why the store still isn't open?
15  Some stuff has been delivered, some hasn't been.
16          My guess is that Len would get in touch
17  with Andy, and ask him for an update as to how the
18  project is progressing.
19      Q.  Okay.
20          All right.  Just to backtrack a little bit,
21  give me a quick description of the different job
22  titles you've had at Ascentium.
23      A.  When I first was hired in 2008, I was a
24  vice president of collections, and I believe my
25  title changed in 2011 to vice president and manager

Page 60

1   of special assets.
2       Q.  So where were you before 2008 when you came
3   to Ascentium?
4       A.  All right.  It's a long story, but I worked
5   for a company -- believe it or not, I began in
6   1979 --
7       Q.  Okay.
8       A.  -- with a leasing company called
9   Studebaker, like the old car.  Do you want me to
10  spell that?  S-T-U-D-E --
11      Q.  Oh, yeah.
12      A.  B-A-K-E-R.  Studebaker Worthington,
13  W-O-R-T-H-I-N-G-T-O-N, Leasing Corp.
14          And in 1979, I was only out of school a few
15  years.  I went on board with Studebaker Worthington
16  Leasing who did basically what Ascentium does, but
17  on a much, much smaller scale out of New York.
18          We grew to about 30 people over the first
19  few years, and I was in the tax department.  I did a
20  little bit of credit work.  I did a lot of
21  collection work.  I did document review.  Like -- I
22  was like -- I did a little bit of everything, had my
23  hands in everything, and learned the finance
24  business.
25      Q.  Did you do any sales?

Page 61

1       A.  No.  I was never involved in any sales.
2          So the years go by, and in 2008 -- it was a
3   privately held company.  One gentleman owned, I
4   think it was, 70 percent.  The other owned 30
5   percent.
6          The 70 percent owner was getting on in age.
7   He wanted to retire.  The 30 percent owner bought
8   him out.  And this was in 2008.
9          At that time, the gentleman who was now 100
10  percent owner wanted to sell the company, but wanted
11  the company sold and to be acquired by a larger
12  company, but keeping the same staff.
13          So in 2008, we were purchased by Main
14  Street Bank, who was out of Kingwood, Texas.  They
15  were a bank by name.  I think they had two or three
16  branches, but what they really were, what Main
17  Street Bank really was -- and again, they acquired
18  Studebaker Worthington Leasing in 2008.  All the
19  employees in New York stayed the same.
20          But Main Street Bank basically did what
21  Ascentium does now.  They did a lot of leases and
22  loans nationwide.  But being that they were a bank,
23  and they got their funds very cheap because they
24  were a bank, but being that they were a bank, they
25  had to adhere to all these banking rules and

16 (Pages 58 - 61)

Tiffany Alley, A Veritext Company

Conf. 30(b)(6) Anthony Campisciano          August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

---

**Page 62**

1   regulations, and deal with the FDIC every year, and
2   state regulators, et cetera, et cetera.
3           So -- so the people that owned the bank
4   decided, well, if we do not want to be a bank
5   anymore, and deal with all these rules and
6   regulations, let's sell the branches, and start a
7   new company with the same employees, and let's call
8   it Ascentium Capital.
9       Q.  Gotcha.
10      A.  And that came into effect in 2011.
11          Between 2008, when they were Main Street
12  Bank, when they first bought Studebaker, and 2011,
13  when they became Ascentium, basically with the same
14  staff, the people in New York, at the Studebaker
15  branch, started to get let go little by little,
16  because they wanted to control more and more of the
17  operation down in Kingwood.
18          So it turned out that, over those next
19  three years, we went from like 30 people to three
20  people.  Thank God I was still one of the ones that
21  were left.
22          And that's -- that's the story, basically.
23      Q.  So was -- is it your understanding that
24  around 2011 is when Ascentium acquired the
25  Baccarros' company, American Equipment Finance?

---

**Page 63**

1       A.  I believe it was '12 -- 2012 or 2013.
2       Q.  Okay.
3       A.  I think it was 2012, and I believe Len ran
4   that company -- owned that company with his brother,
5   Richard, and I believe they were called American
6   Equipment Finance.
7       Q.  Did they -- do you know anything about that
8   purchase and sale agreement?
9       A.  I do not.
10      Q.  Do you know anything about -- did they have
11  a similar situation that Studebaker -- Studebaker
12  Worthington wanted, where they kept their operation
13  intact?
14      A.  Yes.
15      Q.  Okay.
16      A.  And they still do have the Jersey office.
17  I don't know how many people that they had when
18  Ascentium acquired them, and I don't know how many
19  they have now, but I believe -- I believe, I'm
20  guessing, most of that staff was retained or has
21  been -- or is still there, and has been retained,
22  but I'm not 100 percent sure.
23      Q.  Okay.  Had you had any experience dealing
24  with gas station or convenience store loans prior to
25  your work at Ascentium or, I guess, Main Street

---

**Page 64**

1   Bank, which became Ascentium?
2       A.  I began having experience with C-stores
3   when Main Street -- with Main Street Bank in 2008.
4   Studebaker did not finance that type of business.
5       Q.  And why was that?
6       A.  I'm not sure.  I didn't make the policies
7   back then.  I was just a --
8       Q.  So what type of loans did Studebaker
9   finance?
10      A.  Mostly office equipment.
11      Q.  Okay.
12      A.  We would finance computers, and copiers,
13  and office furniture for law firms and CPA firms.
14  That was the crux of our business.
15      Q.  Okay.
16          MR. STINE:  Can we take a five-minute break
17  at some point?
18          MR. MCKENZIE:  Yes, we can.  I don't even
19  know what time it is.
20          MR. STINE:  My watch is wrong.
21          MR. MCKENZIE:  It's 10 till noon.  We can
22  maybe take a five-minute break, and then we could do
23  a little longer break maybe at 1:00, and get lunch.
24  Is that okay with you?
25          MR. STINE:  That's fine.  Okay with me.

---

**Page 65**

1           (Recess 11:49 a.m. - 12:04 p.m.)
2   BY MR. MCKENZIE:
3       Q.  All right.  Back to our case.
4           Are you involved in collection efforts for
5   Ascentium for every loan that goes into default or
6   becomes a problem loan?
7       A.  Not 100 percent of them.  No.
8       Q.  So is there -- is there somebody else
9   that's your equal?  That does the same thing that
10  you do?
11      A.  Generally my boss.
12      Q.  Okay.
13      A.  I mean, not my equal --
14      Q.  Right.
15      A.  -- on the totem pole in the company with
16  him, but we basically will handle all the troubled
17  loans.
18      Q.  Okay.  And --
19      A.  Together.
20      Q.  What percentage of loan transactions become
21  problem loans or trouble loans, was the phrase you
22  used, if you know?
23      A.  I do not know the percentage.
24      Q.  Is it more common or less common for there
25  to be -- for a loan to become a troubled loan?

17 (Pages 62 - 65)

Page 66

1    A.  Less common.
2    Q.  Less common?
3    A.  Uh-huh.
4    Q.  Okay.
5        Let's see.  Do you know the percentage of
6  troubled loans that originate in the gas station
7  C-store --
8    A.  I do not.
9    Q.  -- market?
10    A.  I do not.
11    Q.  So you've never noticed there's a higher
12  percentage of gas station C-store loans that --
13    A.  Correct.
14    Q.  Okay.
15        Do you only become involved in a loan
16  transaction if it becomes a troubled loan?
17    A.  No.
18    Q.  And so what other instance would you become
19  involved in a loan transaction?
20    A.  Most of the work I do are troubled.  I work
21  on the troubled loans.  I would also handle what we
22  call payment modification requests, where if we have
23  an account that's falling behind 30 or 60 days, and
24  they tell us that there's a specific reason as to
25  why they've fallen behind, and that they believe

Page 67

1  it's a temporary situation, and in three, four, five
2  months down the road, they'll be -- the cash flow
3  will be back to where they needed to be to make the
4  full payments, I will work on modifying the payments
5  for four -- for the next four, five, or six months,
6  where we would let them pay interest only on the
7  outstanding balance for a period of anywhere between
8  three and six months.  We call it payment
9  modification, interest only, for six months, and
10  then we would add those six months' payments onto
11  the end of the loan.
12        So I would handle payment modification
13  requests, to make it a simpler statement.
14    Q.  Does -- does it matter -- do you all use
15  just one form, equipment finance agreement?
16    A.  No.
17    Q.  And so --
18    A.  Well, let me retract that.  Equipment
19  finance agreement, yes.  I believe there's one form
20  that gets revised --
21    Q.  Okay.
22    A.  -- from here or there.
23        We also have what we call installment
24  payment agreements.
25    Q.  Okay.  Go ahead.

Page 68

1    A.  And we have a product called daily pay
2  loan.  I'm not sure what the document is called, but
3  we will loan money where the customer would make --
4  we would ACH payment out of his account on a daily
5  basis.
6        So we have daily pay loans.  We have
7  installment payment agreements.  We have lease
8  agreements, true leases, and then we have the EFAs.
9    Q.  And were the three different transactions
10  involving Phoenix, were all of those equipment
11  finance agreements, or were any of those a different
12  type of agreement?
13    A.  They were all equipment finance agreements.
14    Q.  Okay.  That was my impression.  I just
15  wanted to make sure.
16    A.  Right.
17        MR. MCKENZIE:  I do have you a copy of that
18  one.  This is the -- this is going to be Exhibit 54,
19  Defendant's Exhibit 54.
20        (Defendant's Exhibit 54 marked.)
21  BY MR. MCKENZIE:
22    Q.  This is the amended declaration of Tony
23  Campi, which is Document 3115113015 in the case you
24  filed against the Adams Tank defendants.
25        Did you prepare this document, Mr. Campi?

Page 69

1    A.  I did not prepare it.  No.
2    Q.  So do you know what the purpose of this
3  document -- do you know what the purpose of this
4  document is?
5    A.  I believe so.
6    Q.  Okay.  What do you think the purpose is?
7    A.  It's me saying that I understand what is in
8  here, and what our -- what we're trying to
9  accomplish in the lawsuit.
10    Q.  So is it your -- all right.  So let's look
11  at Item Number 6.
12    A.  Uh-huh.
13    Q.  Review that paragraph, and then just kind
14  of break it down for me, and explain it in layman's
15  terms.
16    A.  Uh-huh.  Okay.  I will.  Sorry.
17        (Complies with request.)
18        Okay.  So what this is saying is, we are
19  contending that, on the first Cairo agreement, there
20  are amounts owing, and this paragraph is breaking
21  those amounts out into three separate sections.
22        The first amount is the $60,192.28.  That
23  is the principal sum still due on the loan.  It also
24  lists the interest through those dates of $1,213.48,
25  and also additional interest from October '15 to the

18 (Pages 66 - 69)

Conf. 30(b)(6) Anthony Campisciano          August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 70

1   entry of judgment at the default rate of 16 percent.
2       Q.   And where do these -- how are these numbers
3   calculated?
4       A.   The $60,192 is a number that is calculated
5   using the default clause in the EFA.
6       Q.   Okay.
7       A.   It's the accelerated balance of the loan
8   from the date of default, and it gives credit for
9   any payments that were made during that time by the
10  customer, and it also gives a credit for the present
11  value's future payments, which at the date that the
12  figure was calculated, future payments are
13  discounted present value.
14      Q.   So is it Ascentium's belief that Adams Tank
15  and/or Andy Adams owes the money provided in
16  Paragraph 6?
17      A.   It's our contention that Phoenix Petroleum
18  owes that money.
19      Q.   Okay.  So in Item Number 7, review that,
20  and then we can be a little more brief.  If you'd
21  just tell me what Item 7 represents.
22      A.   It's the same as Item 6, only it refers to
23  the second Cairo agreement.
24      Q.   Okay.
25      A.   Same as I just explained for Item 6.

Page 71

1       Q.   And is it Ascentium's belief that Andy
2   Adams or Adams Tank owes Ascentium the money
3   outlined in Item 7?
4       A.   Phoenix Petroleum owes that money.
5       Q.   Okay.  Well, there's -- excuse me.  There's
6   a second paragraph in Item 7.
7       A.   Oh, I see.  Sorry.  I didn't read it.
8       Q.   I was just presuming that was a new one,
9   but.
10      A.   Okay.  So the second paragraph in Item 7
11  refers to the Jackson agreement.
12      Q.   Okay.
13      A.   And I believe that number -- or the
14  $166,562 is calculated the same as the other numbers
15  in Paragraph 6 and 7 on the first two Cairo
16  agreements.  And calculation-wise, it's done the
17  same way as the other two.
18      Q.   And is the amount outlined in that second
19  paragraph, in Item Number 7, an amount that
20  Ascentium believes is owed by Adams Tank or --
21      A.   Yes.
22      Q.   -- Andy Adams?
23      A.   Yes.
24      Q.   Okay.  And is -- does Ascentium believe
25  that Adams Tank and Andy Adams owe the full amount

Page 72

1   outlined in that paragraph of Item 7?
2       A.   Yes.
3       Q.   Okay.  And what is Ascentium's basis for
4   that claim?
5       A.   Well, the basis for the claim is Ascentium
6   funded Adams --
7       Q.   Okay.
8       A.   -- $216,000 to deliver specific items on an
9   invoice that Adams had provided us.
10      Q.   Okay.
11      A.   And to our knowledge, none of the items on
12  that invoice were ever delivered.
13           So we funded $216,000.  Collateral-wise or
14  equipment-wise, we feel that it's zero, so that's
15  why we feel that Adams owes the money.
16      Q.   Okay.  So if we look back at Exhibit 50 and
17  51, do -- do these exhibits not show that the
18  equipment -- that there was equipment provided at
19  the Jackson facility by Adams Tank?
20      A.   At the Jackson facility, the Ruby Sapphire
21  System was there still in boxes, and the Veeder Root
22  Tank Monitoring System were there still in boxes.
23  And I'm not sure if those were the items that were
24  specifically on his invoice to us.
25      Q.   Okay.

Page 73

1       A.   Serial-number-wise.
2       Q.   And then how about the other exhibit?
3       A.   The other Jackson inspection, the pumps
4   were viewed.  However, we learned that those pumps
5   were not pumps that we had paid for.  They were paid
6   for by another finance company.  So the pumps that
7   we thought we were paying for on the invoice of
8   $216,000 from Andy were never delivered.  These were
9   somebody else's dispensers.
10      Q.   Was it also your opinion that the other
11  items you mentioned that are listed on Exhibit 50
12  were someone else's equipment or --
13      A.   I don't recall.
14      Q.   Okay.
15           All right.  Do you still have the
16  declaration in front of you?
17      A.   Yes, I do.
18      Q.   Okay.  Let's look at the -- I believe
19  they're called Composite Exhibit A.
20      A.   (Complies with request.)
21           Okay.
22      Q.   So is this a -- a standard format of a
23  printout in a computer system?
24      A.   Yes.
25      Q.   Okay.  And tell me -- there's a date at the

19 (Pages 70 - 73)

Conf. 30(b)(6) Anthony Campisciano

August 30, 2016

Ascentium Capital vs. Adams Tank & Lift

Page 74

1  top right corner.  What does that date show?
2      A.  That's the date that the report was
3  printed.
4      Q.  Was printed?
5      A.  Yes.
6      Q.  Okay.
7          And -- okay.  So where it says total
8  scheduled payments $264,748.92 --
9      A.  Uh-huh.  Yes.
10     Q.  -- what does that -- what amount does that
11  represent?
12     A.  That is the gross receivable amount of the
13  agreement.  So number of payments times the monthly
14  payment equals $264,000 and whatever it is.
15     Q.  And is that gross amount for the equipment
16  finance agreement where Ascentium was loaning
17  $240,000 --
18     A.  Yes.
19     Q.  -- to Phoenix?
20     A.  Yes.  But then it turned out to be
21  $214,000, because we never funded the other 10
22  percent.
23          MR. STINE:  (Indicating.)
24  BY MR. MCKENZIE:
25     Q.  Or do you mean $216,000?

Page 75

1      A.  $216,000.  I'm sorry.  These numbers are
2  small, and I don't have my reading glasses.
3      Q.  Hey, it's fine.  It's easy to do.
4      A.  $216,000.  Yeah.
5      Q.  Okay.  So -- all right.
6          So above the total scheduled payments,
7  there's a line that says regular payment amount, and
8  that says $3,875.08.  So what does that amount
9  represent?
10     A.  That's the monthly amount of the payment
11  per the agreement.
12     Q.  Okay.  And is that -- is that payment
13  amount fixed, or is it -- is it a graduated payment?
14     A.  It's usually fixed.
15     Q.  Okay.
16     A.  But without looking at the agreement, I
17  can't tell.
18     Q.  Okay.
19     A.  But they're usually fixed.
20     Q.  And then the next line says total amount
21  applied.
22     A.  Uh-huh.
23     Q.  $88,855.42.  What does that amount
24  represent?
25     A.  Those are the amount of funds received in

Page 76

1  to Ascentium, and applied to the balance.
2  Subtracted from the balance of $264,000.
3      Q.  So the 88 -- the total amount applied
4  figure --
5      A.  Uh-huh.  Yes.
6      Q.  -- that represents the amount paid by
7  Phoenix?
8      A.  No.  It represents the amount paid by
9  Phoenix -- I'm sorry.  Yes.  This is the Jackson
10  agreement.  Yes.  The answer to that is yes.  It
11  represents the amount paid by Phoenix on this
12  contract.
13     Q.  All right.
14          All right.  So let's go over to the other
15  side, and it says Contract Number 2118850.
16          Is that the equipment finance number
17  involving the Jackson facility?
18     A.  Yes, it is.
19     Q.  Okay.  And then this -- at the end of that
20  little section on the left, it says:
21          (Reading) "Equipment description:
22  Dispensers and canopy."
23          What's the significance of displaying that
24  at the top of the agreement?
25     A.  Well, when an agreement is entered into our

Page 77

1  computer system, there are several boxes that have
2  to be filled in.  A lot of them are shortened, so we
3  have a box for equipment description.  It could be a
4  2007 international truck.  It could be hotel
5  furniture.  In this particular case, dispensers,
6  meaning gas pumps and canopy.
7      Q.  So let's -- let's go down -- oh.  Here's --
8  all right.  So in the middle, it says payment
9  structure irregular.  What does that mean?
10     A.  I'm not sure.
11     Q.  All right.  Under that, it says the
12  inception --
13     A.  Oh, I am sure.
14     Q.  Okay.  Go ahead.
15     A.  Excuse me.  I just figured it out.
16          This was the Jackson deal.  And on this
17  particular contract, we requested that Phoenix pay
18  10 percent of the total amount of the deal up front.
19  So remember, the deal was originally for $240,000.
20  And if you look at the second payment down in the
21  transaction amount, it says $24,000.  That was
22  Phoenix's first payment to us.
23     Q.  Okay.
24     A.  Then the payments went down to the $3,875.
25  So irregular means it's not the same amount through

20 (Pages 74 - 77)

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 78

1    the contract -- through all the contracts' payments.
2        Q.  Gotcha.
3            So then it says inception date and first
4    payment date are the same, and those indicate
5    7/10/13.  Is that -- is the inception date and first
6    payment date always the same, or is that unique to
7    this situation?
8        A.  Inception date and first payment date are
9    always the same.
10       Q.  And what -- what significance does -- does
11   the inception date -- I mean, what does that mean?
12       A.  It means that's when the payments are to
13   begin.
14       Q.  Is that when -- is the inception date from
15   when interest would accrue as well?
16       A.  That's the start date of the contract.
17       Q.  Okay.
18       A.  Yes.
19       Q.  All right.  So let's flip to the next page.
20       A.  (Complies with request.)
21           Okay.
22       Q.  There's three of these charts.  I'll try to
23   make this go quicker.
24           There's three of these charts.
25       A.  Right.

Page 79

1        Q.  And there's similar headings at the top;
2    correct?
3        A.  Correct.
4        Q.  Okay.  So on the second one, the contract
5    number is 2116122.
6        A.  Correct.
7        Q.  And do you know which equipment finance
8    agreement that --
9        A.  That would be the Cairo Number 1 agreement.
10       Q.  Okay.  And do you recall what was -- what
11   was included in the Cairo Number 1 agreement?
12       A.  10 fuel dispensers.  And I'm not sure if
13   there was anything else.  I think there was the
14   point-of-sale system or -- point-of-sale system and
15   the fuel monitoring system also.
16       Q.  So where it says, "Equipment description,
17   dispensers, canopy, et cetera", is that like a
18   misprint where it says canopy?
19       A.  I believe it's incorrect.
20       Q.  Okay.
21       A.  The canopy was not part of this contract.
22       Q.  Okay.
23           Is there a reason why somebody would put
24   canopy by equipment description?
25       A.  I don't know.

Page 80

1        Q.  So if we go down to where it shows the
2    transaction history --
3        A.  Okay.
4        Q.  -- at the bottom, if you go down to Number
5    30.
6        A.  Okay.
7        Q.  Kind of walk me through that line, and tell
8    me what the title -- how the title of the column and
9    dates relate to the payments listed.
10       A.  Under the column labeled effective date,
11   there's a date of 8/24/15.  That was the date we
12   received proceeds from the bank that we had sold the
13   dispensers to.
14       Q.  Okay.
15       A.  The bank that's foreclosed on the property.
16       Q.  Okay.
17       A.  $74,400 was attributable to the equipment
18   on the Cairo Number 1 agreement.
19       Q.  And how did you all attribute that $74,400
20   to the equipment?
21       A.  I'm not sure I understand.
22       Q.  Was there an appraisal performed, or was
23   that an arbitrary --
24       A.  What we did was, we took the balance of the
25   Cairo Number 1 --

Page 81

1        Q.  Uh-huh.
2        A.  -- and the Cairo Number 2 agreement, and we
3    prorated.  Let's say, Cairo Number 1, out of the
4    entire balance due to the two contracts, Cairo 1
5    balance was 60 percent -- and these are not real
6    numbers.  I'm trying to --
7        Q.  Yeah.
8        A.  -- explain.  And Cairo 2 was 40 percent.
9    So we took the total amount received on both of the
10   contracts of the equipment that we sold to the bank,
11   and we prorated it between the two.
12           Because if you look at the next one,
13   $49,600 was attributed both to the Cairo Number 2
14   contract.  If you add those two numbers up, it comes
15   to the amount that we received from the bank in
16   total on the two contracts.
17       Q.  Gotcha.
18           So -- okay.  And I failed to do this on the
19   first one.  So flip back over, and I'll do it --
20       A.  Okay.
21       Q.  -- more quickly.  So if we look at the
22   bottom of the transaction history, on the first of
23   the Composite Exhibit A, which, on the court docket
24   numbering is Page 6 of 8.  That might make it easier
25   to reference.

21 (Pages 78 - 81)

Page 82

1        At the very bottom right-hand corner,
2    there's a number that says $175,893.50.
3        A. Correct.
4        Q. Is that the total amount owed under the
5    equipment finance agreement related to Jackson?
6        A. Yes.
7        Q. Okay. And then if we go -- so if we look
8    at Page 7 of 8, bottom right-hand corner, $45,291,
9    is that the total balance owed on the Cairo 1
10   equipment finance agreement?
11       A. Yes, it is.
12       Q. And then I'm sure you can see where I'm
13   going. If we look at the bottom right corner of
14   Page 8 of 8, it indicates $34,734 as the total
15   balance owed under the second Cairo agreement. Is
16   that your understanding?
17       A. That's correct.
18       Q. Okay.
19       Also, if we go up to the -- on this last
20   page, if we go up to the equipment description, it
21   also reads dispensers, canopy, et cetera.
22       A. Correct.
23       Q. Is that correct?
24       A. Yes.
25       Q. Were these, internally -- did Ascentium

Page 83

1    treat the two Cairo projects the same?
2        A. I'm not sure I understand what you mean by
3    the treating of the same.
4        Q. Well, did they just -- I mean, I know they
5    have different equipment finance agreements; right?
6        A. (Nods head affirmatively.)
7        Q. But is there any significance behind this
8    equipment description being the same for the Cairo
9    project?
10       A. No. I believe it's an error.
11       Q. Okay.
12       All right. So this was No. 54.
13       All right. Let's talk about -- all right.
14       So I'm going to -- I want to talk through
15   the equipment finance agreements with you.
16       A. Okay.
17       Q. This is going to be more cumbersome than it
18   would need to be, because, for some reason, I don't
19   know what -- some sort of electronic error -- we
20   received some, I think some, complete legible copies
21   of the executed equipment finance agreements
22   yesterday, and I believe Mr. Stine's office sent or
23   tried to send them a month ago.
24       So I don't know what happened, but for
25   whatever reason, we didn't get it until yesterday.

Page 84

1        So anyways, it's not a big deal, but it's
2    going to just be more cumbersome than it needs to
3    be, because we're going to have to walk through and
4    explain and compare ---
5        A. That's fine.
6        Q. All right.
7        So at the depositions that were held in
8    Florida in -- let's see -- June 22nd through the
9    24th, there were a grouping of exhibits that
10   Mr. Stine used, and there's a reference on these
11   documents that we're going to go over, and it's
12   Exhibit 14, 15, and 16. And these are copies of the
13   equipment finance agreements.
14       A. Okay.
15       Q. Okay.
16       And we'll mark this as -- since they're not
17   part of these, we'll mark these as another exhibit.
18   So -- but don't cover that up. This is going to be
19   50 -- Exhibit 55.
20       (Defendant's Exhibit 55 marked.)
21   BY MR. MCKENZIE:
22       Q. Let her stick a sticker on there.
23       All right. So what is the agreement number
24   here on this -- what's Defendant's Exhibit 55, and
25   what was Exhibit 14 at Mr. Adams' deposition? Can

Page 85

1    you read that?
2        A. Oh. Exhibit 14. I'm sorry. Yes. And
3    this is the Cairo Number 1 agreement.
4        Q. Okay. And by looking so quickly, how did
5    you know this was the Cairo 1 agreement?
6        A. I have the agreement numbers basically
7    memorized. I know 2116122 is the first one.
8        Q. Okay. All right. So let's -- now, is this
9    -- is this a document that you recognize as the
10   standard form of the equipment finance agreement?
11       A. Yes.
12       Q. Okay. And if you look in -- well -- okay.
13   Let's do this.
14       All right.
15       All right. Let's go -- if you flip back
16   two pages.
17       A. (Complies with request.)
18       Okay.
19       Q. And then you get to an invoice.
20       A. Okay.
21       Q. On that invoice, there appears to be a
22   stamp where it says Schedule A.
23       A. Correct.
24       Q. Is that something that Ascentium stamps on
25   this document?

22 (Pages 82 - 85)

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 86

1    A. Yes.
2    Q. At what point is this document stamped
3  Schedule A?
4    A. When the signed agreement is received, and
5  the invoice is received, the invoice that goes with
6  this agreement is stamped Schedule A, and it fills
7  in the agreement number, which corresponds to the
8  agreement number on the top of the EFA.
9    Q. Okay.
10   A. So what it's basically saying is this EFA
11 covers the equipment on this particular invoice.
12   Q. Okay. And what -- what do you know about
13 this invoice, and how -- like how Ascentium got this
14 invoice? Do you know anything about that?
15   A. I do not.
16   Q. You don't? Okay.
17     So at what -- at what point did you see
18 this invoice for the first time?
19   A. When the loan started to go bad, and I
20 started to review the documents.
21   Q. Okay. So just for the record, this is the,
22 what you call, the Cairo 1 or the first Cairo
23 agreement?
24   A. Correct.
25   Q. And what -- by your reviewing the invoice,

Page 87

1  what equipment is covered under this invoice in your
2  Schedule A?
3    A. There are 10 gas dispensers. There is
4  something described as hanging hardware. I'm not
5  sure what that is. And there is the dual terminal
6  Ruby Sapphire System. That's a point-of-sale
7  system, from what I understand.
8    Q. Okay.
9    A. And that's it.
10   Q. And then is there also a shipping and
11 handling?
12   A. Oh, I'm sorry. Yeah.
13   Q. Okay.
14   A. Yes, there is.
15   Q. Okay.
16   A. $2,025.
17   Q. Okay. All right. Then if we flip the
18 page, the next two pages make up what appears to be
19 a guarantee by Mr. Masoodzadehgan? Is that correct?
20   A. I call him Ataollah, but yes, that's
21 correct. I can't pronounce his last name.
22   Q. Okay.
23   A. Let me clarify that. That is not
24 Mr. Ataollah's personal guaranty. He is signing a
25 corporate guaranty for Falcon Entity, LLC.

Page 88

1    Q. Gotcha. Okay.
2      And who is Falcon Entity, LLC? Do you
3  know?
4    A. From what I understand, that was another
5  entity that Ataollah owned.
6    Q. Okay.
7    A. He had two or three different entities. I
8  think he had Phoenix, he had Falcon Entity, and he
9  had an entity called Great American Travel Center.
10 I'm not sure what those other two entities did.
11   Q. So as to the Cairo 1 transaction,
12 Mr. Masoodzadehgan did not sign any personal
13 guaranties?
14   A. He did. It's on Page 1 of the face of the
15 EFA, two-thirds of the way down on the left.
16   Q. Okay. Gotcha.
17     Okay. All right. And then the next two
18 documents appears to be another guaranty, with the
19 guarantor, Great American Travel Center; is that
20 correct?
21   A. Correct. Signed by Ataollah.
22   Q. Okay. All right. Then the next document
23 is -- appears to be a UCC financing statement. Is
24 that correct?
25   A. That's correct.

Page 89

1    Q. And it appears to have been filed and
2  recorded January 24, 2013. Is that correct?
3    A. Yes, it is.
4    Q. Is that the same date that the agreement
5  was signed and/or executed by Ataollah?
6    A. The agreement itself, the EFA, does not
7  have a date on it.
8    Q. How about the guaranty -- the guaranties?
9    A. The guaranty for Falcon Entity is dated
10 1/24/13.
11   Q. Okay.
12   A. The guaranty for Great American Travel
13 Center, 1/24/13.
14   Q. Okay.
15   A. And the date of the UCC filing is 1/24/13.
16   Q. Okay. All right.
17     Then the next document is a commencement
18 agreement?
19   A. Correct.
20   Q. And you referenced this earlier at the very
21 beginning of our discussion today. What -- just
22 tell me, just, you know, generally -- my
23 understanding from what you said earlier is that the
24 purpose of the commencement agreement is to show
25 that the agreement has started, and you can begin

23 (Pages 86 - 89)

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 90

1  accepting payments.  Is that --
2      A.  The purpose of the agreement is the
3  customer telling Ascentium, basically, authorizes --
4  authorizing Ascentium to begin the agreement, and
5  start billing us for the payments.  So they want to
6  commence the deal, so to speak.
7      Q.  So at -- so on -- the commencement
8  agreement appears to be dated January 22nd, 2013?
9      A.  Correct.
10     Q.  Okay.  So as of January 22nd, 2013, was
11 that -- is that the day that you funded the project?
12 The first invoice?
13     A.  I would have to go back and look at my
14 notes.  I have a copy of the dates that we funded
15 the deal.  I don't have it in front of me, though.
16     Q.  Okay.
17     A.  Can I just say something?
18     Q.  Yeah.
19     A.  The date of January 22, '13, it looks like
20 the date that Ascentium prepared the agreement, the
21 commencement agreement.  It doesn't necessarily mean
22 he signed it on 1/22/13.  He could have signed it a
23 day or two later, the same days that he signed the
24 guaranties, which was 1/24/13.
25     Q.  Okay.

Page 91

1      A.  That's the date that this document was
2  prepared, I believe, and sent to him for signature.
3      Q.  All right.  So now let's look at the next
4  page, and that's a delivery and acceptance
5  certificate.
6      A.  Correct.
7      Q.  What is the purpose of that?
8      A.  The purpose of this document is the
9  customer advising Ascentium that all the equipment
10 covered by the agreement has been delivered and
11 installed.
12     Q.  All right.  And what date was that signed?
13     A.  1/24/13.
14     Q.  So how -- how is it that Mr. Masoodzadehgan
15 could certify all the equipment is delivered and
16 installed before the equipment is delivered and
17 installed?
18     A.  I have no idea.  Many, many times -- this
19 is not only on the Phoenix deals -- customers
20 prematurely sign this document.  The reason why is
21 because they get all the documents together in one
22 package, and they start signing, and they start
23 signing (indicating), and they get to this one, oh,
24 I'll sign this too, and I'll date it the same day I
25 date everything else, not even reading the document

Page 92

1  as to what it's saying.
2      These are very commonly prematurely signed.
3      Q.  Okay.  All right.  Let's -- yes.  These are
4  --
5      MR. STINE:  Off the record.
6      (Off-the-record discussion.)
7  BY MR. MCKENZIE:
8      Q.  Okay.  This is -- let's see.  We're looking
9  at Exhibit 14 in Mr. Adams' deposition, which is
10 marked as Defendant's Exhibit 55.
11     A.  Correct.
12     Q.  All right.  So keep that in front of you,
13 and we'll call this next exhibit, which is a fax
14 transmission from Ed Schuler to Maria Negri, which
15 contains a copy of the equipment finance agreement,
16 Agreement Number 2116122 --
17     A.  Okay.
18     Q.  -- for you to review, and we'll discuss
19 this, because it's more legible.
20     A.  Okay.
21     (Defendant's Exhibit 56 marked.)
22     MR. STINE:  This is D-56?
23     MR. MCKENZIE:  56.
24 BY MR. MCKENZIE:
25     Q.  Okay.  So let's start at the beginning of

Page 93

1  the facts, and then when we get to the agreement, we
2  can compare where we need to, if we even need to.
3      A.  Okay.
4      Q.  So if you look at the top of this page, the
5  first page of Defendant's Exhibit 56 is Page 1 of 15
6  in a fax transmission; is that correct?
7      A.  Correct.
8      Q.  Okay.
9      All right.  So what, if you know, what does
10 this appear to be to you?
11     A.  It appears to be a fax from Maria Negri,
12 who works in Len's office in New Jersey, to Ed
13 Schuler, sending him what we call the document
14 package for execution by Phoenix.
15     Q.  Or is this the reverse?
16     A.  I apologize.
17     Q.  Okay.
18     A.  It's from Ed to Maria.  It's after the
19 documents were executed.  It's going back --
20     Q.  Okay.
21     A.  -- to Maria.  I apologize.
22     Q.  No, that's fine.
23     A.  I didn't look at the "to" and "from".
24     Q.  All right.  So let's look at Page 2 of 15,
25 which is the first -- you know, the substance of the

24 (Pages 90 - 93)

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 94

1  documents.  What -- tell me what this form is, and
2  what its purpose is.
3       A.  This is a letter going to the customer from
4  Ascentium congratulating them that their financing
5  had been approved, and it tells them what to do with
6  the documents once they received them.
7       If there is a check that's needed to come
8  back with the executed documents, it breaks down the
9  amount on the bottom.  Tells them where to send it.
10  Tells them what items to fill in, and that's
11  basically it.
12      Q.  And when Mr. Schuler returns the executed
13  version of the contract, is he supposed to provide
14  all these items, and follow all these instructions?
15      A.  Well, whoever is executing the documents --
16      Q.  Okay.
17      A.  -- is supposed to.
18      Q.  Okay.
19      All right.  So let's look at the next page.
20      A.  Okay.
21      Q.  Tell me what this document is.
22      A.  Can I just read it for a second?
23      Q.  You sure can.
24      A.  This is a document that the customer fills
25  out authorizing Ascentium, giving them the name and

Page 95

1  the phone number and the title of the person that
2  they wish us to do the verbal verification with.
3       Q.  And what is a verbal verification?
4       A.  Verbal verification is done prior to any
5  funding to the supplier.
6       Q.  Okay.  All right.
7       A.  So in this document, Ataollah is basically
8  authorizing Ascentium to do the verbal with
9  Mr. Schuler.
10      Q.  Okay.  And what is the purpose of doing a
11  verbal verification?
12      A.  We want to make sure that -- that the
13  customer verifies that they know of the agreement,
14  first of all, number one.  We verify what we show as
15  their billing address.  We verify what we show as
16  what the equipment location -- where the equipment
17  location is supposed to be.  And we ask them if any
18  of the equipment has been delivered and/or installed
19  yet, and do they authorize us to pay the supplier
20  for the collateral.
21      Q.  And why does Ascentium do that?  I know --
22  I mean, does -- that's a bad question.  Let's do
23  this.  Let's look at what we'll mark as Exhibit 57.
24      (Defendant's Exhibit 57 marked.)
25  BY MR. MCKENZIE:

Page 96

1       Q.  Let me show you that.
2       This Exhibit 57 is a transcription by a
3  court reporter that we had prepared of a .wav file.
4  It was -- it was an electronic document provided to
5  us through discovery by Ascentium called .wav file
6  468.
7       You all can -- it's real short.  You all
8  can look at it real quick.
9       A.  (Refers to document.)
10      Okay.
11      Q.  So is this transcription of the .wav file
12  468 this verbal verification referenced in on Page 3
13  of 15 of Defendant's Exhibit 56?
14      A.  Yes.
15      Q.  Okay.
16      A.  Well, can I correct that a bit?
17      Q.  Yes.
18      A.  This refers only to Cairo 1.  (Indicating)
19  this is referring to Cairo 1 and Cairo 2.
20      Q.  Right.
21      A.  Okay.
22      Q.  So does that -- does the fact that this
23  transcription referenced both or two different Cairo
24  equipment finance agreement numbers indicate they
25  were executed on the same date?

Page 97

1       A.  Yes, I would say so.
2       Q.  Okay.  And is this the standard line of
3  questioning that's asked, or does -- do these verbal
4  verification questions vary depending on the loan
5  and the customer?
6       A.  It's a standard form.
7       Q.  Okay.  Is this a low level Ascentium
8  representative, or is this someone within the
9  company with authority, or a salesperson talking to
10  --
11      A.  I would say it's a lower level employee.
12      Q.  Okay.
13      And if you look at Line -- so the numbers
14  at the side -- I don't know if you've read a
15  transcript -- but the line numbers --
16      A.  Okay.
17      Q.  -- if you'd look at Line Number 22.
18      A.  Okay.
19      Q.  Read from 22 to 25.
20      Just read it out loud.  I'm sorry.
21      A.  Oh, I'm sorry.
22      (Reading) "Ascentium says:  Do you
23  authorize Adams Tank & Lift?  I'm sorry.  Do you
24  authorize my company," meaning Ascentium, I guess,
25  "to disburse the first disbursement to Adams Tank &

25 (Pages 94 - 97)

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

Page 98

1  Lift?  Answer by Mr. Schuler:  Yes, we do."
2      Q.  Is -- is this procedure, for verbal
3  verification asking whether Ascentium is
4  specifically authorized to disburse funds to Adams
5  Tank, is that to protect Ascentium from the customer
6  complaining that they paid something they weren't
7  supposed to?
8      A.  Yes.  If we disburse funds, we have it on
9  record that the customer authorized us to disburse
10  the funds.
11     Q.  And why does Ascentium feel the need to
12  have the customer authorize that disbursement?
13     A.  Well, we're letting money go out the door,
14  and we want to make sure that the customer is
15  agreeable for us to release the funds --
16     Q.  Okay.
17     A.  -- to his supplier.
18     Q.  Have you listened to this?  Did you ever
19  listen to this --
20     A.  I have not listened to it.  No.
21     Q.  Okay.
22         If you'll flip to the next page.
23     A.  Okay.
24     Q.  At the top of the page, just read -- read
25  out loud Lines 1 through 4.

Page 99

1      A.  (Reading) "Ascentium rep:  Do you have an
2  anticipated date as to when you're going to receive
3  that equipment?  Mr. Schuler:  Everything but the
4  canopy is already on-site."
5      Q.  So, I mean, what would be the purpose of --
6  if the Ascentium representative asked that question,
7  would that have been something that somebody higher
8  up at Ascentium would have wanted her to ask, or is
9  that a normal question to ask?
10     A.  That's a normal question.
11     Q.  Okay.
12         All right.  This is?
13     A.  57.
14     Q.  Okay.
15         All right.  Let's look -- go back to 56.
16     A.  (Complies with request.)  Okay.
17     Q.  All right.  If we look at -- it's Page 415.
18     A.  Okay.
19     Q.  This is the first page of the standard
20  equipment finance agreement, which was made specific
21  to Phoenix.
22         If you look down, do you see where it says,
23  right above the first signature block, there's a
24  bold faced --
25     A.  Yes.

Page 100

1      Q.  -- section?
2          Read that out loud for me.
3      A.  (Reading) "This agreement, the terms of
4  which have been freely negotiated by each party, is
5  also subject to the terms and conditions on the
6  reverse side or following page, which are all made
7  part hereof, and which debtor and secured party
8  acknowledge.  They have read and accepted.  This is
9  a non-cancellable agreement."
10     Q.  And then what's it say again?
11     A.  You want me to reread it?
12     Q.  No.  What's it say under that last
13  sentence?
14     A.  (Reading) "This is non-cancellable
15  agreement."
16     Q.  So it says, "This is a non-cancellable
17  agreement" twice?
18     A.  Yes, it does.
19     Q.  So what did -- what does that mean to you?
20     A.  I don't know.
21     Q.  Does -- do you think that means that once
22  you sign this agreement, you can't cancel the
23  agreement?
24     A.  That's correct.  But I don't know why it's
25  there twice, is what I'm saying.

Page 101

1      Q.  Okay.
2          Well, do you know why it's there once?
3      A.  It's there because it's -- the customer's
4  agreeing that once he signs the agreement, it cannot
5  be canceled.  He has to make all the payments.
6      Q.  All right.  If you go to the next page,
7  which is 5 of 15.
8      A.  (Complies with request.)
9          Okay.
10     Q.  Number 5, titled "Payments".
11     A.  Okay.
12     Q.  If you look towards the end, the bold all
13  caps sentence, read that out loud.
14     A.  (Reading) "Your obligation to make payments
15  and pay other amounts -- "
16         Again, this is small print, so give me a
17  minute.
18         (Reading) " -- other amounts hereunder is
19  absolute and unconditional, and not subject to
20  abatement, reduction, or setoff for any reason
21  whatsoever.  Following the first payment date, the
22  terms shall continue", it looks like, "without
23  interruption for the number of months referred to --
24  referred on the first page."
25         I'm sorry I'm reading slow.

26 (Pages 98 - 101)

Conf. 30(b)(6) Anthony Campisciano
August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 102

1    Q. No, that's fine.
2    A. Because, again, my eyesight --
3    Q. Right.
4    A. -- with this print is hard.
5    Q. Right.
6       So does that reaffirm that what's stated on
7  the first page, that, quote, this is a
8  non-cancellable agreement --
9       MR. STINE: Object to the form.
10 BY MR. MCKENZIE:
11   Q. -- end quote?
12   A. Let me just reread it quickly again.
13   Q. And that's fine. And this is just in your
14 opinion.
15      MR. STINE: Object to the form.
16   A. Yes, it does. It's reaffirming the
17 non-cancellable agreement on Page 1.
18   Q. So when this agreement is executed, do all
19 the parties intend for it to not be canceled under
20 any circumstance?
21      MR. STINE: Object to the form.
22   A. Yes.
23   Q. Okay.
24      All right. Let's flip to Page 10 of 15.
25   A. (Complies with request.)

Page 103

1       Okay.
2    Q. And this is the commencement agreement; is
3  that correct?
4    A. Correct.
5    Q. Okay.
6       MR. STINE: What page?
7       THE WITNESS: 10 of 15.
8       MR. STINE: Gotcha.
9  BY MR. MCKENZIE:
10   Q. Oh, yeah. That first introductory
11 paragraph.
12   A. Okay.
13   Q. Read the last two sentences out loud for
14 me.
15   A. Starting with "the equipment"?
16   Q. Uh-huh.
17   A. (Reading) "The equipment is being delivered
18 at various times, and the vendor or vendors of the
19 equipment have to be paid for each item of equipment
20 at or before it's delivered to you. You agree to
21 commence the initial non-cancellable term of the
22 agreement immediately, even though items of the
23 equipment remain to be delivered to and accepted by
24 you from one or more vendors."
25   Q. So -- so what -- I mean, what significance

Page 104

1  is given to this last section that you just read
2  aloud?
3    A. The last section on the top paragraph?
4    Q. Yeah. It states:
5       (Reading) "Even though items of equipment
6  remain to be delivered to and accepted by you from
7  one or more vendors, what -- what is the purpose of
8  mentioning acceptance by the borrower in that
9  statement? Do you know?
10      MR. STINE: Object to the form.
11   A. I'm not quite sure I understand what you're
12 asking. I think I understood the first part of your
13 question. Not the second part.
14   Q. Well, what, in Tony Campi terms --
15   A. Okay.
16   Q. -- what does this last sentence mean?
17   A. The last sentence?
18   Q. Uh-huh.
19      MR. STINE: Object to the form.
20   A. I'm going to read it again. Okay?
21   Q. Yeah, that's fine.
22   A. (Reads to himself.)
23      What that sentence means is, it's the
24 customer advising Ascentium that they may commence
25 the agreement, start the clock ticking, as we say,

Page 105

1  begin billing us the payments immediately, even
2  though items of equipment remain to be delivered and
3  accepted from however many vendors that there may
4  be.
5    Q. So if items aren't accepted by the
6  customer, the terms would still be non-cancellable?
7  Is that how that reads to you?
8       MR. STINE: Object to the form.
9    A. Yes. That's how it reads to me.
10   Q. Okay.
11      All right. Let's go to Page 11 of 15.
12   A. Okay.
13   Q. All right. Tell me -- you can look at it
14 for a minute, if you want to, and tell me what this
15 form is, and what its purpose is.
16   A. The purpose of this form is the customer
17 authorizing Ascentium to debit their bank account
18 every month for the payments that are due, as
19 opposed to them mailing in a check.
20   Q. Okay.
21   A. So we call this ACH. We ACH the payments.
22   Q. So -- so this was an ACH payment --
23   A. Authorization form.
24   Q. -- and do you know if all the payments made
25 by Phoenix were ACH?

27 (Pages 102 - 105)

Tiffany Alley, A Veritext Company

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 106

1     A. I do not know.
2     Q. Okay.
3     If we look back at the schedule of payments
4  sheet, would it indicate whether they were ACH or --
5     A. I do not believe it does.
6     Q. Let's look. I'm curious.
7     All right. Let's look at -- and see if
8  this tells us anything. Let's look at -- this is
9  Exhibit 54. Exhibit -- Composite Exhibit A, Page 7
10 of 8, which is related to Contract Number 2116122,
11 which is also the contract number referenced in
12 Defendant's Exhibit 56.
13     If you look in the one, two, three, four,
14 five -- fifth column, where it says check number --
15     A. Okay.
16     Q. -- it -- there's some four digit numbers,
17 and then it goes 1 through 25.
18     A. Correct.
19     Q. Are those numbers 1 through 25 ACH?
20     A. Yes, they are.
21     Q. Okay.
22     So if we look at the last two number --
23 well, not the last two, but Numbers 28 and 29 --
24     A. Okay.
25     Q. -- would that show $30 ACH payments?

Page 107

1     A. (Nods head affirmatively.)
2     Q. What does that -- does that indicate
3  anything to you?
4     A. It's a returned item fee.
5     Q. Which means?
6     A. If an ACH that we -- when we debit an
7  account, if an ACH comes back NSF, non-sufficient
8  funds, we charge them a $30 fee, because we have to
9  try to re-process it again.
10     Q. Okay. So when they quit making payments,
11 really they -- you all have been ACH'ing them the
12 whole time?
13     A. In this particular --
14     Q. Okay.
15     A. On this particular schedule, yes.
16     Q. Okay. I'm getting there. I'm just trying
17 to understand all these --
18     A. Okay.
19     Q. -- forms.
20     Okay. All right. Number -- next page in
21 Exhibit 50 -- Defendant's Exhibit 56, this is Page
22 12 of 15, and it's called "Signer identification
23 addendum."
24     A. Okay.
25     Q. There doesn't appear to be any significance

Page 108

1  to that. And we go to -- here we go. Page 13 of
2  15.
3     A. (Complies with request.)
4     Okay.
5     Q. Titled "Delivery and Acceptance
6  Certificate", which we discussed briefly earlier --
7     A. Right.
8     Q. -- when we were talking about Exhibit 55.
9     I recall you indicated that these are often
10 signed before they're supposed to be.
11     A. Prematurely.
12     Q. So why are they included with the agreement
13 package by Ascentium?
14     A. When the package first goes out --
15     Q. Uh-huh.
16     A. -- so the customer has it, but what they're
17 supposed to do is hold onto it. Then after
18 everything comes in, it's delivered, then they're
19 supposed to sign it, and send it back.
20     But like I said, a lot of times they just
21 rush through it, and they sign everything that's put
22 in front of them.
23     Q. So when you all get these that are signed
24 on the same date, and they're stuck in the file, I
25 mean, what does that tell you if it goes to

Page 109

1  collection? Does that tell you anything?
2     A. Not really.
3     Q. All right.
4     MR. MCKENZIE: Do you all want to grab
5  something to eat?
6     THE WITNESS: What time is it?
7     MR. MCKENZIE: 1:20.
8     MR. STINE: Yeah. Let's do that.
9     (Recess 1:20 p.m. - 2:06 p.m.)
10 BY MR. MCKENZIE:
11     Q. Before the break, we were discussing
12 Defendant's Exhibit 55 and 56. If you'll get those.
13     A. (Complies with request.)
14     Okay. I have them.
15     Q. So earlier, we discussed, you know,
16 Defendant's Exhibit 55 is what has been used as an
17 exhibit by Ascentium. And then Exhibit 56,
18 Defendant's Exhibit 56, was recently provided to
19 Defendants, and is a fax transmission containing
20 legible signed versions of the equipment finance
21 agreement, which is also represented by Defense
22 Exhibit 55.
23     A. Correct.
24     Q. Okay.
25     Now, Exhibits -- I mean, Defendant's

28 (Pages 106 - 109)

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 110

1  Exhibit 55 contains an invoice marked by Ascentium,
2  as you previously stated, Schedule A; is that
3  correct?
4      A. Correct.
5      Q. Okay.
6         However, does Defendant's Exhibit 56
7  contain a copy of the invoice?
8      A. Let me look through it.
9         No, it does not.
10     Q. Why is that?
11     A. I'm not sure.
12     Q. And then if you look at Defendant's Exhibit
13  55, it contains a copy of a UCC financing statement.
14     A. Okay.
15     Q. But Defendant's Exhibit 56 does not; is
16  that correct?
17     A. That's correct.
18         However, Exhibit 56 are copies of documents
19  sent by Ed Schuler of Phoenix to Ascentium. Ed
20  Schuler would not have a copy of the UCC file by us.
21  UCC filed by us would have been right after receipt
22  of this.
23     Q. Okay.
24     A. And looking back on your prior question, Ed
25  Schuler would probably could not have a copy of Andy

Page 111

1  Adams' invoice, which was stamped Schedule A, when
2  he sent the docs back to us. The invoice would have
3  come from Adams Tank & Lift to Ascentium, not from
4  Phoenix.
5      Q. Okay. So let's look at the date. Let's
6  look at that invoice.
7      A. Okay.
8      Q. So isn't it true that the date on the
9  invoice included with Defendant's Exhibit 55 is
10  1/21/13?
11     A. Yes.
12     Q. All right. So now let's look at Defense
13  Exhibit 56, the Page 2 of 15.
14     A. (Complies with request.)
15         Okay.
16     Q. Is a letter dated January 22nd, 2013;
17  correct?
18     A. Correct.
19     Q. So at the time this packet was sent to
20  Mr. Schuler for execution, wouldn't Ascentium have
21  had the invoice from Mr. Adams?
22     A. Not necessarily. Just because the invoice
23  is dated 1/21, it doesn't mean that it was sent to
24  us -- into us on 1/21. He could have sent it one,
25  two, three, four days later.

Page 112

1      Q. Is that standard procedure to have these
2  documents executed by the borrower without the
3  Schedule A included with the documents?
4      A. I don't know.
5      Q. Okay.
6      A. I don't know for sure.
7      Q. Okay.
8         All right. Now, let's look at -- we're
9  going to call this -- we'll wait on that. All
10  right.
11         All right. Now I'm going to give -- we're
12  going to mark as Exhibit 57 --
13         THE COURT REPORTER: 58?
14         MR. MCKENZIE: Well, we'll start with 57.
15  BY MR. MCKENZIE:
16     Q. No. 57 was Exhibit 15 to the depositions
17  that were held recently in Florida?
18     A. Okay.
19     Q. And so mark that one, and then we'll --
20  I'll give it to him.
21         THE COURT REPORTER: This will be No. 58.
22         MR. MCKENZIE: Okay. Sorry. No. 58.
23  Sorry.
24         (Defendant's Exhibit 58 marked.)
25  BY MR. MCKENZIE:

Page 113

1      Q. All right. So just tell me what this
2  document is. It's --
3      A. This is a copy of the Cairo Number 2 job.
4      Q. Okay. And how do you know that?
5      A. I recognize the agreement number.
6      Q. Okay.
7      A. And it also says, under collateral
8  location, Highway 14, Cairo, Georgia.
9      Q. Okay.
10         All right. Let's go -- does this -- if you
11  look down -- let's see.
12         Let's go to the third page.
13     A. (Complies with request.)
14         Okay.
15     Q. Do you see an invoice?
16     A. I do.
17     Q. Okay. What's the date on that invoice?
18     A. 1/21/13.
19     Q. Okay. And what items of equipment are
20  represented on this invoice?
21     A. It is the Carrol cooler, 12-door cooler and
22  beer cave, the eight-column gas canopy, and the
23  four-column diesel canopy.
24     Q. Okay.
25         And this appears to be marked Schedule A.

29 (Pages 110 - 113)

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 114

1  Was that done by Ascentium?
2      A. Yes.  It was a stamp.
3      Q. Okay.
4         All right.  Let's look at the next page.
5  This appears to be a UCC financing statement with a
6  file date of January 25, 2013; is that correct?
7      A. Yes, it is.
8      Q. And is this document, to your knowledge,
9  that I've marked as No. 58, which is similar to the
10 document I marked as No. 55, is this how the
11 equipment finance agreement is kept in a file
12 somewhere in Ascentium?
13     A. I do not know, because I'm not located in
14 Kingwood.
15     Q. Okay.
16     A. I know that when the documents are received
17 in, they're scanned into our computer system.
18 The piece of paper itself, I'm not sure
19 where it goes to.
20     Q. Are they always illegible like this?
21     A. No, they're not.
22     Q. Okay.
23     A. And as I was telling Kevin yesterday, for a
24 company that does as well as Ascentium, you'd think
25 that they could invest in a little bit of a better

Page 115

1  scanner.  I don't know if they have several of them
2  down there, and some are better than others, because
3  some documents I look at that are scanned in are
4  clear as a bell, and some are horrible.  This one
5  actually is more on the horrible, but I've seen it
6  even worse.
7      Q. Oh, wow.
8      A. Yeah.
9      Q. I couldn't imagine.  Okay.
10        All right.  Let's go to -- all right.
11     MR. MCKENZIE:  I'm going to mark the next
12 one as Exhibit 59.
13     (Defendant's Exhibit 59 marked.)
14 BY MR. MCKENZIE:
15     Q. All right.  So what does Exhibit 59 appear
16 to be?  You can take a minute to look at it.
17     A. It appears to be documents that Ed Schuler
18 faxed back to Maria Negri on January 24, 2013, which
19 appears to be the Cairo Number 2 agreement.
20 Executed documents.
21     Q. All right.  And earlier, we reviewed a
22 transcript of a verbal authorization which was
23 marked as Exhibit 57.  Do you recall that?
24     A. Yes, I do.
25     Q. And is this Page 3 of 15 to Exhibit 59,

Page 116

1  does that relate to that verbal authorization we
2  reviewed earlier?
3      A. Yes, it does.
4      Q. Okay.
5         All right.  Let's turn to Page 4 of 15.
6      A. Okay.
7      Q. I believe this one got murdered by the
8  scanner as well.
9      A. Yes.  It looks like it.
10     Q. But if you look at the bold typed face
11 paragraph above the signature, does this equipment
12 finance agreement, which is the second Cairo deal,
13 also include the language that that agreement was
14 also a non-cancellable agreement?
15     A. Yes.  Same as the other one.
16     Q. And if you turn the page, does Paragraph 5
17 regarding payments also include the same language
18 you reviewed earlier, to your recollection?
19     A. Just reading it quickly again.
20        Yes, it does.
21     Q. Okay.  If we look at Page 10 of 15 -- I
22 mean, 10 of 15 titled "Commencement Agreement".
23     A. Okay.
24     Q. So is this a similar -- does this document
25 serve the same purposes as the commencement

Page 117

1  agreement we discussed in more detail with relation
2  to the other financial agreement of Cairo?
3      A. Yes, it does.
4      Q. And then if we look at 13 of 15, a document
5  titled "Delivery and Acceptance Certificate" --
6      A. Okay.
7      Q. -- does this document also serve the same
8  purpose as the delivery and acceptance certificate
9  we discussed earlier?
10     A. Yes, it does.
11     Q. Is this -- if you look back -- let's look
12 back at -- we reviewed, quickly, this equipment
13 finance agreement for Agreement Number 2118557;
14 correct?
15     A. Correct.
16     Q. Does this appear to be the same form used
17 as with the first Cairo agreement, which is --
18     A. Can I take a look --
19     Q. -- marked as Defendant's Exhibit 58?
20     A. Was it No. 58?  No.
21     Q. No, no, no.  Excuse me.  No. 56.
22     A. No.
23     Q. Yeah.  Just take a look, because I want
24 to...
25     A. Yes.  They're the same agreements.

30 (Pages 114 - 117)

Conf. 30(b)(6) Anthony Campisciano  August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 118

1    Q.  Okay.
2       MR. MCKENZIE:  All right.  This is going to
3    be Number 60.
4       (Defendant's Exhibit 60 marked.)
5    BY MR. MCKENZIE:
6    Q.  All right.  And what does Defendant's
7    Exhibit 60 appear to be?
8    A.  Could I just read it, please?
9    Q.  Sure.  Yeah.  Review this.  You can review
10   all the pages.
11   A.  Okay.  This is another fax from Ed Schuler
12   to Maria Negri on January 24th, 2013, and it appears
13   to be a copy of the two advanced rental checks on
14   the Cairo 1 and Cairo 2 agreement.  And I'm not
15   quite sure why he attached another executed Cairo
16   Number 2 agreement to the back of the fax, but
17   apparently he did.
18   Q.  Okay.
19   A.  It looks a little bit clearer than the
20   other one.
21   Q.  All right.  So was this -- were these
22   copies of checks that were mailed, or were these to
23   provide information for the ACH?
24   A.  I do not know.
25   Q.  Okay.

Page 119

1    A.  This would not be an ACH type of
2    authorization, I don't believe.
3    Q.  Okay.  Okay.
4    A.  And if you look at the payment histories,
5    it's got a check number on it.
6    Q.  Okay.
7    A.  And I'm not sure if that corresponds with
8    these, but it should.
9    Q.  Okay.
10   A.  But these were not -- this has nothing to
11   do with ACH.
12   Q.  All right.
13   A.  Matter of fact, if you look at -- if you
14   look at Exhibit 59 --
15   Q.  Okay.
16   A.  -- the second page in, where we tell them
17   how much we need, $2,341, there's the check for
18   $2,341.
19   Q.  Okay.  Great.
20   A.  So it corresponds.
21   Q.  All right.  Enough of that.
22       MR. MCKENZIE:  Next is going to be Exhibit
23   61.
24       (Defendant's Exhibit 61 marked.)
25   BY MR. MCKENZIE:

Page 120

1    Q.  Exhibit 61 is a version of Equipment
2    Finance Agreement Number 2118850 that was marked as
3    Exhibit 16, and used in the deposition as taken by
4    Ascentium of Andy Adams and Adams Tank employees.
5       If you want to take a look at it, and we
6    can talk about it.
7    A.  (Complies with request.)
8       Okay.
9    Q.  Okay.  So what is this document?
10   A.  This is a copy of the agreement for the
11   Jackson location.
12   Q.  Is this Exhibit 61?
13       MR. STINE:  Yeah.
14   A.  Yeah.
15   Q.  All right.  Let's go to the third page.
16   A.  Okay.
17   Q.  All right.  What is this?
18   A.  This is an invoice submitted from Adams
19   Tank to Ascentium for the Jackson equipment.
20   Q.  Okay.  And does this document appear
21   different than the other invoices that were
22   attached?
23   A.  Yes, it does.
24   Q.  Okay.  What's the date on this document?
25   A.  June 27th, 2013.

Page 121

1    Q.  Okay.  And who is the -- excuse me.  Why
2    -- or do you know why the billed-to party is Phoenix
3    Petroleum?
4    A.  Well, on an EFA --
5    Q.  Okay.
6    A.  -- the equipment is actually owned by the
7    debtor.  However, Ascentium pays for that equipment
8    to the supplier, and places a lien on the collateral
9    covered by that agreement.
10   Q.  So at what point is -- so, I mean, I guess
11   at what point does the borrower own the collateral?
12       MR. STINE:  Object to the form.
13   BY MR. MCKENZIE:
14   Q.  Do you know?
15   A.  I don't -- I don't know.
16   Q.  Okay.
17       For all -- earlier, you said an EFA.  Do
18   you mean equipment finance agreement?
19   A.  Yes.
20   Q.  For all EFAs, does Ascentium have the
21   borrower address the bill-to party?  Is that
22   standard operation?
23   A.  Yes.
24   Q.  Okay.
25       All right.  And so if you look at this

31 (Pages 118 - 121)

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 122

1  invoice, what does it show Adams Tank will be
2  providing to Phoenix Petroleum?
3      A. It shows that they should be delivering
4  fuel dispensers. I believe there were nine on this
5  invoice. If you want me to go back and count them,
6  I will. Nine fuel dispensers.
7      Q. Okay.
8      A. Hanging hardware. The Ruby Terminal
9  Point-of-Sale System, and the Veeder Root Tank
10 Monitoring System.
11     Q. So --
12     A. And installation.
13     Q. So does this invoice -- when discussing the
14 dispensers --
15     A. Okay.
16     Q. -- does this invoice appear to you to
17 indicate that they will be furnished in the future?
18     A. It indicates that this -- these are the
19 products that the debtor, Phoenix, wishes to obtain,
20 and it indicates that Adams Tank & Lift will be
21 delivering and providing the items on the invoice.
22     Q. Okay.
23        All right. So let's skip -- do you ever
24 see the Adams Tank contract proposals to its
25 customer, in this case Phoenix Petroleum?

Page 123

1      A. Me personally?
2      Q. Uh-huh.
3      A. No.
4      Q. You don't?
5         Does Ascentium maintain copies of those
6  proposals in any form?
7      A. I don't know.
8      Q. Do you know that there's a -- I mean, do
9  you know that there's a difference in a proposal
10 between the borrower and their equipment supplier
11 and an invoice that's provided to the finance
12 company?
13     A. Yes, I do.
14     Q. Okay.
15        All right. Switching gears. The next
16 document is the UCC financing statement, which
17 appears to have a file date of June 28, 2013; is
18 that correct?
19     A. Correct.
20     Q. And so does -- it also appears that CT Lien
21 Solutions is the representation of filing; is that
22 correct?
23     A. Correct.
24     Q. What -- is CT Lien Solutions a third party
25 that files these UCCs for Ascentium?

Page 124

1      A. Yes.
2      Q. Okay. Was there only a UCC filed as to
3  Phoenix Petroleum for -- in relation to Equipment
4  Finance Agreement 2118850?
5      A. I'm not sure I understand what you're
6  asking.
7      Q. Was there ever a UCC financing statement
8  filed as to any other of the entities that were
9  guarantors under Equipment Finance Agreement
10 2118850?
11     A. I do not know. I don't believe so.
12     Q. Okay.
13     A. Otherwise, we would have had copies here.
14     Q. Okay.
15        All right. Then the next page is something
16 that I do not recall seeing in my documents. It's
17 called a real property waiver.
18     A. Uh-huh.
19     Q. Is that -- is that a document that you're
20 familiar with?
21     A. I'm semi-familiar with it. Yes. We don't
22 -- I don't see a lot of them, but I have seen them
23 before.
24     Q. And let me just confirm that there's one in
25 here. We can talk about it, and we can read it.

Page 125

1         No. Okay. Just generally, what's the
2  purpose of the real property waiver?
3      A. From what I understand, this is a document
4  that is signed by the property owner --
5      Q. Uh-huh.
6      A. -- indicating that the collateral that
7  Ascentium has a lien on, that's being placed on this
8  property, should it ever have to be removed, it
9  would not be considered real property. It would be
10 considered personal property, and can be removed.
11        Because in the case of gas dispensers, you
12 know, they're bolted to the concrete, and a landlord
13 or a property owner may argue that, well, these have
14 now become part of real property. And this is a
15 waiver with the property owner advising Ascentium
16 that's not the case. If it needs to be removed, you
17 could remove it. We'll consider it personal
18 property.
19     Q. Okay.
20     A. That's my understanding of it.
21     Q. All right. Then we can -- all right.
22        So the next document appears to be a
23 guaranty; is that correct?
24     A. Yes. Correct.
25     Q. If you go to the second page, who's the

32 (Pages 122 - 125)

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift
August 30, 2016

Page 126

1  guarantor?
2  A. Falcon Entity, LLC.
3  Q. Okay. And then on what date was this
4  guaranty executed?
5  A. June 27th, 2013.
6  Q. All right. And then if we go to the next
7  document, it also appears to be a guaranty; is that
8  correct?
9  A. Correct.
10  Q. And who is that guarantor?
11  A. Great American Travel Center, LLC.
12  Q. Okay.
13  All right. Let's look back at -- grab No.
14  59.
15  A. (Complies with request.)
16  Okay.
17  Q. All right. If you go to the -- if you
18  review the signatures of Mr. Masoodzadehgan on the
19  documents included with Defendant's Exhibit 59 --
20  A. Okay.
21  Q. -- and Defendant's Exhibit 61, do those
22  appear to be different to you?
23  A. The last name looks very very similar or
24  the same. The "A" in the first name looks a bit
25  different.

Page 127

1  Q. Are you aware that Mr. Schuler testified in
2  his deposition that he signed Mr. Masoodzadehgan's
3  name to the January 24, 2013 --
4  A. I'm not aware of that.
5  Q. -- agreement? What significance do you
6  think that has?
7  MR. STINE: Object to the form.
8  A. I'm not sure.
9  Q. Okay.
10  All right. Let's go to the next document
11  in Exhibit 61.
12  A. Okay.
13  Q. It is a commencement agreement.
14  A. Okay.
15  Q. Does that appear -- if you want to -- I
16  don't know if you can read that. There might be a
17  more legible copy in the next one, the next exhibit.
18  A. What would you like me to read?
19  Q. Well, does this appear -- does this
20  commencement agreement, as to Agreement Number
21  2118850, serve the same purpose as the commencement
22  agreement that was included with the agreement
23  numbers -- the agreements that were referenced in
24  Exhibits --
25  A. The Cairo 1 and Cairo 2?

Page 128

1  Q. The Cairo 1 and Cairo 2 exhibits.
2  A. The answer is yes.
3  Q. Okay.
4  And is that the same for the delivery and
5  acceptance certificate?
6  A. Correct.
7  Q. Okay.
8  Isn't it true that Mr. Masoodzadehgan or
9  his signatures on the delivery and acceptance ticket
10  on 6/27/13 -- is that --
11  A. I'm sorry. I didn't know that it was a
12  question.
13  Q. On the delivery and acceptance.
14  A. Could you repeat that, please?
15  Q. Yeah.
16  What's the date that Mr. Masoodzadehgan's
17  name was signed to the delivery and acceptance
18  certificate?
19  A. June 27th, 2013.
20  Q. Okay.
21  Okay. Let's look at -- okay.
22  MR. MCKENZIE: This is going to be No. 62.
23  (Defendant's Exhibit 62 marked.)
24  MR. STINE: Let's have a look.
25  MR. MCKENZIE: I've got you one.

Page 129

1  MR. STINE: Do you?
2  MR. MCKENZIE: Yeah.
3  MR. STINE: Thanks.
4  BY MR. MCKENZIE:
5  Q. All right. Take a look at Defendant's
6  Exhibit 62, and just let me know after you've had an
7  opportunity to just peruse through.
8  A. This looks like the same documents we just
9  looked at in Exhibit 61, only it looks like these
10  were e-mailed from --
11  Q. Okay.
12  A. -- Phoenix Petroleum to Maria Negri.
13  Q. Instead of faxed?
14  A. Correct.
15  Q. Okay. All right. So let's -- all right.
16  So what date were these items -- for the record,
17  Selina Barnard is my assistant who printed this
18  e-mail, and that's why her name is on the top.
19  A. Okay.
20  Q. So let's see.
21  All right. So when was this document
22  e-mailed to Ascentium from Phoenix?
23  A. June 27th, 2013.
24  Q. Okay. All right. Let's just go through --
25  let's look at the first page.

33 (Pages 126 - 129)

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

Page 130

1    What is that first page?
2    A. The ACH verbal authorization form.
3    Q. All right. And let's look at what we will
4  call Exhibit 63.
5    (Defendant's Exhibit 63 marked.)
6  BY MR. MCKENZIE:
7    Q. I only have, for whatever reason, two of
8  these. Share that one. I'm sorry.
9    While he's looking, I'll do the lead-in.
10    So Exhibit 63 or Defendant's Exhibit 63 is
11  a transcript of a telephone conference that was
12  recorded and provided to Defendants as .wav file
13  469, and it's a call between an Ascentium
14  representative and Ataollah Masoodzadehgan.
15    Review that just to yourself, and then we
16  can talk about it.
17    A. (Complies with request.)
18    Okay.
19    Q. All right. So read -- read aloud 20
20  through 22.
21    A. (Reading) "Ascentium rep: Do you authorize
22  Ascentium Capital to release the first disbursement
23  to Adams Tank & Lift?"
24    I'll say Ataollah.
25    (Reading) "Mr. -- "

Page 131

1    Whatever his name is, he answered yes.
2    (Reading) "Ascentium rep: Do you authorize
3  Ascentium Capital to pay your equipment supplier,
4  and start your agreement? Ataollah: The answer is
5  yes."
6    Q. All right. Now go to the next page.
7    A. (Complies with request.)
8    Okay.
9    Q. And read that -- you can just read that
10  first line.
11    A. (Reading) "Ascentium rep: Okay. That's
12  it."
13    Q. Okay. So -- so what -- what does appear to
14  be the purpose of this verbal authorization?
15    A. It's Ataollah authorizing Ascentium to fund
16  90 percent of the deal to Adams Tank.
17    Q. Okay. And does this verbal authorization
18  coincide with the authorization to perform verbal
19  verification, which is included with these e-mail
20  documents marked as Defendant's Exhibit 62?
21    A. Yes, it does.
22    Q. Okay. All right.
23    All right. So tell me what -- all right.
24  So this next document -- this next page is Equipment
25  Finance Agreement 2118850; correct?

Page 132

1    A. Sorry. Which exhibit are you on?
2    Q. Oh, I'm sorry. We're back on Exhibit 62.
3    A. 62? Okay.
4    Q. Sorry about that.
5    A. That's okay.
6    Q. And the third page.
7    A. Okay.
8    Q. All right. So this is Equipment Finance
9  Agreement Number 2118850; correct?
10    A. Correct.
11    Q. Okay. And where -- what project site does
12  this relate to?
13    A. The Jackson site.
14    Q. Okay. Does this form appear different than
15  the forms that were used with the Cairo agreements?
16    A. Yes.
17    Q. And why is that?
18    A. It looks like there's a different date in
19  the lower left-hand corner than the first two
20  agreements --
21    Q. Okay.
22    A. -- with Cairo, so it must have been revised
23  --
24    Q. Okay.
25    A. -- between those and this one.

Page 133

1    Q. Is it your understanding that this revised
2  form serves the same -- I mean, it's the same
3  function as the prior form used for Cairo?
4    A. Yes.
5    Q. Okay.
6    All right. So let's look at -- let's look
7  at Section 4, titled "Payments".
8    A. Okay.
9    Q. If you'll just read aloud the -- all those
10  words that are in all caps.
11    A. (Reading) "Your obligation to make payment
12  and pay other amounts due hereunder is absolute and
13  unconditional, and not subject to abatement,
14  reduction, or setoff for any reason whatsoever.
15  This is a non-cancellable agreement. This agreement
16  -- "
17    Excuse me.
18    (Reading) " -- the terms of which have been
19  freely negotiated by each party is -- "
20    I'm sorry. My eyes again.
21    Q. That's all right.
22    A. (Reading) " -- is also subject to the terms
23  and conditions of the following page, which is made
24  part hereof, and which debtor and secured party
25  acknowledge they have read and accepted."

34 (Pages 130 - 133)

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 134

1    Q. And now, is that language similar to the
2  language we read in relation to Cairo 1 and Cairo 2
3  agreements --
4    A. I --
5    Q. -- earlier?  Just in a little different
6  form?
7    A. I believe it's -- I don't know if it's
8  verbatim --
9    Q. Right.
10   A. -- but it's the same.
11   Q. Okay.
12   A. It's meant to mean the same thing.
13   Q. Right.
14     All right.  If we skip to the commencement
15  agreement, which is, I think, the 7th page back.
16   A. Okay.
17   Q. You got it?
18   A. Yeah.
19   Q. Read the last two sentences of that first
20  opening paragraph.
21   A. (Reading) "The equipment is being delivered
22  at various times, and the vendor or vendors of the
23  equipment have to be paid for each item of equipment
24  at or before its delivery to you.  You agree to
25  commence the initial non-cancellable terms of the

Page 135

1  agreement immediately, even though items of
2  equipment remain to be delivered to and accepted by
3  you from one or more vendors."
4    Q. Does that appear to be the same language
5  that was used in the commencement agreement attached
6  or included with the Cairo 1 and Cairo 2 --
7    A. Yes, it does.
8    Q. -- agreements?
9      Okay.
10     All right.  And if you'll look at the
11  delivery and acceptance ticket.
12   A. (Complies with request.)
13     Okay.
14   Q. Does that appear to be the same form that
15  we've discussed previously, and which was used in
16  connection with the Cairo 1 and 2 equipment finance
17  agreements?
18   A. Yes, it does.
19   Q. Okay.
20     And the next one is the real property
21  waiver.
22   A. Okay.
23   Q. This one is more legible.  I mean, I know
24  it's small print, but if you'll just read over it to
25  yourself, and then I'm going to do the same thing.

Page 136

1    A. (Complies with request.)
2      Okay.  I basically read the important
3  parts.
4    Q. So is it still your belief that the real
5  property waiver is for the purpose of allowing the
6  borrower to remove the financed equipment from the
7  property when it's leasing the property, and it
8  doesn't own the property?
9    A. Not the borrower.  Ascentium would be --
10   Q. Okay.
11   A. -- the party removing it.
12   Q. So this -- this document -- does this
13  document allow Ascentium to remove the borrower's
14  property when the borrower is leasing?
15   A. Yes, it does.
16   Q. Okay.
17   A. Because it's saying that the landlord
18  waives any claim --
19   Q. Okay.
20   A. -- to the equipment.
21   Q. All right.
22     Okay.  All right.
23     MR. MCKENZIE:  This is going to be No. 64.
24     (Defendant's Exhibit 64 marked.)
25     MR. STINE:  Was No. 63 that .wav file?  The

Page 137

1  transcript of the .wav file?
2      THE WITNESS:  Yeah.  No. 63 was the .wav
3  file.
4      MR. STINE:  Okay.
5  BY MR. MCKENZIE:
6    Q. All right.  So review this e-mail and
7  attachments, and explain to me what's going on here.
8    A. Well, this appears to be two e-mails from
9  me to Andy Adams, one dated December 17th, 2014, one
10  dated January 2nd, 2015, asking Andy to give me a
11  call to discuss the attached invoice for the Jackson
12  job of $240,000.
13   Q. So at this point in December of 2014, what
14  are you thinking has happened?
15   A. I'm thinking -- I'm trying to remember the
16  timing, but this must have been right after we
17  learned that there was no collateral at the Jackson
18  site.  So I must have called Andy, because it says
19  "Andy, per our discussion".  And I must have called
20  him, and said, "Andy, I've got an invoice from you
21  for $240,000.  We did a site inspection, and there's
22  nothing there."
23   Q. Okay.
24   A. And he probably said, well, what invoice
25  are you talking about?  Send me a copy of the

35 (Pages 134 - 137)

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 138

1  invoice you're talking about. And that's apparently
2  what I did.
3      Q. Okay.
4      MR. MCKENZIE: All right. This next one is
5  going to be No. 65.
6      (Defendant's Exhibit 65 marked.)
7  BY MR. MCKENZIE:
8      Q. Take a look at that, and then...
9      A. This is an e-mail from me to Andy Adams on
10 January 12th, 2015. If I remember correctly, he
11 said, yeah, the nine pumps are in storage. The nine
12 dispensers. The site is not going to open. And I
13 must have asked him if he would be able to find us a
14 buyer for those nine dispensers.
15     Q. Okay.
16     Do you recall if he offered to try to find
17 buyers?
18     A. Yes. I believe he did.
19     Q. Okay.
20     A. Yeah. And because, at the time, I thought
21 we were about to obtain possession of them.
22     Q. Gotcha.
23     A. But that was before we found out that they
24 weren't ours.
25     Q. All right.

Page 139

1      MR. MCKENZIE: Next will be No. 66.
2      (Defendant's Exhibit 66 marked.)
3  BY MR. MCKENZIE:
4      Q. All right. So read over this, and then we
5  can talk about it.
6      A. Well, this is me e-mailing Andy again, and
7  copying Len Baccaro on 2/24/15. Once again,
8  attaching a copy of the Jackson invoice, asking Andy
9  for the serial numbers on the nine dispensers,
10 because we had then, at that time, did the site
11 inspection, and we wanted to make sure the serial
12 numbers that Andy had in his records and what our
13 site inspections showed were the same serial
14 numbers.
15     Q. Okay.
16     A. This was before we were aware of Providence
17 Capital to this -- to these dispensers.
18     Q. So --
19     A. Still thought that we had a proper lien --
20     Q. Okay.
21     A. -- on these dispensers at the time of this
22 e-mail.
23     Q. All right. So do you know -- so, okay, so
24 at this point, February 24, 2015, you did not know
25 about -- or excuse me -- Ascentium was not aware of

Page 140

1  Providence Capital yet? Is that what your testimony
2  is?
3      A. I believe that's what my -- I believe so.
4  Yes.
5      Q. Okay.
6      MR. MCKENZIE: All right. Next one is
7  going to be 67.
8      (Defendant's Exhibit 67 marked.)
9  BY MR. MCKENZIE:
10     Q. So if you look -- let's look -- have you
11 reviewed this?
12     A. I'm reading it now.
13     Q. Oh, I'm sorry.
14     A. I was looking at all the attachments first.
15     Q. No, no. That's fine. Take your time. Let
16 me know when you're finished, and then we can talk
17 about it.
18     A. Okay.
19     MR. STINE: Take your time with that
20 exhibit, and I'll be right back.
21     (Mr. Stine exits.)
22     THE WITNESS: Okay.
23     (Mr. Stine enters.)
24 BY MR. MCKENZIE:
25     Q. All right.

Page 141

1      A. Okay. I looked at this.
2      Q. All right. So the -- if we go back to the
3  second page, the first, you know, the first e-mail
4  in the chain is at the bottom.
5      A. Uh-huh.
6      Q. Is that the same e-mail we just talked
7  about in the previous exhibit?
8      A. Yes, it is.
9      Q. Okay. So at the bottom of Page 1 is Mr.
10 Adams' response; is that correct?
11     A. Yes, it is.
12     Q. And then -- and then your response is at
13 the top of the e-mail dated March 9, 2015; is that
14 correct?
15     A. Yes, it is.
16     Q. So what -- what transpired in between
17 February 25th, Mr. Adams' response, and your
18 response dated five -- I mean, March 9, 2015?
19     A. I do not remember.
20     Q. And then did you have a chance to review
21 the attachments to your e-mail?
22     A. Yes, I did.
23     Q. Do you recall, were those attached
24 documents provided by Mr. Adams at some previous
25 time; or what?

36 (Pages 138 - 141)

Tiffany Alley, A Veritext Company

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 142

1    A.  When he answered my e-mail is the first
2  time I believe that I had seen these attachments.
3    Q.  Okay.
4    A.  Other than the invoice for $240,000 --
5    Q.  Right.
6    A.  -- which we already had.
7    Q.  And one thing you say in your e-mail is:
8      (Reading) "The serial numbers from our
9  inspector are attached, dot, dot, dot.  Why don't
10  these serial numbers match up to the doc you
11  attached above?"
12      Do you recall that?
13    A.  I --
14    Q.  Do you remember, like, what was going on
15  during this time period, or you're just going off
16  what's written in this e-mail?
17    A.  I vaguely remember that we had an
18  inspection done at the storage facility.
19    Q.  Is that the inspection report that we
20  discussed earlier?
21    A.  It was one of them.
22    Q.  Okay.
23    A.  We discussed numerous inspection reports.
24    Q.  Yeah.  Yeah.  Right.
25    A.  It was the one that we did at the Jones

Page 143

1  warehouse facility.
2    Q.  In February of 2015?
3    A.  I believe that was -- I believe that was
4  when it was done.  Yeah.
5    Q.  Okay.
6    A.  And the inspection -- the inspection showed
7  that nine pumps were there.  I think they were
8  shrink wrapped or something, and he's got the serial
9  numbers.  And then I asked Andy for the serial
10  numbers that he had on those same pumps.
11      And from what he sent me here, Page 5 of
12  this attachment of this exhibit, the numbers on this
13  piece of paper didn't match up, I believe, if I can
14  remember correctly, with the numbers on the
15  inspection report.
16    Q.  So if you go -- if you go back a few more
17  pages to the Wayne invoice --
18    A.  Uh-huh.
19    Q.  -- if you look to "ship to" location, and
20  it says Cairo, Georgia -- do you see that?
21    A.  Yes, I do.
22    Q.  Does it appear that Mr. Adams might have
23  been confused about what equipment you were asking
24  about?
25    A.  I don't believe so, because I attached the

Page 144

1  Jackson invoice, which was $240,000.  This, I think,
2  was the third -- the second or third time I had sent
3  it to him.
4    Q.  Okay.
5    A.  So he knew specifically that I was dealing
6  -- speaking about --
7    Q.  Jackson?
8    A.  -- the pump -- the nine pumps that was
9  supposed to be at Jackson.
10    Q.  Okay.  All right.
11      MR. MCKENZIE:  All right.  This is going to
12  be No. 68.
13      (Defendant's Exhibit 68 marked.)
14  BY MR. MCKENZIE:
15    Q.  Do you recall seeing this e-mail to Mr.
16  Adams?
17    A.  Yes, I do.  I have to read it, though.
18    Q.  Oh, yeah.  Please.
19    A.  I'm sure I sent it.
20      (Refers to document.)
21      Okay.
22    Q.  All right.  So let's go down.  Well, what
23  does this -- I mean, what is the point of this
24  e-mail?  What are you --
25    A.  This appears to be an e-mail that I sent to

Page 145

1  Andy after we had discovered that Providence Capital
2  was laying claim to the nine pumps in the Jackson
3  warehouse.  So I'm -- what I did was, I attached
4  Andy's three invoices, Cairo 1, and I listed the
5  serial numbers of the 10 pumps.  I attached his
6  invoice for Cairo 2, without a contract number on
7  it, and I listed the cooler and the two canopies.
8  And then I sent Andy another copy of his invoice for
9  the Jackson contract showing nine pumps, no serial
10  numbers.
11      I didn't have them, because what our
12  inspection showed and what Andy sent on his previous
13  e-mail showed it didn't match up.
14      So bottom line is, to make a long story
15  short, my last sentence -- my last two sentences:
16      (Reading) "So the question is, where are
17  our nine pumps that are listed on your invoice dated
18  6/27/13?  We paid for 19 pumps", meaning Cairo and
19  Jackson, "and we've only found 10 in Cairo."
20    Q.  So -- okay.  So if you look at the first
21  two paragraphs --
22    A.  Uh-huh.
23    Q.  -- is that where you're discussing the two
24  Cairo invoices?
25    A.  First two paragraphs?

37 (Pages 142 - 145)

Conf. 30(b)(6) Anthony Campisciano

August 30, 2016

Ascentium Capital vs. Adams Tank & Lift

Page 146

1   Q.  Well, I'm sorry.  The third and fourth
2  paragraph.
3   A.  Hold on one second.
4      (Refers to documents.)
5      So what was your question?  I'm sorry.
6   Q.  Okay.  So at the end of the fourth
7  paragraph --
8   A.  Uh-huh.
9   Q.  -- isn't it true you say:
10     (Reading) "No issues or problems with this
11  one either."
12   A.  That's what I --
13   Q.  (Reading) "Here's where it gets confusing."
14     So -- so are you all -- is this you telling
15  Andy that you've got all your collateral at Cairo?
16  Is that -- was that your understanding at the time?
17   A.  Yes.  What I was saying was, on -- in
18  Paragraph 3, we paid for 10 dispensers.  Your serial
19  numbers and Wayne's serial numbers matched up.
20   Q.  Okay.
21   A.  We've confirmed that those 10 pumps are
22  there.  The fourth paragraph, I'm saying we paid for
23  a 12-door cooler, and the canopies, and those are
24  there.
25   Q.  Okay.  Gotcha.

Page 147

1      All right.  So on the attachments to this
2  e-mail, I think you just said -- but is that your
3  handwriting on these attachments?
4   A.  Yes.
5   Q.  Okay.  All right.
6      MR. MCKENZIE:  All right.  Okay.  This is
7  going to be No. 69.
8      (Defendant's Exhibit 69 marked.)
9  BY MR. MCKENZIE:
10   Q.  All right.  Start at the back, and review
11  this e-mail chain.
12   A.  (Complies with request.)
13   Q.  All right.  So --
14   A.  Okay.
15   Q.  So what's going on, you know, during the
16  course of these e-mails back and forth behind the
17  scenes at Ascentium?
18   A.  Well, we were in contact, obviously, with
19  Kevin and his firm, and engaged him in this matter,
20  and he was trying to speak with Andy to maybe get
21  the story from him as opposed to Andy speaking with
22  me most of the prior months.
23     It looks like Kevin was trying to get in
24  touch with Andy to speak with him directly, and it
25  looks like they kept missing each other.

Page 148

1   Q.  And what was the purpose of -- I mean, what
2  were you all trying to get from Andy?
3   A.  His explanation as to what happened with
4  the Jackson equipment, mostly.  I mean, that was --
5   Q.  Yeah.
6   A.  -- most of what Kevin was trying to find
7  out.
8   Q.  Was Ascentium targeting Andy as a potential
9  defendant at this point?
10   A.  It's possible.  I mean, we really didn't
11  understand what was happening or what happened.
12   Q.  Uh-huh.
13   A.  We laid out a lot of money, and there was
14  no collateral behind that money that was -- went out
15  the door, the $216,000.  Correct?
16   Q.  Right.
17   A.  So I think we were trying to understand,
18  get Andy's side of the story, as to what happened at
19  that point.  Get his explanation.
20   Q.  Okay.
21      MR. MCKENZIE:  All right.  And the next one
22  will be No. 70.
23      (Defendant's Exhibit 70 marked.)
24  BY MR. MCKENZIE:
25   Q.  Have you seen this -- do you recall this

Page 149

1  e-mail and the attached affidavit?
2   A.  I recall the affidavit.  Yes.  I mean, not
3  off the top of my head, but I remember seeing it
4  before --
5   Q.  Did you --
6   A.  -- in the past.
7   Q.  Did you contribute in drafting the
8  affidavit?
9   A.  In the drafting of it?  No.
10   Q.  Did you contribute --
11   A.  I mean, I gave Kevin the facts at that
12  point in time as to what I understood --
13   Q.  Okay.
14   A.  -- the facts to be, but I didn't draft the
15  language or anything.
16   Q.  Gotcha.
17   A.  If that's what you meant.
18   Q.  But you contributed information to the
19  affidavit?
20   A.  Correct.  To Kevin.  That's correct.
21   Q.  And what was that information based on?
22   A.  Everything I knew regarding the three
23  contracts up and to that point in time.
24   Q.  Okay.  And what -- on April 20th, 2015, do
25  you recall what the conversations at Ascentium are

38 (Pages 146 - 149)

Conf. 30(b)(6) Anthony Campisciano            August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 150

1  about how you all are going to handle these Phoenix
2  transactions?
3      A. Could you repeat that? I'm sorry.
4      Q. Yeah.
5          At the time this e-mail was sent on April
6  20th, 2015, what's -- what conversations were you
7  all having at Ascentium about how to handle this
8  Phoenix transaction?
9      A. Well, from what I recall, we wanted to get
10  the facts from Andy, the way he understood them.
11  That's why this affidavit was prepared --
12      Q. Uh-huh.
13      A. -- for Andy to confirm in writing what he
14  had told Kevin over the phone.
15          And I don't think, at that point in time,
16  we knew where we were going, or going to end up with
17  this, although I'm sure it was in the back of some
18  people's minds that Andy did something that just
19  didn't make sense to us, and we needed to get to the
20  bottom of it. Of course, we were out a lot -- we
21  were losing a lot of money at this point.
22      Q. Right.
23      A. Phoenix had stopped paying.
24      Q. Okay.
25          Okay. All right. There's about 20 of

Page 151

1  these (indicating.) I'm just kidding. Take this
2  notebook.
3      A. Is this for me?
4      Q. Yeah.
5      A. Okay.
6      Q. Everywhere you see red, we're going to talk
7  about -- I'm just kidding.
8          All right. So --
9      THE WITNESS: Want me to put this up here
10  so you can see it also?
11      MR. STINE: Yeah.
12      MR. MCKENZIE: I don't have copies of this.
13  I'm new at this master exhibit.
14      MR. STINE: That's fine.
15  BY MR. MCKENZIE:
16      Q. All right. So go to Exhibit 23.
17      (Exhibit 23 previously marked.)
18      MR. STINE: By the way, is this all the
19  exhibits from --
20      MR. MCKENZIE: Len Baccarro.
21      MR. STINE: Okay. But not exhibits from
22  the depositions in Florida? Gotcha. You said 22 or
23  23?
24      MR. MCKENZIE: No. 23.
25  BY MR. MCKENZIE:

Page 152

1      Q. All right. So read that e-mail chain, and
2  then we'll go back, and then forward.
3      A. Start in the back?
4      Q. Yeah.
5          All right. This is just a background --
6  just had some background question. Who is Lon
7  Thompson?
8      A. Lon Thompson is the head of the VSR, which
9  are Vendor Service Reps. They handle a lot of the
10  agreements, executed agreements, when they are
11  received. They put the file together once the EFA
12  is executed, and --
13      Q. Okay.
14      A. -- they -- they are the ones who eventually
15  get the deal funded --
16      Q. Gotcha.
17      A. -- after all the documents are received,
18  and it goes through the process.
19      Q. All right. So if you'll look at the --
20  there's an October 3, 2014 e-mail from Maria to Len
21  Baccarro and Lon Thompson, and it references a site
22  and verbal. Do you know what those terms mean?
23      A. Site inspection and verbal verification.
24      Q. And it says:
25      (Reading) "We need a site and verbal done."

Page 153

1          Are these site inspections, verbal
2  verifications in addition to the verbal verification
3  that was done at the beginning of the commencement
4  of the contracts?
5      A. I don't think so. I don't believe so.
6  Well, I'm getting my dates mixed up. This is
7  October '14. Yeah, this would have been addition --
8  in addition to, because it was a year later.
9      Q. Okay. And is this around the time that --
10      A. It looks like this is around the time where
11  we were getting ready to --
12      Q. The default occurred?
13      A. When the default occurred, but we were
14  getting ready to pay the last 10 percent. And
15  before we did that, it looks like we were saying,
16  well, before we do this last 10 percent, we need a
17  site inspection done, and the second verbal. So the
18  follow-up verbal. Not the pre-fund 90 percent
19  verbal.
20      Q. So --
21      A. I'm guessing that's what this means.
22      Q. And I know that you weren't a party to
23  these e-mails, by the way, but do you think that
24  this -- this conversation is what led to the October
25  site inspection, that we discussed earlier, at the

39 (Pages 150 - 153)

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 154

1  Jackson facility?
2      A. Yes.
3      Q. Okay. All right.
4         All right. Go to Exhibit 31.
5         (Exhibit 31 previously marked.)
6         All right. So it's just a one-page e-mail;
7  correct?
8      A. Yes.
9      Q. What -- is there -- do you recall sending
10 this e-mail to Jerry Noon, dated April 30, 2015?
11     A. I do not.
12     Q. You don't? Where you say "fyi"?
13     A. I do not recall.
14     Q. Okay. If you look up at the top, an e-mail
15 from Jerry Noon, dated April 30, 2015.
16     A. Uh-huh. Okay.
17     Q. To Len Baccarro, Hernon Traversone, Tony
18 Campi. And it has attachments?
19     A. Correct.
20     Q. Do you -- is this -- are you sending Jerry
21 Noon those attachments in the previous e-mail?
22     MR. STINE: Just to clarify, are you asking
23 the earlier e-mail --
24     A. I know what he's asking.
25     MR. STINE: -- that was sent to Jerry, did

Page 155

1  that include the attachment?
2  BY MR. MCKENZIE:
3      Q. Yeah. I'm just curious how --
4      A. Yes, it did. In other words, I e-mailed
5  Jerry with the attachments saying fyi, look at the
6  attachments. This is for your information. And
7  then he forwarded those attachments to others in the
8  organization.
9      Q. Okay. Would you -- would you have these
10 attachments? Like would you be able to get these
11 attachments?
12     MR. STINE: Yeah.
13     MR. MCKENZIE: Okay.
14     MR. STINE: Well, okay, I think the way we
15 can do this, so -- I mean, I can tell from the
16 subject line --
17     MR. MCKENZIE: We might come across them.
18     THE WITNESS: One of them is the affidavit.
19     MR. STINE: The affidavit. And my guess is
20 -- well, I'm not even sure how many attachments
21 there are. I guess there's a couple of ways to
22 approach this. So I don't mind -- I need to look at
23 the attachments, just to double check they are what
24 they appear to be, as opposed to, like, being a memo
25 from me or something.

Page 156

1      MR. MCKENZIE: For sure.
2      MR. STINE: But if they're just either
3  drafts or the final affidavit that Mr. Adams signed,
4  which that's what they appear to be, I don't have
5  any problem with producing those attachments.
6         So one way to do it would be to see
7  probably if you were able to locate, Tony -- not
8  this minute, obviously, but when you get back to
9  your office, if you can locate the original e-mail
10 you sent Jerry with the attachments --
11     THE WITNESS: Uh-huh.
12     MR. STINE: -- and then forward that to me
13 with the attachments, and then I can send it to him.
14     THE WITNESS: Here's the problem. Look at
15 the date.
16     MR. STINE: April --
17     THE WITNESS: It's more than 12 months ago,
18 right?
19     MR. STINE: Yeah.
20     THE WITNESS: You remember our IT
21 department? I'm only able to access e-mails going
22 back 12 months. However, if I do need something
23 going back further, I have to go through IT.
24     MR. STINE: IT.
25     THE WITNESS: I have to put in a trouble

Page 157

1  ticket.
2      MR. STINE: Okay.
3      THE WITNESS: So, I mean, yes, I can get it
4  eventually. Yes. I can't get it tomorrow or the
5  next day.
6      MR. MCKENZIE: Okay. Well, we'll see --
7      MR. STINE: I don't mind --
8      MR. MCKENZIE: It may pop up later like in
9  a chain or something, but I don't think it does. So
10 --
11     MR. STINE: I don't mind trying to --
12     THE WITNESS: Would you be able to e-mail
13 me to remind me to try to get that?
14     MR. STINE: Yeah. I don't mind trying to
15 find it for you.
16     MR. MCKENZIE: Just to make -- I'm sure
17 it's something I've seen, but -- okay.
18     MR. STINE: So this is from -- for
19 reference purposes, this is Exhibit 31 from Len
20 Baccarro's deposition.
21     And am I right, Collier, that if we find
22 the original e-mail that he sent to Mr. Noon with
23 the attachments intact, that's what you want to see?
24     MR. MCKENZIE: Yeah.
25     MR. STINE: Yeah.

40 (Pages 154 - 157)

Conf. 30(b)(6) Anthony Campisciano
August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 158

1  BY MR. MCKENZIE:
2      Q.  Okay.  So let's look at Exhibit 32.
3          (Exhibit 32 previously marked.)
4      A.  Okay.
5      Q.  And this appears to be correspondence
6  between the same group of individuals related to the
7  attachment that we don't have.
8          But read those, and then we can talk about
9  them.
10     A.  Okay.
11         (Complies with request.)
12         MR. STINE:  For the record, Collier, are
13  these notations yours, or were they produced that
14  way?
15         MR. MCKENZIE:  I don't remember.
16         MR. STINE:  I don't remember either.
17         MR. MCKENZIE:  I don't remember any
18  discussion of that when I was reading Len Baccarro's
19  deposition, but --
20         MR. STINE:  He may have done it during the
21  deposition with a pen.
22         MR. MCKENZIE:  It could have been, and we
23  didn't know it.  Yeah.
24         MR. STINE:  Okay.  It doesn't matter.
25         MR. MCKENZIE:  But we know that you didn't

Page 159

1  do it.  So.
2          THE WITNESS:  Correct.
3  BY MR. MCKENZIE:
4      Q.  Okay.  So who is Hernon Traversone?
5      A.  Hernon Traversone is the -- is an executive
6  vice president of credit risk.  He's the top credit
7  guy in the company.
8      Q.  Okay.  So is this -- when you send this --
9  whatever you sent on April 30th --
10     A.  Right.
11     Q.  -- is this the first time that Hernon
12  Traversone had heard of this --
13     A.  I believe --
14     Q.  -- issue?
15     A.  I believe so.  Yeah.
16         Because I sent it to Jerry, who's my
17  immediate boss, and when Jerry looked at the
18  attachments, I guess --
19     Q.  Gotcha.
20     A.  -- and one of them was the affidavit from
21  Andy, as we know, he immediately sent it to Hernon,
22  and copied Len.
23     Q.  Gotcha.
24         And so then what -- what is your -- how did
25  you read this e-mail from Len Baccarro at the top?

Page 160

1      A.  I read it twice.  The only thing I could
2  understand as to what he's saying is, he's surprised
3  that we have an issue with Andy.  He's one of the
4  top 10 Wayne distributors, I guess, in the country.
5  And Len has been dealing with him for 10 years, and
6  has never had an issue, and he's trying to make
7  sense of all of this.  That's why I think he says
8  the word exhale.
9      Q.  And why does he say, "Boy, does this sound
10  familiar"?
11     A.  That's the part of the e-mail I do not
12  understand.  I do not understand what he means by
13  that.
14     Q.  Does Len Baccarro have a reputation for
15  originating troubled loans?
16     A.  Not to my knowledge, no.
17     Q.  All right.  Let's look at 33.
18         (Exhibit 33 previously marked.)
19  BY MR. MCKENZIE:
20     Q.  So if you read that -- I mean, read all of
21  it, but --
22     A.  Well, I've already read up to here
23  (indicating).
24     Q.  Okay.  Perfect.
25     A.  So after Hernon says --

Page 161

1      Q.  Right.
2      A.  -- he's not happy about the vendor, meaning
3  Andy, he's going to cut him off for future fundings.
4  Jerry says, yeah, it looks like that's what
5  happened.  This is what he verbally admitted to
6  Kevin.  And we're attempting to get him to
7  acknowledge the same in writing so that we could use
8  that to prosecute the customer, it says.
9      Q.  And I assume he means to, like, file suit
10  against the customer?
11         MR. STINE:  Object to the form.
12     A.  Correct.  Correct.
13     Q.  Okay.
14         So does this -- do you recall any of these
15  conversations in the conversations that you all were
16  having at Ascentium about how to proceed regarding
17  Ascentium -- I mean, the Phoenix --
18     A.  I do not.
19     Q.  -- agreement?  Okay.
20         THE COURT REPORTER:  Did you say that
21  Hernon --
22         THE WITNESS:  Hernon works for Ascentium
23  Capital.  He's the chief credit risk officer,
24  executive VP.
25  BY MR. MCKENZIE:

41 (Pages 158 - 161)

Conf. 30(b)(6) Anthony Campisciano                        August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 162

    1      Q. All right. Look at Exhibit 37.
    2          (Exhibit 37 previously marked.)
    3      A. Okay.
    4      Q. If you'll just read the --
    5      A. Yeah.
    6      Q. -- the top e-mail.
    7      A. Okay. I think he was trying to just make a
    8  joke. Hernon. That's my take on it.
    9      Q. So he -- he's just making that up?
   10      A. The answer is I don't know.
   11      Q. Okay.
   12      A. I'm interpreting it as a joke.
   13      Q. Okay.
   14      A. Because I'm one of the top collectors
   15  there, and I don't see that Len has any more
   16  troubled loans than any other salesman --
   17      Q. Salesman?
   18      A. -- salesperson, to be honest with you.
   19          Unfortunately, they all left.
   20      Q. All right. Next one is No. 38.
   21          (Exhibit 38 previously marked.)
   22  BY MR. MCKENZIE:
   23      Q. You can just read that out loud. It's so
   24  short.
   25      A. (Reading) "Can we review a bunch of tier

Page 163

    1  one vendors that we have had issues with? I'll be
    2  in on Tuesday and Wednesday. Adams Tank, Pesco,
    3  Guardian Fueling come to mind."
    4      Q. And who is that e-mail between? Sorry.
    5      A. Between Len and Jerry. My boss, Jerry
    6  Noon.
    7      Q. Okay. So do you know anything about Pesco?
    8      A. I do not.
    9      Q. Do you know anything about Guardian
   10  Fueling?
   11      A. No. I'm assuming that they're both
   12  suppliers, sort of like Adams Tank & Lift.
   13      Q. Okay. So you don't have any -- no issues
   14  ring a bell?
   15      A. Correct.
   16      Q. Okay.
   17          All right. Let's go to Exhibit 39.
   18          (Exhibit 39 previously marked.)
   19  BY MR. MCKENZIE:
   20      Q. Let's start from the bottom, and read up.
   21      A. (Complies with request.)
   22          Okay.
   23      Q. So what's going on?
   24      A. Well, the first e-mail from me to Jerry --
   25  Kevin wanted to send out a letter, and I says to

Page 164

    1  Jerry, before we file suit against our debtor -- it
    2  should be comma -- Adams Tank & Lift, comma, and
    3  Andy Adams, we want to send a letter giving all
    4  parties a chance to make us a settlement offer.
    5  Before telling Kevin it was okay to send it, I want
    6  to run it by you, because Len said they had a
    7  longstanding relationship with Adams. I wanted to
    8  make sure Jerry was okay with the letter.
    9          Jerry then e-mails me back, and he copies
   10  Len, and he copies Hernon, and he copies Tom Depping
   11  who is the CEO of the company, telling Len that we
   12  had previously made him aware, and were looking into
   13  this. I want the letter to go out tomorrow. Please
   14  review. I believe we need to stop doing any future
   15  business with Adams.
   16          Depping writes back -- again, it looks like
   17  a joke. Where do we find these guys? And Len says,
   18  blame my brother, meaning Richard. "Jerry and Tony,
   19  give me a bit to digest all this." Again, he's
   20  reminding us that Andy Adams is a top 10 Wayne
   21  distributor.
   22      Q. So, I mean, what -- what caused Ascentium's
   23  focus to change from the beginning of May to the
   24  beginning of June regarding to file suit against --
   25      A. Well, I believe that's the time that the

Page 165

    1  affidavit was signed by Andy referring to what he
    2  had told you on the phone.
    3          MR. STINE: And let me interject. I don't
    4  have any problem with you testifying to discussions
    5  you had internally with Mr. Noon or anybody else
    6  within Ascentium, but in terms of -- if answering
    7  the question would require you to disclose advice
    8  that I gave, counsel, that I gave, we want to avoid
    9  that subject matter.
   10          So you could answer as it pertains to your
   11  mindset and your discussions internally.
   12          THE WITNESS: Okay.
   13          MR. STINE: As opposed to discussions with
   14  your counsel.
   15          THE WITNESS: Got it. Okay. So could you
   16  repeat the question again, please?
   17  BY MR. MCKENZIE:
   18      Q. Yes.
   19          So what -- what shifted Ascentium's focus
   20  from filing suit against the borrower, Phoenix
   21  Petroleum, to filing suit against Adams Tank and
   22  Andy Adams in the month of May?
   23      A. I believe it was because of the affidavit
   24  signed by Andy admitting to the facts that what we
   25  had presented him with in the affidavit.

42 (Pages 162 - 165)

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 166

1    Q.  Okay.
2        MR. STINE:  And I'll state for the record
3  that we did also sue the borrower, so it wasn't as
4  if -- the question suggested the focus shifted from
5  one to another, and, in reality, the borrower and
6  the guarantors have also been sued.
7        MR. MCKENZIE:  That's true.
8  BY MR. MCKENZIE:
9    Q.  So Mr. Adams was sued personally, and not
10  one of the guarantors until maybe recently.
11       Okay.  This is an e-mail that I was going
12  to -- No. 71, just to make things make sense.
13       (Defendant's Exhibit 71 marked.)
14  BY MR. MCKENZIE:
15   Q.  All right.  So --
16       MR. STINE:  Off the record.
17       (Off-the-record discussion.)
18       MR. STINE:  Back on the record.
19       THE WITNESS:  Okay.
20  BY MR. MCKENZIE:
21   Q.  All right.  So this top e-mail is an e-mail
22  from Steve (sic).  Just kidding.
23       Kevin Stine to Andy Adams, dated May 8,
24  2015; correct?  And you're cc'd; is that correct?
25   A.  Correct.

Page 167

1    Q.  Okay.
2        And what does that appear to indicate in
3  Mr. Stine's e-mail?
4    A.  It looks like Andy may have made a change
5  or two to the affidavit that Kevin had sent him, or
6  some revisions, and Kevin is telling Andy he doesn't
7  have any comments regarding your revisions.  That it
8  has to be in his words, and he's telling him to
9  print it, and sign it, notarize it, and send it back
10  right away.
11   Q.  Okay.  So the -- e-mail that you sent
12  to Jerry Noon that we're going to look for, which is
13  Exhibit 31, that would not have been a signed copy
14  of the affidavit; correct?
15   A.  What was the date of that?
16   Q.  4/30/15.
17   A.  Correct.  It couldn't have been signed on
18  that date.
19   Q.  Okay.  All right.  Let's look at Exhibit 40
20  in that notebook.
21       (Exhibit 40 previously marked.)
22   A.  Okay.
23   Q.  So do you -- do you remember this
24  correspondence, the backdrop to these e-mails?
25   A.  I do not specifically remember them.  No.

Page 168

1    Q.  Do you remember speaking to -- the top
2  e-mail from Len Baccaro to Jerry Noon, dated
3  6/2/15, indicates:
4        (Reading) Quote, "I'm good.  I spoke to
5  Tony.  Thanks," period.
6        Is that correct?
7    A.  That's what it says, but I don't recall my
8  conversation with Len.
9    Q.  Okay.
10       MR. MCKENZIE:  There also appears to be an
11  attachment to Exhibit 40, Kevin.  I don't know if
12  that's --
13       THE WITNESS:  Which e-mail?
14       MR. STINE:  (Inaudible.)
15       THE COURT REPORTER:  I'm sorry?
16       MR. STINE:  I was asking Mr. McKenzie which
17  e-mail is focusing on.
18       MR. MCKENZIE:  Exhibit 40, at the very end.
19       MR. STINE:  Okay.
20       Okay.  I can tell from the attachment
21  description that it would be a WORD document that I
22  had sent you, and you then forwarded it on to Jerry
23  Noon.
24       THE WITNESS:  Okay.
25  BY MR. MCKENZIE:

Page 169

1    Q.  All right.  And let's go to Exhibit 46.
2        (Exhibit 46 previously marked.)
3        THE WITNESS:  You done with this?
4  BY MR. MCKENZIE:
5    Q.  Oh, sorry.
6        MR. STINE:  Yeah.
7    A.  Okay.
8    Q.  At the beginning of the deposition, you
9  indicated you looked at some text messages.  Was
10  this what you looked at?
11   A.  I read them in Len's deposition.
12   Q.  Okay.
13   A.  I believe I had read these text messages
14  some months ago.
15   Q.  Okay.
16   A.  Not recently.
17   Q.  Did any of these stick out as having any
18  significance to you?
19   A.  I'd have to go through them again quickly.
20   Q.  Look at the June 4, 2015 text message on
21  Page 2.
22   A.  Oh, I'm sorry.
23       MR. STINE:  June 4 or February 4?
24  BY MR. MCKENZIE:
25   Q.  June 4.

43 (Pages 166 - 169)

Tiffany Alley, A Veritext Company

Conf. 30(b)(6) Anthony Campisciano
August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 170

1    A. What year?
2    Q. On Page 2.
3    MR. STINE:  There you go.
4    A. Okay. I don't even know who's saying what
5  to who.
6    Q. Well, read -- just read the first -- just
7  read it out loud.
8    A. The June 4th text?
9    Q. Yeah.
10    A. (Reading) "Making sure you saw my text from
11  Tuesday. I received yesterday, and I'm pissed. So
12  am I. But honestly, my people don't want to force
13  legal action. I know it wasn't intentional, but I
14  can't stop this, and it's way over my head.  Sorry
15  to hear that, since I spent the past numerous years
16  giving all my business to your firm, and finally got
17  Wayne to sign you up. I'll have a conversation with
18  them also. C'mon. I feel terrible about this,
19  Andy.  Sick to my stomach. They know the
20  relationship, so that's why no lawsuit."
21    Q. So if we go back to Exhibit 40 --
22    A. Okay.
23    Q. -- and the e-mail from Len to Jerry says:
24    (Reading) "I'm good.  I spoke to Tony.
25  Thanks."

Page 171

1    A. Uh-huh.
2    Q. Did you know that, two days later, he was
3  going to text message Andy?
4    A. Of course not.
5    Q. Okay.
6    And then go down on that same page to the
7  November 18, 2015 text.
8    A. Okay.
9    Q. And read that out loud.
10    A. (Reading) "Andy, c'mon, we can't settle for
11  15 grand.  Please delete this."
12    Q. Do you know what he's referring to there?
13    A. Do I know for sure?  No.
14    Q. What do you think he's referring to?
15    A. I believe that Andy probably told Len I'll
16  offer $15,000 to you guys for this to go away, and
17  Len is telling him there's no way that they're going
18  to settle for $15,000.
19    Q. So why did he say please delete this?
20    A. I have no idea.
21    Q. Okay.
22    And then if you go to the next page,
23  February 4, 2016.
24    A. (Complies with request.)
25    Okay.

Page 172

1    Q. Do you recall some sort of conversation
2  that you had with Len Baccarro that would have led
3  to him sending this text message to --
4    A. Well, I probably explained to Len, you
5  know, what happened on the Jackson job, and that's
6  why he's telling Andy or asking Andy how could you
7  have taken the $216,000, and applied the money
8  elsewhere.
9    Q. So how do you -- how do you interpret this
10  sentence:
11    (Reading) "What proof do you have that you
12  applied the final $116K to the Cairo job?"
13    What does that -- what do you think he's
14  asking Andy there?
15    A. He's asking Andy we had already paid you
16  for the Cairo 1 job, so why are you taking $116,000
17  from the $216,000, and telling us that you're
18  applying it to Cairo, if you've already been paid
19  for Cairo months before?
20    He says, I've already paid you. You were
21  already paid for that job. So why are you telling
22  me that part of this $216,000 went to that deal?
23    Q. Right.  And then to your knowledge, there
24  wasn't any kind of written response to that?
25    A. Correct.

Page 173

1    Q. Okay.
2    Let me see why I have this marked.
3    All right.  We're finished with these.
4    Q. Okay. Now we're going to go over these --
5  all right. So that, what I just handed you, is what
6  was marked earlier today as Plaintiff's Exhibit 2.
7    A. Correct.
8    Q. What is this document?
9    A. It's evidence of property insurance. It
10  looks like Phoenix Petroleum is the insured.  It
11  lists the agency and the insurance company.  It
12  lists the dispensers and the canopy located at
13  Cairo, Georgia.  And it lists Ascentium Capital as
14  additional interest.
15    Q. And do you all -- does Ascentium Capital
16  get property -- are they added as an additional
17  insured under the borrower's property insurance?
18    A. Yes. That's one of our requirements.
19    Q. Okay.
20    A. Yeah.
21    Q. So this is just matter of course --
22    A. (Nods head affirmatively.)
23    Q. -- in your normal transactions?
24    A. Standard.
25    Q. Okay. All right.

44 (Pages 170 - 173)

Tiffany Alley, A Veritext Company
800.808.4958
770.343.9696

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 174

1    A. Who gets this? Me or you?
2    Q. Just put it --
3       MR. STINE: That stays in the middle.
4  BY MR. MCKENZIE:
5    Q. Right there.
6       MR. STINE: And the court reporter takes
7  all the original exhibits.
8  BY MR. MCKENZIE:
9    Q. Let's talk about this first, and then we'll
10 talk -- which is kind of weird, but okay.
11      Number 7.
12      MR. STINE: For the record, Plaintiff's
13 Exhibit 7?
14 BY MR. MCKENZIE:
15   Q. Yeah. Yeah. Plaintiff's Exhibit 7.
16      Now, earlier, Mr. Stine said on the record
17 that this is a document that you created; is that
18 correct?
19   A. Correct.
20   Q. And what was the purpose of you creating
21 this document? What does it show?
22   A. It shows all of the transactions that
23 Ascentium Capital did as -- financed all the Adams
24 Tank & Lift deals that Ascentium financed.
25   Q. Okay. And so tell me -- so this is -- so

Page 175

1  how many -- how many contracts?
2    A. There are 12 agreements on here, three of
3  which are Phoenix.
4    Q. Okay. Do you have any -- have you had any
5  collection issues with any of the other contracts
6  where Adams Tank & Lift was involved?
7    A. Not that I can remember.
8    Q. Okay. What does the -- if you go one, two,
9  three, four, five, six columns over, where it says
10 status, what does that mean?
11   A. "T" means the contract has been terminated,
12 which would either mean it was paid off during the
13 normal course, or it was paid off early.
14   Q. Okay.
15   A. Sometimes people want to get out of their
16 contract, they make an early payoff.
17   Q. Okay.
18   A. So "T" would be terminated. "A" would mean
19 active, meaning it's still an ongoing contract.
20   Q. So beside -- the third down is Phoenix
21 Petroleum 2116122, and beside where it says status
22 there, that says active?
23   A. Correct.
24   Q. And why does that say active?
25   A. Well, because it's not a contract that's

Page 176

1  been terminated or paid off. It's still --
2    Q. So "T" --
3    A. There still is a balance.
4    Q. So if a contract is marked "T" that's a
5  good termination?
6    A. Oh, yeah.
7    Q. Okay.
8    A. Yeah, yeah, yeah.
9    Q. Okay. And so if it says, next to that,
10 payments made 23 out of 60 on the two contracts
11 marked "T", that means they just must have made --
12   A. They paid off early.
13   Q. Okay. And do the payments made -- does
14 that payments made column indicate anything to you
15 regarding whether any of the contracts are troubled
16 loans?
17   A. No. It just tells you the amount of
18 payments made versus how many are totally -- totally
19 due.
20   Q. So does that show you how far into the term
21 of the contract?
22   A. Yeah. It tells me there 40 -- like the
23 second one down is 47 months into it. They've made
24 47 payments into a 60-month contract.
25   Q. Gotcha. And with the exception of the

Page 177

1  Phoenix Petroleum, these other customers are still
2  actively making payments to Ascentium? Is that your
3  testimony?
4    A. I'm not saying that. I don't know. I
5  haven't checked the --
6    Q. Okay.
7    A. -- if they were current or not.
8    Q. But none have come across your desk as
9  problems?
10   A. Correct.
11   Q. Okay.
12      MR. STINE: Let me ask you, do you feel
13 like this document should be treated confidential?
14 Because there are other customers listed here.
15      THE WITNESS: I would think it should be.
16      MR. STINE: Why don't we do that.
17      For the record, we're designating that
18 exhibit as confidential under the protective order
19 that our judge has entered in our case.
20 BY MR. MCKENZIE:
21   Q. All right. Now let's talk about -- thank
22 you. Well, quickly, on No. 7 --
23      MR. STINE: By the way -- I'm sorry. You
24 mentioned you were tired. Do you need a cup of
25 coffee or something?

45 (Pages 174 - 177)

Tiffany Alley, A Veritext Company

800.808.4958                                          770.343.9696

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift
August 30, 2016

**Page 178**

1    THE WITNESS: No. Let's just forge ahead.
2    MR. MCKENZIE: We're getting close.
3    MR. MCKENZIE:
4    Q. So on Plaintiff's Exhibit 7, this is a
5    discussion of the Adams -- the customers where Adams
6    Tank & Lift was involved; correct?
7    A. Right.
8    Q. Were any of these projects -- were there
9    any, that you know of, any changes or delays or
10   cancellation of any portions of any orders?
11   A. Not that I'm aware of.
12   Q. Okay.
13       All right. So let's talk about -- okay.
14   So these are different.
15   A. I have three copies of the same thing, I
16   think here. 21169156 three times. Right?
17       MR. STINE: What do you got? You know
18   what? I may have divided these up wrong. It's --
19       MR. MCKENZIE: Were there two?
20       MR. STINE: These are intended to be three
21   unique equipment finance agreements, but it's
22   possible that I handed you a stack of three of the
23   same, gave him three of the same, and kept three of
24   the same, instead of (indicating).
25       MR. MCKENZIE: Okay. I think that's what

**Page 179**

1    you did.
2        MR. STINE: Yeah. It looks like it.
3        MR. MCKENZIE: Yeah, because I have the
4    Oshun Group Inc., and you have Great Riviera of the
5    Nile (sic) or something.
6        THE WITNESS: Big River Enterprises, I
7    have.
8        MR. MCKENZIE: Or that.
9        THE WITNESS: Three times.
10       MR. STINE: And I have 100 Percent
11   Chiropractor Denver three times as well.
12       THE WITNESS: Three times, probably.
13       MR. MCKENZIE: Okay. So yeah, let's --
14       MR. STINE: All right. Let's see if we can
15   sort this out.
16       (Off-the-record discussion.)
17       MR. STINE: Okay.
18   BY MR. MCKENZIE:
19       Q. All right. So I need -- what order do you
20   have yours in? Because I need to switch mine.
21       A. Big River is first.
22       Q. Okay.
23       A. 100 Percent Chiropractic is second. And
24   the Oshun Group is third.
25       Q. All right. So let's -- I'm going to let

**Page 180**

1    you tell me about these agreements, since you
2    brought them with you.
3        So tell me what item does -- do these
4    different agreements, marked as Plaintiff's Exhibit
5    6, what items do they coincide with on the
6    Defendant's Exhibit 48, which is the 30(b)(6) notice
7    of deposition?
8        A. I'd have to look at that again.
9        Q. Okay.
10       A. Which one was it? I'm sorry.
11       MR. STINE: So he's asking we produced
12   these documents to be responsive to what portion of
13   the notice.
14       THE WITNESS: Right. But I wanted to read
15   the --
16   BY MR. MCKENZIE:
17       Q. Or just read those, and see what you think
18   is -- they address.
19       A. See which number I think they address?
20       Q. Yeah.
21       A. Okay.
22       (Off-the-record discussion.)
23       A. Number 13.
24       MR. STINE: Yeah.
25   BY MR. MCKENZIE:

**Page 181**

1        Q. Okay. Let me see that.
2        All right. Read Number 13. Well -- yeah.
3    Read Number 13 for me, and then we'll talk about
4    those.
5        A. Okay.
6        (Reading) "The facts and circumstances of
7    any transaction involving Ascentium, which may be
8    used by Ascentium to show industry standards or
9    customary business practices of an equipment
10   supplier or vendor where a customer's order was
11   delayed, changed, or canceled, and the customer's
12   borrowed funds were returned to Ascentium instead of
13   being returned to the customer or otherwise applied
14   as directed or approved by the customer."
15       Q. Okay. All right. So let's talk about
16   Equipment Finance Agreement Number 2169156.
17       A. Okay.
18       Q. And this is marked as Plaintiff's Exhibit
19   6, and is also marked by Mr. Stine as
20   confidential.
21       All right.
22       A. Okay.
23       Q. All right. So what is it about 2169156
24   that relates to Item Number 13 that we discussed?
25       A. Well, this looks like a contract that

46 (Pages 178 - 181)

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 182

1  commenced in late 2015 or -- I should say probably
2  in December of 2015.
3      Q.  For the record, is that after suit -- you
4  filed -- Ascentium filed suit against Adams Tank,
5  Andy Adams, and the --
6      A.  I'm trying to get my dates.  Yes, I believe
7  suit had already been filed --
8      Q.  Okay.
9      A.  -- by late 2015.
10     And the -- we financed $98,365 of equipment
11 for this Big River Enterprises, the vendor or
12 supplier was Electrum Corporation.
13     Q.  Okay.
14     A.  Their invoice for the $96,000.
15     And reading the notes, I don't know why the
16 deal was canceled.  I had asked for an explanation.
17 Nobody was able to answer my question, but it does
18 say that the vendor refunded our 50 percent
19 pre-fund.  We received a check directly from the
20 vendor back to Ascentium for $48,182.99 on February
21 12th, 2016.
22     So something must have happened with Big
23 River and the vendor.  I don't know what happened
24 between the two of them, but they decided not to
25 deliver the equipment, and the vendor gave us our 50

Page 183

1  percent pre-fund back, and whatever the payments the
2  customer may have made to us by that time.  It was
3  most likely only one or two payments.  I don't have
4  the payment history here.  Was refunded back to them
5  also.
6      So the deal was rescinded, or like it never
7  occurred.
8      Q.  Did you inquire as to why -- and I believe
9  you just said that you don't know why it was
10 unwound; is that correct?
11     A.  Correct.  If you look at -- on Page 1, 2 --
12 Page 5, there's an e-mail from me dated August 5th,
13 2016, to Hernon, copied to Jerry.
14     (Reading) "Hernon, we did a 50 percent
15 pre-fund in December of 2015 on the above-referenced
16 deal.  In February of 2016, the deal was unwound,
17 and the vendor refunded our 50 percent.  In Jerry's
18 absence -- "
19     And Jerry was on vacation that week.
20     (Reading) "-- can you please look into
21 Aspire -- "
22     That's one of our programs that I don't
23 have access to.  That's what the credit people use.
24     (Reading) " -- and see if there are any
25 notes or e-mails as to what transpired as to why

Page 184

1  this deal was unwound."
2      And I told him why I needed this
3  information.
4      Q.  If you look at the page immediately after
5  that --
6      A.  Uh-huh.
7      Q.  -- what is that?
8      A.  These are collection notes from our
9  collection system.
10     Q.  And do you see that Len Baccarro is
11 included with that, do you know?  Was he --
12     A.  Len was cc'd on this.
13     Q.  Would that mean he's the salesman?
14     A.  Not necessarily.  It could be -- remember,
15 Len is head of several salesmen.
16     Q.  Okay.
17     A.  I believe he has five, six, seven salesmen
18 under him, in addition to being a salesman himself.
19 It's possible that Len was included, because this
20 was a deal that one of his salesmen under him
21 originated.
22     Q.  Okay.  All right.
23     Do you know if there was any type of
24 penalty applied to the customer in order to unwind
25 the deal or rescind the agreement?

Page 185

1      A.  I do not know.
2      Q.  Okay.
3      All right.  Let's look at the second
4  agreement, which is Equipment Finance Agreement
5  Number -- oh, excuse me.  Let's go back to this one.
6      Now, if I look at this form -- sorry.
7  We're back at the --
8      A.  That's okay.
9      Q.  -- Big River Enterprise.  This is Agreement
10 Number 2169156.  In the bottom left corner of this
11 equipment finance agreement, it appears it states
12 140120151211; is that correct?
13     A.  That's what it looks like without my
14 glasses.  Yes.
15     Q.  Okay.  And what does that mean to you?
16     A.  I don't know what the 1401 means.  I'm --
17 I'm guessing that the 2015 is the year, and 1211 is
18 the month and date that this agreement was -- came
19 into effect.  I guess it was a revision of a prior
20 agreement.
21     Q.  Okay.
22     A.  That, to me, is a date down there, the
23 20151211.
24     Q.  Okay.  Now, on this equipment finance
25 agreement, do you see anywhere on here the language

47 (Pages 182 - 185)

Conf. 30(b)(6) Anthony Campisciano                        August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 186

1  that applied to our agreements stating that they
2  were non-cancellable agreements?
3     A. I don't, and the reason I don't is because
4  I can't read it. Sorry.
5     Q. Is that the reason, or is it because it's
6  not there?
7     A. No, I really cannot read this fine print.
8     Q. Let's see.
9     A. I see a sentence here that says this EFA is
10 irrevocable.
11    Q. Where is that?
12    A. On the left-hand side about the middle of
13 the way down, all the way on the left-hand margin,
14 "This EFA is irrevocable."
15    See it, Kevin?
16    MR. STINE: Yeah.
17    A. And then read on.
18    Q. Your obligation -- okay.
19    So what -- can you decipher that in any
20 way?
21    A. Well, it's sort of like it says that the
22 payments have to be made no matter what.
23    Q. What does it actually say?
24    A. (Reading) "Your obligation -- "
25    If I can read it.

Page 187

1     (Reading) "Your obligation to pay any -- to
2  pay all amounts payable hereunder is absolute, and
3  unconditional, and will not be -- "
4     I can't read that.
5     (Reading) " -- subject to any reduction."
6     I can't read it. It's too small.
7     Q. That's okay.
8     A. I'm sorry.
9     MR. STINE: Looks like it says:
10    (Reading) "To set off Defendant's
11 counterclaim, deferment, or recoupment for any
12 reason."
13    A. Right. Now that you say the words, I could
14 decipher them.
15    Q. Okay.
16    MR. STINE: We're going to work on your
17 company's choice of font.
18    MR. MCKENZIE: Maybe when you get done with
19 this litigation, you can --
20    THE WITNESS: Afford a new scanner.
21    MR. MCKENZIE: Give him a scanner.
22    MR. STINE: I just say bigger type.
23    THE WITNESS: Oh, my God.
24    MR. STINE: Everybody likes to fit their
25 agreements on one page. You know?.

Page 188

1     THE WITNESS: Yeah. This one's even worse.
2  BY MR. MCKENZIE:
3     Q. Yeah. Okay. Now, this is -- the next one
4  I have in my stack is Equipment Finance Agreement
5  Number 2176594. This is still part of Plaintiff's
6  6; correct?
7     A. Correct.
8     Q. Okay. Now, this debtor is -- appears to be
9  100 Percent Chiropractic Denver, LLC?
10    A. Looks like Denver 1 or Denver 5.
11    Q. Five or something? Okay. Now --
12    A. Denver 5.
13    MR. STINE: If you work your way through
14 the exhibit, there's a more legible --
15    THE WITNESS: Yeah.
16    MR. STINE: -- description of the debtor.
17    MR. MCKENZIE: Okay. At the end? Okay.
18 BY MR. MCKENZIE:
19    Q. All right. So tell me why you included
20 this as part of Plaintiff's Exhibit 6?
21    A. Can I just go through it quickly, please?
22    Q. Yeah.
23    A. It appears that this is another agreement
24 that went on the books around March of 2016. Not
25 very long ago. Let's make sure I got the month

Page 189

1  correct. Where there were two suppliers involved.
2  One was Biokinemetrics. There's an invoice for
3  $14,450, and the other supplier was Custom X-ray
4  Digital. There's an invoice for $13,650. And the
5  Biokinemetrics vendor gave us back our entire
6  $14,450.
7     Q. Wait. You got a --
8     A. Check from them to Ascentium.
9     Q. All right. So where are you in all this?
10    A. I'm sorry.
11    Q. That's okay.
12    MR. STINE: Keep looking at the pages.
13 It's got two checks.
14    A. Further back.
15    MR. STINE: See mine?
16    A. After the two -- that's one invoice.
17    Q. Okay.
18    A. That's the second invoice. The second
19 supplier.
20    Q. Refund check. Is this handwriting at the
21 bottom of these checks your handwriting?
22    A. Yes. Where it says two refund checks from
23 vendors. That's my handwriting.
24    Q. Yeah. That looks familiar.
25    A. So on the first vendor, for the $14,450, it

48 (Pages 186 - 189)

Page 190

1 looks like we funded him 100 percent at the
2 beginning, in March of 2016, and on the Custom X-ray
3 vendor, we fund what looks like a 50 percent
4 pre-fund of $6825, because that's half of their
5 invoice of $13,650.
6     So -- and then we attach, after that,
7 there's a copy of the verbal verification, where the
8 customer is authorizing us for the funding.
9     And the last three pages are copies of --
10 out of our collection note system. The third page
11 from the last, the collection note dated May 9th.
12    Q. All right.
13    A. There's an e-mail from Brian Abell. He's
14 one of our customer service reps to Bob Fisher. I
15 believe he was the salesperson on this deal. It
16 pertains to this customer.
17    (Reading) "Hey, Bob, the customer called in
18 stating that his loan was canceled. Do you know
19 anything about this?"
20    Q. So when he says the customer called in
21 stating his loan was canceled, does he mean the
22 borrower?
23    A. Yes.
24    Q. So in this case, the borrower told
25 Ascentium that it wanted to cancel the loan? Is

Page 191

1 that what happened in this case?
2    A. Yes. And it was maybe less than 60 days
3 after the deal went on the books. It was very early
4 in the process.
5    Q. And when he says the customer called in
6 stating his loan was canceled, do you know what --
7 what allowed a customer to be able to just cancel
8 his loan?
9    A. I do not know.
10    Q. Okay. And then how -- how was the vendor
11 informed that the loan was canceled, and that it
12 needed to refund Ascentium?
13    A. I do not know.
14    Q. Okay.
15    A. I can make an assumption, but I don't know.
16    Q. All right. Well, what's your assumption?
17    A. My assumption is that Bob Fisher, the
18 salesman, called both of the vendors, and said the
19 customer doesn't want to go through with the deal.
20 The equipment, I guess, he couldn't get the
21 equipment in time, or it wasn't what he thought it
22 was going to be, and he wanted to cancel it.
23    Q. If we go back to the Big River Enterprises
24 deal --
25    A. Okay.

Page 192

1    Q. -- do we know who contacted Ascentium that
2 that deal was canceled?
3    A. I do not.  No.
4    Q. Okay.
5    All right.  The next one is -- okay.  The
6 next one is Equipment Finance Agreement Number
7 2171292.  The customer is the Oshun Group, Inc.; is
8 that correct?
9    A. Correct.
10    MR. STINE: It's spelled O-S-H-U-N.
11    A. Yeah.  That's correct.  Oshun, I guess, or
12 Oshun.
13    Q. All right.  So review this, and then we'll
14 talk about why you brought this with you.
15    A. This looks like another deal that was only
16 on the books for a month or two, and the customer
17 advised that they did not want to go through with
18 it, and this one, we also received a full refund
19 from the vendor.
20    Q. And when did this agreement commence?
21    A. I don't have an exact date.  It looks like
22 it was early in 2016.  Probably January of 2016.
23    Q. What -- if you go to the 7th to the last
24 page, it's the beginning of the collection notes, I
25 believe.

Page 193

1    A. Notes?  Okay.
2    Q. Yeah.
3    A. Okay.
4    Q. Under where it says payoff quote, read
5 that, and explain that to me.
6    A. This is an automated -- if somebody calls
7 in, and wants a payoff quote, and it looks like
8 somebody did on January 20th, somebody meaning the
9 customer, the debtor, they punch the account number
10 into the accounting system.  It spits out a payoff
11 figure.
12    In this case, the payoff figure was, on the
13 first Line, $16,689.  All of this other verbiage
14 down here is this is a template.
15    Q. Okay.
16    A. So the only thing that populates in an
17 e-mail or a payoff quote, such as this, is the
18 figure.
19    Q. Okay.
20    A. And the date as to when it's good through.
21    Q. Okay.  Are there any collection notes like
22 this for the Phoenix deals?
23    A. Collection notes?
24    Q. Like this?
25    A. Yes.

49 (Pages 190 - 193)

Conf. 30(b)(6) Anthony Campisciano                                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 194

1    Q. There are?
2    A. Yes.
3    Q. Have those been provided?
4        MR. STINE: I don't think so.
5        MR. MCKENZIE: I don't think so either.
6        MR. STINE: Are you asking for a copy?
7        MR. MCKENZIE: If you have those. Yeah.
8    BY MR. MCKENZIE:
9    Q. Is there anything else you're hiding under
10   a rock? I'm just kidding. Okay. Let's see.
11       All right. So the next collection note,
12   what is that about?
13   A. What's the date on it? I'm sorry.
14   Q. It's January 20th, 11:34 a.m.
15   A. Oh. This is Patrick Small, who's a
16   salesperson e-mailing our customer service
17   department, can you please send along a payoff to
18   Sandra Weise.
19   Q. Okay.
20   A. He's asking for the payoff, and then, as
21   you could see five hours later, that's when the
22   payoff was sent.
23   Q. All right. So then if we look at the next
24   page at the bottom, there appears to be an e-mail
25   from Sandra Weise, January 20, 2016, 5:44 p.m.

Page 195

1        Do you see that? There's a little arrow
2    pointing to it.
3    A. Yes, I see it.
4    Q. Is Sandra Weise the customer?
5    A. Yes.
6    Q. Okay. So read that.
7    A. Hold on. Hold on. Let me check. That may
8    be the vendor.
9        She's the customer. She signed the
10   contract.
11   Q. Okay. So read that e-mail out loud.
12   A. This is from Sandra to Ascentium, copying
13   Patrick Small, who was the salesperson. I'm not
14   sure who Rachel Stone is.
15       (Reading) "I just faxed the number provided
16   on Finance Agreement 2171292."
17       Oh, I know who this is to. It went to
18   Ascentium Assurant. Assurant is the insurance
19   company we use.
20   Q. Okay.
21   A. If somebody doesn't provide insurance.
22   Remember? And we provide force insurance if they
23   don't cover the equipment, and then we'll bill them
24   for the premium. Assurant.com is the company we use
25   for the forced insurance.

Page 196

1        So this is the customer writing to our
2    insurance people.
3        (Reading) "I just faxed a number provided
4    on Finance Agreement 2171292 to decline your
5    coverage, and have provided my own certificate."
6        So in other words, they're telling us they
7    have their own insurance.
8    Q. Okay.
9    A. But then she goes on to say:
10       (Reading) "I will never take possession of
11   stated equipment, as it is being returned and
12   refunded, and this account will be paid off in full
13   as soon as a refund is received."
14   Q. What does that mean?
15   A. I'm not sure. I think what she means is,
16   Ascentium will be made whole once the vendor returns
17   the funds to you. I think that's what she means.
18   It'll be paid in full, meaning Ascentium will get
19   their money back, and that will be it.
20   Q. Be done.
21   A. And I will never have this equipment.
22   Q. Okay. So then the e-mail right above that,
23   January 28th --
24   A. Right.
25   Q. -- from Ascentium Assurant to customer care

Page 197

1    at Ascentium.
2    A. Correct. That's the insurance company to
3    our customer service department.
4    Q. All right. And what does that say?
5    A. (Reading) "Regarding this agreement, per
6    customer, is returning the equipment. Please
7    advise."
8        In other words, the insurance people want
9    to know what they should do.
10   Q. So this is the first time that the
11   collection or customer care folks at Ascentium know
12   that the customer wants to return the equipment?
13   A. It looks that way. Yes.
14   Q. Okay.
15   A. And then customer service e-mails the
16   salesman, Patrick Small.
17   Q. To actual people?
18   A. Right.
19   Q. Okay.
20   A. (Reading) "Please see below communications
21   from the insurance department." So.
22   Q. Okay. All right. So then -- all right.
23   So then the next -- the next page, I think, is just
24   like the end of the e-mail. And then this goes --
25   A. Correct. Correct.

50 (Pages 194 - 197)

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

---

Page 198

1    Q. All right. So -- so read these e-mails on
2  this page, and then we can talk about what's going
3  on.
4    A. So which page are you on? Which e-mail?
5    MR. STINE: Second to the last page?
6    MR. MCKENZIE: Yes. Kevin.
7    A. The one on 1/29/16 at 10:54 a.m.?
8    MR. STINE: Yeah.
9    A. Where it says insurance resolved. Up at
10  the top?
11    Q. 10/24 --
12    A. I'm not sure which one you're on.
13    Q. Oh, yeah, yeah, yeah. That's the one. I'm
14  sorry. Yes. If you start at the bottom.
15    A. Yeah.
16    Q. No, you started -- I don't know -- they're
17  all out of whack.
18    A. They are out of whack.
19    MR. STINE: How come it's like 11:18 a.m.,
20  10:07 a.m., and then 10:24 a.m.? Like they're not
21  in chronological order.
22  BY MR. MCKENZIE:
23    Q. All right. Well, let's go in chronological
24  order.
25    MR. STINE: Well, just for clarification,

---

Page 199

1  is it possible that the -- that the time stamp is
2  affected by the time zone? So if somebody from
3  Texas, for example, is e-mailing somebody on the
4  east coast?
5    THE WITNESS: I don't believe it is.
6    MR. STINE: Okay.
7    MR. MCKENZIE: That was a clever thought,
8  though.
9    MR. STINE: Well, yeah.
10  BY MR. MCKENZIE:
11    Q. All right. Well, to make matters more
12  confusing, up to the very last page, because there's
13  an e-mail that's dated January 28th.
14    A. Okay.
15    Q. Read that, and then we can talk about that.
16    A. Okay. This is from --
17    Q. Just read it out loud. It's so short.
18    A. (Reading) "Hello. Please find attached a
19  faxed note from the customer stating that they do
20  not have the equipment in their possession, and
21  never will. Please advise how you wish for us to
22  proceed. If you have any questions, feel free to
23  contact. Et cetera, et cetera, et cetera."
24    Q. Okay. So that's -- that is an e-mail from
25  Ascentium Assurant to Kim --

---

Page 200

1    A. McAnarney.
2    Q. -- McArnarney and Jerry Noon; is that
3  correct?
4    A. Correct.
5    Q. Okay. So now let's go to the page right
6  before it.
7    A. And that was the afternoon of January 28th.
8    Q. Okay. And this is the following day. So
9  --
10    MR. STINE: Oh, I figured it out.
11    MR. MCKENZIE: What?
12    MR. STINE: Did you figure it out? The
13  time difference? So -- so the last page is the
14  e-mail on January 28th from Ascentium Assurant to
15  Kim McAnarney. And then the second to last page,
16  this is where she forwards that message to Patrick
17  Small, the salesman.
18    THE WITNESS: Right.
19    MR. STINE: And then when he replies, he
20  replies at the very top.
21    MR. MCKENZIE: Gotcha.
22    MR. STINE: He replies:
23    (Reading) I pasted in the response I sent
24  along earlier."
25    So this is him cutting and pasting --

---

Page 201

1    MR. MCKENZIE: Gotcha.
2    THE WITNESS: An earlier e-mail from 14
3  minutes earlier.
4    MR. STINE: Yes.
5    THE WITNESS: There you go.
6    MR. MCKENZIE: Genius.
7  BY MR. MCKENZIE:
8    Q. All right. So let's read -- okay. Read
9  Patrick Small's pasted response.
10    A. Okay.
11    (Reading) "I spoke with the customer the
12  day that this communication took place. She had met
13  with her accountant, and was frustrated by many
14  things regarding our documentation. Specifically
15  not providing a rate on the docs, paren, similar to
16  her personal loans, close paren. I explained how
17  commercial finance agreements are structured, and
18  she did not like my explanation. I have spoken with
19  the vendor this week, and they currently have her on
20  the install schedule. They haven't heard from her
21  since last Wednesday."
22    Q. Okay. Does that indicate to you that the
23  customer told Ascentium that it wanted to cancel the
24  agreement?
25    A. Yes.

---

51 (Pages 198 - 201)

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

Page 202

1    Q.  And then that Ascentium reached out to the
2  vendor regarding it refunding the money?
3    A.  Yes.
4    Q.  Okay.
5      MR. MCKENZIE:  If you all want to, can we
6  take like a five-minute break?
7      THE WITNESS:  Sure.
8      MR. MCKENZIE:  I want to look at my notes,
9  and just make sure there isn't some things that I
10  wanted to ask you about.
11      THE WITNESS:  Okay.
12      MR. MCKENZIE:  And we are almost finished.
13      (Recess 4:50 p.m. - 5:02 p.m.)
14  BY MR. MCKENZIE:
15    Q.  So are you able to provide any information
16  regarding the policies and procedures of Ascentium
17  related to funding projects?
18    A.  Not really.  No.
19    Q.  Are you able to or are you familiar with --
20  familiar enough with the policies and procedures
21  related to oversight of finance projects after
22  they're funded?
23    A.  I'm not sure.  What do you mean by
24  oversight of?
25    Q.  Well, like are you familiar with

Page 203

1  Ascentium's policies, procedures, practices related
2  to oversight of ongoing projects to make sure
3  projects are proceeding --
4    A.  Definitely not.
5    Q.  -- as per the agreement?
6    A.  Definitely not.
7    Q.  Okay.  So who would be the person in
8  Ascentium that would be most familiar with those
9  subjects?
10    A.  That would be the salesperson and the
11  vendor service rep.  As I said, they get the
12  documents in, the vendor service reps, and then they
13  move the deal along toward the funding.  The booking
14  and the funding of the deal.
15    Q.  Okay.
16    A.  So they would be the people following the
17  deal along as it goes.
18    Q.  How about policies and procedures related
19  to oversight of sales representatives, and also
20  Ascentium's communication with the borrowers during
21  the course of the project?  Who would be familiar
22  with those?
23    A.  The salesperson.
24    Q.  The same two salespersons and --
25    A.  And VSR, Vendor Service Rep.

Page 204

1    Q.  How about the Ascentium's policies,
2  procedures, and practices relating to perfecting
3  security interests in collateral?
4    A.  That's not in my scope of work either.
5    Q.  Who would be that?
6    A.  The VSR would also get those.  Those are
7  the people who file the UCCs.
8    Q.  Is the VSR, is that Lon Thompson?
9    A.  Lon is head of a group of people that are
10  VSRs.
11    Q.  Is Maria Negri a VSR?
12    A.  She is a VSR, but she works out of the
13  Jersey office where Len is located.
14    Q.  Is Steve Shabazian a VSR?
15    A.  No.  Steve is, I believe, a salesperson
16  under Len.
17    Q.  Okay.
18      Okay.  And how about policies and
19  procedures, practices of Ascentium related to credit
20  and loan approval decisions?
21    A.  That's not in my scope of work either.
22    Q.  Who would be that?
23    A.  Hernon Traversone.  As I said before, he's
24  head of credit risk.  And then he has several people
25  under him in the credit department, all at various

Page 205

1  different levels.  Credit approval, et cetera.
2    Q.  And then policies, procedures, and
3  practices related to debt collection efforts.  That
4  would be --
5    A.  That's me.
6    Q.  Okay.  And we've talked about a lot of
7  those today?
8    A.  Yeah.
9    Q.  And how about Ascentium's practices,
10  policies, procedures related to financing options
11  for gas, C-store, and car wash projects, which are
12  similar to the projects that are the subject to
13  Plaintiff's complaint?
14    A.  Not in my scope of work.
15    Q.  Who would that be?
16    A.  For that type of business, I would say it
17  would be Len.
18    Q.  Okay.
19    A.  I mean Len doesn't make the policies and
20  procedures, if that's what you're asking me.  Len
21  implements the policies and procedures.
22    Q.  Who makes the policies and procedures?
23    A.  People higher up than Len.  The CEO, the
24  CFO.  I guess the board of directors.
25    Q.  Is that like Len's brother?

52 (Pages 202 - 205)

Tiffany Alley, A Veritext Company

Conf. 30(b)(6) Anthony Campisciano          August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 206

1    A.  Richard Baccarro is higher in the company
2  than Len.  He's -- yes.  He's --
3    Q.  Does he make policies and procedures?
4    A.  I don't know for sure.
5    Q.  Are you aware of -- well, would you be able
6  to testify regarding the sale or assignment of any
7  of the equipment financing agreements?
8    A.  No, I would not.
9    Q.  So who -- who would be the person that
10  would know that information?
11    A.  Brian Wheeler.
12    Q.  Who is Gary Houchins?
13    A.  Gary is a credit person under Hernon.  He's
14  in the credit department.
15    Q.  And that's H-O-U-C-H-I-N-S?
16    A.  Correct.
17    Q.  So -- okay.
18      And then are you familiar with the policies
19  and procedures related to standard documents and
20  correspondence Ascentium uses with borrowers at the
21  initiation of transactions?
22    A.  No, I'm not.
23    Q.  You're not?
24    A.  No.
25    Q.  The ones we talked about earlier today?

Page 207

1  The finance agreements and --
2    A.  Can you repeat the question, then?
3    Q.  Yeah.
4    A.  I may have misunderstood you.
5    Q.  I was asking if you're familiar with the
6  policies, procedures, practices, and the standard
7  documents related to the, you know, the form
8  documents that you all have, and the correspondence
9  associated with the transactions, like the ones
10  involved in our case.
11    A.  Yeah, I'm familiar with the documents
12  itself.  I wasn't sure that's what you were asking
13  before.
14    Q.  But you don't know why certain terms --
15    A.  I thought you meant the drafting of the
16  documents.  No, I'm familiar with the documents once
17  they come back and are executed.
18    Q.  Do you know why certain terms are in those
19  documents or the significance of certain terms?
20    A.  Not really.
21    Q.  Okay.
22    A.  I mean, you know.
23    Q.  So who would be that person?
24    A.  Whoever drafted the document.  I would
25  assume our general -- our in-house general counsel,

Page 208

1  I'm sure.
2    Q.  So you all do have like an in-house general
3  counsel?
4    A.  We do have an in-house general counsel, and
5  I'm sure he had a lot to do with the drafting of the
6  verbiage of all the documents.
7    Q.  Okay.  And these are all subject matters
8  that we just discussed from Number 14 in the
9  30(b)(6) notice of deposition, which was provided as
10  Defendant's Exhibit 48.
11    A.  Okay.
12    Q.  Okay.  So -- okay.
13      See if you know this.  At what point in a
14  project do the Ascentium salesmen get paid?
15    A.  It's when the deal is booked.  And what I
16  mean by that is, the vendor is funded, the deal goes
17  into the computer system, and we start the billing.
18  That's what we call the booking.  It's the final
19  process.
20    Q.  So is that -- is that standard practice in
21  the industry?
22    A.  Yes.
23    Q.  From a --
24    A.  Well, let me back up.  I believe for the
25  majority of the finance companies it is.  Obviously,

Page 209

1  for Ascentium it is, and for Studebaker, when I was
2  with them, that's the way it worked.  As soon as the
3  deal is booked, the commission goes to the
4  salesperson.  I can't say 100 percent --
5    Q.  Okay.
6    A.  -- across the industry, though.
7    Q.  So from a collection guy standpoint, does
8  that create problems that you see on the back end?
9    A.  Not at all.
10    Q.  It doesn't?
11    A.  No.
12    Q.  Okay.  Does that create a situation where
13  the salesmen don't pay attention to the job?
14    A.  I wouldn't -- I wouldn't know.
15    Q.  Okay.  Do you know anything about the --
16  the reduced credit requirements for loans to
17  customers that are under $250,000?
18    A.  I know some about -- somewhat about it,
19  yes.
20    Q.  Do you know why Ascentium does that?
21    A.  My belief is that they want to turn around
22  the credit decisions as quickly as possible, because
23  vendors -- suppliers and vendors are like that.
24  When they submit an application, they don't want it
25  to sit at the finance company for three days before

53 (Pages 206 - 209)

Tiffany Alley, A Veritext Company

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 210

1  they get an answer for their customer, whether
2  they're approved or not.
3        So by Ascentium doing -- reducing
4  information that we need to do a deal under
5  $250,000, it gets -- it gets turned around in a
6  matter of hours.
7     Q. Do you see a higher percentage of -- do you
8  see a higher percentage of troubled loans come out
9  of that under $250,000?
10    A. I haven't noticed.
11    Q. Okay.
12    A. Not to my -- not to my knowledge.
13    Q. And to your knowledge, how many deals has
14 Ascentium financed with Ataollah Masoodzadehgan,
15 Phoenix Petroleum, Great American Travel, Falcon, or
16 any of his entities?
17    A. Three.
18    Q. Three?  And just the three that are the
19 subject matter of our lawsuit?
20    A. Correct.
21    Q. Okay.  That's what I thought.
22        Are projects, just based on your knowledge,
23 are projects, like the one that's the subject matter
24 of our lawsuit, are those ever complete at the time
25 of funding in the time that the equipment finance

Page 211

1  agreements are executed?
2     A. Generally not.
3     Q. So do the invoices that you get from the
4  vendor -- well, first off, do you always get -- does
5  Ascentium always get invoices from the supplier, or
6  do they sometimes get those from the customer?
7     A. No.  They get them from the supplier.
8     Q. Okay.
9     A. The vendor.
10    Q. And are those typically -- did those
11 invoices typically show equipment or services that
12 will be provided in the future?
13    A. Correct.
14    Q. Okay.
15        Were those projects that were produced as
16 Plaintiff's Exhibit 6 that we discussed earlier,
17 were those the only deals you could think of that
18 had been unwound, and the vendor returned money to
19 Ascentium?
20    A. I didn't think of them.  I had asked my
21 boss, Jerry, if he had any off the top of his head
22 that he could think of.
23    Q. Okay.
24    A. This was a couple of weeks ago.
25    Q. Gotcha.

Page 212

1     A. He said, well, here are three examples,
2  just off the top of my head.
3     Q. Okay.
4     A. So that's where he got those from.
5     Q. If Ascentium sold any of the loans that are
6  the subject matter of the complaint, would you know
7  that?
8     A. I don't know it at the time they're sold,
9  but...
10    Q. Would you know that now?
11    A. Sure.
12    Q. Okay.  Have you ever had a conversation or
13 e-mail or text message or anything with -- other
14 correspondence with anybody from Phoenix Petroleum?
15    A. Have I ever spoken to anyone at Phoenix?
16    Q. Yeah.  Have you ever had any communication
17 with anybody from Phoenix?
18    A. I believe I have.
19    Q. And do you remember who that was?
20    A. I know it was not Ataollah.  I've never
21 spoken or --
22    Q. Do you recall if it was Ed Schuler?
23    A. I do not recall.
24    Q. Have you spoken to Maria Negri about these
25 transactions?

Page 213

1     A. Yes.
2     Q. And what did she have to say?
3     A. I was asking her to look back at her
4  e-mails to see if there were any e-mails between her
5  and Andy Adams.
6     Q. Okay.
7     A. Going way back regarding delivery of
8  equipment, et cetera, et cetera.
9     Q. Did Maria indicate anything she thought
10 happened with these transactions?
11    A. I can't remember.
12    Q. Okay.
13    A. This was a while ago.
14    Q. Did you talk to Gary Houchins about this?
15    A. I did not.
16    Q. Okay.  Have you talked to him at all about
17 the lawsuit or anything?
18    A. I have not.
19    Q. Okay.  Do you know why some deals are
20 funded 90 percent up front and 10 percent on the
21 back end, as in our case, versus 50 percent up
22 front, and 50 percent on the back end?
23    A. It has to do with the strength of the
24 vendor or supplier, how we view them, because when
25 we do business with any vendor, we always run a

54 (Pages 210 - 213)

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 214

1   credit report on the company, see how long they've
2   been around, if they're reputable, whatever.  So I
3   think that they -- I think that our credit
4   department puts them into categories, a tier one,
5   tier two, tier three.  Tier ones would be to get the
6   best treatment such as Adams Tank & Lift.  They get
7   funded 90 percent up front, 10 percent shortly
8   thereafter, and-- well, sometimes 100 percent up
9   front.
10      Q.  So does -- is it fair to say Ascentium uses
11  the funding percentages as a way to kind of hedge
12  risk?
13      A.  Yeah.  Because if they feel like they have
14  a risky vendor, they may pre-fund at nothing.
15      Q.  Okay.
16      A.  To make sure everything is in, and
17  installed, the customer is happy, before they let a
18  penny go out the door.
19      Q.  Gotcha.  Is it common for Ascentium to
20  enter into and execute these equipment finance
21  agreements with borrowers that they never see
22  personally?
23      A.  Sure.
24      Q.  Okay.  Do you know whether Phoenix
25  Petroleum was a strong credit package?

Page 215

1       A.  I do not know.
2       Q.  Okay.  What does it take to -- we talked
3   about some examples where a deal was unwound.  What
4   does it take for Ascentium to unwind one of these
5   deals?  I mean, what -- how big of a process is
6   that?
7       A.  I really don't know, because we don't do it
8   all that often, but it would have to happen early in
9   the game, so to speak, where only one or two or
10  maybe three payments were made by the customer.  And
11  everybody would have to be in agreement to do it.
12      The vendor would have to tell us, I'll give
13  you 100 percent of your money back.  I haven't
14  delivered a thing.  The customer would say, I made
15  two payments.  Are you giving those back to me?  And
16  Ascentium would say yes.
17      They get their two payments back, the
18  vendor gives us back our full amount of whatever we
19  had funded them.  Everybody goes away.  It's, in
20  effect, rescinded.
21      Q.  Okay.
22      A.  Like it never happened.  Everyone's made
23  whole in a situation like that.  And again, it's
24  always early in the process.
25      Q.  And is -- and why -- do you know why

Page 216

1   Ascentium will do that for borrowers?
2       A.  I think we do it -- I can't answer the
3   question.  I don't know.
4       Q.  Well, why do you think?
5       A.  I think we do it more to keep the vendor
6   happy, because our relationships, you know, are
7   vendor driven.  Our business is driven by the
8   vendors.  The suppliers, they're the ones who bring
9   us the business.
10      So if we have a good relationship with the
11  vendor, and he doesn't have -- if he's never
12  delivered anything, we shouldn't have an issue
13  giving us back our money.
14      Q.  Right.
15      A.  Especially if we've already paid him for
16  something that he can't deliver.
17      Q.  So do you know if there is a written or
18  implied policy relating to how long a project can go
19  without final funding?
20      A.  I do not know.
21      Q.  Okay.  Do you know if the initial Cairo --
22  the Cairo 1 and 2 were split into two projects so
23  that one of them -- one or both of them could be
24  sold separately?  Do you know if that was ever
25  discussed?

Page 217

1       A.  That was the case, from what I understand.
2   Yes.
3       Q.  Okay.
4       All right.  Are there any other documents
5   that you can think of during the course of this
6   deposition that we don't have that you might should
7   get Kevin to give me?
8       A.  The only thing that comes to mind is what
9   you mentioned before.
10      Q.  Okay.
11      A.  The collection notes.
12      Q.  Okay.
13      Did you provide all the Ascentium documents
14  to Mr. Stine?
15      A.  What?  Collection notes?
16      Q.  Or just -- did you -- when we sent him the
17  document request --
18      A.  Uh-huh.
19      Q.  -- did you provide all the documents?  Are
20  you his contact at Ascentium?
21      A.  Yes.  I think I probably provided 90
22  percent of the stuff.
23      Q.  Okay.
24      A.  And maybe Jerry sent him some stuff.
25      Q.  Gotcha.

55 (Pages 214 - 217)

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 218

1    A. Maria maybe, but I would have done most of
2 it.
3        Q. So you would be the guy to know if there's
4 something lingering out there --
5    A. Correct.
6    Q. -- that we don't have?
7        Okay.
8        Do you know what Len Baccarro's -- like how
9 he gets paid, and how much he gets paid?
10   A. I have no -- no idea.
11   Q. Okay.
12   A. Couldn't even take a stab at it.
13   Q. Do you ever come across deals where an
14 equipment supplier will refund a customer a deposit
15 it paid after financing?
16   A. No. Never.
17   Q. Okay. Do you know Dave Lacowl (phonetic)
18 or Alex Davinivitis (phonetic) at Wayne?
19   A. I do not.
20   Q. You don't?
21       Do you know or have you ever spoken to Ted
22 Racagli (phonetic) or Brad Perrier (phonetic) at
23 Mansville Oil (phonetic)?
24   A. No.
25   Q. Who's Scott Linton?

Page 219

1    A. I believe Scott Linton, at one time, was a
2 salesperson.
3    Q. At Ascentium?
4    A. At Ascentium. I do not believe he's any
5 longer with the company.
6    Q. And I think you mentioned earlier. You
7 did. Have you ever spoken to John Kennedy,
8 Phoenix's receiver?
9    A. It was either Mr. Kennedy or -- is he the
10 receiver?
11   Q. Yeah. John Kennedy is the receiver.
12   A. Who's the attorney for the --
13   Q. Jack Nichols.
14   A. I think I've spoken to both of them.
15   Q. Okay.
16   A. But I think most of our conversations was
17 with the attorney, Mr. Nichols.
18   Q. And what --
19   A. Early on in the game, when we first learned
20 about the receivership.
21   Q. Okay. And so was that during the time
22 period you were investigating what happened?
23   A. Correct.
24   Q. Okay. And we had -- we talked about that
25 earlier.

Page 220

1    A. Correct.
2    Q. All right.
3    A. Don't tell me. Is that it?
4        MR. MCKENZIE: Finished.
5        THE WITNESS: All right. Terrific.
6        MR. MCKENZIE: Thank you very much for all
7 of your time.
8        (Thereupon, the deposition concluded.)
9        (Signature reserved.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 221

1    The following reporter and firm disclosures were
2 presented at this proceeding for review by counsel:
3
         REPORTER DISCLOSURES
4
    The following representations and
5 disclosures are made in compliance with Georgia Law,
more specifically:
6
    Article 10(B) of the Rules and Regulations
7 of the Board Of Court Reporting (disclosure forms)
OCGA 9-11-28(c) (disqualification of reporter for
8 financial interest); OCGA 15-14-37(a) and (b)
(prohibitions against contracts except on a
9 case-by-case basis).
10   - I am a certified reporter in the State of
Georgia.
11
    - I am a subcontractor for Tiffany Alley
12 Veritext.
13   - I have been assigned to make a complete
and accurate record of these proceedings.
14
    - I have no relationship of interest in the
15 matter on which I am about to report which would
disqualify me from making a verbatim record or
16 maintaining my obligation of impartiality in
compliance with the Code of Professional Ethics.
17
    - I have no direct contract with any party
18 in this action and my compensation is determined
solely by the terms of my subcontractor agreement.
19
20
21
22
23
24
25

56 (Pages 218 - 221)

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 222

1           FIRM DISCLOSURES
2          - Tiffany Alley Veritext was contacted to
   provide reporting services by the noticing or
3  taking attorney in this matter.
4          - There is no agreement in place that is
   prohibited by OCGA 15-14-37(a) and (b).  Any
5  case-specific discounts are automatically
   applied to all parties, at such time as any
6  party receives a discount.
7          - Transcripts:  The transcript of this
   proceeding as produced will be a true, correct, and
8  complete record of the colloquies, questions, and
   answers as submitted by the certified court
9  reporter.
10         - Exhibits:  No changes will be made to the
   exhibits as submitted by the reporter, attorneys, or
11 witnesses.
12         - Password-Protected Access:  Transcripts
   and exhibits relating to this proceeding will be
13 uploaded to a password-protected repository, to
   which all ordering parties will have access.
14
15
16
17
18
19
20
21
22
23
24
25

Page 223

1              CERTIFICATE
2  STATE OF GEORGIA:
   COUNTY OF FULTON:
3
           I hereby certify that the foregoing
4  transcript was taken down, as stated in the caption,
   and the colloquies, questions and answers were
5  reduced to typewriting under my direction; that the
   transcript is a true and correct record of the
6  evidence given upon said proceeding.
7          I further certify that I am not a relative
   or employee or attorney of any party, nor am I
8  financially interested in the outcome of this
   action.
9
           I have no relationship of interest in this
10 matter which would disqualify me from maintaining my
   obligation of impartiality in compliance with the
11 Code of Professional Ethics.
12         I have no direct contract with any party in
   this action and my compensation is based solely on
13 the terms of my subcontractor agreement.
14         Nothing in the arrangements made for this
   proceeding impacts my absolute commitment to serve
15 all parties as an impartial officer of the court.
16
           This the 12th day of September, 2016.
17
18
19         _Shawn E. Fleck_
20         _____
           Shawn E. Fleck, RPR, CCR #2859
21
22
23
24
25

Page 224

1       TIFFANY ALLEY, A VERITEXT COMPANY
2         FIRM CERTIFICATE AND DISCLOSURE
3
4  Tiffany Alley Veritext represents that the
   foregoing transcript as produced by our Production
5  Coordinators, Georgia Certified Notaries, is a true,
   correct and complete transcript of the colloquies,
6  questions and answers as submitted by the certified
   court reporter in this case.  Tiffany Alley Veritext
7  further represents that the attached exhibits, if any,
   are a true, correct and complete copy as submitted by
8  the certified reporter, attorneys or witness in this case;
   and that the exhibits were handled and produced exclusively
9  through our Production Coordinators, Georgia Certified
   Notaries.  Copies of notarized production certificates
10 related to this proceeding are available upon request to
   litsup-ga@veritext.com.
11
   Tiffany Alley Veritext is not taking this deposition
12 under any relationship that is prohibited by
   OCGA 15-14-37(a)and(b).  Case-specific discounts are
13 automatically applied to all parties, at such time as any
   party receives a discount. Ancillary services such as
14 calendar and financial reports are available to all
   parties upon request.
15
16
17
18
19
20
21
22
23
24
25

Page 225

1  TO: Kevin Stine
2  Re: Signature of Deponent Conf. 30(b)(6) Anthony Campisciano
3  Date Errata due back at our offices:  10/12/2016
4
5  Greetings:
6  The deponent has reserved the right to read and sign.
   Please have the deponent review the attached PDF
7  transcript, noting any changes or corrections on the
   attached PDF Errata.  The deponent may fill out the
8  Errata electronically or print and fill out manually.
9
   Once the Errata is signed by the deponent and notarized,
10 please mail it to the offices of Tiffany Alley (below).
11
   When the signed Errata is returned to us, we will seal
12 and forward to the taking attorney to file with the
   original transcript.  We will also send copies of the
13 Errata to all ordering parties.
14
   If the signed Errata is not returned within the time
15 above, the original transcript may be filed with the
   court without the signature of the deponent.
16
17
18 Please send completed Errata to:
19 Tiffany Alley Veritext
20 1075 Peachtree Street NE, #3625
21 Atlanta, GA 30309
22 (770) 343-9696
23
24
25

57 (Pages 222 - 225)

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

Page 226

1  ERRATA
2  I, the undersigned, do hereby certify that I have read the
   transcript of my testimony, and that
3
4  ____ There are no changes noted.
5  ____ The following changes are noted:
6
   Pursuant to Rule 30(7)(e) of the Federal Rules of Civil
7  Procedure and/or OCGA 9-11-30(e), any changes in form or
   substance which you desire to make to your testimony shall
8  be entered upon the deposition with a statement of the
   reasons given for making them.  To assist you in making any
9  such corrections, please use the form below.  If additional
   pages are necessary, please furnish same and attach.
10
11 Page _____ Line _____ Change _____
12 _____
13 Reason for change _____
14 Page _____ Line _____ Change _____
15 _____
16 Reason for change _____
17 Page _____ Line _____ Change _____
18 _____
19 Reason for change _____
20 Page _____ Line _____ Change _____
21 _____
22 Reason for change _____
23 Page _____ Line _____ Change _____
24 _____
25 Reason for change _____

Page 227

1  Page _____ Line _____ Change _____
2  _____
3  Reason for change _____
4  Page _____ Line _____ Change _____
5  _____
6  Reason for change _____
7  Page _____ Line _____ Change _____
8  _____
9  Reason for change _____
10 Page _____ Line _____ Change _____
11 _____
12 Reason for change _____
13 Page _____ Line _____ Change _____
14 _____
15 Reason for change _____
16 Page _____ Line _____ Change _____
17 _____
18 Reason for change _____
19
20 _____
          DEPONENT'S SIGNATURE
21
   Sworn to and subscribed before me this ____ day of
22 _____, _____.
23 _____

24 NOTARY PUBLIC
25 My Commission Expires:_____

58 (Pages 226 - 227)

Conf. 30(b)(6) Anthony Campisciano          August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

[& - 2]                                              Page 1

| & |
|---|
| **&**   1:7 6:5 7:4 |
| 11:12,16 23:23 |
| 26:18 97:23,25 |
| 111:3 122:20 |
| 130:23 163:12 |
| 164:2 174:24 |
| 175:6 178:6 214:6 |

| 1 |
|---|
| **1**   1:1 2:4 8:14,15 |
| 8:23 18:23 29:10 |
| 42:5 53:15 54:24 |
| 57:10 79:9,11 |
| 80:18,25 81:3,4 |
| 82:9 85:3,5 86:22 |
| 88:11,14 93:5 |
| 96:18,19 98:25 |
| 102:17 106:17,19 |
| 118:14 127:25 |
| 128:1 134:2 135:6 |
| 135:16 141:9 |
| 145:4 172:16 |
| 183:11 188:10 |
| 216:22 |
| **1,213.48**   69:24 |
| **1/12/15**   3:6 |
| **1/2/15**   3:5 |
| **1/21**   111:23,24 |
| **1/21/13**   111:10 |
| 113:18 |
| **1/22/13**   90:22 |
| **1/24/13**   2:19,22,23 |
| 89:10,13,15 90:24 |
| 91:13 |
| **1/29/16**   198:7 |
| **10**   1:10 4:6,8 6:18 |
| 18:23,25 28:20 |
| 41:13,18 43:9 |
| 57:10,18,21 64:21 |
| 74:21 77:18 79:12 |

87:3 102:24 103:7
116:21,22 145:5
145:19 146:18,21
153:14,16 160:4,5
164:20 213:20
214:7 221:6
**10/12/2016**   225:3
**10/24**   198:11
**10/3/14**   3:16
**10/7/14**   4:6 46:20
**100**   45:8 50:13
52:8 61:9 63:22
65:7 179:10,23
188:9 190:1 209:4
214:8 215:13
**100,000**   25:19 26:9
34:2 54:24 57:6
**1075**   225:20
**10:07**   198:20
**10:14**   1:14
**10:24**   198:20
**10:32**   3:19
**10:38**   3:6
**10:54**   198:7
**11**   1:11 4:9 5:2
105:11
**11/12**   49:4,5
**11/12/15**   2:14
**112**   2:21
**115**   2:22
**116,000**   172:16
**116k**   172:12
**118**   2:23
**119**   2:24
**11:18**   198:19
**11:34**   194:14
**11:49**   65:1
**12**   1:12 28:21
56:19 63:1 107:22
113:21 146:23
156:17,22 175:2

**12/11/15**   2:15
**1211**   185:17
**123**   1:6 7:7
**128**   2:25
**12:04**   65:1
**12th**   44:23 50:5
51:1 138:10
182:21 223:16
**13**   1:13 56:12
90:19 108:1 117:4
180:23 181:2,3,24
**13,650**   189:4 190:5
**130**   3:4
**136**   3:5
**138**   3:6
**139**   3:7
**14**   1:14 16:15 17:4
18:23,25 47:6
51:9 84:12,25
85:2 92:9 113:8
153:7 201:2 208:8
**14,450**   189:3,6,25
**140**   3:8
**1401**   185:16
**140120151211**
185:12
**144**   3:9
**147**   3:10
**148**   3:11
**15**   1:15 47:7 49:5
50:3,5,8 51:3
69:25 84:12 93:5
93:24 96:13 101:7
102:24 103:7
105:11 107:22
108:2 111:13
112:16 115:25
116:5,21,22 117:4
171:11
**15,000**   171:16,18

**15-14-37**   221:8
222:4 224:12
**150,000**   54:24
**151**   3:16
**154**   3:17
**158**   3:18
**16**   1:16 2:23 38:10
70:1 84:12 120:3
**16,689**   193:13
**160**   3:19
**1600**   1:17 6:7
**162**   3:20,22
**163**   3:23
**166**   3:12
**166,562**   71:14
**167**   3:24
**169**   3:25
**17**   1:17
**175,893.50.**   82:2
**17th**   137:9
**18**   1:18 171:7
**19**   1:19 2:11,12
145:18
**1979**   60:6,14
**1:00**   64:23
**1:15**   1:6 7:7
**1:20**   109:7,9

| 2 |
|---|
| **2**   1:2 2:5 9:2,3,9 |
| 9:18 24:24,25 |
| 26:2,4,7,8 38:19 |
| 38:25 39:16,21,22 |
| 42:5 53:16 54:25 |
| 57:5,5,14 81:2,8 |
| 81:13 93:24 96:19 |
| 111:13 113:3 |
| 115:19 118:14,16 |
| 127:25 128:1 |
| 134:2 135:6,16 |
| 145:6 169:21 |
| 170:2 173:6 |

Tiffany Alley, A Veritext Company

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

[2 - 478]

Page 2

183:11 216:22
**2,025**   87:16
**2,341**   119:17,18
**2/12/2015**   50:18
**2/24/15**   3:7 139:7
**20**   1:20 16:4 22:19
130:19 150:25
194:25
**2007**   77:4
**2008**   59:23 60:2
61:2,8,13,18 62:11
64:3
**2011**   59:25 62:10
62:12,24
**2012**   63:1,3
**2013**   53:10 54:2,20
63:1 89:2 90:8,10
111:16 114:6
115:18 118:12
120:25 123:17
126:5 127:3
128:19 129:23
**2014**   9:18 10:6
41:9 44:7 137:9
137:13 152:20
**2015**   27:6,6 44:23
49:8 51:1 137:10
138:10 139:24
141:13,18 143:2
149:24 150:6
154:10,15 166:24
169:20 171:7
182:1,2,9 183:15
185:17
**20151211**   185:23
**2016**   1:13 171:23
182:21 183:13,16
188:24 190:2
192:22,22 194:25
223:16

**20th**   149:24 150:6
193:8 194:14
**21**   1:21
**2116122**   41:24
79:5 85:7 92:16
106:10 175:21
**21169156**   178:16
**2118557**   2:21
41:25 117:13
**2118850**   2:24
41:24 76:15 120:2
124:4,10 127:21
131:25 132:9
**214,000**   74:21
**216,000**   25:7,13,17
25:20,22 26:6
28:13,18,23 41:13
72:8,13 73:8
74:25 75:1,4
148:15 172:7,17
172:22
**2169156**   4:8
181:16,23 185:10
**2171292**   192:7
195:16 196:4
**2176594**   188:5
**22**   1:22 90:19
97:17,19 130:20
151:22
**223-2207**   6:9
**22nd**   84:8 90:8,10
111:16
**23**   1:23 3:16
151:16,17,23,24
176:10
**24**   1:24 49:7 89:2
115:18 127:3
139:24
**24,000**   41:19 77:21
**240,000**   41:15
74:17 77:19

137:12,21 142:4
144:1
**24th**   84:9 118:12
**25**   1:25 97:19
106:17,19 114:6
**250,000**   209:17
210:5,9
**25th**   141:17
**264,000**   74:14 76:2
**264,748.92**   74:8
**2679**   38:10
**27th**   120:25 126:5
128:19 129:23
**28**   106:23 123:17
**2859**   1:19 223:20
**28th**   196:23
199:13 200:7,14
**29**   106:23
**2:06**   109:9
**2nd**   6:14 137:10

**3**

**3**   1:3 2:6 9:14,15
38:22 40:10,15
96:12 115:25
146:18 152:20
**3,875**   77:24
**3,875.08.**   75:8
**3/19/15**   3:9
**3/9/15**   3:8
**30**   1:12,13 2:12
8:8,17 10:14
11:10 18:15,19,22
19:24 60:18 61:4
61:7 62:19 66:23
80:5 106:25 107:8
154:10,15 180:6
208:9 225:2 226:6
**30,000**   26:13
**30309**   225:21
**30326**   1:18 6:8

**30th**   159:9
**31**   3:17 54:20
154:4,5 157:19
167:13
**3115113015**   68:23
**31201**   6:15
**31st**   53:10
**32**   3:18 158:2,3
**33**   3:19 160:17,18
**34,734**   82:14
**3414**   1:16 6:7
**343-9696**   225:22
**3625**   225:20
**37**   3:20 162:1,2
**38**   3:22 162:20,21
**39**   3:23 163:17,18

**4**

**4**   1:4 2:7 4:4 9:19
10:2 18:23 37:5
98:25 116:5 133:7
169:20,23,23,25
171:23
**4/20/15**   3:11,17
**4/30/15**   167:16
**4/7/15**   3:10
**40**   3:24 81:8
167:19,21 168:11
168:18 170:21
176:22
**40,000**   26:14
**404**   6:9
**415**   99:17
**435**   6:14
**44**   2:13
**45,291**   82:8
**46**   3:25 169:1,2
**468**   96:6,12
**469**   3:4 130:13
**47**   176:23,24
**478**   6:16

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

**[48 - accepted]**

Page 3

| | | | |
|---|---|---|---|
| **48**  2:11,14 18:14 19:6 180:6 208:10 | 109:18 110:6,15 110:18 111:13 117:21 | 132:2,3 | **9** |
| **48,182.99**  182:20 | **57**  2:20 95:23,24 | **63**  3:4 130:4,5,10 130:10 136:25 137:2 | **9**  1:9 2:5,6 4:4 8:17 141:13,18 |
| **49**  2:12 19:17,20 | 96:2 99:13 112:12 112:14,16 115:23 | **64**  3:5 136:23,24 | **9-11-28**  221:7 |
| **49,600**  81:13 | **58**  2:21 112:13,21 112:22,24 114:9 117:19,20 | **65**  3:6 138:5,6 | **9-11-30**  226:7 |
| **4:50**  202:13 | | **66**  3:7 139:1,2 | **90**  41:12 55:19 131:16 153:18 213:20 214:7 217:21 |
| **4th**  170:8 | **59**  2:22 115:12,13 115:15,25 119:14 126:14,19 | **67**  3:8 140:7,8 | |
| **5** | | **68**  2:17 3:9 144:12 144:13 | **92**  2:19 |
| **5**  1:5 4:5 8:17 10:3 10:5 38:17 43:13 43:14 46:1,6,21 101:7,10 116:16 143:11 183:12 188:10,12 | **5:02**  202:13 | **6825**  190:4 | **95**  2:20 |
| | **5:31**  1:14 | **69**  3:10 147:7,8 | **96,000**  182:14 |
| | **5:44**  194:25 | **6th**  44:7 50:3 | **98,365**  182:10 |
| | **5th**  183:12 | **7** | **9th**  190:11 |
| **5/1/15**  3:18,19,20 | **6** | **7**  1:7 4:9 11:6,13 11:20 70:19,21 71:3,6,10,15,19 72:1 82:8 106:9 174:11,13,15 177:22 178:4 226:6 | **a** |
| **5/7/15**  3:22 | **6**  1:6,12 2:12 4:7 8:8,17 10:6,9,14 11:4,10 18:15,19 18:22 19:24 69:11 70:16,22,25 71:15 81:24 180:5,6 181:19 188:6,20 208:9 211:16 225:2 | | **a.m.**  1:14 65:1 194:14 198:7,19 198:20,20 |
| **5/8/15**  3:12 | | **7/10/13**  78:5 | **abatement**  101:20 133:13 |
| **50**  2:13 44:9,10 46:2,9 50:21 72:16 73:11 84:19 107:21 182:18,25 183:14,17 190:3 213:21,22 | | **70**  3:11 61:4,6 148:22,23 | **abell**  190:13 |
| | | **71**  3:12 166:12,13 | **able**  28:25 138:13 155:10 156:7,21 157:12 182:17 191:7 202:15,19 206:5 |
| | | **74,400**  80:17,19 | |
| **500**  6:14 | | **745-2821**  6:16 | |
| **51**  2:14 47:25 48:1 50:21 72:17 | **6/1/15**  3:23 | **770**  225:22 | **abramson**  10:1 |
| **52**  2:15,15 52:19 52:20 57:7,8 | **6/2/15**  3:24 168:3 | **7th**  134:15 192:23 | **absence**  183:18 |
| | **6/27/13**  2:25 128:10 145:18 | **8** | **absolute**  101:19 133:12 187:2 223:14 |
| **53**  2:16,16 55:24 55:25 57:8 | **60**  2:23 16:10 66:23 81:5 118:3 118:4,7 176:10,24 191:2 | **8**  1:8 2:4 81:24 82:8,14,14 106:10 166:23 | |
| **54**  2:17 68:18,19 68:20 83:12 106:9 | | **8/24/15**  80:11 | **accelerated**  70:7 |
| **55**  2:18 84:19,20 84:24 92:10 108:8 109:12,16,22 110:1,13 111:9 114:10 | | **84**  2:18 | **acceptance**  91:4 104:8 108:5 117:5 117:8 128:5,9,13 128:17 135:11 |
| | **60,192**  70:4 | **88**  76:3 | |
| | **60,192.28.**  69:22 | **88,855.42.**  75:23 | |
| | **61**  2:24 119:23,24 120:1,12 126:21 127:11 129:9 | | **accepted**  100:8 103:23 104:6 105:3,5 133:25 135:2 |
| **56**  2:19 92:21,22 92:23 93:5 96:13 99:15 106:12 107:21 109:12,17 | | | |
| | **62**  2:25 128:22,23 129:6 131:20 | | |

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

**[accepting - agreements]**

Page 4

accepting 90:1
access 156:21
  183:23 222:12,13
accomplish 69:9
account 15:7,9,9
  15:24 16:1,3,16
  55:11 66:23 68:4
  105:17 107:7
  193:9 196:12
accountant 201:13
accounting 193:10
accounts 13:4
  15:19
accrue 78:15
accurate 14:21
  221:13
ach 68:4 105:21,21
  105:22,25 106:4
  106:19,25 107:6,7
  118:23 119:1,11
  130:2
ach'ing 107:11
acknowledge
  100:8 133:25
  161:7
acquire 23:11
acquired 61:11,17
  62:24 63:18
action 1:5 7:6
  170:13 221:18
  223:8,12
active 175:19,22
  175:24
actively 177:2
actual 197:17
adams 1:7,8 7:4,5
  11:12,16 15:5
  23:23,23 25:5,6,15
  25:15,17,20 26:18
  27:4,23 28:5,6,9
  30:3 32:6,11

34:18,25 41:13
45:11,22 48:22,23
49:11,11,18,18
51:5 52:6 68:24
70:14,15 71:2,2,20
71:22,25,25 72:6,9
72:15,19 84:25
92:9 97:23,25
98:4 111:1,3,21
120:4,4,18 122:1
122:20,24 130:23
131:16 137:9
138:9 141:10,17
141:24 143:22
144:16 156:3
163:2,12 164:2,3,7
164:15,20 165:21
165:22 166:9,23
174:23 175:6
178:5,5 182:4,5
213:5 214:6
add 67:10 81:14
added 173:16
addendum 107:23
addition 153:2,7,8
  184:18
additional 9:8
  69:25 173:14,16
  226:9
address 40:7
  46:24 47:2 95:15
  121:21 180:18,19
addressed 8:18,19
  10:19
adhere 61:25
adkins 13:12
admitted 161:5
admitting 165:24
advanced 118:13
advice 165:7

advise 32:14 33:4
  34:11 43:3 58:16
  197:7 199:21
advised 35:1 52:3
  192:17
advising 16:7
  31:10 41:20 43:11
  58:18 91:9 104:24
  125:15
affidavit 149:1,2,8
  149:19 150:11
  155:18,19 156:3
  159:20 165:1,23
  165:25 167:5,14
affirmatively
  36:25 83:6 107:1
  173:22
afford 187:20
afternoon 200:7
age 61:6
agency 173:11
ago 13:6 83:23
  156:17 169:14
  188:25 211:24
  213:13
agree 103:20
  134:24
agreeable 7:14,19
  7:20 12:20 98:15
agreed 8:25
agreeing 101:4
agreement 2:18
  4:7 7:9 25:3,4
  26:2,4 28:5 29:21
  31:8,9,23 32:2,7,9
  32:15 33:19 42:4
  55:9 63:8 67:15
  67:19 68:12 69:19
  70:23 71:11 74:13
  74:16 75:11,16
  76:10,24,25 79:8,9

79:11 80:18 81:2
82:5,10,15 84:23
85:3,5,6,10 86:4,6
86:7,8,23 89:4,6
89:18,24,25 90:2,4
90:8,20,21 91:10
92:15,16 93:1
95:13 96:24 99:20
100:3,9,15,17,22
100:23 101:4
102:8,17,18 103:2
103:22 104:25
108:12 109:21
113:5 114:11
115:19 116:12,13
116:14,22 117:1,2
117:13,13,17
118:14,16 120:2
120:10 121:9,18
124:4,9 127:5,13
127:20,20,22,22
131:4,25 132:9
133:15,15 134:15
135:1,5 161:19
181:16 184:25
185:4,4,9,11,18,20
185:25 188:4,23
192:6,20 195:16
196:4 197:5
201:24 203:5
215:11 221:18
222:4 223:13
agreements 10:22
11:2 29:14 31:3
33:14 67:24 68:7
68:8,11,13 71:16
83:5,15,21 84:13
117:25 127:23
132:15,20 134:3
135:8,17 152:10
152:10 175:2

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

[agreements - ascentium]

Page 5

| | | | |
|---|---|---|---|
| 178:21 180:1,4 | **analysis** 36:14 | **anthony** 1:12 8:4 | 186:1 222:5 |
| 186:1,2 187:25 | **ancillary** 224:13 | 20:13 225:2 | 224:13 |
| 201:17 206:7 | **andrew** 1:8 7:4 | **anticipated** 99:2 | **applying** 172:18 |
| 207:1 211:1 | 49:11,18 | **anybody** 43:16 | **appraisal** 80:22 |
| 214:21 | **andy** 23:23 25:5 | 165:5 212:14,17 | **approach** 155:22 |
| **agreemt** 2:21,24 | 25:15,17 27:23 | **anymore** 62:5 | **approached** 35:15 |
| **ahead** 18:13 53:2 | 28:6 34:25 48:23 | **anyways** 84:1 | **approval** 4:4 9:21 |
| 67:25 77:14 178:1 | 51:5 52:6 55:15 | **apologize** 40:3 | 35:5 37:19 38:2 |
| **al** 7:5 | 55:16 59:8,17 | 93:16,21 | 204:20 205:1 |
| **albany** 1:3 | 70:15 71:1,22,25 | **apparently** 55:3 | **approve** 34:5 35:4 |
| **alex** 218:18 | 73:8 110:25 120:4 | 118:17 138:1 | **approved** 94:5 |
| **alley** 221:11 222:2 | 137:9,10,18,19,20 | **appear** 50:25 51:1 | 181:14 210:2 |
| 224:1,4,6,11 | 138:9 139:6,8,12 | 93:10 107:25 | **april** 149:24 150:5 |
| 225:10,19 | 143:9 145:1,8,12 | 115:15 117:16 | 154:10,15 156:16 |
| **allow** 12:11 | 146:15 147:20,21 | 118:7 120:20 | 159:9 |
| 136:13 | 147:24 148:2,8 | 122:16 126:22 | **arbitrary** 80:23 |
| **allowable** 7:12 | 150:10,13,18 | 127:15,19 131:13 | **area** 37:8 |
| **allowed** 191:7 | 159:21 160:3 | 132:14 135:4,14 | **argue** 125:13 |
| **allowing** 136:5 | 161:3 164:3,20 | 143:22 155:24 | **arrangements** |
| **allows** 29:22 | 165:1,22,24 | 156:4 167:2 | 223:14 |
| **aloud** 104:2 | 166:23 167:4,6 | **appearances** 6:1 | **arrears** 16:16 |
| 130:19 133:9 | 170:19 171:3,10 | **appeared** 46:24 | **arrested** 23:18 |
| **amended** 2:17 | 171:15 172:6,6,14 | **appears** 41:8 | **arrow** 195:1 |
| 68:22 | 172:15 182:5 | 43:20 44:21 45:19 | **article** 6:18 221:6 |
| **american** 1:9 41:5 | 213:5 | 45:23 47:3,8,9,12 | **ascentium** 1:4 |
| 62:25 63:5 88:9 | **andy's** 145:4 | 49:7 56:10,19,22 | 2:11 7:3 8:9 9:7 |
| 88:19 89:12 | 148:18 | 57:23 85:21 87:18 | 9:16,23 10:18 |
| 126:11 210:15 | **annually** 22:5 | 88:18,23 89:1 | 11:2,11,16 14:4 |
| **amount** 25:23 | **answer** 7:17 12:12 | 90:8 93:11 113:25 | 18:15,22 19:24 |
| 26:12,13 35:3 | 21:16 30:8,9,18,21 | 114:5 115:17,19 | 21:3,24 22:4,10,16 |
| 69:22 71:18,19,25 | 30:22 46:4 49:3 | 118:12 123:17,20 | 23:22 25:1,10 |
| 74:10,12,15 75:7,8 | 76:10 98:1 128:2 | 125:22 126:7 | 26:21 27:7 28:4 |
| 75:10,13,20,23,25 | 131:4 162:10 | 137:8 144:25 | 29:2,7,16 30:6 |
| 76:3,6,8,11 77:18 | 165:10 182:17 | 158:5 168:10 | 31:10 33:2,12,18 |
| 77:21,25 81:9,15 | 210:1 216:2 | 185:11 188:8,23 | 34:8,20 35:1,22 |
| 82:4 94:9 176:17 | **answered** 131:1 | 194:24 | 36:1,4 38:5 48:22 |
| 215:18 | 142:1 | **application** 38:4 | 49:10,17,19 52:23 |
| **amounts** 41:21 | **answering** 13:1 | 209:24 | 56:6 58:9 59:22 |
| 69:20,21 101:15 | 19:23 20:1 165:6 | **applied** 75:21 76:1 | 60:3,16 61:21 |
| 101:18 133:12 | **answers** 222:8 | 76:3 172:7,12 | 62:8,13,24 63:18 |
| 187:2 | 223:4 224:6 | 181:13 184:24 | 63:25 64:1 65:5 |

Tiffany Alley, A Veritext Company

Conf. 30(b)(6) Anthony Campisciano           August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

71:2,20,24 72:5
74:16 76:1 82:25
85:24 86:13 90:3
90:4,20 91:9 94:4
94:25 95:8,21
96:5 97:7,22,24
98:3,5,11 99:1,6,8
104:24 105:17
108:13 109:17
110:1,19 111:3,20
114:1,12,24 120:4
120:19 121:7,20
123:5,25 125:7,15
129:22 130:13,21
130:22 131:2,3,11
131:15 136:9,13
139:25 147:17
148:8 149:25
150:7 161:16,17
161:22 165:6
173:13,15 174:23
174:24 177:2
181:7,8,12 182:4
182:20 189:8
190:25 191:12
192:1 195:12,18
196:16,18,25
197:1,11 199:25
200:14 201:23
202:1,16 203:8
204:19 206:20
208:14 209:1,20
210:3,14 211:5,19
212:5 214:10,19
215:4,16 216:1
217:13,20 219:3,4
**ascentium's** 17:17
20:16 22:22 25:16
28:10 38:6 70:14
71:1 72:3 164:22
165:19 203:1,20

204:1 205:9
**asked** 21:20 35:19
55:16 59:8 97:3
99:6 138:13 143:9
182:16 211:20
**asking** 12:11 16:8
21:12 27:24 32:5
35:10 59:5 98:3
104:12 124:6
137:10 139:8
143:23 154:22,24
168:16 172:6,14
172:15 180:11
194:6,20 205:20
207:5,12 213:3
**aspect** 21:23 24:22
**aspire** 183:21
**asset** 2:15 53:4
**assets** 60:1
**assigned** 221:13
**assignment** 206:6
**assist** 226:8
**assistant** 129:17
**associated** 207:9
**assume** 12:16
32:13 36:11 39:16
50:16 161:9
207:25
**assuming** 32:19
59:9 163:11
**assumption**
191:15,16,17
**assurant** 195:18
195:18 196:25
199:25 200:14
**assurant.com**
195:24
**at&l** 26:18
**ataollah** 16:19
25:20 26:10 27:8
27:14 36:6 41:4

43:22 87:20 88:5
88:21 89:5 95:7
130:14,24 131:4
131:15 210:14
212:20
**ataollah's** 87:24
**atlanta** 1:18 6:8
225:21
**attach** 190:6 226:9
**attached** 3:15
46:16 118:15
120:22 135:5
137:11 141:23
142:9,11 143:25
145:3,5 149:1
199:18 224:7
225:6,7
**attaching** 139:8
**attachment**
143:12 155:1
158:7 168:11,20
**attachments** 137:7
140:14 141:21
142:2 147:1,3
154:18,21 155:5,6
155:7,10,11,20,23
156:5,10,13
157:23 159:18
**attempting** 36:7
161:6
**attention** 209:13
**attorney** 6:4,12
17:7 45:10 219:12
219:17 222:3
223:7 225:12
**attorneys** 15:17
222:10 224:8
**attributable** 80:17
**attribute** 80:19
**attributed** 81:13

**august** 1:13
183:12
**authority** 97:9
**authorization**
105:23 115:22
116:1 119:2 130:2
131:14,17,18
**authorize** 95:19
97:23,24 98:12
130:21 131:2
**authorized** 98:4,9
**authorizes** 90:3
**authorizing** 90:4
94:25 95:8 105:17
131:15 190:8
**automated** 193:6
**automatically**
222:5 224:13
**available** 224:10
224:14
**average** 22:8
**avoid** 12:8 165:8
**aware** 17:10 18:25
48:17 58:7 127:1
127:4 139:16,25
164:12 178:11
206:5

**b**

**b** 1:12 2:12 6:18
8:8,17 10:14
11:10 18:15,19,22
19:24 34:1 60:12
180:6 208:9 221:6
221:8 222:4
224:12 225:2
**baccarro** 3:21
8:20 13:20,25
15:15 35:15 38:8
58:16,25 139:7
151:20 152:21
154:17 159:25

Tiffany Alley, A Veritext Company

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

**[baccarro - borrower]**

Page 7

160:14 168:2
172:2 184:10
206:1
**baccarro's** 3:14
13:5 157:20
158:18 218:8
**baccarros** 62:25
**back** 15:9,19
24:11 25:20 26:9
26:11 27:24 28:21
28:23 29:25 35:4
40:11 42:22 44:17
47:6 48:16 49:2
51:8 64:7 65:3
67:3 72:16 81:19
85:15 90:13 93:19
94:8 99:15 106:3
107:7 108:19
110:24 111:2
115:18 117:11,12
118:16 122:5
126:13 132:2
134:15 140:20
141:2 143:16
147:10,16 150:17
152:2,3 156:8,22
156:23 164:9,16
166:18 167:9
170:21 182:20
183:1,4 185:5,7
189:5,14 191:23
196:19 207:17
208:24 209:8
213:3,7,21,22
215:13,15,17,18
216:13 225:3
**backdrop** 167:24
**background** 23:21
152:5,6
**backorder** 56:21

**backtrack** 50:15
59:20
**bad** 22:9 30:16
46:25 56:15 86:19
95:22
**baker** 1:15 6:5
**balance** 67:7 70:7
76:1,2 80:24 81:4
81:5 82:9,15
176:3
**balances** 37:19
**bank** 17:14,19,19
61:14,15,17,20,22
61:24,24 62:3,4,12
64:1,3 80:12,15
81:10,15 105:17
**banking** 61:25
**banks** 16:24
**barn** 18:4 47:3,10
47:17 51:16
**barnard** 129:17
**base** 14:19 28:8,11
**based** 9:24 45:19
149:21 210:22
223:12
**basically** 11:15
21:11 26:17 29:22
37:4 44:4 60:16
61:20 62:13,22
65:16 85:6 86:10
90:3 94:11 95:7
136:2
**basis** 68:5 72:3,5
221:9
**bearman** 6:5
**beds** 23:10
**beer** 56:19 113:22
**began** 60:5 64:2
**beginning** 9:1
27:22 34:7 45:16
89:21 92:25 153:3

164:23,24 169:8
190:2 192:24
**behalf** 6:2,10
21:24
**belief** 25:16 28:9
28:11 33:3 70:14
71:1 136:4 209:21
**believe** 10:18
16:15,22 18:4,5
25:19 27:5,16,22
28:1,12,20 29:13
29:19,25 30:5
31:18 41:9,19
44:24 45:4,6
48:10,24 51:4,13
52:2,5,5,8 54:8,23
56:12 57:3 59:24
60:5 63:1,3,5,19
63:19 66:25 67:19
69:5 71:13,24
73:18 79:19 83:10
83:22 91:2 106:5
116:7 119:2 122:4
124:11 134:7
138:18 140:3,3
142:2 143:3,3,13
143:25 153:5
159:13,15 164:14
164:25 165:23
169:13 171:15
182:6 183:8
184:17 190:15
192:25 199:5
204:15 208:24
212:18 219:1,4
**believes** 71:20
**bell** 49:8 115:4
163:14
**berkowitz** 6:6
**best** 20:1 39:8
55:11 214:6

**better** 114:25
115:2
**big** 84:1 179:6,21
182:11,22 185:9
191:23 215:5
**bigger** 187:22
**bill** 121:21 195:23
**billed** 121:2
**billing** 29:23 31:11
90:5 95:15 105:1
208:17
**biokinemetrics**
189:2,5
**bit** 23:9 38:16 39:9
59:20 60:20,22
96:16 114:25
118:19 126:24
164:19
**blacked** 56:16
57:2
**blame** 164:18
**block** 99:23
**board** 6:19 60:15
205:24 221:7
**bob** 51:13 190:14
190:17 191:17
**bold** 99:24 101:12
116:10
**bolted** 125:12
**booked** 4:9 208:15
209:3
**booking** 203:13
208:18
**books** 188:24
191:3 192:16
**borrowed** 30:2,2
181:12
**borrower** 31:16
32:3 33:19 35:14
104:8 112:2
121:11,21 123:10

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

**[borrower - carlos]**

Page 8

136:6,9,14 165:20
166:3,5 190:22,24
**borrower's** 30:2
136:13 173:17
**borrowers** 203:20
206:20 214:21
216:1
**boss** 13:14 26:23
42:17 52:2 65:11
159:17 163:5
211:21
**bottom** 50:4 80:4
81:22 82:1,8,13
94:9 141:4,9
145:14 150:20
163:20 185:10
189:21 194:24
198:14
**bought** 61:7 62:12
**box** 77:3
**boxed** 47:15
**boxes** 45:14,19,23
47:13 51:18 72:21
72:22 77:1
**boy** 160:9
**brad** 218:22
**branch** 62:15
**branches** 61:16
62:6
**brand** 48:14
**break** 64:16,22,23
69:14 109:11
202:6
**breaking** 69:20
**breaks** 94:8
**brian** 190:13
206:11
**brief** 70:20
**briefly** 108:6
**bring** 216:8

**brother** 63:4
164:18 205:25
**brought** 180:2
192:14
**building** 9:6 45:7
45:11 46:23 47:9
47:10,16,17,18,21
57:23
**built** 18:4,11 36:16
44:3,3 47:11
51:16
**bulb** 25:13
**bunch** 23:15
162:25
**business** 11:11
23:5,8,9 39:10
54:17 55:18 60:24
64:4,14 164:15
170:16 181:9
205:16 213:25
216:7,9
**businesses** 23:15
**buyer** 138:14
**buyers** 138:17

**c**

**c** 20:13,14 27:11
34:1 64:2 66:7,12
205:11 206:15
221:7
**c'mon** 170:18
171:10
**cairo** 9:4 17:11
24:24,25 25:3
26:1,4,7,8 36:10
42:5,5 53:14,15,15
54:5,24,25 56:11
56:14 57:5,5,9
69:19 70:23 71:15
79:9,11 80:18,25
81:2,3,4,8,13 82:9
82:15 83:1,8 85:3

85:5 86:22,22
88:11 96:18,19,19
96:23 113:3,8
115:19 116:12
117:2,17 118:14
118:14,15 127:25
127:25 128:1,1
132:15,22 133:3
134:2,2 135:6,6,16
143:20 145:4,6,18
145:19,24 146:15
172:12,16,18,19
173:13 216:21,22
**calculated** 70:3,4
70:12 71:14
**calculation** 71:16
**caldwell** 6:5
**calendar** 224:14
**call** 16:6 62:7
66:22 67:8,23
86:22 87:20 92:13
93:13 105:21
112:9 130:4,13
137:11 208:18
**called** 8:5 24:4
55:15 60:8 63:5
68:1,2 73:19 88:9
96:5 107:22
124:17 137:18,19
190:17,20 191:5
191:18
**calls** 193:6
**campi** 2:17 7:3,24
10:21 11:14 12:1
19:18 20:2 21:13
68:23,25 104:14
154:18
**campisciano** 1:12
8:4 20:13 225:2
**cancel** 100:22
190:25 191:7,22

201:23
**canceled** 15:6
24:25 33:4 101:5
102:19 181:11
182:16 190:18,21
191:6,11 192:2
**cancellable** 100:9
100:14,16 102:8
102:17 103:21
105:6 116:14
133:15 134:25
186:2
**cancellation**
178:10
**cancelled** 10:25
**canopies** 57:4,12
145:7 146:23
**canopy** 9:7 56:22
56:23 57:8 76:22
77:6 79:17,18,21
79:24 82:21 99:4
113:22,23 173:12
**cap** 36:24 37:3
**capacity** 20:3
**capital** 1:4 7:4 8:9
9:7,17,23 10:18
11:2,12,16 18:16
18:22 22:1 24:15
24:19 45:2 48:20
62:8 130:22 131:3
139:17 140:1
145:1 161:23
173:13,15 174:23
**caps** 101:13
133:10
**caption** 223:4
**car** 60:9 205:11
**care** 196:25
197:11
**carlos** 15:22 16:2
16:3,4,9 42:8,15

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

**[carlos - commencement]**

Page 9

42:16,17,24
**carrol**  56:19
113:21
**case**  7:3 10:1 11:3
13:21 15:9 17:3
31:24 34:17 35:7
35:11,13 38:8
58:16 65:3 68:23
77:5 122:25
125:11,16 177:19
190:24 191:1
193:12 207:10
213:21 217:1
221:9,9 222:5
224:6,8,12
**cases**  34:9
**cash**  42:20 67:2
**categories**  214:4
**caused**  164:22
**cave**  56:19 113:22
**cc'd**  166:24 184:12
**ccr**  1:19 223:20
**center**  1:9 88:9,19
89:13 126:11
**ceo**  164:11 205:23
**certain**  10:6 49:12
50:13 207:14,18
207:19
**certainly**  50:9
**certificate**  9:4
18:7 91:5 108:6
117:5,8 128:5,18
196:5 223:1 224:2
**certificates**  224:9
**certified**  221:10
222:8 224:5,6,8,9
**certify**  91:15
223:3,7 226:2
**cetera**  16:9,9 62:2
62:2 79:17 82:21
199:23,23,23

205:1 213:8,8
**cfo**  205:24
**chain**  141:4
147:11 152:1
157:9
**chance**  19:12
141:20 164:4
**change**  34:18 35:8
35:15,20 164:23
167:4 226:11,13
226:14,16,17,19
226:20,22,23,25
227:1,3,4,6,7,9,10
227:12,13,15,16
227:18
**changed**  59:25
181:11
**changes**  178:9
222:10 225:7
226:4,5,7
**charge**  107:8
**charts**  78:22,24
**cheap**  61:23
**check**  94:7 105:19
106:14 119:5,17
155:23 182:19
189:8,20 195:7
**checked**  57:7
177:5
**checking**  57:4,9
**checks**  118:13,22
189:13,21,22
**chief**  161:23
**chiropractic**
179:23 188:9
**chiropractor**
179:11
**choice**  187:17
**chronological**
198:21,23

**circumstance**
102:20
**circumstances**
181:6
**civil**  1:5 7:6,13
21:14 226:6
**claim**  72:4,5
136:18 145:2
**clarification**  30:14
198:25
**clarify**  20:25
87:23 154:22
**clause**  70:5
**clear**  115:4
**clearer**  118:19
**clearly**  12:6
**clever**  199:7
**clock**  29:23 55:10
104:25
**close**  178:2 201:16
**closed**  27:12
**coast**  199:4
**code**  221:16
223:11
**coffee**  177:25
**coincide**  131:18
180:5
**coke**  23:2
**collateral**  17:25
18:3 21:10 24:18
24:18 25:2,11,25
26:1,1,4 28:14,25
29:3,8,18 31:12
49:13,20 51:10
72:13 95:20 113:7
121:8,11 125:6
137:17 146:15
148:14 204:3
**collect**  21:9
**collection**  16:6
40:25 41:3 54:1

58:9 60:21 65:4
109:1 175:5 184:8
184:9 190:10,11
192:24 193:21,23
194:11 197:11
205:3 209:7
217:11,15
**collections**  59:24
**collector**  15:24
16:1 42:12 43:2
58:15
**collector's**  59:12
**collectors**  15:18
16:5 162:14
**collier**  6:11 11:22
157:21 158:12
**colloquies**  222:8
223:4 224:5
**column**  56:22,23
80:8,10 106:14
113:22,23 176:14
**columns**  175:9
**come**  10:22 26:10
41:5 94:7 111:3
155:17 163:3
177:8 198:19
207:17 210:8
218:13
**comes**  81:14 107:7
108:18 217:8
**comfort**  39:20
**coming**  32:16
**comma**  164:2,2
**commence**  90:6
103:21 104:24
134:25 192:20
**commenced**  182:1
**commencement**
29:14,21 31:3,7,9
31:22 32:6 55:9
89:17,24 90:7,21

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

[commencement - copies]

Page 10

103:2 116:22,25
127:13,20,21
134:14 135:5
153:3
comments 167:7
commercial
  201:17
commission 209:3
  227:25
commit 16:20
  43:22
commitment
  223:14
common 65:24,24
  66:1,2 214:19
commonly 92:2
communication
  32:20 201:12
  203:20 212:16
communications
  197:20
companies 208:25
company 15:10
  17:23 24:4,5 60:5
  60:8 61:3,10,11,12
  62:7,25 63:4,4
  65:15 73:6 97:9
  97:24 114:24
  123:12 159:7
  164:11 173:11
  195:19,24 197:2
  206:1 209:25
  214:1 219:5 224:1
company's 187:17
compare 84:4 93:2
compensation
  221:18 223:12
complaining 98:6
complaint 12:23
  48:25 49:6,7,11
  205:13 212:6

complete 45:24
  83:20 210:24
  221:13 222:8
  224:5,7
completed 225:18
compliance 221:5
  221:16 223:10
complies 69:17
  73:20 78:20 85:17
  99:16 101:8
  102:25 108:3
  109:13 111:14
  113:13 120:7
  126:15 130:17
  131:7 135:12
  136:1 147:12
  158:11 163:21
  171:24
composite 73:19
  81:23 106:9
computer 73:23
  77:1 114:17
  208:17
computers 64:12
concerned 44:24
concluded 220:8
concrete 125:12
conditions 100:5
  133:23
conducted 36:5
conf 2:20 3:4
  225:2
conference 130:11
confidential 1:8
  2:7 4:3 9:20,25
  10:4,10 11:4,7
  177:13,18 181:20
confirm 14:20
  124:24 150:13
confirmed 146:21

confused 143:23
confusing 146:13
  199:12
congratulating
  94:4
connection 135:16
consider 125:17
considered 125:9
  125:10
construction 45:8
  47:18 57:24
cont'd 3:1 4:1
contact 33:3 34:11
  55:16 58:15
  147:18 199:23
  217:20
contacted 34:13
  34:25 192:1 222:2
contacts 35:22
contain 110:7
contained 13:3
containing 109:19
contains 92:15
  110:1,13
contending 69:19
contention 70:17
continue 101:22
contract 24:25
  28:15 32:12 41:17
  43:24 57:5,10
  76:12,15 77:17
  78:1,16 79:4,21
  81:14 94:13
  106:10,11 122:24
  145:6,9 175:11,16
  175:19,25 176:4
  176:21,24 181:25
  195:10 221:17
  223:12
contracts 13:2,3
  16:20 17:10 31:12

39:18 41:10,20
  42:5 53:16 54:23
  58:18 78:1 81:4
  81:10,16 149:23
  153:4 175:1,5
  176:10,15 221:8
contradiction
  45:25
contribute 149:7
  149:10
contributed
  149:18
control 62:16
controlled 30:6
convenience 22:16
  22:24 44:3 51:16
  63:24
conversation
  153:24 168:8
  170:17 172:1
  212:12
conversations
  149:25 150:6
  161:15,15 219:16
cooler 56:19 57:4
  57:8,12 113:21,21
  145:7 146:23
coordinators
  224:5,9
copied 159:22
  183:13
copiers 64:12
copies 44:13 56:15
  83:20 84:12
  110:18 118:22
  123:5 124:13
  151:12 164:9,10
  164:10 178:15
  190:9 224:9
  225:12

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

[copy - cv]

Page 11

**copy** 9:8,10,13
40:17 68:17 90:14
92:15 110:7,13,20
110:25 113:3
118:13 120:10
127:17 137:25
139:8 145:8
167:13 190:7
194:6 224:7
**copying** 139:7
195:12
**cork** 6:13
**corner** 74:1 82:1,8
82:13 132:19
185:10
**corp** 60:13
**corporate** 87:25
**corporation**
182:12
**correct** 15:18 20:9
20:17 21:25 22:2
31:4 38:11,14
41:20 42:13 50:16
66:13 79:2,3,6
82:3,17,22,23
85:23 86:24 87:19
87:21 88:20,21,24
88:25 89:2,19
90:9 91:6 92:11
93:6,7 96:16
100:24 103:3,4
106:18 109:23
110:3,4,16,17
111:17,18 114:6
117:14,15 123:18
123:19,22,23
125:23,24 126:8,9
128:6 129:14
131:25 132:9,10
141:10,14 148:15
149:20,20 154:7

154:19 159:2
161:12,12 163:15
166:24,24,25
167:14,17 168:6
172:25 173:7
174:18,19 175:23
177:10 178:6
183:10,11 185:12
188:6,7 189:1
192:8,9,11 197:2
197:25,25 200:3,4
206:16 210:20
211:13 218:5
219:23 220:1
222:7 223:5 224:5
224:7
**corrections** 225:7
226:9
**correctly** 138:10
143:14
**correspond** 17:6
**correspondence**
158:5 167:24
206:20 207:8
212:14
**corresponds** 86:7
119:7,20
**counsel** 6:1,21 7:9
8:11,12 165:8,14
207:25 208:3,4
221:2
**count** 122:5
**counterclaim**
187:11
**country** 160:4
**county** 223:2
**couple** 13:5,20
45:10 155:21
211:24
**course** 11:19
24:23 147:16

150:20 171:4
173:21 175:13
203:21 217:5
**court** 1:1 6:19,21
7:5 20:9 81:23
96:3 112:13,21
161:20 168:15
174:6 221:7 222:8
223:15 224:6
225:15
**cover** 84:18
195:23
**coverage** 196:5
**covered** 87:1
91:10 121:9
**covers** 86:11
**cpa** 64:13
**create** 31:15 209:8
209:12
**created** 174:17
**creating** 174:20
**credit** 4:4 9:21,23
27:17 34:5 35:4
36:11,14,17 37:3,8
37:11,18 38:2,4,6
38:14 60:20 70:8
70:10 159:6,6
161:23 183:23
204:19,24,25
205:1 206:13,14
209:16,22 214:1,3
214:25
**cross** 7:11
**crux** 64:14
**ct** 123:20,24
**cumbersome**
83:17 84:2
**cup** 177:24
**curious** 106:6
155:3

**current** 58:21
177:7
**currently** 201:19
**custom** 189:3
190:2
**customary** 181:9
**customer** 16:7
26:11 29:21 31:10
32:13,19,20,22
33:4,7 34:1,11,14
35:1,23 41:16
43:11 55:7 68:3
70:10 90:3 91:9
94:3,24 95:13
97:5 98:5,9,12,14
104:24 105:6,16
108:16 122:25
161:8,10 181:13
181:14 183:2
184:24 190:8,14
190:16,17,20
191:5,7,19 192:7
192:16 193:9
194:16 195:4,9
196:1,25 197:3,6
197:11,12,15
199:19 201:11,23
210:1 211:6
214:17 215:10,14
218:14
**customer's** 30:2
42:20 101:3
181:10,11
**customers** 10:23
10:24 91:19 177:1
177:14 178:5
209:17
**cut** 161:3
**cutting** 200:25
**cv** 1:6 7:7

Tiffany Alley, A Veritext Company

800.808.4958

770.343.9696

Conf. 30(b)(6) Anthony Campisciano                    August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

**[d - denver]**                                                      Page 12

| d | | | |
|---|---|---|---|
| **d** 60:10 92:22 | **days** 16:4,10 66:23 | **decides** 26:21 | 130:12 |
| **daily** 68:1,4,6 | 90:23 111:25 | **decipher** 56:17 | **defense** 8:11 |
| **date** 41:8 44:5,23 | 171:2 191:2 | 186:19 187:14 | 109:21 111:12 |
| 48:25 49:5 50:1,1 | 209:25 | **decision** 27:7 | **defense's** 11:9 |
| 50:3,4,7,17 51:14 | **deal** 11:1 33:12 | **decisionmaker** | **deferment** 187:11 |
| 55:12 58:19 70:8 | 34:10 39:19 41:12 | 27:1 | **definitely** 50:12 |
| 70:11 73:25 74:1 | 41:14,19 43:6 | **decisions** 204:20 | 203:4,6 |
| 74:2 78:3,4,5,6,8,8 | 53:2 58:4,14 62:1 | 209:22 | **delayed** 15:6 |
| 78:11,14,16 80:10 | 62:5 77:16,18,19 | **declaration** 2:17 | 181:11 |
| 80:11,11 89:4,7,15 | 84:1 90:6,15 | 68:22 73:16 | **delays** 178:9 |
| 90:19,20 91:1,12 | 116:12 131:16 | **decline** 196:4 | **delete** 171:11,19 |
| 91:24,25 96:25 | 152:15 172:22 | **deemed** 8:19 | **delinquency** 16:15 |
| 99:2 101:21 | 182:16 183:6,16 | **default** 15:20 41:8 | 23:25 42:19 43:7 |
| 108:24 111:5,8 | 183:16 184:1,20 | 41:17 65:5 70:1,5 | 43:8 |
| 113:17 114:6 | 184:25 190:15 | 70:8 153:12,13 | **delinquent** 43:24 |
| 120:24 123:17 | 191:3,19,24 192:2 | **defendant** 2:9 | **deliver** 28:14 |
| 126:3 128:16 | 192:15 203:13,14 | 21:13 148:9 | 32:21,23 36:2 |
| 129:16 132:18 | 203:17 208:15,16 | **defendant's** 18:14 | 72:8 182:25 |
| 156:15 167:15,18 | 209:3 210:4 215:3 | 19:6,17,20 44:10 | 216:16 |
| 185:18,22 192:21 | **dealing** 51:6 63:23 | 46:2,9 47:25 48:1 | **delivered** 24:17 |
| 193:20 194:13 | 144:5 160:5 | 52:20 55:25 68:19 | 28:24 54:9,13 |
| 225:3 | **deals** 29:17 39:10 | 68:20 84:20,24 | 55:20 57:17 58:6 |
| **date's** 50:12 | 91:19 174:24 | 92:10,21 93:5 | 59:15 72:12 73:8 |
| **dated** 9:18 10:6 | 193:22 210:13 | 95:24 96:13 | 91:10,15,16 95:18 |
| 41:7 49:3 89:9 | 211:17 213:19 | 106:12 107:21 | 103:17,20,23 |
| 90:8 111:16,23 | 215:5 218:13 | 109:12,16,18,25 | 104:6 105:2 |
| 137:9,10 141:13 | **debbie** 23:2 | 110:6,12,15 111:9 | 108:18 134:21 |
| 141:18 145:17 | **debit** 105:17 107:6 | 112:24 115:13 | 135:2 215:14 |
| 154:10,15 166:23 | **debt** 205:3 | 117:19 118:4,6 | 216:12 |
| 168:2 183:12 | **debtor** 31:24 | 119:24 126:19,21 | **delivering** 122:3 |
| 190:11 199:13 | 100:7 121:7 | 128:23 129:5 | 122:21 |
| **dates** 69:24 80:9 | 122:19 133:24 | 130:5,10 131:20 | **delivery** 91:4 |
| 90:14 153:6 182:6 | 164:1 188:8,16 | 136:24 138:6 | 108:5 117:5,8 |
| **dave** 218:17 | 193:9 | 139:2 140:8 | 128:4,9,13,17 |
| **davinivitis** 218:18 | **december** 9:18 | 144:13 147:8 | 134:24 135:11 |
| **day** 29:13 51:19 | 17:4 41:7 137:9 | 148:23 166:13 | 213:7 |
| 51:22 90:11,23 | 137:13 182:2 | 180:6 187:10 | **demand** 9:13 |
| 91:24 157:5 200:8 | 183:15 | 208:10 | 27:23 28:3 51:5 |
| 201:12 223:16 | **decide** 27:3 30:23 | **defendants** 1:10 | **denver** 179:11 |
| 227:21 | **decided** 62:4 | 3:2,13 6:10 11:3 | 188:9,10,10,12 |
| | 182:24 | 68:24 109:19 | |

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

Page 13

[department - documents]

| | | | |
|---|---|---|---|
| **department** 9:24<br>29:17,20 38:6<br>54:22 60:19<br>156:21 194:17<br>197:3,21 204:25<br>206:14 214:4<br>**dependency** 38:22<br>39:15<br>**depending** 97:4<br>**depo** 2:11,12<br>**deponent** 225:2,6<br>225:6,7,9,15<br>**deponent's** 227:20<br>**deposed** 21:4<br>**deposit** 218:14<br>**deposition** 1:12<br>3:14,15 7:2,8,9,15<br>7:24 8:8,9,18 9:1<br>10:15 11:10,14,19<br>11:22 12:2,22<br>13:5,13 14:16,23<br>15:17 18:15 19:17<br>37:22 84:25 92:9<br>120:3 127:2<br>157:20 158:19,21<br>169:8,11 180:7<br>208:9 217:6 220:8<br>224:11 226:8<br>**depositions** 84:7<br>112:16 151:22<br>**depping** 164:10,16<br>**described** 87:4<br>**description** 2:1,3<br>2:10 3:1,3 4:1<br>59:21 76:21 77:3<br>79:16,24 82:20<br>83:8 168:21<br>188:16<br>**designating**<br>177:17 | **designations** 42:2<br>**desire** 226:7<br>**desk** 177:8<br>**detail** 40:8 117:1<br>**details** 11:10<br>**determined**<br>221:18<br>**diesel** 56:23<br>113:23<br>**difference** 123:9<br>200:13<br>**different** 30:23<br>51:22 59:21 68:9<br>68:11 83:5 88:7<br>96:23 120:21<br>126:22,25 132:14<br>132:18 134:5<br>178:14 180:4<br>205:1<br>**digest** 164:19<br>**digit** 106:16<br>**digital** 189:4<br>**direct** 221:17<br>223:12<br>**directed** 181:14<br>**direction** 223:5<br>**directly** 34:13<br>35:15 147:24<br>182:19<br>**directors** 205:24<br>**disburse** 97:25<br>98:4,8,9<br>**disbursed** 25:7<br>**disbursement**<br>97:25 98:12<br>130:22<br>**disclose** 165:7<br>**disclosure** 6:20<br>221:7 224:2<br>**disclosures** 221:1<br>221:3,5 222:1 | **discount** 222:6<br>224:13<br>**discounted** 70:13<br>**discounts** 222:5<br>224:12<br>**discovered** 145:1<br>**discovery** 7:10<br>56:6 96:5<br>**discrepancy** 46:1<br>46:13,14<br>**discuss** 33:18,20<br>33:23,25 92:18<br>137:11<br>**discussed** 26:23<br>108:6 109:15<br>117:1,9 135:15<br>142:20,23 153:25<br>181:24 208:8<br>211:16 216:25<br>**discussing** 109:11<br>122:13 145:23<br>**discussion** 89:21<br>92:6 137:19<br>158:18 166:17<br>178:5 179:16<br>180:22<br>**discussions** 165:4<br>165:11,13<br>**dispensers** 9:6<br>24:3,11,14,16 35:3<br>39:19 48:8,10,18<br>48:19 51:20 57:1<br>57:10,19,21 73:9<br>76:22 77:5 79:12<br>79:17 80:13 82:21<br>87:3 122:4,6,14<br>125:11 138:12,14<br>139:9,17,21<br>146:18 173:12<br>**displaying** 76:23 | **disqualification**<br>221:7<br>**disqualify** 221:15<br>223:10<br>**distributor** 164:21<br>**distributors** 160:4<br>**district** 1:1,2 7:5,6<br>**divided** 178:18<br>**division** 1:3<br>**doc** 142:10<br>**docket** 81:23<br>**docs** 111:2 201:15<br>**document** 12:22<br>37:6,12 60:21<br>68:2,23,25 69:3,4<br>85:9,25 86:2<br>88:22 89:17 91:1<br>91:8,20,25 93:13<br>94:21,24 95:7<br>96:4,9 113:2<br>114:8,10 116:24<br>117:4,7 120:9,20<br>120:24 123:16<br>124:19 125:3,22<br>126:7 127:10<br>129:21 131:24<br>136:12,13 144:20<br>168:21 173:8<br>174:17,21 177:13<br>207:24 217:17<br>**documentation**<br>29:19 201:14<br>**documents** 8:24<br>10:11 13:2 29:20<br>29:24 35:5 46:15<br>84:11 86:20 88:18<br>91:21 93:19 94:1<br>94:6,8,15 110:18<br>112:2,3 114:16<br>115:3,17,20<br>124:16 126:19 |

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

**[documents - equipment]**

Page 14

129:8 131:20
141:24 146:4
152:17 180:12
203:12 206:19
207:7,8,11,16,16
207:19 208:6
217:4,13,19
**doing** 17:16,19
53:18 95:10
164:14 210:3
**donelson** 1:15 6:5
**door** 56:19 98:13
113:21 146:23
148:15 214:18
**dot** 142:9,9,9
**double** 155:23
**draft** 149:14
**drafted** 207:24
**drafting** 149:7,9
207:15 208:5
**drafts** 156:3
**driven** 216:7,7
**dual** 87:5
**due** 16:10 41:21
41:21 69:23 81:4
105:18 133:12
176:19 225:3
**duly** 8:5
**duties** 34:19
**duty** 31:15

**e**

**e** 1:19 2:25 3:5,6,7
3:8,9,10,11,12,16
3:17,18,19,20,22
3:23,24 15:10,11
16:6 60:10,12
129:10,18,22
131:19 137:6,8
138:9 139:6,22
141:3,6,13,21
142:1,7,16 144:15

144:24,25 145:13
147:2,11,16 149:1
150:5 152:1,20
153:23 154:6,10
154:14,21,23
155:4 156:9,21
157:12,22 159:25
160:11 162:6
163:4,24 164:9
166:11,21,21
167:3,11,24 168:2
168:13,17 170:23
183:12,25 190:13
193:17 194:16,24
195:11 196:22
197:15,24 198:1,4
199:3,13,24
200:14 201:2
212:13 213:4,4
223:20 226:6,7
**earlier** 20:8,15
31:5 35:19 42:7
48:16 89:20,23
108:6 109:15
115:21 116:2,18
117:9 121:17
134:5 142:20
153:25 154:23
173:6 174:16
200:24 201:2,3
206:25 211:16
219:6,25
**early** 27:5 41:7
51:3 175:13,16
176:12 191:3
192:22 215:8,24
219:19
**easier** 81:24
**east** 199:4
**easy** 75:3

**eat** 109:5
**ed** 92:14 93:12,18
110:19,19,24
115:17 118:11
212:22
**educated** 22:21
**efa** 41:24,24,24
70:5 86:8,10
88:15 89:6 121:4
121:17 152:11
186:9,14
**efas** 68:8 121:20
**effect** 13:23 62:10
185:19 215:20
**effective** 80:10
**efforts** 65:4 205:3
**eight** 56:22 113:22
**either** 15:6 17:18
25:11 30:22 33:15
39:15 43:2 146:11
156:2 158:16
175:12 194:5
204:4,21 219:9
**electronic** 83:19
96:4
**electronically**
225:8
**electrum** 182:12
**else's** 73:9,12
**emergency** 15:11
**employee** 97:11
223:7
**employees** 61:19
62:7 120:4
**empty** 44:2
**engage** 17:23
**engaged** 27:21
52:3 147:19
**enter** 214:20
**entered** 10:1 76:25
177:19 226:8

**enterprise** 185:9
**enterprises** 179:6
182:11 191:23
**enters** 43:23
140:23
**entire** 28:18 81:4
189:5
**entities** 36:6 88:7
88:10 124:8
210:16
**entity** 1:9 41:5
87:25 88:2,5,8,9
89:9 126:2
**entry** 70:1
**equal** 65:9,13
**equals** 74:14
**equation** 25:6
**equip** 2:14,21,24
**equipment** 2:18
4:7 23:11 25:8,24
25:25 26:15 28:16
31:13,17,20 32:16
33:9,13,20 34:2,15
35:16,24,25 38:10
38:25 39:16,21
44:21 45:13,18
54:5,7,11 57:15
58:5,14 62:25
63:6 64:10 67:15
67:18 68:10,13
72:14,18,18 73:12
74:15 76:16,21
77:3 79:7,16,24
80:17,20 81:10
82:5,10,20 83:5,8
83:15,21 84:13
85:10 86:11 87:1
91:9,15,16 92:15
95:16,16,18 96:24
99:3,20 103:15,17
103:19,19,23

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

**[equipment - fair]**

Page 15

104:5 105:2
109:20 113:19
114:11 116:11
117:12 120:1,19
121:6,7,18 123:10
124:3,9 131:3,24
132:8 134:21,23
134:23 135:2,16
136:6,20 143:23
148:4 178:21
181:9,16 182:10
182:25 185:4,11
185:24 188:4
191:20,21 192:6
195:23 196:11,21
197:6,12 199:20
206:7 210:25
211:11 213:8
214:20 218:14
**errata** 225:3,7,8,9
225:11,13,14,18
226:1
**error** 83:10,19
**especially** 216:15
**et** 7:5 16:8,9 62:2
62:2 79:17 82:21
199:23,23,23
205:1 213:8,8
**ethics** 221:16
223:11
**eventually** 152:14
157:4
**everybody** 187:24
215:11,19
**everyone's** 215:22
**evidence** 2:5 7:11
173:9 223:6
**exact** 192:21
**examination** 5:2
7:11 11:23

**examinations** 5:1
**examined** 8:6
**example** 199:3
**examples** 212:1
215:3
**exception** 176:25
**exclusively** 224:8
**excuse** 71:5 77:15
117:21 121:1
133:17 139:25
185:5
**execute** 214:20
**executed** 83:21
89:5 93:19 94:8
94:12 96:25
102:18 112:2
115:20 118:15
126:4 152:10,12
207:17 211:1
**executing** 94:15
**execution** 93:14
111:20
**executive** 159:5
161:24
**exhale** 160:8
**exhibit** 2:3,4,5,6
2:10,11,12,13,14
2:15,16,17,18,19
2:20,21,22,23,24
2:25 3:3,4,5,6,7,8
3:9,10,11,12,16,17
3:18,19,20,22,23
3:24,25 4:4,5,7,9
8:14,15,23 9:2,3,9
9:14,15,19 10:2,3
10:5,9 11:4,6,13
11:20 18:14 19:6
19:17,20 37:5
40:10,15 43:14
44:9,10 46:1,2,6,9
46:21 47:25 48:1

52:18,20 55:24,25
57:7,8 68:18,19,20
72:16 73:2,11,19
81:23 84:12,17,19
84:20,24,25 85:2
92:9,10,13,21 93:5
95:23,24 96:2,13
106:9,9,9,12
107:21,21 108:8
109:12,16,17,17
109:18,22 110:1,6
110:12,15,18
111:9,13 112:12
112:16,24 115:12
115:13,15,23,25
117:19 118:4,7
119:14,22,24
120:1,3,12 126:19
126:21 127:11,17
128:23 129:6,9
130:4,5,10,10
131:20 132:1,2
136:24 138:6
139:2 140:8,20
141:7 143:12
144:13 147:8
148:23 151:13,16
151:17 154:4,5
157:19 158:2,3
160:18 162:1,2,21
163:17,18 166:13
167:13,19,21
168:11,18 169:1,2
170:21 173:6
174:13,15 177:18
178:4 180:4,6
181:18 188:14,20
208:10 211:16
**exhibits** 2:1,7 3:1
3:13 4:1 72:17
84:9 109:25

127:24 128:1
151:19,21 174:7
222:10,10,12
224:7,8
**exits** 43:19 140:21
**experience** 63:23
64:2
**expires** 227:25
**explain** 69:14 81:8
84:4 137:7 193:5
**explained** 70:25
172:4 201:16
**explaining** 18:16
27:23
**explanation** 148:3
148:19 182:16
201:18
**extra** 9:9
**eyes** 46:25 133:20
**eyesight** 102:2

**f**

**face** 88:14 116:10
**faced** 99:24
**facility** 18:3 24:2,7
25:11,12 27:15
28:13 36:16 44:1
44:24 48:10,11
51:7,12,15,19
53:15 56:11 72:19
72:20 76:17
142:18 143:1
154:1
**fact** 41:11 48:17
48:19 55:15 59:10
96:22 119:13
**facts** 93:1 149:11
149:14 150:10
165:24 181:6
**failed** 58:25 81:18
**fair** 12:17 214:10

Conf. 30(b)(6) Anthony Campisciano                   August 30, 2016
Ascentium Capital vs. Adams Tank & Lift

**[falcon - fleck]**                                          Page 16

| | | | |
|---|---|---|---|
| **falcon** 1:9 41:4 | **figured** 27:18,18 | 114:11 116:12 | **firm** 27:22 52:3 |
| 87:25 88:2,8 89:9 | 28:22 77:15 | 117:13 120:2 | 147:19 170:16 |
| 126:2 210:15 | 200:10 | 121:18 123:11 | 221:1 222:1 224:2 |
| **fall** 10:14 16:16 | **file** 1:5 21:8 22:8 | 124:4,9 131:25 | **firms** 64:13,13 |
| **fallen** 66:25 | 23:22 24:13 26:21 | 132:8 135:16 | **first** 8:5 15:19 |
| **falling** 66:23 | 27:3,8 29:12 | 178:21 181:16 | 16:14 17:22 38:12 |
| **falls** 16:4 | 53:22 96:3,5,11 | 185:4,11,24 188:4 | 40:25 44:1 55:6 |
| **familiar** 40:22 | 108:24 110:20 | 192:6 195:16 | 56:2 59:23 60:18 |
| 124:20,21 160:10 | 114:6,11 123:17 | 196:4 201:17 | 62:12 69:19,22 |
| 189:24 202:19,20 | 130:12 136:25 | 202:21 207:1 | 71:15 77:22 78:3 |
| 202:25 203:8,21 | 137:1,3 152:11 | 208:25 209:25 | 78:5,8 81:19,22 |
| 206:18 207:5,11 | 161:9 164:1,24 | 210:25 214:20 | 85:7 86:18,22 |
| 207:16 | 204:7 225:12 | **financed** 16:24 | 90:12 93:5,25 |
| **far** 18:12 33:21 | **filed** 12:23 28:1 | 24:15 25:1 48:18 | 95:14 97:25 99:19 |
| 46:2 55:1 176:20 | 29:10,25 48:22 | 136:6 174:23,24 | 99:23 101:21,24 |
| **favorable** 39:17 | 49:7,10,17 51:4 | 182:10 210:14 | 102:7 103:10 |
| **fax** 2:19,22,23 | 68:24 89:1 110:21 | **financial** 117:2 | 104:12 108:14 |
| 92:13 93:6,11 | 124:2,8 182:4,4,7 | 221:8 224:14 | 117:17 126:24 |
| 109:19 118:11,16 | 225:15 | **financially** 223:8 | 129:25 130:1,22 |
| **faxed** 115:18 | **files** 123:25 | **financing** 10:17 | 131:10 132:19 |
| 129:13 195:15 | **filing** 89:15 123:21 | 22:25 34:12 35:22 | 134:19 140:14 |
| 196:3 199:19 | 165:20,21 | 35:23 39:12 88:23 | 141:3,3 142:1 |
| **fdic** 62:1 | **fill** 94:10 225:7,8 | 94:4 110:13 114:5 | 145:20,25 159:11 |
| **february** 44:23 | **filled** 77:2 | 123:16 124:7 | 163:24 170:6 |
| 47:7 50:3,5 51:1,3 | **fills** 86:6 94:24 | 205:10 206:7 | 174:9 179:21 |
| 139:24 141:17 | **fin** 2:24 | 218:15 | 189:25 193:13 |
| 143:2 169:23 | **final** 11:8 54:4 | **find** 17:15 51:7,10 | 197:10 211:4 |
| 171:23 182:20 | 156:3 172:12 | 51:11 58:23 59:14 | 219:19 |
| 183:16 | 208:18 216:19 | 138:13,16 148:6 | **fisher** 190:14 |
| **federal** 7:12 226:6 | **finally** 170:16 | 157:15,21 164:17 | 191:17 |
| **fee** 107:4,8 | **finance** 2:18,21 | 199:18 | **fit** 25:6 187:24 |
| **feel** 72:14,15 98:11 | 4:7 23:3,6,12 | **fine** 19:14 20:6 | **five** 39:7,8 64:16 |
| 170:18 177:12 | 33:14,19 34:3,15 | 22:3 33:17 44:18 | 64:22 67:1,5 |
| 199:22 214:13 | 35:2 60:23 62:25 | 64:25 75:3 84:5 | 106:14 141:18 |
| **feet** 42:23 | 63:6 64:4,9,12 | 93:22 102:1,13 | 175:9 184:17 |
| **felt** 26:10 28:22 | 67:15,19 68:11,13 | 104:21 140:15 | 188:11 194:21 |
| **fifth** 106:14 | 73:6 74:16 76:16 | 151:14 186:7 | 202:6 |
| **figure** 70:12 76:4 | 79:7 82:5,10 83:5 | **finish** 12:11 | **fixed** 75:13,14,19 |
| 193:11,12,18 | 83:15,21 84:13 | **finished** 30:21 | **flag** 42:18 43:1 |
| 200:12 | 85:10 92:15 96:24 | 140:16 173:3 | **fleck** 1:19 223:20 |
| | 99:20 109:20 | 202:12 220:4 | |

Tiffany Alley, A Veritext Company

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

**[flip - giving]**

Page 17

| | | | |
|---|---|---|---|
| **flip** 78:19 81:19 85:15 87:17 98:22 102:24 | **formalities** 7:14 | 153:18 182:19 183:1,15 190:3,4 214:14 | **game** 215:9 219:19 |
| **florida** 84:8 112:17 151:22 | **format** 73:22 | **funded** 11:16 26:7 28:16 41:12 53:15 54:24 58:4,13 72:6,13 74:21 90:11,14 152:15 190:1 202:22 208:16 213:20 214:7 215:19 | **garage** 47:3 |
| **flow** 42:20 67:2 | **forms** 107:19 132:15 221:7 | | **gary** 206:12,13 213:14 |
| **focus** 164:23 165:19 166:4 | **forth** 147:16 | | **gas** 22:16 27:11 35:2 39:19 44:3 56:22 57:21 63:24 66:6,12 77:6 87:3 113:22 125:11 205:11 |
| **focusing** 168:17 | **forward** 36:1 152:2 156:12 225:12 | | |
| **folks** 197:11 | | | |
| **follow** 94:14 153:18 | **forwarded** 155:7 168:22 | | **gears** 123:15 |
| **following** 3:13 100:6 101:21 133:23 200:8 203:16 221:1,4 226:5 | **forwards** 200:16 | **funding** 2:6 9:12 10:17,23 11:1 15:4 43:5 54:4,5 54:15,21 55:19 95:5 190:8 202:17 203:13,14 210:25 214:11 216:19 | **general** 13:18 207:25,25 208:2,4 |
| | **found** 18:2 43:21 44:25 52:4 138:23 145:19 | | **generally** 65:11 89:22 125:1 211:2 |
| | **four** 47:7,17 54:3 55:18 56:23 67:1 67:5,5 106:13,16 111:25 113:23 175:9 | | **generated** 9:23 |
| **follows** 8:6 | | | **genius** 201:6 |
| **font** 187:17 | | **fundings** 161:3 | **gentleman** 61:3,9 |
| **force** 170:12 195:22 | | **funds** 26:15 27:24 30:3 61:23 75:25 98:4,8,10,15 107:8 181:12 196:17 | **georgia** 1:2,18 6:8 6:19 7:6 38:11 113:8 143:20 173:13 221:5,10 223:2 224:5,9 |
| **forced** 195:25 | **fourth** 56:18 146:1 146:6,22 | | |
| **foreclosed** 80:15 | **free** 199:22 | | |
| **foreclosure** 43:7 | **freely** 100:4 133:19 | **furnish** 226:9 | **getting** 18:7,9 31:20 45:24 61:6 107:16 153:6,11 153:14 178:2 |
| **foregoing** 223:3 224:4 | | **furnished** 122:17 | |
| | **freeze** 39:12 | **furniture** 23:6 64:13 77:5 | |
| **forge** 178:1 | **front** 33:6 73:16 77:18 90:15 92:12 108:22 213:20,22 214:7,9 | | **give** 19:5 40:19 48:5 53:6 59:21 101:16 112:11,20 137:10 164:19 187:21 215:12 217:7 |
| **forgot** 25:23 53:3 | | **further** 8:22 11:21 45:15 156:23 189:14 223:7 224:7 | |
| **form** 7:16 29:5 30:7 34:22 41:1 67:15,19 85:10 94:1 97:6 102:9 102:15,21 104:10 104:19 105:8,15 105:16,23 117:16 121:12 123:6 127:7 130:2 132:14 133:2,3 134:6 135:14 161:11 185:6 207:7 226:7,9 | | | |
| | **frustrated** 201:13 | | |
| | **fuel** 24:2 51:17 79:12,15 122:4,6 | **future** 70:11,12 122:17 161:3 164:14 211:12 | **given** 12:1 26:11 38:5 104:1 223:6 226:8 |
| | **fueling** 163:3,10 | **fyi** 154:12 155:5 | **gives** 41:21 70:8 70:10 215:18 |
| | **full** 20:9,12 26:8 67:4 71:25 192:18 196:12,18 215:18 | | |
| | | **g** | |
| | **fully** 53:15 | **g** 60:13 | **giving** 94:25 164:3 170:16 215:15 |
| | **fulton** 223:2 | **ga** 6:15 224:10 225:21 | |
| | **function** 133:3 | | |
| | **fund** 30:1,2 41:14 43:9 131:15 | **galvez** 15:22 42:9 42:10 | |

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

**[giving - happy]**

Page 18

216:13
**glanced** 37:20
**glasses** 75:2
185:14
**gmail** 15:7
**go** 8:2,21 17:23
18:13 19:8 21:4
28:21 33:10 36:22
37:21 38:1,16
41:14 43:2,10
50:23 51:9 52:11
53:2 54:25 61:2
62:15 67:25 76:14
77:7,14 78:23
80:1,4 82:7,19,20
84:11 85:15 86:19
90:13 98:13 99:15
101:6 105:11
108:1,1 113:10,12
115:10 120:15
122:5 125:25
126:6,17 127:10
129:24 131:6
141:2 143:16,16
144:22 151:16
152:2 154:4
156:23 163:17
164:13 169:1,19
170:3,21 171:6,16
171:22 173:4
175:8 185:5
188:21 191:19,23
192:17,23 198:23
199:12 200:5
201:5 214:18
216:18
**goatley** 51:14
**god** 62:20 187:23
**goes** 16:3 34:16
42:7 65:5 86:5
106:17 108:14,25

114:19 152:18
196:9 197:24
203:17 208:16
209:3 215:19
**going** 9:25 11:3
16:8 17:13 18:14
19:16 21:19 24:21
26:9 27:19 32:16
33:22,24 37:22
40:7 42:19,21
43:9 44:9 47:5,25
48:3 49:13 51:7
52:13,18 55:1,23
58:23 59:9 68:18
82:13 83:14,17
84:2,3,11,18 93:19
94:3 99:2 104:20
112:9,11,12
115:11 118:2
119:22 128:22
135:25 136:23
137:7 138:5,12
140:7 142:14,15
144:11 147:7,15
150:1,16,16 151:6
156:21,23 161:3
163:23 166:11
167:12 171:3,17
173:4 179:25
187:16 191:22
198:2 213:7
**good** 39:20 168:4
170:24 176:5
193:20 216:10
**goods** 32:21,23
**gotcha** 14:7 43:12
57:25 62:9 78:2
81:17 88:1,16
103:8 138:22
146:25 149:16
151:22 152:16

159:19,23 176:25
200:21 201:1
211:25 214:19
217:25
**gotten** 55:16
**grab** 109:4 126:13
**graduated** 75:13
**grand** 171:11
**great** 1:8 8:1 41:5
88:9,19 89:12
119:19 126:11
179:4 210:15
**greetings** 225:5
**grew** 60:18
**gross** 74:12,15
**ground** 55:18
**group** 158:6 179:4
179:24 192:7
204:9
**grouping** 84:9
**guarantee** 87:19
**guaranties** 88:13
89:8 90:24
**guarantor** 16:19
27:14 88:19 126:1
126:10
**guarantors** 9:18
124:9 166:6,10
**guaranty** 87:24,25
88:18 89:8,9,12
125:23 126:4,7
**guardian** 163:3,9
**guess** 17:3 22:18
22:21 39:2,5,9,14
40:1,2,4 47:7 49:9
55:14 59:16 63:25
97:24 121:10
155:19,21 159:18
160:4 185:19
191:20 192:11
205:24

**guessing** 27:5,18
63:20 153:21
185:17
**guy** 42:7 54:1 58:9
159:7 209:7 218:3
**guys** 164:17
171:16

**h**

**h** 60:13 192:10
206:15,15
**half** 190:4
**hand** 46:10 82:1,8
132:19 186:12,13
**handed** 173:5
178:22
**handle** 16:9 21:3,7
65:16 66:21 67:12
150:1,7 152:9
**handled** 224:8
**handling** 87:11
**hands** 60:23
**handwriting**
147:3 189:20,21
189:23
**hanging** 87:4
122:8
**happen** 58:10
215:8
**happened** 13:19
13:19 15:4 16:13
17:8 51:1 83:24
137:14 148:3,11
148:18 161:5
172:5 182:22,23
191:1 213:10
215:22 219:22
**happening** 148:11
**happens** 22:7
**happy** 161:2
214:17 216:6

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

**[hard - inspect]**

Page 19

**hard**  47:8 56:16
102:4
**hardware**  87:4
122:8
**he'll**  11:18 16:5
34:14
**head**  12:10 36:25
83:6 107:1 149:3
152:8 170:14
173:22 184:15
204:9,24 211:21
212:2
**headings**  79:1
**hear**  170:15
**heard**  16:22
159:12 201:20
**hedge**  214:11
**held**  61:3 84:7
112:17
**hello**  199:18
**hereof**  100:7
133:24
**hereunder**  101:18
133:12 187:2
**hernon**  154:17
159:4,5,11,21
160:25 161:21,22
162:8 164:10
183:13,14 204:23
206:13
**hey**  32:14 75:3
190:17
**hiding**  194:9
**higher**  66:11 99:7
205:23 206:1
210:7,8
**highlights**  4:5
**highway**  38:10
113:8
**hired**  59:23

**historical**  11:11
**histories**  13:4
119:4
**history**  80:2 81:22
183:4
**hold**  44:12 45:3
108:17 146:3
195:7,7
**home**  23:8,9,11
**homes**  23:12
**honest**  162:18
**honestly**  22:12
59:3 170:12
**hooked**  47:15
48:15
**horrible**  115:4,5
**hospitality**  23:5
**hotel**  77:4
**hotels**  23:6,7
**houchins**  206:12
213:14
**hours**  194:21
210:6
**house**  207:25
208:2,4
**housekeeping**  8:7
**houston**  14:4,9,10
14:12
**huh**  12:7,8 14:17
15:3 18:18 30:4
31:6 34:4 36:13
40:16 42:1,11
52:25 66:3 69:12
69:16 74:9 75:22
76:5 81:1 103:16
104:18 108:15
123:2 124:18
125:5 141:5
143:18 145:22
146:8 148:12
150:12 154:16

156:11 171:1
184:6 217:18

**i**

**idaho**  39:13
**idea**  91:18 171:20
218:10
**identification**
107:22
**identified**  9:7
**ignore**  59:11
**illegible**  114:20
**imagine**  115:9
**immediate**  159:17
**immediately**  43:2
103:22 105:1
135:1 159:21
184:4
**impacts**  223:14
**impartial**  223:15
**impartiality**
221:16 223:10
**implements**
205:21
**implied**  216:18
**important**  136:2
**impression**  68:14
**inaudible**  168:14
**inception**  77:12
78:3,5,8,11,14
**include**  27:19
116:13,17 155:1
**included**  79:11
108:12 111:9
112:3 126:19
127:22 131:19
135:6 184:11,19
188:19
**incorrect**  50:8
79:19
**index**  5:1

**indicate**  49:19
78:4 96:24 106:4
107:2 122:17
167:2 176:14
201:22 213:9
**indicated**  15:8
20:15 48:16 108:9
169:9
**indicates**  82:14
122:18,20 168:3
**indicating**  9:5
37:2 40:13 46:3
50:23 74:23 91:23
96:18 125:6 151:1
160:23 178:24
**individual**  20:3
**individually**  19:18
**individuals**  158:6
**industry**  22:25
23:5 38:19 39:6
39:11,21 181:8
208:21 209:6
**information**  51:25
59:2,12 118:23
149:18,21 155:6
184:3 202:15
206:10 210:4
**informed**  16:23
37:18 191:11
**initial**  16:5 42:12
52:6 54:3 103:21
134:25 216:21
**initially**  27:8
52:23
**initiate**  55:5
**initiation**  206:21
**inquire**  183:8
**inside**  45:9 47:13
47:15
**inspect**  24:7

**[inspected - jersey]**            Page 20

| | | | |
|---|---|---|---|
| **inspected** 46:3 | **intend** 102:19 | 143:17 144:1 | **j** |
| **inspection** 2:13,14 | **intended** 178:20 | 145:6,8,17 182:14 | |
| 2:15,16 10:6 | **intentional** 170:13 | 189:2,4,16,18 | **j** 1:8 |
| 17:24 43:20,25 | **interest** 17:18 | 190:5 | **jack** 219:13 |
| 44:5,22 46:20 | 28:10 29:3,8 36:7 | **invoices** 26:7 | **jackson** 17:11 |
| 47:20 48:8 51:23 | 67:6,9 69:24,25 | 120:21 145:4,24 | 18:2 24:2 25:8,11 |
| 52:11,22 53:5,9,18 | 78:15 173:14 | 211:3,5,11 | 28:13 36:8,9,16 |
| 54:1,20 56:5,10,14 | 221:8,14 223:9 | **involuntarily** 17:1 | 38:11,14 41:12,18 |
| 73:3 137:21 | **interested** 223:8 | **involved** 20:21 | 42:5 43:6,10 44:1 |
| 139:11 142:18,19 | **interests** 29:18 | 21:23 22:5 61:1 | 44:24 45:11 48:9 |
| 142:23 143:6,6,15 | 204:3 | 65:4 66:15,19 | 49:14,20 51:7,11 |
| 145:12 152:23 | **interject** 165:3 | 175:6 178:6 189:1 | 51:14 71:11 72:19 |
| 153:17,25 | **internally** 82:25 | 207:10 | 72:20 73:3 76:9 |
| **inspections** 24:1 | 165:5,11 | **involving** 68:10 | 76:17 77:16 82:5 |
| 51:21 58:17 | **international** 77:4 | 76:17 181:7 | 120:11,19 132:13 |
| 139:13 153:1 | **interpret** 172:9 | **irregular** 77:9,25 | 137:11,17 139:8 |
| **inspector** 24:6 | **interpreting** | **irrevocable** | 144:1,7,9 145:2,9 |
| 45:6,17 47:6 | 162:12 | 186:10,14 | 145:19 148:4 |
| 51:13 142:9 | **interrupted** 22:2 | **island** 14:6 | 154:1 172:5 |
| **install** 31:16 35:25 | **interruption** | **issue** 26:9 49:20 | **january** 89:2 90:8 |
| 201:20 | 101:23 | 159:14 160:3,6 | 90:10,19 111:16 |
| **installation** 122:12 | **introduce** 9:1 | 216:12 | 114:6 115:18 |
| **installed** 31:14,20 | **introductory** | **issues** 42:21 | 118:12 127:3 |
| 54:8,12,16 55:21 | 103:10 | 146:10 163:1,13 | 137:10 138:10 |
| 56:23 57:16 58:5 | **invest** 114:25 | 175:5 | 192:22 193:8 |
| 58:14 91:11,16,17 | **investigating** | **it'll** 196:18 | 194:14,25 196:23 |
| 95:18 214:17 | 219:22 | **item** 69:11 70:19 | 199:13 200:7,14 |
| **installment** 67:23 | **investigation** | 70:21,22,25 71:3,6 | **jerry** 13:15,16 |
| 68:7 | 24:24 27:2 53:18 | 71:10,19 72:1 | 14:8 15:15 26:23 |
| **instance** 66:18 | **invoice** 45:11,22 | 103:19 107:4 | 26:25 27:3 42:17 |
| **instruct** 30:18 | 72:9,12,24 73:7 | 134:23 180:3 | 43:3,4 52:2 |
| **instructions** 94:14 | 85:19,21 86:5,5,11 | 181:24 | 154:10,15,20,25 |
| **insurance** 2:5 9:4 | 86:13,14,18,25 | **items** 15:5 18:1,23 | 155:5 156:10 |
| 173:9,11,17 | 87:1 90:12 110:1 | 28:24 34:3 36:2 | 159:16,17 161:4 |
| 195:18,21,22,25 | 110:7 111:1,2,6,9 | 45:10,22 47:14 | 163:5,5,24 164:1,8 |
| 196:2,7 197:2,8,21 | 111:21,22 113:15 | 54:15 72:8,11,23 | 164:9,18 167:12 |
| 198:9 | 113:17,20 120:18 | 73:11 94:10,14 | 168:2,22 170:23 |
| **insured** 9:5,6 | 122:1,5,13,16,21 | 103:22 104:5 | 183:13,19 200:2 |
| 173:10,17 | 123:11 137:11,20 | 105:2,5 113:19 | 211:21 217:24 |
| **intact** 63:13 | 137:24 138:1 | 122:21 129:16 | **jerry's** 183:17 |
| 157:23 | 139:8 142:4 | 135:1 180:5 | **jersey** 14:1 63:16 |
| | | | 93:12 204:13 |

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

**[job - len]**

Page 21

**job** 54:5 59:21
113:3 137:12
172:5,12,16,21
209:13
**john** 219:7,11
**joke** 162:8,12
164:17
**jones** 6:13 24:8
48:11,12 51:20
142:25
**judge** 10:1 177:19
**judgment** 21:9,9
70:1
**july** 49:7 56:20
**jumping** 53:1
**june** 84:8 120:25
123:17 126:5
128:19 129:23
164:24 169:20,23
169:25 170:8

**k**

**k** 60:12
**keep** 24:21 92:12
189:12 216:5
**keeping** 61:12
**kennedy** 219:7,9
219:11
**kept** 63:12 114:11
147:25 178:23
**kevin** 6:3 13:7
27:22 52:6 56:2
114:23 147:19,23
148:6 149:11,20
150:14 161:6
163:25 164:5
166:23 167:5,6
168:11 186:15
198:6 217:7 225:1
**kevin's** 27:21 52:3
**kidding** 151:1,7
166:22 194:10

**kim** 199:25 200:15
**kind** 46:14 69:13
80:7 172:24
174:10 214:11
**kingwood** 14:11
61:14 62:17
114:14
**knew** 36:15 144:5
149:22 150:16
**know** 13:20 15:19
15:20 16:7 18:20
19:22 20:2 22:4
22:12,13,15 23:3
28:20 33:25 36:4
37:24 38:15,17,20
38:22 39:1,4,15,25
40:3,5,21 41:23
46:3,17 47:16
51:15 53:1 55:14
56:7 57:13 58:8
59:3,4,7,9 63:7,10
63:17,18 64:19
65:22,23 66:5
69:2,3 79:7,25
83:4,19,24 85:5,7
86:12,14 88:3
89:22 93:9,25
95:13,21 97:14
100:20,24 101:2
104:9 105:24
106:1 109:15
112:4,6 113:4
114:13,16 115:1
118:24 121:2,14
121:15 123:7,8,9
124:11 125:12
127:16 128:11
129:6 134:7
135:23 139:23,24
140:16 141:3
147:15 152:22

153:22 154:24
158:23,25 159:21
162:10 163:7,9
168:11 170:4,13
170:19 171:2,12
171:13 172:5
177:4 178:9,17
182:15,23 183:9
184:11,23 185:1
185:16 187:25
190:18 191:6,9,13
191:15 192:1
195:17 197:9,11
198:16 206:4,10
207:7,14,18,22
208:13 209:14,15
209:18,20 212:6,8
212:10,20 213:17
214:24 215:1,7,25
216:3,6,17,20,21
216:24 218:3,8,17
218:21
**knowingly** 28:14
**knowledge** 20:2
28:4,7 55:12 58:7
72:11 114:8
160:16 172:23
210:12,13,22
**knows** 20:3 40:6

**l**

**labeled** 80:10
**labels** 45:19
**lacowl** 218:17
**laid** 148:13
**landlord** 125:12
136:17
**language** 116:13
116:17 134:1,2
135:4 149:15
185:25

**larger** 61:11
**late** 42:22 182:1,9
**law** 6:4,12 64:13
221:5
**lawsuit** 20:21
26:22 27:3,20,25
48:22 49:17 51:4
53:19,24 69:9
170:20 210:19,24
213:17
**lawsuits** 21:3
**laying** 145:2
**layman's** 69:14
**lead** 130:9
**leads** 54:8
**learn** 17:13
**learned** 15:20
16:14,14,17,18,18
17:20 23:25 24:14
24:23 25:10,19
42:24 44:1 58:17
58:20 60:23 73:4
137:17 219:19
**learning** 58:4,13
59:2
**lease** 68:7
**leases** 61:21 68:8
**leasing** 60:8,13,16
61:18 136:7,14
**led** 153:24 172:2
**left** 62:21 76:20
88:15 132:19
162:19 185:10
186:12,13
**legal** 170:13
**legible** 83:20
92:19 109:20
127:17 135:23
188:14
**len** 3:14 8:20
13:20,20,24 14:1

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

**[len - looks]**

Page 22

15:15 38:8 55:15
58:16,17,18,20,25
59:7,11,16 63:3
139:7 151:20
152:20 154:17
157:19 158:18
159:22,25 160:5
160:14 162:15
163:5 164:6,10,11
164:17 168:2,8
170:23 171:15,17
172:2,4 184:10,12
184:15,19 204:13
204:16 205:17,19
205:20,23 206:2
218:8
**len's** 93:12 169:11
205:25
**lenny** 14:13
**letter** 16:7 27:23
28:3 40:22 41:1,5
41:11 42:6,14
43:10 51:5 52:6
94:3 111:16
163:25 164:3,8,13
**letting** 98:13
**level** 16:5 39:21
97:7,11
**levels** 205:1
**lien** 28:25 121:8
123:20,24 125:7
139:19
**lift** 1:7 7:4 11:12
11:16 26:19 97:23
98:1 111:3 122:20
130:23 163:12
164:2 174:24
175:6 178:6 214:6
**light** 25:12,15
26:18

**likes** 187:24
**line** 75:7,20 80:7
97:2,13,15,17
131:10 145:14
155:16 193:13
226:11,14,17,20
226:23 227:1,4,7
227:10,13,16
**lines** 98:25
**lingering** 218:4
**linton** 218:25
219:1
**listed** 73:11 80:9
145:4,7,17 177:14
**listen** 98:19
**listened** 98:18,20
**lists** 11:15 69:24
173:11,12,13
**litigation** 21:23
22:5 187:19
**litsup** 224:10
**little** 17:21 23:2
38:16 43:17 45:15
59:20 60:20,22
62:15,15 64:23
70:20 76:20
114:25 118:19
134:5 195:1
**live** 20:18
**lja** 1:6
**llc** 1:4,8,9,9 7:4
18:16 87:25 88:2
126:2,11 188:9
**llp** 6:13
**loan** 32:9 65:5,6
65:20,25,25 66:15
66:16,19 67:11
68:2,3 69:23 70:7
86:19 97:4 190:18
190:21,25 191:6,8
191:11 204:20

**loaning** 74:16
**loans** 22:9,10,13
22:15 61:22 63:24
64:8 65:17,21,21
66:6,12,21 68:6
160:15 162:16
176:16 201:16
209:16 210:8
212:5
**locate** 156:7,9
**located** 46:24
114:13 173:12
204:13
**location** 9:5 38:10
95:16,17 113:8
120:11 143:19
**locations** 16:23
17:9 36:15 51:22
**lon** 152:6,8,21
204:8,9
**long** 14:5 60:4
145:14 188:25
214:1 216:18
**longer** 27:13 55:17
64:23 219:5
**longstanding**
164:7
**look** 19:3,10,12
28:21 38:9 43:13
43:15 44:8 45:3
45:12 48:5 50:21
50:21 52:24 53:6
56:2,7,17,18 69:10
72:16 73:18 77:20
81:12,21 82:7,13
85:12 90:13 91:3
93:4,23,24 94:19
95:23 96:8 97:13
97:17 99:15,17,22
101:12 105:13
106:3,6,7,8,13,22

110:8,12 111:5,6
111:12 112:8
113:11 114:4
115:3,16 116:10
116:21 117:4,11
117:11,18,23
119:4,13,14 120:5
121:25 126:13
128:21,24 129:5
129:25 130:3
133:6,6 135:10
138:8 140:10,10
143:19 145:20
152:19 154:14
155:5,22 156:14
158:2 160:17
162:1 167:12,19
169:20 180:8
183:11,20 184:4
185:3,6 194:23
202:8 213:3
**looked** 46:7 48:13
53:21 55:7 56:12
129:9 141:1
159:17 169:9,10
**looking** 46:4 75:16
85:4 92:8 110:24
130:9 140:14
164:12 189:12
**looks** 43:4,25 53:9
57:9 90:19 101:22
116:9 118:19
126:23,24 129:8,9
132:18 147:23,25
153:10,15 161:4
164:16 167:4
173:10 179:2
181:25 185:13
187:9 188:10
189:24 190:1,3
192:15,21 193:7

**[looks - mckenzie]**                                                          Page 23

197:13
**losing** 150:21
**loss** 9:8
**lot** 21:3 22:25 44:2
  56:15 57:2 60:20
  61:21 77:2 108:20
  124:22 148:13
  150:20,21 152:9
  205:6 208:5
**loud** 97:20 98:25
  100:2 101:13
  103:13 162:23
  170:7 171:9
  195:11 199:17
**loudly** 12:6
**low** 97:7
**lower** 16:4 97:11
  132:19
**lunch** 64:23

**m**

**m** 20:13
**macon** 6:15
**mail** 2:25 3:5,6,7,8
  3:9,10,11,12,16,17
  3:18,19,20,22,23
  3:24 15:10,11
  16:6 129:18
  131:19 137:6
  138:9 139:22
  141:3,6,13,21
  142:1,7,16 144:15
  144:24,25 145:13
  147:2,11 149:1
  150:5 152:1,20
  154:6,10,14,21,23
  156:9 157:12,22
  159:25 160:11
  162:6 163:4,24
  166:11,21,21
  167:3,11 168:2,13
  168:17 170:23

183:12 190:13
193:17 194:24
195:11 196:22
197:24 198:4
199:13,24 200:14
201:2 212:13
225:10
**mailed** 118:22
  129:10,22 155:4
**mailing** 105:19
  139:6 194:16
  199:3
**mails** 137:8
  147:16 153:23
  156:21 164:9
  167:24 183:25
  197:15 198:1
  213:4,4
**main** 14:4 22:22
  23:13,14 46:15
  61:13,16,20 62:11
  63:25 64:3,3
**maintain** 123:5
**maintaining**
  221:16 223:10
**majority** 208:25
**making** 9:8 55:8
  55:13 58:21
  107:10 162:9
  170:10 177:2
  221:15 226:8,8
**manager** 59:25
**mansville** 218:23
**manually** 225:8
**march** 141:13,18
  188:24 190:2
**margin** 186:13
**maria** 2:19 92:14
  93:11,18,21
  115:18 118:12
  129:12 152:20

204:11 212:24
213:9 218:1
**mark** 9:25 11:4
  18:14 19:4,16
  84:16,17 95:23
  112:12,19 115:11
**marked** 3:14 4:3
  8:13,15 9:2,15,19
  10:3,9 11:6 19:6
  19:20 44:10 48:1
  52:20 55:25 68:20
  84:20 92:10,21
  95:24 110:1
  112:24 113:25
  114:9,10 115:13
  115:23 117:19
  118:4 119:24
  120:2 128:23
  130:5 131:20
  136:24 138:6
  139:2 140:8
  144:13 147:8
  148:23 151:17
  154:5 158:3
  160:18 162:2,21
  163:18 166:13
  167:21 169:2
  173:2,6 176:4,11
  180:4 181:18,19
**market** 22:17,23
  66:9
**masoodzadehgan**
  27:9 36:6 87:19
  88:12 91:14
  126:18 128:8
  130:14 210:14
**masoodzadehgan's**
  127:2 128:16
**master** 151:13
**match** 24:12
  142:10 143:13

145:13
**matched** 146:19
**math** 41:19
**matter** 8:7,17
  10:14 11:9 13:18
  21:14 35:22 67:14
  119:13 147:19
  158:24 165:9
  173:21 186:22
  210:6,19,23 212:6
  221:15 222:3
  223:10
**matters** 8:10
  10:15,19 199:11
  208:7
**mcanarney** 200:1
  200:15
**mcarnarney** 200:2
**mckenzie** 5:2 6:11
  7:2,21 8:1,25 9:11
  11:24 19:4,7,15,21
  29:6 30:15 31:1
  36:19,22 37:1
  40:4,9 43:17
  44:12,15,18 48:2
  50:14 52:16,21
  55:23 56:1 64:18
  64:21 65:2 68:17
  68:21 74:24 84:21
  92:7,23,24 95:25
  102:10 103:9
  109:4,7,10 112:14
  112:15,22,25
  115:11,14 118:2,5
  119:22,25 121:13
  128:22,25 129:2,4
  130:6 136:23
  137:5 138:4,7
  139:1,3 140:6,9,24
  144:11,14 147:6,9
  148:21,24 151:12

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

**[mckenzie - negotiated]**

Page 24

151:15,20,24,25
155:2,13,17 156:1
157:6,8,16,24
158:1,15,17,22,25
159:3 160:19
161:25 162:22
163:19 165:17
166:7,8,14,20
168:10,16,18,25
169:4,24 174:4,8
174:14 177:20
178:2,3,19,25
179:3,8,13,18
180:16,25 187:18
187:21 188:2,17
188:18 194:5,7,8
198:6,22 199:7,10
200:11,21 201:1,6
201:7 202:5,8,12
202:14 220:4,6
**mean** 21:2,2 23:23
28:10 32:25 33:22
37:10 39:3,24
53:20 57:18 59:5
59:5,7 65:13
74:25 77:9 78:11
78:11 83:2,4
90:21 95:22 99:5
100:19 103:25
104:16 108:25
109:25 111:23
116:22 121:10,18
123:8 133:2
134:12 135:23
141:18 144:23
148:1,4,10 149:2
149:11 152:22
155:15 157:3
160:20 161:17
164:22 175:10,12
175:18 184:13

185:15 190:21
196:14 202:23
205:19 207:22
208:16 215:5
**meaning** 77:6
97:24 145:18
161:2 164:18
175:19 193:8
196:18
**means** 38:17,20,23
39:1 77:25 78:12
100:21 104:23
107:5 153:21
160:12 161:9
175:11 176:11
185:16 196:15,17
**meant** 134:12
149:17 207:15
**meeting** 13:7
**memo** 155:24
**memorized** 85:7
**memory** 51:2
**mentioned** 42:7
73:11 177:24
217:9 219:6
**mentioning** 31:2
104:8
**message** 169:20
171:3 172:3
200:16 212:13
**messages** 3:25
169:9,13
**met** 201:12
**middle** 1:2 7:5
38:12 39:13 52:15
77:8 174:3 186:12
**mind** 28:17 44:13
155:22 157:7,11
157:14 163:3
217:8

**minds** 150:18
**mindset** 165:11
**mine** 179:20
189:15
**minus** 28:23
**minute** 64:16,22
101:17 105:14
115:16 156:8
202:6
**minutes** 201:3
**misprint** 79:18
**missing** 147:25
**mistake** 47:21
**mistaken** 24:8
**misunderstood**
21:15 207:4
**mixed** 153:6
**modification**
66:22 67:9,12
**modifying** 67:4
**monarch** 1:17
**money** 26:12 30:5
33:5,10 43:5 68:3
70:15,18 71:2,4
72:15 98:13
148:13,14 150:21
172:7 196:19
202:2 211:18
215:13 216:13
**monitoring** 47:14
51:18 72:22 79:15
122:10
**month** 22:8 42:21
42:22 83:23
105:18 165:22
176:24 185:18
188:25 192:16
**monthly** 33:21,23
34:7 74:13 75:10
**months** 13:6 41:8
47:7,17 54:3,4,14

54:23 55:13,19
56:11,13 57:11
67:2,5,8,9,10
101:23 147:22
156:17,22 169:14
172:19 176:23
**morning** 36:21
**mortgages** 16:25
**move** 203:13
**murdered** 116:7

**n**

**n** 20:14 60:13,13
192:10 206:15
**name** 20:9,12 24:4
61:15 87:21 94:25
126:23,24 127:3
128:17 129:18
131:1
**named** 42:7
**nationwide** 61:22
**nature** 9:24
**ne** 1:16 6:7 225:20
**near** 45:24
**necessarily** 10:12
90:21 111:22
184:14
**necessary** 226:9
**need** 23:9,11 83:18
93:2,2 98:11
119:17 152:25
153:16 155:22
156:22 164:14
177:24 179:19,20
210:4
**needed** 67:3 94:7
150:19 184:2
191:12
**needs** 35:23 84:2
125:16
**negotiated** 100:4
133:19

Tiffany Alley, A Veritext Company

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

**[negri - oh]**

Page 25

**negri** 2:19 92:14
  93:11 115:18
  118:12 129:12
  204:11 212:24
**never** 21:4,4 44:13
  48:14,14 61:1
  66:11 73:8 74:21
  160:6 183:6
  196:10,21 199:21
  212:20 214:21
  215:22 216:11
  218:16
**new** 14:1,5 20:16
  20:18 48:14 60:17
  61:19 62:7,14
  71:8 93:12 151:13
  187:20
**nichols** 219:13,17
**nile** 179:5
**nine** 48:17,19
  51:20 122:4,6
  138:11,11,14
  139:9 143:7 144:8
  145:2,9,17
**nod** 12:10
**nods** 36:25 83:6
  107:1 173:22
**non** 100:9,14,16
  102:8,17 103:21
  105:6 107:7
  116:14 133:15
  134:25 186:2
**noon** 13:15,16
  26:23 27:3 42:17
  64:21 154:10,15
  154:21 157:22
  163:6 165:5
  167:12 168:2,23
  200:2
**noon's** 14:8

**normal** 42:19 99:9
  99:10 173:23
  175:13
**notaries** 224:5,9
**notarize** 167:9
**notarized** 224:9
  225:9
**notary** 227:24
**notations** 158:13
**note** 190:10,11
  194:11 199:19
**notebook** 151:2
  167:20
**noted** 226:4,5
**notes** 90:14 182:15
  183:25 184:8
  192:24 193:1,21
  193:23 202:8
  217:11,15
**notice** 2:6,11,12
  8:9,18 9:13,16
  10:15,16 11:10
  18:15,19 19:17
  41:16 180:6,13
  208:9
**noticed** 49:22 50:2
  66:11 210:10
**notices** 7:9
**noticing** 222:2
**noting** 225:7
**november** 17:3
  50:8 171:7
**nsf** 107:7
**number** 7:6 22:12
  24:24,25 52:19
  57:5,10 69:11
  70:4,19 71:13,19
  73:1 74:13 76:15
  76:16 79:5,9,11
  80:4,18,25 81:2,3
  81:13 82:2 84:23

  85:3 86:7,8 92:16
  95:1,14 97:17
  101:10,23 106:10
  106:11,14,22
  107:20 113:3,5
  115:19 117:13
  118:3,16 119:5
  120:2 127:20
  132:9 145:6
  174:11 180:19,23
  181:2,3,16,24
  185:5,10 188:5
  192:6 193:9
  195:15 196:3
  208:8
**numbering** 81:24
**numbers** 8:17
  24:10,11,12 42:4
  70:2 71:14 75:1
  81:6,14 85:6
  96:24 97:13,15
  106:16,19,23
  127:23 139:9,12
  139:14 142:8,10
  143:9,10,12,14
  145:5,10 146:19
  146:19
**numerous** 142:23
  170:15
**nursing** 23:8,9,11
  23:12

---

**o**

**o** 20:14 60:13,13
  192:10 206:15
**object** 29:5 30:7
  34:22 102:9,15,21
  104:10,19 105:8
  121:12 127:7
  161:11
**objected** 8:11
  30:10

**objection** 30:17,22
**objections** 7:16
  8:13
**obligated** 32:11
**obligation** 32:2
  101:14 133:11
  186:18,24 187:1
  221:16 223:10
**obtain** 21:8 122:19
  138:21
**obviously** 147:18
  156:8 208:25
**occupancy** 18:8
**occur** 58:4
**occurred** 10:23
  34:17 153:12,13
  183:7
**occurrence** 22:6
**ocga** 221:7,8 222:4
  224:12 226:7
**october** 10:6 16:15
  17:3 41:9 44:7
  47:6,20 51:9
  69:25 152:20
  153:7,24
**offer** 164:4 171:16
**offered** 138:16
**office** 13:24 14:2,4
  14:5,8 20:16
  63:16 64:10,13
  83:22 93:12 156:9
  204:13
**officer** 161:23
  223:15
**offices** 225:3,10
**official** 40:19 58:3
**oh** 21:15 23:17
  38:13 44:8 46:8
  59:12 60:11 71:7
  77:7,13 85:2
  87:12 91:23 97:21

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

**[oh - ongoing]**

Page 26

| | | | |
|---|---|---|---|
| 103:10 115:7 | 79:4,10,20,22 80:3 | 129:11,15,19,24 | 184:22 185:2,8,15 |
| 132:2 140:13 | 80:6,14,16 81:18 | 130:18 131:8,11 | 185:21,24 186:18 |
| 144:18 169:5,22 | 81:20 82:7,18 | 131:13,17,22 | 187:7,15 188:3,8 |
| 176:6 185:5 | 83:11,16 84:14,15 | 132:3,5,7,11,14,21 | 188:11,17,17 |
| 187:23 194:15 | 85:4,8,12,12,18,20 | 132:24 133:5,8 | 189:11,17 191:10 |
| 195:17 198:13 | 86:9,12,16,21 87:8 | 134:11,16 135:9 | 191:14,25 192:4,5 |
| 200:10 | 87:13,15,17,22 | 135:13,19,22 | 193:1,3,15,19,21 |
| **oil** 218:23 | 88:1,6,16,17,22 | 136:2,10,16,19,22 | 194:10,19 195:6 |
| **okay** 7:21 12:4,9 | 89:11,14,16 90:10 | 137:4,23 138:3,15 | 195:11,20 196:8 |
| 12:18,24 13:10,11 | 90:16,25 92:3,8,17 | 138:19 139:15,20 | 196:22 197:14,19 |
| 13:16 14:3,10 | 92:20,25 93:3,8,17 | 139:23 140:5,18 | 197:22 199:6,14 |
| 15:13,23 16:11 | 93:20 94:16,18,20 | 140:22 141:1,9 | 199:16,24 200:5,8 |
| 17:5 19:19,25 | 95:6,10 96:10,15 | 142:3,22 143:5 | 201:8,10,22 202:4 |
| 20:6,7,20 21:6,17 | 96:21 97:2,7,12,16 | 144:4,10,21 | 202:11 203:7,15 |
| 21:21 22:14,20 | 97:18 98:16,21,23 | 145:20 146:6,20 | 204:17,18 205:6 |
| 23:20,22 25:9 | 99:11,14,16,18 | 146:25 147:5,6,14 | 205:18 206:17 |
| 26:20,24 28:2,4,8 | 101:1,9,11 102:23 | 148:20 149:13,24 | 207:21 208:7,11 |
| 29:2,7,11 30:10,19 | 103:1,5,12 104:15 | 150:24,25 151:5 | 208:12,12 209:5 |
| 30:25 32:24 35:19 | 104:20 105:10,12 | 151:21 152:13 | 209:12,15 210:11 |
| 36:3 37:13,23,25 | 105:20 106:2,15 | 153:9 154:3,14,16 | 210:21 211:8,14 |
| 38:7,15 40:14,18 | 106:21,24 107:10 | 155:9,13,14 157:2 | 211:23 212:3,12 |
| 41:3 42:6 44:8,14 | 107:14,16,18,20 | 157:6,17 158:2,4 | 213:6,12,16,19 |
| 44:20,21 46:8,19 | 107:24 108:4 | 158:10,24 159:4,8 | 214:15,24 215:2 |
| 47:23 49:10,24 | 109:14,24 110:5 | 160:24 161:13,19 | 215:21 216:21 |
| 50:6,9,18,19,24,25 | 110:14,23 111:5,7 | 162:3,7,11,13 | 217:3,10,12,23 |
| 51:2 52:7,9,10 | 111:15 112:5,7,18 | 163:7,13,16,22 | 218:7,11,17 |
| 53:9,11,17,23 | 112:22 113:4,6,9 | 164:5,8 165:12,15 | 219:15,21,24 |
| 55:22 56:4,9 | 113:14,17,19,24 | 166:1,11,19 167:1 | **old** 47:17 60:9 |
| 57:20,22 58:24 | 114:3,15,22 115:9 | 167:11,19,22 | **once** 16:3 21:8 |
| 59:4,12,19 60:7 | 116:4,6,21,23 | 168:9,19,20,24 | 27:21 29:20 42:18 |
| 63:2,15,23 64:11 | 117:6 118:1,11,18 | 169:7,12,15 170:4 | 94:6 100:21 101:2 |
| 64:15,24,25 65:12 | 118:25 119:3,3,6,9 | 170:22 171:5,8,21 | 101:4 139:7 |
| 65:18 66:4,14 | 119:15,19 120:8,9 | 171:25 173:1,4,19 | 152:11 196:16 |
| 67:21,25 68:14 | 120:16,20,24 | 173:25 174:10,25 | 207:16 225:9 |
| 69:6,16,18 70:6,19 | 121:1,5,16,24 | 175:4,8,14,17 | **one's** 188:1 |
| 70:24 71:5,10,12 | 122:7,15,22 | 176:7,9,13 177:6 | **ones** 23:14 62:20 |
| 71:24 72:3,7,10,16 | 123:14 124:2,12 | 177:11 178:12,13 | 152:14 206:25 |
| 72:25 73:14,18,21 | 124:14 125:1,19 | 178:25 179:13,17 | 207:9 214:5 216:8 |
| 73:25 74:6,7 75:5 | 126:3,12,16,20 | 179:22 180:9,21 | **ongoing** 175:19 |
| 75:12,15,18 76:19 | 127:9,12,14 128:3 | 181:1,5,15,17,22 | 203:2 |
| 77:14,23 78:17,21 | 128:7,20,21,21 | 182:8,13 184:16 | |

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

**[open - pay]**

Page 27

**open** 45:24 54:17
54:17 55:17,21
58:21,22 59:14
138:12
**opened** 25:12
**opening** 134:20
**operation** 27:13
62:17 63:12
121:22
**opinion** 34:18 35:8
35:16,20,21 39:6
59:6 73:10 102:14
**opportunity** 129:7
**opposed** 39:17
105:19 147:21
155:24 165:13
**options** 205:10
**order** 10:1 33:5
50:3 177:18
179:19 181:10
184:24 198:21,24
**ordered** 43:21,25
44:22 54:19
**ordering** 222:13
225:13
**orders** 178:10
**organization**
155:8
**original** 12:23
45:13 46:17 156:9
157:22 174:7
225:12,15
**originally** 77:19
**originate** 22:10
66:6
**originated** 184:21
**originating** 160:15
**oshun** 179:4,24
192:7,11,12
**outcome** 49:12
223:8

**outlined** 71:3,18
72:1
**outstanding** 67:7
**oversight** 202:21
202:24 203:2,19
**owe** 71:25
**owed** 71:20 82:4,9
82:15
**owes** 70:15,18
71:2,4 72:15
**owing** 69:20
**owned** 36:6 61:3,4
62:3 63:4 88:5
121:6
**owner** 61:6,7,10
125:4,13,15

**p**

**p** 20:13 43:13
**p.c.** 6:6
**p.m.** 1:14 65:1
109:9,9 194:25
202:13,13
**pack** 52:15
**package** 91:22
93:14 108:13,14
214:25
**packaged** 45:18
**packet** 111:19
**page** 2:3,7,10 3:3
5:1 19:11 56:18
57:14 78:19 81:24
82:8,14,20 87:18
88:14 91:4 93:4,5
93:5,24 94:19
96:12 98:22,24
99:17,19 100:6
101:6,24 102:7,17
102:24 103:6
105:11 106:9
107:20,21 108:1
111:13 113:12

114:4 115:25
116:5,16,21
119:16 120:15
124:15 125:25
129:25 130:1
131:6,24 132:6
133:23 134:15
141:3,9 143:11
154:6 169:21
170:2 171:6,22
183:11,12 184:4
187:25 190:10
192:24 194:24
197:23 198:2,4,5
199:12 200:5,13
200:15 226:11,14
226:17,20,23
227:1,4,7,10,13,16
**pages** 85:16 87:18
118:10 143:17
189:12 190:9
226:9
**paid** 24:16 25:23
26:3,16 29:1 33:6
45:2,2 48:9,18,19
58:19 73:5,5 76:6
76:8,11 98:6
103:19 134:23
145:18 146:18,22
172:15,18,20,21
175:12,13 176:1
176:12 196:12,18
208:14 216:15
218:9,9,15
**paper** 114:18
143:13
**paperwork** 21:7
**paragraph** 69:13
69:20 70:16 71:6
71:10,15,19 72:1
103:11 104:3

116:11,16 134:20
146:2,7,18,22
**paragraphs**
145:21,25
**paren** 201:15,16
**part** 24:24 25:22
26:5 31:16 36:14
37:22 45:7 79:21
84:17 100:7
104:12,13 125:14
133:24 160:11
172:22 188:5,20
**partially** 51:16
**particular** 77:5,17
86:11 107:13,15
**parties** 102:19
164:4 222:5,13
223:15 224:13,14
225:13
**parts** 136:3
**party** 20:22 100:4
100:7 121:2,21
123:24 133:19,24
136:11 153:22
221:17 222:6
223:7,12 224:13
**pass** 56:2
**password** 222:12
222:13
**pasted** 200:23
201:9
**pasting** 200:25
**patrick** 194:15
195:13 197:16
200:16 201:9
**pay** 16:8 25:2
26:15 28:20 30:1
33:10 43:6 67:6
68:1,6 77:17
95:19 101:15
131:3 133:12

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

**[pay - plaintiff's]**

Page 28

153:14 187:1,2
209:13
**payable** 187:2
**payee** 9:8
**paying** 26:6 32:17
42:21 55:8 59:13
73:7 150:23
**payment** 9:13 13:4
66:22 67:8,12,24
68:4,7 74:14 75:7
75:10,12,13 77:8
77:20,22 78:4,6,8
101:21 105:22
119:4 133:11
183:4
**payments** 17:22
28:19,21,23 29:23
31:11 32:15 33:6
33:21,24 34:7
41:24 55:8,13
58:22 67:4,4,10
70:9,11,12 74:8,13
75:6 77:24 78:1
78:12 80:9 90:1,5
101:5,10,14 105:1
105:18,21,24
106:3,25 107:10
116:17 133:7
176:10,13,14,18
176:24 177:2
183:1,3 186:22
215:10,15,17
**payoff** 175:16
193:4,7,10,12,17
194:17,20,22
**pays** 121:7
**pdf** 225:6,7
**peachtree** 1:16 6:7
225:20
**pen** 158:21

**penalty** 184:24
**penny** 214:18
**people** 15:16 23:1
29:24 60:18 62:3
62:14,19,20 63:17
170:12 175:15
183:23 196:2
197:8,17 203:16
204:7,9,24 205:23
**people's** 150:18
**percent** 22:19
41:12,14,18 43:9
45:8 50:13 52:8
55:19 61:4,5,6,7
61:10 63:22 65:7
70:1 74:22 77:18
81:5,8 131:16
153:14,16,18
179:10,23 182:18
183:1,14,17 188:9
190:1,3 209:4
213:20,20,21,22
214:7,7,8 215:13
217:22
**percentage** 22:15
65:20,23 66:5,12
210:7,8
**percentages**
214:11
**perfect** 29:8 36:7
160:24
**perfecting** 29:18
204:2
**perform** 32:11
131:18
**performed** 44:6
50:17 80:22
**period** 45:5 67:7
142:15 168:5
219:22

**perrier** 218:22
**person** 29:17 95:1
203:7 206:9,13
207:23
**personal** 16:19
27:13 87:24 88:12
125:10,17 201:16
**personally** 23:4
123:1 166:9
214:22
**pertain** 10:16
**pertaining** 28:12
**pertains** 165:10
190:16
**peruse** 129:7
**pesco** 163:2,7
**peter** 20:13
**petroleum** 1:8 9:6
9:17,22 13:2 24:8
25:21 31:25 35:2
41:4 48:12 70:17
71:4 121:3 122:2
122:25 124:3
129:12 165:21
173:10 175:21
177:1 210:15
212:14 214:25
**pgs** 2:23
**phoenix** 1:8 9:5,17
9:22 13:2 16:20
25:20 27:10 28:19
29:15 31:24 35:2
35:6 36:12 39:10
39:19 41:4 42:25
55:12 58:19 59:12
68:10 70:17 71:4
74:19 76:7,9,11
77:17 88:8 91:19
93:14 99:21
105:25 110:19
111:4 121:2 122:2

122:19,25 124:3
129:12,22 150:1,8
150:23 161:17
165:20 173:10
175:3,20 177:1
193:22 210:15
212:14,15,17
214:24
**phoenix's** 77:22
219:8
**phone** 14:18 16:5
59:8 95:1 150:14
165:2
**phonetic** 15:22
218:17,18,22,22
218:23
**photos** 46:16,17
**phrase** 65:21
**picked** 34:15
**pictures** 24:9 51:8
**piece** 114:18
143:13
**pissed** 170:11
**place** 28:25 58:2
201:12 222:4
**placed** 34:19
125:7
**places** 121:8
**plaintiff** 1:5 2:2
4:2 6:2 8:8,10
21:13
**plaintiff's** 8:11,14
8:15,23 9:2,3,9,14
9:15,19 10:2,3,5,9
11:4,6,13,19 37:5
40:10,15 43:14
46:1,6 173:6
174:12,15 178:4
180:4 181:18
188:5,20 205:13
211:16

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

**[play - projects]**

Page 29

play  41:6
plaza  1:17
please  30:12 35:4
    43:15 48:6 53:7
    118:8 128:14
    144:18 164:13
    165:16 171:11,19
    183:20 188:21
    194:17 197:6,20
    199:18,21 225:6
    225:10,18 226:9,9
pocketed  25:17
point  14:24 15:1
    23:6 27:2 29:11
    38:2 40:24 41:3
    45:20,21 47:12
    51:17 64:17 79:14
    79:14 86:2,17
    87:6 121:10,11
    122:9 137:13
    139:24 144:23
    148:9,19 149:12
    149:23 150:15,21
    208:13
pointing  195:2
pole  65:15
policies  64:6
    202:16,20 203:1
    203:18 204:1,18
    205:2,10,19,21,22
    206:3,18 207:6
policy  216:18
pop  157:8
populates  193:16
portion  32:12
    180:12
portions  178:10
position  27:24
positive  52:8
possession  138:21
    196:10 199:20

possible  47:20
    148:10 178:22
    184:19 199:1
    209:22
potential  148:8
potpourri  23:14
power  48:15
practice  208:20
practices  181:9
    203:1 204:2,19
    205:3,9 207:6
pre  153:18 182:19
    183:1,15 190:4
    214:14
prematurely
    91:20 92:2 108:11
premium  195:24
preparation  12:22
    15:16 37:15 53:24
prepare  13:13
    53:19 68:25 69:1
prepared  11:14
    38:3 48:21 90:20
    91:2 96:3 150:11
present  6:21 70:10
    70:13
presentation  4:4
    38:3
presented  165:25
    221:2
president  59:24,25
    159:6
pressing  32:21
presuming  71:8
pretty  39:20
previous  8:20
    10:19 141:7,24
    145:12 154:21
previously  3:13
    10:7 110:2 135:15
    151:17 154:5

158:3 160:18
    162:2,21 163:18
    164:12 167:21
    169:2
principal  69:23
print  101:16 102:4
    135:24 167:9
    186:7 225:8
printed  74:3,4
    129:17
printout  73:23
prior  57:11 63:24
    95:4 110:24 133:3
    147:22 185:19
privately  61:3
probably  22:18
    23:13 39:7,20
    54:21 55:6 58:15
    110:25 137:24
    156:7 171:15
    172:4 179:12
    182:1 192:22
    217:21
problem  65:6,21
    156:5,14 165:4
problems  18:7
    146:10 177:9
    209:8
procedure  7:13
    58:2,3 98:2 112:1
    226:7
procedures  37:19
    202:16,20 203:1
    203:18 204:2,19
    205:2,10,20,21,22
    206:3,19 207:6
proceed  11:22
    161:16 199:22
proceeding  6:22
    203:3 221:2 222:7
    222:12 223:6,14

224:10
proceedings  7:1
    221:13
proceeds  36:1
    80:12
process  34:8 40:25
    41:4 107:9 152:18
    191:4 208:19
    215:5,24
produce  8:24
    42:16
produced  10:7
    36:20 52:23
    158:13 180:11
    211:15 222:7
    224:4,8
produces  42:15
producing  10:7,12
    156:5
product  68:1
production  224:4
    224:9,9
productions  10:13
products  122:19
professional
    221:16 223:11
programs  183:22
progressed  17:12
progressing  59:18
prohibited  222:4
    224:12
prohibitions  221:8
project  17:18
    59:18 83:9 90:11
    132:11 203:21
    208:14 216:18
projects  83:1
    178:8 202:17,21
    203:2,3 205:11,12
    210:22,23 211:15
    216:22

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

[pronounce - reads]

Page 30

pronounce   87:21
proof   172:11
proper   139:19
property   9:4
 80:15 124:17
 125:2,4,8,9,10,13
 125:14,15,18
 135:20 136:5,7,7,8
 136:14 173:9,16
 173:17
proposal   123:9
proposals   122:24
 123:6
prorated   81:3,11
prosecute   161:8
protect   28:10 29:3
 98:5
protected   222:12
 222:13
protective   9:25
 177:18
protocol   58:2
provide   94:13
 118:23 195:21,22
 202:15 217:13,19
 222:2
provided   46:24
 47:2 56:6 70:15
 72:9,18 96:4
 109:18 123:11
 130:12 141:24
 194:3 195:15
 196:3,5 208:9
 211:12 217:21
providence   24:15
 24:18 28:16 45:2
 48:20 139:16
 140:1 145:1
providing   122:2
 122:21 201:15

public   227:24
pump   144:8
pumps   24:7,9
 54:13 57:17,18
 73:3,4,5,6 77:6
 138:11 143:7,10
 144:8 145:2,5,9,17
 145:18 146:21
punch   193:9
purchase   63:8
purchased   61:13
purpose   20:5 31:7
 31:9 69:2,3,6
 89:24 90:2 91:7,8
 94:2 95:10 99:5
 104:7 105:15,16
 117:8 125:2
 127:21 131:14
 136:5 148:1
 174:20
purposes   7:10,12
 116:25 157:19
pursuant   6:18 7:8
 226:6
put   16:25 17:14
 40:12 42:25 79:23
 108:21 151:9
 152:11 156:25
 174:2
puts   214:4

**q**

quality   38:16
 39:14
question   7:17
 12:11,14 21:16,19
 30:12,16,22,23
 46:5,11 95:22
 99:6,9,10 104:13
 110:24 128:12
 145:16 146:5
 152:6 165:7,16

166:4 182:17
 207:2 216:3
questioning   97:3
questions   12:25
 14:22 19:22 23:21
 56:16 97:4 199:22
 222:8 223:4 224:6
quick   43:15 59:21
 96:8
quicker   78:23
quickly   16:17
 81:21 85:4 102:12
 116:19 117:12
 169:19 177:22
 188:21 209:22
quikpro   2:16
quit   107:10
quite   13:8 22:7
 23:8 39:9,18
 104:11 118:15
quote   102:7,11
 168:4 193:4,7,17

**r**

r   60:12,13
racagli   218:22
rachel   195:14
ran   63:3
rare   34:9
rate   34:6 70:1
 201:15
rating   38:16 39:14
ray   189:3 190:2
reached   202:1
read   13:5 14:15
 57:1 71:7 85:1
 94:22 97:14,19,20
 98:24,24 100:2,8
 101:13 103:13
 104:1,20 118:8
 124:25 127:16,18
 130:19,19 131:9,9

133:9,25 134:2,19
 135:24 136:2
 139:4 144:17
 152:1 158:8
 159:25 160:1,20
 160:20,22 162:4
 162:23 163:20
 169:11,13 170:6,6
 170:7 171:9
 180:14,17 181:2,3
 186:4,7,17,25
 187:4,6 193:4
 195:6,11 198:1
 199:15,17 201:8,8
 225:6 226:2
reading   14:21
 45:13,17 46:23
 47:2 54:11 57:15
 75:2 76:21 91:25
 97:22 99:1 100:3
 100:14 101:14,18
 101:25 103:17
 104:5 116:19
 130:21,25 131:2
 131:11 133:11,18
 133:22 134:21
 140:12 142:8
 145:16 146:10,13
 152:25 158:18
 162:25 168:4
 170:10,24 171:10
 172:11 181:6
 182:15 183:14,20
 183:24 186:24
 187:1,5,10 190:17
 195:15 196:3,10
 197:5,20 199:18
 200:23 201:11
reads   56:21 82:21
 104:22 105:7,9

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

**[ready - remember]**

Page 31

**ready** 45:24 56:8
153:11,14
**reaffirm** 102:6
**reaffirming**
102:16
**real** 43:15 81:5
96:7,8 124:17
125:2,9,14 135:20
136:4
**reality** 166:5
**really** 40:2,5 61:16
61:17 107:11
109:2 148:10
186:7 202:18
207:20 215:7
**reason** 10:24
46:15 50:7 66:24
79:23 83:18,25
91:20 101:20
130:7 133:14
186:3,5 187:12
226:13,16,19,22
226:25 227:3,6,9
227:12,15,18
**reasons** 226:8
**recall** 24:4 27:3
73:13 79:10 108:9
115:23 124:16
138:16 141:23
142:12 144:15
148:25 149:2,25
150:9 154:9,13
161:14 168:7
172:1 212:22,23
**receipt** 110:21
**receivable** 74:12
**receive** 29:24 99:2
**received** 28:13
29:14,20,22 31:13
33:7 38:5 54:7,12
57:16 75:25 80:12

81:9,15 83:20
86:4,5 94:6
114:16 152:11,17
170:11 182:19
192:18 196:13
**receiver** 17:6 51:6
219:8,10,11
**receiver's** 17:7
**receivership** 16:24
16:25 17:15,21
27:11 43:1,8
45:10 219:20
**receives** 222:6
224:13
**receiving** 51:23
**recess** 65:1 109:9
202:13
**recognize** 85:9
113:5
**recollection**
116:18
**record** 20:11
86:21 92:5,6 98:9
129:16 158:12
166:2,16,17,18
174:12,16 177:17
179:16 180:22
182:3 221:13,15
222:8 223:5
**record's** 41:23
**recorded** 24:10
89:2 130:12
**records** 139:12
**recoupment**
187:11
**recover** 21:10
**red** 42:18 43:1
151:6
**reduced** 209:16
223:5

**reducing** 210:3
**reduction** 101:20
133:14 187:5
**refer** 36:17
**reference** 81:25
84:10 157:19
**referenced** 89:20
96:12,23 106:11
127:23 183:15
**references** 152:21
**referral** 39:23
**referred** 101:23
101:24
**referring** 11:18
96:19 165:1
171:12,14
**refers** 70:22 71:11
96:9,18 144:20
146:4
**refreshed** 51:2
**refund** 33:5
189:20,22 191:12
192:18 196:13
218:14
**refunded** 28:17
182:18 183:4,17
196:12
**refunding** 202:2
**regard** 7:14
**regarding** 26:18
33:13 36:5 37:18
49:20 116:17
149:22 161:16
164:24 167:7
176:15 197:5
201:14 202:2,16
206:6 213:7
**regular** 15:9 22:5
75:7
**regulations** 6:19
62:1,6 221:6

**regulators** 62:2
**rehab** 27:15
**relate** 17:17 80:9
116:1 132:12
**related** 18:17 82:5
106:10 158:6
202:17,21 203:1
203:18 204:19
205:3,10 206:19
207:7 224:10
**relates** 53:5
181:24
**relating** 204:2
216:18 222:12
**relation** 117:1
124:3 134:2
**relationship** 11:11
164:7 170:20
216:10 221:14
223:9 224:12
**relationships**
216:6
**relative** 223:7
**release** 98:15
130:22
**remain** 103:23
104:6 105:2 135:2
**remaining** 41:18
43:9
**remember** 16:18
19:1 26:12 27:10
46:21 48:24 49:5
53:21 55:9 77:19
137:15 138:10
141:19 142:14,17
143:14 149:3
156:20 158:15,16
158:17 167:23,25
168:1 175:7
184:14 195:22
212:19 213:11

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

[remembered - right]

Page 32

| | | | |
|---|---|---|---|
| **remembered** 27:21 | **repository** 222:13 | **rescind** 184:25 | 118:9 126:18 |
| **remind** 157:13 | **represent** 42:3 | **rescinded** 183:6 | 130:15 137:6 |
| **reminding** 164:20 | 74:11 75:9,24 | 215:20 | 141:20 147:10 |
| **remove** 125:17 | **representation** | **research** 36:5 | 162:25 164:14 |
| 136:6,13 | 123:21 | **reserve** 7:25 | 192:13 221:2 |
| **removed** 125:8,10 | **representations** | **reserved** 7:16 | 225:6 |
| 125:16 | 221:4 | 220:9 225:6 | **reviewed** 12:21 |
| **removing** 136:11 | **representative** | **resolve** 8:12 | 37:15 115:21 |
| **rental** 118:13 | 18:21,22 19:24 | **resolved** 49:21 | 116:2,18 117:12 |
| **rep** 99:1 130:21 | 97:8 99:6 130:14 | 198:9 | 140:11 |
| 131:2,11 203:11 | **representatives** | **respirators** 23:10 | **reviewing** 86:25 |
| 203:25 | 203:19 | **response** 21:22 | **revised** 67:20 |
| **repeat** 12:15 30:12 | **represented** | 55:4 58:3,10,12,13 | 132:22 133:1 |
| 49:15 128:14 | 109:21 113:20 | 59:1 141:10,12,17 | **revision** 185:19 |
| 150:3 165:16 | **represents** 70:21 | 141:18 172:24 | **revisions** 167:6,7 |
| 207:2 | 76:6,8,11 224:4,7 | 200:23 201:9 | **richard** 63:5 |
| **rephrase** 12:15 | **reps** 152:9 190:14 | **responses** 56:6 | 164:18 206:1 |
| **replies** 200:19,20 | 203:12 | **responsibilities** | **right** 11:25 12:1 |
| 200:22 | **reputable** 214:2 | 34:19 | 12:19 14:23 15:1 |
| **report** 2:13 4:5 | **reputation** 160:14 | **responsible** 31:19 | 16:12 19:16 20:8 |
| 9:22,24 13:15 | **request** 69:17 | 32:1 | 27:25 31:2,11 |
| 18:5 24:11 27:17 | 73:20 78:20 85:17 | **responsive** 180:12 | 32:8,10,18 37:5 |
| 36:24 44:22 48:16 | 99:16 101:8 | **responsiveness** | 38:1,9 39:23 40:2 |
| 48:21 49:19,23 | 102:25 108:3 | 7:17 | 40:12,20,24 43:12 |
| 50:1,4,7,17 52:22 | 109:13 111:14 | **retail** 39:24 | 43:21 44:9,16 |
| 53:5,18 54:1,20 | 113:13 120:7 | **retained** 63:20,21 | 47:23,24 48:3 |
| 56:5,25 74:2 | 126:15 130:17 | **retire** 61:7 | 49:9 50:4,15,20 |
| 142:19 143:15 | 131:7 135:12 | **retract** 67:18 | 52:10,17,18 53:1 |
| 214:1 221:15 | 136:1 147:12 | **return** 197:12 | 55:23 57:14 58:1 |
| **reporter** 6:21 20:9 | 158:11 163:21 | **returned** 11:1 | 59:20 60:4 65:3 |
| 96:3 112:13,21 | 171:24 217:17 | 107:4 181:12,13 | 65:14 68:16 69:10 |
| 161:20 168:15 | 224:10,14 | 196:11 211:18 | 73:15 74:1 75:5 |
| 174:6 221:1,3,7,10 | **requested** 11:10 | 225:11,14 | 76:13,14 77:8,11 |
| 222:9,10 224:6,8 | 77:17 | **returning** 197:6 | 78:19,25 82:1,8,13 |
| **reporting** 6:19 | **requests** 66:22 | **returns** 94:12 | 83:5,12,13,13 84:6 |
| 221:7 222:2 | 67:13 | 196:16 | 84:23 85:8,14,15 |
| **reports** 51:24 | **require** 165:7 | **reverse** 93:15 | 87:17 88:17,22 |
| 52:11 142:23 | **requirements** | 100:6 | 89:16 91:3,12 |
| 224:14 | 173:18 209:16 | **review** 53:17 | 92:3,12 93:9,24 |
| | **reread** 100:11 | 60:21 69:13 70:19 | 94:19 95:6 96:20 |
| | 102:12 | 86:20 92:18 118:9 | 99:12,15,17,23 |

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

**[right - scott]**

Page 33

| | | | |
|---|---|---|---|
| 101:6 102:3,5,24 | 185:3 187:13 | **rush** 108:21 | 45:12 46:22 50:3 |
| 105:11,13 106:7 | 188:19 189:9 | | 54:10 57:14 74:7 |
| 107:20 108:7 | 190:12 191:16 | **s** | 75:7,8,20 76:15,20 |
| 109:3 110:21 | 192:5,13 194:11 | **s** 20:14 60:10 | 77:8,11,21 78:3 |
| 111:12 112:8,10 | 194:23 196:22,24 | 192:10 206:15 | 79:16,18 82:2 |
| 112:11 113:1,10 | 197:4,18,22,22 | **sake** 12:5 41:23 | 85:22 97:22 99:22 |
| 114:4 115:10,10 | 198:1,23 199:11 | **sale** 23:6 45:20,21 | 100:16 106:14 |
| 115:15,21 116:5 | 200:5,18 201:8 | 47:12 51:17 63:8 | 113:7 137:18 |
| 118:2,6,21 119:12 | 216:14 217:4 | 79:14,14 87:6 | 143:20 152:24 |
| 119:21 120:15,17 | 220:2,5 225:6 | 122:9 206:6 | 160:7,25 161:4,8 |
| 121:25 122:23 | **ring** 49:8 163:14 | **sales** 60:25 61:1 | 163:25 164:17 |
| 123:15 124:15 | **risk** 38:19,25 39:6 | 203:19 | 168:7 170:23 |
| 125:21,21 126:6 | 39:11,16,21,22 | **salesman** 162:16 | 172:20 175:9,21 |
| 126:13,17 127:10 | 159:6 161:23 | 162:17 184:13,18 | 175:22 176:9 |
| 129:5,15,15,21,24 | 204:24 214:12 | 191:18 197:16 | 186:9,21 187:9 |
| 130:3,19 131:6,22 | **risky** 214:14 | 200:17 | 189:22 190:20 |
| 131:23,23 132:8 | **river** 179:6,21 | **salesmen** 184:15 | 191:5 193:4 198:9 |
| 133:6,21 134:9,13 | 182:11,23 185:9 | 184:17,20 208:14 | **scale** 39:7 60:17 |
| 134:14 135:10 | 191:23 | 209:13 | **scanned** 114:17 |
| 136:21,22 137:6 | **riviera** 179:4 | **salesperson** 38:6 | 115:3 |
| 137:16 138:4,25 | **road** 1:16 6:7 23:1 | 58:16 97:9 162:18 | **scanner** 115:1 |
| 139:4,23 140:6,20 | 67:2 | 190:15 194:16 | 116:8 187:20,21 |
| 140:25 141:2 | **rock** 194:10 | 195:13 203:10,23 | **scenes** 21:8 147:17 |
| 142:5,24 144:10 | **role** 35:16 | 204:15 209:4 | **schedule** 85:22 |
| 144:11,22 147:1,5 | **root** 47:14 72:21 | 219:2 | 86:3,6 87:2 106:3 |
| 147:6,10,13 | 122:9 | **salespersons** | 107:15 110:2 |
| 148:16,21 150:22 | **route** 23:2,2 | 203:24 | 111:1 112:3 |
| 150:25 151:8,16 | **rpr** 1:19 223:20 | **sampling** 10:22 | 113:25 201:20 |
| 152:1,5,19 154:3,4 | **rpt** 2:14,15 | **sandra** 194:18,25 | **scheduled** 74:8 |
| 154:6 156:18 | **ruby** 72:20 87:6 | 195:4,12 | 75:6 |
| 157:21 159:10 | 122:8 | **sapphire** 72:20 | **school** 60:14 |
| 160:17 161:1 | **rule** 226:6 | 87:6 | **schuler** 92:14 |
| 162:1,20 163:17 | **rules** 6:18 7:13 | **satisfied** 14:23,25 | 93:13 94:12 95:9 |
| 166:15,21 167:10 | 61:25 62:5 221:6 | **saw** 43:5 51:17 | 98:1 99:3 110:19 |
| 167:19 169:1 | 226:6 | 170:10 | 110:20,25 111:20 |
| 172:23 173:3,5,25 | **run** 27:16 164:6 | **saying** 69:7,18 | 115:17 118:11 |
| 174:5 177:21 | 213:25 | 86:10 92:1 100:25 | 127:1 212:22 |
| 178:7,13,16 | **running** 31:21 | 136:17 146:17,22 | **scope** 21:11 204:4 |
| 179:14,19,25 | 32:17 54:18 55:2 | 153:15 155:5 | 204:21 205:14 |
| 180:14 181:2,15 | 55:17 | 160:2 170:4 177:4 | **scott** 218:25 219:1 |
| 181:21,23 184:22 | | **says** 38:9,16,19,22 | |
| | | 38:25 39:23 41:23 | |

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

**[seal - signed]**

Page 34

seal  225:11
sealed  45:13,23
second  20:25 25:3
  25:3 45:4 48:5
  50:17 53:6 70:23
  71:6,10,18 77:20
  79:4 82:15 94:22
  104:13 116:12
  119:16 125:25
  141:3 144:2 146:3
  153:17 176:23
  179:23 185:3
  189:18,18 198:5
  200:15
secondary  15:8
section  38:12
  76:20 100:1 104:1
  104:3 133:7
sections  69:21
secured  100:7
  133:24
security  29:8,18
  36:7 204:3
see  2:7 7:22 23:17
  36:4 37:23 43:4
  43:12,18 46:16
  47:8 51:10 55:1
  56:15,25 58:1,10
  66:5 71:7 82:12
  84:8 86:17 92:8
  99:22 106:7
  113:11,15 122:24
  124:22 129:20
  143:20 151:6,10
  156:6 157:6,23
  162:15 173:2
  179:14 180:17,19
  181:1 183:24
  184:10 185:25
  186:8,9,15 189:15
  194:10,21 195:1,3

197:20 208:13
  209:8 210:7,8
  213:4 214:1,21
seeing  46:21
  124:16 144:15
  149:3
seen  37:10 46:17
  115:5 124:22
  142:2 148:25
  157:17
sees  42:18
selina  129:17
sell  61:10 62:6
semi  124:21
send  16:6,6 83:23
  94:9 108:19
  137:25 156:13
  159:8 163:25
  164:3,5 167:9
  194:17 225:12,18
sending  93:13
  154:9,20 172:3
sends  42:16
sense  50:10,23
  150:19 160:7
  166:12
sent  24:6 27:22
  35:5 52:6 83:22
  91:2 110:19 111:2
  111:19,23,24
  143:11 144:2,19
  144:25 145:8,12
  150:5 154:25
  156:10 157:22
  159:9,16,21 167:5
  167:11 168:22
  194:22 200:23
  217:16,24
sentence  100:13
  101:13 104:16,17
  104:23 145:15

172:10 186:9
sentences  103:13
  134:19 145:15
separate  69:21
separately  216:24
september  223:16
serial  24:10,11,12
  73:1 139:9,11,13
  142:8,10 143:8,9
  145:5,9 146:18,19
serve  116:25 117:7
  127:21 223:14
server  15:10
serves  133:2
service  152:9
  190:14 194:16
  197:3,15 203:11
  203:12,25
services  211:11
  222:2 224:13
set  187:10
setoff  101:20
  133:14
settle  171:10,18
settlement  164:4
seven  16:23 17:9
  36:15 184:17
shabazian  204:14
share  130:8
shawn  1:19 223:20
sheet  106:4
shifted  165:19
  166:4
ship  143:19
shipping  45:14,18
  87:10
short  45:5 96:7
  145:15 162:24
  199:17
shortened  77:2

shortly  214:7
show  72:17 74:1
  89:24 95:14,15
  96:1 106:25 122:1
  174:21 176:20
  181:8 211:11
showed  36:14
  139:13 143:6
  145:12,13
showing  145:9
shows  80:1 122:3
  174:22
shrink  143:8
sic  166:22 179:5
sick  170:19
side  50:22,22
  76:15 97:14 100:6
  148:18 186:12
sign  31:22 32:6
  88:12 91:20,24
  100:22 108:19,21
  167:9 170:17
  225:6
signage  46:23
signature  7:22,25
  35:5 91:2 99:23
  116:11 220:9
  223:19 225:2,15
  227:20
signatures  126:18
  128:9
signed  29:14,20
  86:4 88:21 89:5
  90:22,22,23 91:12
  92:2 108:10,23
  109:20 125:4
  127:2 128:17
  156:3 165:1,24
  167:13,17 195:9
  225:9,11,14

Tiffany Alley, A Veritext Company

800.808.4958

770.343.9696

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

**[signer - statement]**

Page 35

signer 107:22
significance 76:23
  78:10 83:7 103:25
  107:25 127:5
  169:18 207:19
signing 87:24
  91:22,23
signs 101:4
similar 63:11 79:1
  114:9 116:24
  126:23 134:1
  201:15 205:12
simpler 67:13
sit 209:25
site 10:5 17:24,25
  18:3,10 24:1,6
  31:17,20 36:8,9
  43:20,25 44:4,22
  45:22 49:14 51:11
  51:11,21 55:1
  56:14,20 58:17
  99:4 132:11,13
  137:18,21 138:12
  139:10,13 152:21
  152:23,25 153:1
  153:17,25
sites 17:18,24 29:9
situation 33:1 35:8
  35:12 42:24 63:11
  67:1 78:7 209:12
  215:23
situations 10:16
  10:20
six 67:5,8,9,10
  175:9 184:17
skip 122:23
  134:14
slow 101:25
small 47:1 75:2
  101:16 135:24
  187:6 194:15

195:13 197:16
  200:17
small's 201:9
smaller 60:17
snuff 27:17
sold 21:10 61:11
  80:12 81:10 212:5
  212:8 216:24
solely 221:18
  223:12
solutions 123:21
  123:24
somebody 54:21
  65:8 73:9 79:23
  99:7 193:6,8,8
  195:21 199:2,3
someplace 24:3
somewhat 209:18
soon 196:13 209:2
sorry 19:5 21:15
  21:18 22:2 24:5
  26:13 33:16 40:19
  47:1 48:4 49:6,15
  53:13 58:12 69:16
  71:7 75:1 76:9
  85:2 87:12 97:20
  97:21,23 101:25
  112:22,23 128:11
  130:8 132:1,2,4
  133:20 140:13
  146:1,5 150:3
  163:4 168:15
  169:5,22 170:14
  177:23 180:10
  185:6 186:4 187:8
  189:10 194:13
  198:14
sort 18:5 31:15
  47:15 83:19
  163:12 172:1
  179:15 186:21

sound 160:9
sounds 21:22 49:9
source 39:24
  48:15
speak 7:24 12:5
  90:6 147:20,24
  215:9
speaking 17:14
  144:6 147:21
  168:1
speaks 8:22
special 60:1
specific 29:17
  33:13 34:2 35:24
  66:24 72:8 99:20
  222:5 224:12
specifically 15:2
  36:9 39:4 53:21
  72:24 98:4 144:5
  167:25 201:14
  221:5
spell 60:10
spelled 20:8
  192:10
spent 170:15
spits 193:10
split 216:22
spoke 13:19 14:18
  57:11 168:4
  170:24 201:11
spoken 13:11 52:1
  201:18 212:15,21
  212:24 218:21
  219:7,14
spreadsheet 11:13
spring 27:6
stab 218:12
stack 178:22 188:4
staff 61:12 62:14
  63:20

stamp 85:22 114:2
  199:1
stamped 86:2,6
  111:1
stamps 85:24
stand 21:5
standard 41:1
  73:22 85:10 97:2
  97:6 99:19 112:1
  121:22 173:24
  206:19 207:6
  208:20
standards 181:8
standpoint 209:7
stands 39:4
start 12:12 29:22
  29:23 62:6 78:16
  90:5 91:22,22
  92:25 104:25
  112:14 131:4
  147:10 152:3
  163:20 198:14
  208:17
started 16:16 17:2
  17:6,14 18:10
  47:11,18 54:22
  55:10 62:15 86:19
  86:20 89:25
  198:16
starting 32:14
  103:15
state 49:25 62:2
  166:2 221:10
  223:2
stated 102:6 110:2
  196:11 223:4
statement 6:20
  67:13 88:23 104:9
  110:13 114:5
  123:16 124:7
  226:8

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

[statements - supposed]

Page 36

**statements** 29:10
  29:10,12
**states** 1:1 38:10
  104:4 185:11
**stating** 186:1
  190:18,21 191:6
  199:19
**station** 22:16 44:3
  63:24 66:6,12
**stations** 27:12
**status** 175:10,21
**stay** 52:15
**stayed** 61:19
**stays** 174:3
**step** 42:14 51:24
  52:4
**steps** 29:7
**steve** 166:22
  204:14,15
**stick** 84:22 169:17
**sticker** 84:22
**stine** 6:3 7:20,23
  8:7,16 9:3,12,16
  9:21 10:5,11 11:8
  13:12,12 18:16
  19:3,12 21:12
  29:5 30:7,11,14,17
  30:20,25 34:22
  36:17,20,25 43:16
  43:18,19,23 44:14
  44:17,20 49:25
  50:12 52:15,24
  64:16,20,25 74:23
  84:10 92:5,22
  102:9,15,21 103:6
  103:8 104:10,19
  105:8 109:8
  120:13 121:12
  127:7 128:24
  129:1,3 136:25
  137:4 140:19,21

140:23 151:11,14
  151:18,21 154:22
  154:25 155:12,14
  155:19 156:2,12
  156:16,19,24
  157:2,7,11,14,18
  157:25 158:12,16
  158:20,24 161:11
  165:3,13 166:2,16
  166:18,23 168:14
  168:16,19 169:6
  169:23 170:3
  174:3,6,12,16
  177:12,16,23
  178:17,20 179:2
  179:10,14,17
  180:11,24 181:19
  186:16 187:9,16
  187:22,24 188:13
  188:16 189:12,15
  192:10 194:4,6
  198:5,8,19,25
  199:6,9 200:10,12
  200:19,22 201:4
  217:14 225:1
**stine's** 83:22 167:3
**stipulation** 2:4
  8:12,13,16,21,22
  18:17
**stomach** 170:19
**stone** 195:14
**stop** 164:14
  170:14
**stopped** 17:22
  150:23
**storage** 24:3,7
  25:12 45:1 48:11
  48:12 51:12,19
  138:11 142:18
**store** 22:16,24
  44:3 45:23 47:10

51:16 54:16 55:17
  55:21 58:20,22
  59:14 63:24 66:7
  66:12 205:11
**stores** 27:11 64:2
**storing** 51:20
**story** 17:8 60:4
  62:22 145:14
  147:21 148:18
**street** 6:14 61:14
  61:17,20 62:11
  63:25 64:3,3
  225:20
**strength** 213:23
**strong** 214:25
**structure** 47:4
  77:9
**structured** 201:17
**stuck** 108:24
**studebaker** 60:9
  60:12,15 61:18
  62:12,14 63:11,11
  64:4,8 209:1
**stuff** 59:15 217:22
  217:24
**subcontractor**
  221:11,18 223:13
**subject** 8:10,16
  10:13,14,15,19
  11:9 100:5 101:19
  133:13,22 155:16
  165:9 187:5
  205:12 208:7
  210:19,23 212:6
**subjects** 203:9
**submit** 209:24
**submitted** 6:20
  120:18 222:8,10
  224:6,7
**subscribed** 227:21

**substance** 93:25
  226:7
**subtracted** 76:2
**suburb** 14:11
**sue** 166:3
**sued** 166:6,9
**sufficient** 107:7
**suggested** 166:4
**suicide** 16:20
  43:22
**suit** 21:8 23:22
  27:8 161:9 164:1
  164:24 165:20,21
  182:3,4,7
**suite** 1:17 6:7,14
**suits** 22:8
**sum** 69:23
**summary** 4:5
**supplemental**
  10:13
**supplier** 10:25
  31:19,22 32:1,14
  32:20,21,22 33:1,3
  34:1,8,10,14 35:24
  36:2,2 95:5,19
  98:17 121:8
  123:10 131:3
  181:10 182:12
  189:3,19 211:5,7
  213:24 218:14
**supplier's** 35:16
**suppliers** 33:13,20
  34:10 163:12
  189:1 209:23
  216:8
**supply** 35:25
**supplying** 33:9
**supposed** 18:1
  30:8,20 33:1 58:3
  94:13,17 95:17
  98:7 108:10,17,19

Tiffany Alley, A Veritext Company

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

**[supposed - thing]**

Page 37

144:9
**sure**   12:5,15 17:9
  17:25 19:10 21:1
  21:2 25:18 30:10
  32:4 33:15,25
  34:6 35:9 36:15
  37:21 39:25 45:8
  47:10 48:7 49:3
  53:8,20,21 58:8
  63:22 64:6 68:2
  68:15 72:23 77:10
  77:13 79:12 80:21
  82:12 83:2 87:5
  88:10 94:23 95:12
  98:14 104:11
  110:11 112:6
  114:18 118:9,15
  119:7 124:5 127:8
  139:11 144:19
  150:17 155:20
  156:1 157:16
  164:8 170:10
  171:13 188:25
  195:14 196:15
  198:12 202:7,9,23
  203:2 206:4
  207:12 208:1,5
  212:11 214:16,23
**surprised**   160:2
**swear**   8:2
**switch**   179:20
**switching**   123:15
**sworn**   8:6 227:21
**system**   45:20,21
  47:13,14 51:17,18
  72:21,22 73:23
  77:1 79:14,14,15
  87:6,7 114:17
  122:9,10 184:9
  190:10 193:10
  208:17

**systems**   23:7

**t**

**t**   60:10,13,13
  175:11,18 176:2,4
  176:11
**take**   19:3,10 29:7
  39:2,14 43:15
  44:18 49:2 52:24
  56:7 57:18 64:16
  64:22 115:16
  117:18,23 120:5
  129:5 138:8
  140:15,19 151:1
  162:8 196:10
  202:6 215:2,4
  218:12
**taken**   7:3,8,10
  26:5 120:3 172:7
  223:4
**takes**   174:6
**talk**   13:9,16 14:13
  40:6,10,15 47:24
  83:13,14 120:6
  124:25 130:16
  139:5 140:16
  151:6 158:8 174:9
  174:10 177:21
  178:13 181:3,15
  192:14 198:2
  199:15 213:14
**talked**   15:16 141:6
  205:6 206:25
  213:16 215:2
  219:24
**talking**   15:15
  52:11 97:9 108:8
  137:25 138:1
**tank**   1:7 7:4 11:12
  11:16 23:23 25:6
  25:15,20 26:18
  27:4,23 28:5,9

30:3 32:6,11
  45:11 47:14 48:22
  49:11,18 51:18
  68:24 70:14 71:2
  71:20,25 72:19,22
  97:23,25 98:5
  111:3 120:4,19
  122:1,9,20,24
  130:23 131:16
  163:2,12 164:2
  165:21 174:24
  175:6 178:6 182:4
  214:6
**tank's**   34:18
**tanks**   44:25 45:1
**target**   22:22,24
**targeting**   148:8
**tasty**   39:12
**tax**   60:19
**ted**   218:21
**telephone**   2:20 3:4
  130:11
**tell**   12:21 20:11
  29:2 34:1 37:7
  43:14 48:3 53:4
  54:1 66:24 70:21
  73:25 75:17 80:7
  89:22 94:1,21
  105:13,14 108:25
  109:1 113:1
  119:16 131:23
  155:15 168:20
  174:25 180:1,3
  188:19 215:12
  220:3
**telling**   90:3 114:23
  146:14 164:5,11
  167:6,8 171:17
  172:6,17,21 196:6
**tells**   32:22 54:2,14
  94:5,9,10 106:8

176:17,22
**template**   193:14
**temporary**   67:1
**term**   103:21
  176:20
**terminal**   87:5
  122:8
**terminated**   175:11
  175:18 176:1
**terminating**   41:18
**termination**   2:6
  9:13 176:5
**terms**   33:13,18
  69:15 100:3,5
  101:22 104:14
  105:6 133:18,22
  134:25 152:22
  165:6 207:14,18
  207:19 221:18
  223:13
**terrible**   170:18
**terrific**   220:5
**testified**   8:6 127:1
**testify**   206:6
**testifying**   18:21
  165:4
**testimony**   7:18
  8:20 14:19 140:1
  177:3 226:2,7
**texas**   61:14 199:3
**text**   3:25 169:9,13
  169:20 170:8,10
  171:3,7 172:3
  212:13
**thank**   62:20
  177:21 220:6
**thanks**   9:11 19:9
  44:8,11 129:3
  168:5 170:25
**thing**   17:22 25:14
  25:25 26:17 55:7

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

[thing - transcript]

Page 38

65:9 134:12
135:25 142:7
160:1 178:15
193:16 215:14
217:8
**things** 13:8 14:25
166:12 201:14
202:9
**think** 13:18 15:25
16:12 21:12 23:7
23:20 24:3,7
26:13 40:7 50:1
58:25 59:6,11
61:4,15 63:3 69:6
79:13 83:20 88:8
100:21 104:12
114:24 127:6
134:15 143:7
144:1 147:2
148:17 150:15
153:5,23 155:14
157:9 160:7 162:7
171:14 172:13
177:15 178:16,25
180:17,19 194:4,5
196:15,17 197:23
211:17,20,22
214:3,3 216:2,4,5
217:5,21 219:6,14
219:16
**thinking** 137:14
137:15
**third** 113:12
120:15 123:24
132:6 144:2,2
146:1 175:20
179:24 190:10
**thirds** 88:15
**thompson** 152:7,8
152:21 204:8

**thought** 12:25
24:16 48:9,18
73:7 138:20
139:19 191:21
199:7 207:15
210:21 213:9
**three** 9:17 13:1
16:19 22:8 41:9
42:5 56:17 61:15
62:19,19 67:1,8
68:9 69:21 78:22
78:24 88:7 106:13
111:25 145:4
149:22 175:2,9
178:15,16,20,22
178:23,23 179:9
179:11,12 180:3
190:9 209:25
210:17,18,18
212:1 214:5
215:10
**ticket** 128:9
135:11 157:1
**ticking** 29:23
55:10 104:25
**tier** 162:25 214:4,5
214:5,5
**tiffany** 221:11
222:2 224:1,4,6,11
225:10,19
**till** 64:21
**time** 11:21 15:12
15:25 16:22 17:12
17:21,23 18:10
25:1 27:14,19
28:19 29:25 33:8
44:19,25 45:5
49:10,17 51:6,22
53:20,22 55:3,12
57:3 58:18 61:9
64:19 70:9 86:18

107:12 109:6
111:19 138:20
139:10,21 140:15
140:19 141:25
142:2,15 144:2
146:16 149:12,23
150:5,15 153:9,10
159:11 164:25
183:2 191:21
197:10 199:1,2
200:13 210:24,25
212:8 219:1,21
220:7 222:5
224:13 225:14
**times** 13:20 74:13
91:18 103:18
108:20 134:22
178:16 179:9,11
179:12
**timing** 137:16
**tired** 177:24
**title** 59:25 80:8,8
95:1
**titled** 101:10 108:5
116:22 117:5
133:7
**titles** 59:22
**today** 8:18,25 10:8
10:12 11:14 13:1
37:16 40:8 89:21
173:6 205:7
206:25
**today's** 12:22
13:13 15:17 37:22
**told** 24:2 25:23
150:14 165:2
171:15 184:2
190:24 201:23
**tom** 164:10
**tomorrow** 157:4
164:13

**tony** 7:3 19:18
20:2 21:13 40:5
68:22 104:14
154:17 156:7
164:18 168:5
170:24
**top** 45:12 50:3
56:18 74:1 76:24
79:1 86:8 93:4
98:24 104:3
129:18 141:13
149:3 154:14
159:6,25 160:4
162:6,14 164:20
166:21 168:1
198:10 200:20
211:21 212:2
**total** 74:7 75:6,20
76:3 77:18 81:9
81:16 82:4,9,14
**totally** 47:5 176:18
176:18
**totem** 65:15
**touch** 14:19 59:16
147:24
**town** 18:8
**transaction** 10:17
10:25 29:11 35:17
38:2 66:16,19
77:21 80:2 81:22
88:11 150:8 181:7
**transactions** 11:15
29:4 65:20 68:9
150:2 173:23
174:22 206:21
207:9 212:25
213:10
**transcript** 2:20
97:15 115:22
130:11 137:1
222:7 223:4,5

Tiffany Alley, A Veritext Company

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

**[transcript - uses]**

Page 39

224:4,5 225:7,12
225:15 226:2
**transcription** 96:2
96:11,23
**transcripts** 222:7
222:12
**transmission**
92:14 93:6 109:19
**transpired** 141:16
183:25
**travel** 1:9 88:9,19
89:12 126:11
210:15
**traversone** 154:17
159:4,5,12 204:23
**treat** 83:1
**treated** 177:13
**treating** 83:3
**treatment** 214:6
**trial** 21:5,5
**tried** 16:20 17:12
43:22 83:23
**trouble** 18:9 65:21
156:25
**troubled** 65:16,25
66:6,16,20,21
160:15 162:16
176:15 210:8
**truck** 23:3 77:4
**truckers** 23:1
**trucking** 22:25
**true** 68:8 111:8
128:8 146:9 166:7
222:7 223:5 224:5
224:7
**try** 12:8,10,11
21:8,9,9 78:22
107:9 138:16
157:13
**trying** 17:7 23:7
45:3 51:6 69:8

81:6 107:16
137:15 147:20,23
148:2,6,17 157:11
157:14 160:6
162:7 182:6
**tuesday** 163:2
170:11
**turn** 116:5,16
209:21
**turned** 62:18
74:20 210:5
**twice** 100:17,25
160:1
**two** 10:11 17:10
17:10 22:8 29:13
39:9 41:8 42:21
44:13 45:4 46:15
50:22 51:21,22,23
54:4 56:11,13,17
57:11 61:15 71:15
71:17 81:4,11,14
81:16 83:1 85:16
87:18 88:7,10,15
88:17 90:23 96:23
103:13 106:13,22
106:23 111:25
118:13 130:7
132:19 134:19
137:8 145:7,15,21
145:23,25 167:5
171:2 175:8
176:10 178:19
182:24 183:3
189:1,13,16,22
192:16 203:24
214:5 215:9,15,17
216:22
**type** 28:5 40:22
45:25 47:4 64:4,8
68:12 119:1
184:23 187:22

205:16
**typed** 116:10
**types** 23:15 39:10
**typewriting** 223:5
**typically** 211:10
211:11

**u**

**u** 60:10 192:10
206:15
**ucc** 29:10,10,12,25
88:23 89:15
110:13,20,21
114:5 123:16
124:2,7
**uccs** 123:25 204:7
**uh** 12:7,8,8,8
14:17 15:3 18:18
30:4 31:6 34:4
36:13 40:16 42:1
42:11 52:25 66:3
69:12,16 74:9
75:22 76:5 81:1
103:16 104:18
108:15 123:2
124:18 125:5
141:5 143:18
145:22 146:8
148:12 150:12
154:16 156:11
171:1 184:6
217:18
**ultimate** 26:25
**unable** 45:17
**unconditional**
101:19 133:13
187:3
**underground**
54:12 57:12
**undersigned** 226:2
**understand** 12:14
18:6 26:5 28:15

32:4 33:15 35:9
69:7 80:21 83:2
87:7 88:4 104:11
107:17 124:5
125:3 148:11,17
160:2,12,12 217:1
**understanding**
18:20,24 62:23
82:16 89:23
125:20 133:1
146:16
**understood** 12:13
12:17 20:4 27:14
30:24 104:12
149:12 150:10
**unfavorable** 39:17
**unfinished** 47:3
**unfortunately**
162:19
**unique** 78:6
178:21
**united** 1:1
**unrelated** 11:3
**unsuccessfully**
16:21
**unwind** 184:24
215:4
**unwound** 10:17
11:1 183:10,16
184:1 211:18
215:3
**update** 59:17
**updated** 27:16
**uploaded** 222:13
**use** 7:11,18 25:24
26:14 67:14 161:7
183:23 195:19,24
226:9
**uses** 206:20
214:10

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift
August 30, 2016

**[usually - whatsoever]**

Page 40

usually 16:3,9
38:5 75:14,19

**v**

vacation 183:19
vaguely 142:17
value 70:13
value's 70:11
variance 18:9
various 103:18
  134:22 204:25
vary 97:4
veeder 72:21
  122:9
veeter 47:13
vendor 11:17
  103:18 134:22
  152:9 161:2
  181:10 182:11,18
  182:20,23,25
  183:17 189:5,25
  190:3 191:10
  192:19 195:8
  196:16 201:19
  202:2 203:11,12
  203:25 208:16
  211:4,9,18 213:24
  213:25 214:14
  215:12,18 216:5,7
  216:11
vendors 103:18,24
  104:7 105:3
  134:22 135:3
  163:1 189:23
  191:18 209:23,23
  216:8
verbal 95:2,3,4,8
  95:11 96:12 97:3
  98:2 115:22 116:1
  130:2 131:14,17
  131:18 152:22,23
  152:25 153:1,2,17

153:18,19 190:7
verbally 161:5
verbatim 134:8
  221:15
verbiage 193:13
  208:6
verification 95:2,3
  95:4,11 96:12
  97:4 98:3 131:19
  152:23 153:2
  190:7
verifications 153:2
verifies 95:13
verify 45:17 95:14
  95:15
veritext 221:12
  222:2 224:1,4,6,11
  225:19
veritext.com.
  224:10
version 94:13
  120:1
versions 109:20
versus 7:4 176:18
  213:21
vice 59:24,25
  159:6
view 25:5,7 26:3
  213:24
viewed 48:11 73:4
vis 58:17,17
volume 4:9
vp 161:24
vs 1:6
vsr 152:8 203:25
  204:6,8,11,12,14
vsrs 204:10

**w**

w 6:11 60:13
wait 7:21 40:17
  48:4 112:9 189:7

waived 7:15
waiver 124:17
  125:2,15 135:21
  136:5
waives 136:18
waiving 7:22
walk 37:6,23 80:7
  84:3
want 7:21 13:9
  18:12 24:20 36:17
  36:23 39:3 40:11
  60:9 62:4 83:14
  90:5 95:12 98:14
  100:11 105:14
  109:4 117:23
  120:5 122:5
  127:15 151:9
  157:23 164:3,5,13
  165:8 170:12
  175:15 191:19
  192:17 197:8
  202:5,8 209:21,24
wanted 14:19
  17:22,25 53:2
  54:25 61:7,10,10
  62:16 63:12 68:15
  99:8 139:11 150:9
  163:25 164:7
  180:14 190:25
  191:22 201:23
  202:10
wants 193:7
  197:12
warehouse 143:1
  145:3
warm 43:16,17
wash 205:11
watch 64:20
wav 96:3,5,11
  130:12 136:25
  137:1,2

way 15:18 27:22
  71:17 88:15
  150:10 151:18
  153:23 155:14
  156:6 158:14
  170:14 171:17
  177:23 186:13,13
  186:20 188:13
  197:13 209:2
  213:7 214:11
wayne 143:17
  160:4 164:20
  170:17 218:18
wayne's 146:19
ways 34:16 155:21
we've 10:21
  135:15 145:19
  146:21 205:6
  216:15
wednesday 163:2
  201:21
week 183:19
  201:19
weeks 211:24
weird 174:10
weise 194:18,25
  195:4
went 12:23,25
  13:1,8,23 14:22
  15:7,10,19 16:23
  23:25 25:13 45:6
  47:6 51:5,14,18
  60:15 62:19 77:24
  148:14 172:22
  188:24 191:3
  195:17
west 38:10
whack 198:17,18
whatsoever
  101:21 133:14

Conf. 30(b)(6) Anthony Campisciano
Ascentium Capital vs. Adams Tank & Lift

August 30, 2016

Page 41

[wheeler - zone]

wheeler   206:11
wise   12:22 22:13
  39:11 71:16 72:13
  72:14 73:1
wish   34:3 95:2
  199:21
wished   35:2
wishes   34:12
  122:19
witness   8:2,5
  19:14 21:5 30:19
  30:24 52:13 103:7
  109:6 137:2
  140:22 151:9
  155:18 156:11,14
  156:17,20,25
  157:3,12 159:2
  161:22 165:12,15
  166:19 168:13,24
  169:3 177:15
  178:1 179:6,9,12
  180:14 187:20,23
  188:1,15 199:5
  200:18 201:2,5
  202:7,11 220:5
  224:8
witnesses   222:11
word   23:8 25:25
  160:8 168:21
words   133:10
  155:4 167:8
  187:13 196:6
  197:8
work   13:24 14:5
  20:15 21:11 37:11
  60:20,21 63:25
  66:20,20 67:4
  187:16 188:13
  204:4,21 205:14
worked   8:12 60:4
  209:2

working   55:3
works   13:12 14:1
  93:12 161:22
  204:12
workup   36:12,20
  37:11
worry   59:13
worse   115:6 188:1
worst   39:8
worth   34:2 40:7
worthington
  60:12,15 61:18
  63:12
wow   115:7
wrapped   48:14
  143:8
write   37:4
writes   164:16
writing   47:1
  150:13 161:7
  196:1
written   6:20 28:5
  142:16 172:24
  216:17
wrong   50:1,12
  64:20 178:18

x

x   189:3 190:2

y

yeah   13:22 19:2
  23:20 24:21 30:9
  30:13 36:19 37:3
  39:5 46:14 48:7
  50:2 51:13 60:11
  75:4 81:7 87:12
  90:18 103:10
  104:4,21 109:8
  115:8 117:23
  118:9 120:13,14
  128:15 129:2

134:18 137:2
  138:11,20 142:24
  142:24 143:4
  144:18 148:5
  150:4 151:4,11
  152:4 153:7 155:3
  155:12 156:19
  157:14,24,25
  158:23 159:15
  161:4 162:5 169:6
  170:9 173:20
  174:15,15 176:6,8
  176:8,8,22 179:2,3
  179:13 180:20,24
  181:2 186:16
  188:1,3,15,22
  189:24 192:11
  193:2 194:7 198:8
  198:13,13,13,15
  199:9 205:8 207:3
  207:11 212:16
  214:13 219:11
year   22:11 62:1
  153:8 170:1
  185:17
years   60:15,19
  61:2 62:19 160:5
  170:15
yesterday   13:7
  37:20 83:22,25
  114:23 170:11
york   14:5 20:16
  20:18 60:17 61:19
  62:14

z

zero   25:10 72:14
zone   199:2