IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | |
|---|---|
| ASCENTIUM CAPITAL LLC,<br><br>Plaintiff,<br><br>v.<br><br>ADAMS TANK & LIFT, INC.; ANDREW J. ADAMS; PHOENIX PETROLEUM, LLC; GREAT AMERICAN TRAVEL CENTER, LLC; FALCON ENTITY, LLC,<br><br>Defendants | Civil Action No. 1:15-CV-123(LJA) |

## DEFENDANTS ADAMS TANK & LIFT, INC. AND ANDREW J. ADAMS' RESPONSE TO PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

As we will develop, Ascentium's facts contain some distortions, misstatements of the record and pretty glaring omissions given they involve material and uncontested facts. That spin effort is reflective of an attempt to develop a construct for Adams Tank & Lift, Inc. ("AT&L") and its president Andrew J. Adams ("Adams") being parties to the evident misdeeds of Phoenix Petroleum, LLC ("Phoenix") and its President and sole member, the elusive Ataollah Masoodzadehgan ("Ataollah"). Even though Phoenix and Ataollah are undefended in this action, the record surprisingly just establishes Ataollah was secretive in his complex business dealings, got in over his head and was easily manipulated by Ascentium as it sought to loan the soaring Phoenix money. The record suggests that as Phoenix began its descent, Ataollah may have acted dishonestly to try to maintain his house of cards, perhaps robbing Peter to pay Paul. He paid a price for that conduct. He lost everything, almost including his life at his own hand.

Nevertheless, the indisputable facts of what occurred, not only don't supply what is

essential to carry the day on Ascentium's claims for money had and received/unjust enrichment and/or conversion, they mandate summary judgment for AT&L and Adams on all claims.

We now again address those facts in the context of Ascentium's motion for summary judgment and, in the process, hopefully, can make the rightness of our cause even clearer.

## II. STATEMENT OF MATERIAL FACTS

A.      <u>What Ascentium and AT&L and Adams Must All Admit</u>.

Before we address the shortcomings of Ascentium's "Background Facts," we note that Ascentium, AT&L and Adams are all relying, for contrary objectives, on the fundamentals of what occurred.  This is particularly true as it relates to the Jackson project that is the sole basis for all the claims against AT&L and Adams.  The Cairo transaction and project "facts" have been selectively distorted and then injected by Ascentium into their Jackson claims to try to buttress their sweeping accusation that AT&L is a "dishonest supplier" (Brief, p. 1) and to try to color the indisputable facts of the Jackson project and transaction.  AT&L and Adams have, in contrast, tried to present in their motion for summary judgment all the facts of the Cairo project in substantial detail for the contradictory purpose of vindicating themselves from any dishonesty labels involving either of the two intertwined, overlapping, off and on again, messy, disorganized and complex projects at issue.

Ascentium, AT&L and Adams each foundationally rely on the June 27, 2013 <u>loan</u> transaction that Ascentium and Phoenix negotiated, created and entered into in connection with the Jackson project and against the backdrop of the January 2013 Cairo project transaction.

Ascentium's Lenny Baccaro, its Senior Vice President of <u>Sales</u> (Baccaro Dep., p. 17), continued to pursue Phoenix's Ed Schuler and Ataollah after the Cairo transaction about a loan for the <u>Jackson</u> project even though Ascentium had determined by a May 31, 2013 inspection

that the gasoline and diesel fuel dispensing equipment for the <u>Cairo</u> project, over three months

after that loan had been entered into, had not been installed, or it initially thought, even

delivered.  (Campi Dep., Ex. 52; and Baccaro Dep., Ex. 16).  Ascentium was then told by

Phoenix on June 6th that the equipment was in fact present on the site sitting in a warehouse, but

the installation had been delayed.  (Baccaro Dep., Ex. 17).  Nevertheless, on that very same day,

Ascentium's Baccaro told Phoenix's Schuler "You can tell Bubba [i.e. Ataollah] that we <u>can do</u>

<u>240k right now</u> (490k total exposure with us)[1] but that we cannot consider anything over that

until we get his 1040."  (Id.) (emphasis added).  Obviously, the purported collateral for Cairo not

being delivered or installed for whatever reason did not deter Baccaro in his quest to sell the loan

for Jackson—perhaps to book another sale and earn another commission.  (Baccaro Dep., p. 30).

As the facts bear out, the equipment/collateral was at best the tail on the dog of the

Jackson loan which as it turned out was undergirded by a whole series of contractual lies/

misrepresentations by Phoenix that were authored and mandated by Ascentium.  These mandated

contractual lies/misrepresentations about the equipment/collateral, to which AT&L was neither a

party nor participant had their exact counterparts in the previous Cairo loan.

     1.    <u>The Loan Documents</u>.

With Ascentium's loan commitment of June 24, 2013 in place (Adams Dep., Ex. 26), the

Jackson loan transaction shepherded by Baccaro proceeded quickly to consummation.  On June

26th, Ascentium and Phoenix entered into a "Commencement Agreement."  (Campi Dep., Ex.

62).  Its terms included an express acknowledgement that the equipment to be financed had not

been delivered or installed.  (Id.).  Therein, Ascentium and Phoenix also agreed they <u>had</u> entered

into an equipment finance agreement and specifically acknowledged that the equipment would

---

[1] Including the $250,000 previously loaned on Cairo and demonstrating the intertwinement conceptually of the two transactions.

be delivered "to Phoenix at various times" and that vendors "have to be paid . . . at or before delivery." (Id.). Ascentium further represented <u>it would pay the equipment vendors</u> ". . . <u>upon receipt of satisfactory confirmation from you [Phoenix] that the item of equipment in question has been delivered to and accepted by you</u>." (Id. ¶ 2). (Emphasis added).

The next day, on June 27th, Phoenix sent Ascentium by e-mail the fully executed equipment finance agreement, which excluded a description of collateral referenced on the non-existent "Schedule A." (Campi Dep., Ex. 62). Two hours later, Ascentium requested AT&L prepare a $240,000.00 invoice coinciding with the June 4, 2013 Jackson proposal. (Davidson Aff., ¶ 20, Ex. R; Adams Dep., p. 48). Shortly thereafter, AT&L, at Phoenix's and Ascentium's request, issued an invoice which stated in part, unlike the Cairo invoices: "<u>Contract</u> to furnish and install six Wayne ovation dispensers . . ." etc. (Adams Dep., p. 64 – 65, Ex. 16). (Emphasis added). AT&L was not aware that Ascentium would, after the loan had been consummated, unilaterally make this invoice by the process of rubber stamp and fill in the blank "Schedule A" to the loan agreement. (Ver. Int. Rsp., p. 25; see Campi Dep., p. 86, Ex. 62). Unlike the Cairo project,[2] on the Jackson project, AT&L initially was planning to immediately proceed with ordering, and then supplying all the equipment described in the invoice as well as to then do on delivery all the associated work to make it operable. (Davidson Aff., ¶¶ 21, 22, & 24, Ex. S, T, & V; Adams Dep., p. 72). The equipment and work that had been offered by AT&L as a proposed new contract was part of what AT&L had originally contracted to do in 2011, and which had been partially performed before Phoenix encountered problems and the project went into limbo. (Ver. Int. Rsp., p. 25; Davidson Aff., ¶ 22, Ex. T). What was described in the

---

[2] AT&L, despite its invoice for the canopies and a beer cooler for Cairo as requested by Phoenix and Ataollah, never had a contract for either because, as Ascentium knew, Phoenix was going to supply the canopy (it did that), and Phoenix had not decided whether to get the cooler through Circle K or AT&L (it eventually contracted with AT&L for the cooler). (Ver. Int. Rsp., p. 5).

proposed contract and the invoice in part duplicated what was in the 2011 contract, but there

were differences, and the cost of the equipment and labor had increased.  (See Davidson Aff., ¶

4, Ex. A vs. Davidson Aff., ¶ 17, Ex. O and Adams Dep., p. 64 – 65, Ex. 16).  Ascentium knew

that and, indeed, had been furnished a copy of AT&L's original 2011 contract with Phoenix.

(Ver. Int. Rsp., p. 24; Davidson Aff., ¶ 7, Ex. E).  Just like Cairo, because that was what Baccaro

and Ataollah wanted, the invoice was for exactly the approved loan amount to the penny.  (See

Adams Dep., p. 64 – 65, Ex. 16).  That $240,000 loan amount was approved on or before June 3,

2013 before there was a new Jackson proposal, and was based entirely on Ascentium's

assessment of Phoenix's credit worthiness.  (Davidson Aff., ¶ 16, Ex. N).

Exactly contrary to the Commencement Agreement's June 26th acknowledgements,

Ascentium required Phoenix to execute, the very next day, on June 27th, as a pre-condition to its

financing, a "Delivery and Acceptance Certificate," which provided:

> "The undersigned [Phoenix and Ataollah] hereby certifies: (i) that all of
> the property described below ('Equipment'), which is to be financed pursuant to
> the lease, equipment finance agreement, note, security agreement, loan and
> security agreement or similar document referenced above (the 'Agreement')
> between Ascentium Capital LLC as lessor, lender or secured party and the
> undersigned as lessee, debtor or other obligor, has been delivered to, and received
> by, the undersigned, (ii) the Equipment conforms in all respects to that ordered by
> the undersigned, (iii) its condition is satisfactory in all respects to the undersigned
> and (iv) that the Equipment is accepted by the undersigned under the Agreement
> in all respects, and the undersigned hereby irrevocably directs Ascentium Capital
> LLC to pay the equipment suppliers the purchase price of the Equipment."[3]
> (Emphasis added).

(Delivery and Acceptance Certificate, Campi Dep., Ex. 62).   Exactly to the contrary, Ascentium

admits in response to AT&L's Requests for Admission that Ascentium knew the representation it

compelled Phoenix and Ataollah to make in the Delivery and Acceptance Certificate was

---

[3] "[T]he property described below" was a reference to "Schedule A" purportedly attached to the Certificate as an
exhibit when it was signed by Ataollah.

absolutely untrue at the point it entered into the Jackson Loan Agreement on June 27th <u>AND</u> at

the point it wired $216,000.00 to AT&L on July 1st.

**REQUEST NO. 9**
   "Ascentium knew at the point <u>it entered into the Jackson Agreement and at
the point it wired $216,000.00 to Adams Tank</u> on July 1, 2013 that the following
equipment <u>had not been delivered to or installed</u> at the Jackson facility location:

   'Contract to furnish and install six Wayne Ovation B12/3 …, etc.'
**RESPONSE**
   <u>Admitted</u>."

(Plaintiff's Response to Defendants' First Requests for Admission, No. 9).  (Emphasis added).

  Even more shocking, given the above admissions and the claims that Ascentium is

asserting against AT&L, is that in Jackson loan agreement we have this assertion by Ascentium:

   "<u>We [Ascentium] shall have no obligations under this Agreement
whatsoever until</u> we accept and sign this Agreement at our office <u>and the
satisfaction in our sole discretion of all conditions</u> we may specify <u>including</u> our
<u>receipt of all documents</u> we specify and <u>evidence satisfactory to us in the form of
a telephone audit, physical inspection</u> or <u>otherwise that all of the Collateral has
been received, is in satisfactory condition</u> and you [Phoenix] <u>have accepted the
Collateral</u> for all purposes under this Agreement." (Emphasis added).

(Campi Dep., Ex. 62).  It is rather amazing that Ascentium would blatantly first require Phoenix

to misrepresent it received and accepted the equipment that was supposed to be collateral, and

then that Ascentium itself would represent it was satisfied that the collateral had been received

and accepted, WHEN IT HADN'T AND WHEN THAT COULD ONLY BE AT BEST A HALF

TRUTH if Ascentium was willing to call a lie of its own creation satisfactory evidence of

delivery and acceptance by Phoenix!  This "evidence satisfactory" to Ascentium was as much a

complete farce as was the Delivery and Acceptance Certificate!

  To top it all off, Ascentium required Phoenix and Ataollah to tell another lie, i.e. that the

false information and untrue documents it had signed at Ascentium's insistence were "<u>true</u>,

accurate, complete and <u>not misleading</u>!"  (Campi Dep., Ex. 62).  (Emphasis added).

"You [Phoenix] <u>represent</u> and warrant to us [Ascentium] that <u>all information conveyed to us [Ascentium] in connection with this Agreement and all related documents</u> whether by you, a guarantor, the supplier or any other person, is <u>true, accurate, complete and not misleading</u>."  (Emphasis added).

We are dealing with a contractual fairy tale based on mandated patent misrepresentations of the facts by Phoenix that Ascentium was the author of, and indeed required.  Obviously, from Ascentium's perspective, complete fabrications were entirely acceptable.  Thus, THE REAL DEAL WAS, FROM ITS INCEPTION, CONSUMMATION AND FUNDING, AN UNSECURED LOAN.

      2.      <u>The Non-Relation of Ascentium and AT&L</u>.

It is undisputed fact that Ascentium had no agreement with AT&L, who purportedly had delivered the equipment and which therefore Ascentium should pay for.  (Baccaro Dep., p. 34; Campi Dep., p. 28).  That no agreement whatsoever existed was not by happenstance, but by design. The intricate interrelated loan documents, although acknowledging the involvement of vendors, and future disbursements of loan proceeds to them, imposed no requirements as to the borrower's dealings with vendors.  Moreover, though replete with the opportunity to do so, Ascentium very pointedly avoided any entanglements with the vendors even by the simplest of agreements.  Such an agreement or written understanding would have run afoul logically of the patent misrepresentations Ascentium and Phoenix were parties to.

      3.      <u>Ascentium's Unrestricted Transfer of the Loan Proceeds</u>.

While Ascentium could have issued a joint check for the loan proceeds to Phoenix and AT&L with a conditional or restricted endorsement, it chose a totally different course. Ascentium on July 1, 2013 simply wired AT&L $216,000 (90% of the $240,000 Jackson loan amount) with no instructions, conditions, restrictions or limitations—just as it had done on Cairo. (Ver. Int. Rsp., p. 25; Baccaro Dep., p. 29 – 30; Strach Dep., p. 47).  Of course, Ascentium knew,

as had just occurred at Cairo, the equipment purporting to be financed, and purporting to have been delivered and accepted would not be delivered at the point of the loan agreement or wire transfer, and that indeed, as had occurred at Cairo, it might be delayed for months by the borrower or vendor for a host of potential reasons associated with their contractual agreements.

The purported delivery and acceptance of the equipment collateral was simply a pretense and a farce.  The real deal was unsecured, which its two participants Ascentium and Phoenix knew.  The contractual lies and misrepresentations were just part of the masquerade.

4.    Phoenix's Delay in Proceeding with the Dispenser Installation for Jackson.

No one can contest that Phoenix's Ataollah on July 3, 2013 held up AT&L's ordering of the fuel dispensers described in the proposed contract and invoice (Adams Dep., p. 72; Davidson Aff., ¶ 21, Ex. S), and then put the Jackson project on hold because of sewer problems with Butts County (Ver. Int. Rsp., p. 26) or that it took the Receiver until 2015 to eventually resolve that sewer problem (Davidson Aff., Ex. W, p. 10).  Did Ataollah, who was a party to multiple contractual lies at Ascentium's requirement and with its full knowledge, know when he obtained the loan for Phoenix for Jackson that he was not going to be able to proceed with the project? Did he need some of the money to cover some other debt or deal with some financial crisis?  We don't know.  We do know that AT&L and Adams were not parties to any such scheme any more than they were parties to the multiple contractual lies engineered by Ascentium.  AT&L and Adams never saw the Commencement Agreement, the Delivery and Acceptance Certificate or the Equipment Financing Agreements for Cairo or Jackson.  (Ver. Int. Rsp., p. 25).

5.    The Disbursement of the $216,000 Loan Proceeds.

What the $216,000 loan proceeds were eventually used for by AT&L, with Phoenix's permission and with what AT&L thought was Ascentium's knowledge all consequent upon the

fuel dispenser order being delayed, is best addressed in the Argument and Citations of Authority on the issue of whether AT&L was unjustly enriched.  Suffice it to say, the facts are indisputable that AT&L either refunded the money to its true owner Phoenix or it applied it to pay legitimate debts of Phoenix to AT&L for equipment supplied and services rendered.  (Adams Dep., p. 131).

B.    Purported "Background Facts" versus Reality.

With the above fundamentals in place, the reason for the following distortions, misstatements and glaring omissions is apparent.  Ascentium needs a different record than what exists.  In the order presented, those are as follows:

(1)    On page 2 of its Brief, Ascentium states: "Ascentium agreed to finance and advance 100% of the purchase price for the Cairo equipment on Phoenix's behalf, and Adams caused AT&L to submit two itemized invoices to Ascentium in January 2013 in order to obtain funds for the purchase of the Cairo equipment."  While Adams and AT&L agree they were involved in preparation of the Cairo Invoices, Ascentium distorts reality, and omits it was Ascentium that directed AT&L how to prepare the invoices totaling $250,000.00, even though AT&L had previously sent the November 2012 contract proposal with Phoenix to Baccaro, which showed AT&L was only supplying equipment and services for $143,058.00 plus tax at the Cairo site. (Def. Facts, ¶¶ 19 – 31; see also Ver. Int. Rsp., pp. 5 – 6, 24; Davidson Aff., ¶¶ 8 - 11, Ex. F, G, H, I, ; Baccaro Dep., p. 54-55, Ex. 3, p. 57-59, Ex. 5, p. 61 – 63, Ex. 8, p. 63 – 64, Ex. 9 & 10, p. 92; Adams Dep., p. 50 – 51, 60 – 61, 100, 114 and 125 – 26;  Campi Dep., p. 86).

(2)    Later, on pages 4 – 5 of its Brief, Ascentium stated:  "Unbeknownst to Ascentium, between the time of its first $225,000 advance and the second $25,000 under the Cairo Agreements, Phoenix and AT&L secretly agreed that Phoenix would cancel the Cairo Orders, AT&L would disburse a portion of the Cairo Funds directly to Phoenix, and AT&L would apply

the balance of the funds toward payment of unrelated bills."  Ascentium also stated: "Based on

Adams side agreement with Phoenix, Adams agreed to cancel the Cairo Orders on AT&L's

behalf and refunded $100,000 to Phoenix, without notifying Ascentium."  (Id. p. 5).

Ascentium omits that AT&L previously provided it a copy of the November 2012 Cairo

proposal showing AT&L was only authorized to provide equipment and services at the Cairo site

for $143,058 (plus tax).  (Adams Dep., pp. 51, 60 – 61, 100, and 125 – 126).  AT&L did not have

an order or contract for the canopies or the cooler at the time of funding, which Ascentium knew

at the time it agreed to loan Phoenix the $250,000.  (Id.).  The evidence of record is also clear

that, of the $250,000 wired to AT&L: (a) it only retained funds to pay for the fuel dispensers and

related hardware and services, as listed on Invoice No. 2640474; (b) it refunded $100,000 to

Phoenix for the canopies and cooler it was not supplying at that time; and (c) it did not apply any

money to any "unrelated bills."  (See Def. Facts, ¶¶ 37 – 44; Ver. Int. Rsp., p. 7 – 9; Adams

Dep., p. 58; Davidson Aff., ¶¶ 12 – 15, Ex. J – M).  There was no secret agreement and no

cancellation.

(3)     On page 5 of its Brief, Ascentium stated:  "Notably, in order to obtain the final $25,000

payment from Ascentium, Adams mislead (sic.) Ascentium into believing that the Cairo project

was complete and that all of the Cairo Equipment had been delivered and installed." (Id.).

Ascentium again misstates the facts.  Exhibit 7 cited by Ascentium is a March 27, 2013 email

between Adams and Baccaro.  It reads:  "Len, Dispensers are on site.  Let me know when you

can wire the last draw."  Adams clearly told Baccaro the truth that AT&L had delivered the

dispensers to the Cairo site!  He did not say the project was complete or that everything had been

installed and delivered.

(4)     On page 5 of its Brief, Ascentium also stated: "Phoenix, Adams, and AT&L did this even

though they knew Ascentium was providing financing for the specific purpose of purchasing the Cairo Equipment." However, AT&L and Adams did not know the terms of the loan agreements between Ascentium and Phoenix, and whether and to what extent any of the funds were for the specific purpose of purchasing and collateralizing all of the Cairo equipment. (Adams Dep., pp. 114 & 125; Ver. Int. Rsp., p. 6). Moreover, there was no written agreement between Ascentium and AT&L, and there were no specific conditions, endorsements, designations, or instructions accompanying payment of Phoenix's borrowed funds to AT&L by Ascentium establishing any "specific purpose." (See Baccaro Dep., pp. 29 – 30, 34; Campi Dep., p. 28; Strach Dep., p. 47). To the contrary, Ascentium knew AT&L was only to supply the equipment from the November 2012 proposal at the time Ascentium wired Phoenix's borrowed funds to AT&L[4], and therefore, that all Phoenix's borrowed funds received from Ascentium were not "intended for the specific purpose of Phoenix's purchase of the Cairo Equipment." (Def. Facts, ¶¶ 19 – 31, 33; Ver. Int. Rsp., pp. 5 – 6, 24; Davidson Aff., ¶¶ 8 - 11, Ex. F, G, H, I; Baccaro Dep., p. 29 – 30, 54-55, Ex. 3, p. 57-59, Ex. 5, p. 61 – 63, Ex. 8, p. 63 – 64, Ex. 9 & 10, p. 92; Adams Dep., p. 50 – 51, 60 – 61, 100, 114 and 125 – 26; Campi Dep., p. 86; Strach Dep., p. 47).

(5)      On page 7 of its Brief, Ascentium stated: "Adams caused AT&L to submit an itemized invoice to Ascentium (the **"Jackson Invoice"**) to obtain funds for the purchase of the Jackson Equipment." However, Ascentium misstates the facts in support of this contention. In reality, Baccaro requested AT&L prepare the Jackson Invoice after Ascentium had already received the executed Jackson loan agreement, and instructed Adams and AT&L how to prepare the invoice it requested. (Davidson Aff., ¶ 20, Ex. R; Adams Dep., p. 65, 66 – 68). However, Baccaro never told Adams the invoice would be unilaterally added as a description of collateral to the already

---

[4] As it turns out, AT&L did later supply the cooler at the Cairo site in August 2013, which Ascentium sold in August 2015 along with the dispensers and related equipment provided by AT&L in March 2013, and the canopies which were installed by another contractor or vendor for Phoenix.

executed loan agreement.  Baccaro and Ascentium instructed AT&L how to prepare invoices

(which was Baccaro's standard practice).  (Storch Dep., p. 52 – 58, 62 – 64; Strach Dep., p. 74).

(6)     On page 7 of its Brief, Ascentium also stated: "After Ascentium wired the Jackson Funds

to AT&L, Phoenix and AT&L secretly agreed that Phoenix would cancel the Jackson Order,

AT&L would disburse a portion of the Jackson Funds to Phoenix, and AT&L would apply the

balance of the Jackson Funds toward payment of unrelated charges."  This statement distorts the

truth and implicates Adams and AT&L in a secret scheme with Phoenix to defraud Ascentium.

However, the evidence tells a different story.

On July 3, 2013, after AT&L received Phoenix's borrowed funds from Ascentium,

Ataollah directed AT&L that "I am traveling do not order any pumps until I get back."  (Def.

Facts, ¶ 62; Ver. Int. Rsp., p. 26; Davidson Aff., ¶ 21, Ex. S).  Thereafter, Adams spoke to

Ataollah on the phone.  In his deposition, Adams explained:

> Originally, he said, I'm going to put the job on hold.  He wanted – then
> came back and said, I need the – you know, send me the $100,000 or 100-
> something thousand dollars back on the equipment, on the dispensers.  There is no
> reason you should hold that.
> And as the time I think he was thinking it was going to be about six
> months.  I asked did he talk to Ascentium.
> And he came back with an e-mail that said, Hold up I might have to send
> the money back.  And then he came back and said, Go ahead and send the money
> – wire the money to me.
> And I said, Does Ascentium know?
> And he said, Yes.

(Def. Facts, ¶ 63; Adams Dep., p. 72; see also Davidson Aff., ¶ 24, Ex. V).  Adams legitimately

"assumed that Ascentium knew about [the refund to Phoenix] because that is what [Ataollah]

told [him]."  (Adams Dep., p. 128, Ex. 13, ¶14).

(7)     On page 7 of its Brief, Ascentium further stated: "Phoenix did not have any outstanding

debt to AT&L at the time that Phoenix canceled the Jackson Order."  It cited the deposition

testimony of Phoenix's Ed Schuler as the sole support for this contention.  Schuler was asked: "To your knowledge, did Phoenix Petroleum owe any money to Adams Tank & Lift separate and apart from these two jobs?"  Schuler responded: "Not to my knowledge."  (Schuler Dep. at 108:23-25, 109:1).  Clearly, not knowing whether such debt existed is not evidence that no debt existed!  Rather, the undisputed evidence shows that at the time AT&L received the $216,000.00 on July 3, 2013, AT&L was owed $18,543.88 as a deposit for the Cairo cooler contract, and $22,454.20 for work it performed in 2011 for the Jackson project.  (Def. Facts, ¶¶ 49, 59, 68, & 69; Ver. Int. Rsp., pp. 24, 25 – 27; Davidson Aff. ¶¶ 19, 21 & 27, Ex. Q, S, Y & Z).

(8)     On page 7 of its Brief, Ascentium further stated:   "AT&L never refunded Ascentium nor delivered and installed the Jackson Equipment.  They did this even though they were aware Ascentium was providing financing for the specific purpose of purchasing of the Jackson Equipment."   Ascentium clearly distorted the facts.  No one can dispute that in fall 2014, AT&L supplied basically the same fuel dispensers and services as described in the Jackson Invoice! (Def. Facts, ¶ 75; Adams Dep., p. 196 – 204).  This occurred as a result of Phoenix refinancing the whole Jackson project with Providence in the summer of 2014.  (Def. Facts., ¶ 74; Adams Dep., p. 40, 105 – 106, 132, 167, 171 – 172, 176, 181, 194, 198 – 200, & 203 – 204).  As part of that transaction, Providence purchased the equipment from AT&L, and then leased it back to Great American Travel Center, LLC, which owned the Jackson real estate (See Davidson Aff. II, ¶¶ 5 & 6, Ex. B & C), and from which Ascentium previously required a guaranty as part of the Jackson loan agreement.  (See Campi Dep., Ex. 62).  Moreover, there was no agreement between Ascentium and AT&L, or restrictions on the use of the Jackson funds, which would require AT&L to refund any of Phoenix's borrowed funds to Ascentium (Def. Facts, ¶ 56; Baccaro Dep., pp. 29 – 30, 34; Campi Dep., p. 28; Strach Dep., p. 47).

(9)     On page 9 of its brief, Ascentium stated: "However, contrary to the fact that Adams ordered the Jackson Equipment on behalf of Phoenix through another finance company, in 2014 Adams made multiple representations to Ascentium that the Jackson Equipment had been ordered and the Project was nearing completion, never informing Ascentium that the Jackson Funds had been used for unrelated purposes and/or given to Phoenix." (citing to "E-Mail correspondence between Adams and Len Baccaro dated March 17, 2014 and July 8, 2014 attached hereto as **Composite Exhibit 11**"). Ascentium again distorts the truth. When Adams made these two statements about the Jackson project, they were in fact true!

On March 17, 2014, Baccaro e-mailed Adams to ask about the status of the project. Adams responded: "It should be finish in the next couple of months. He had delays? Are they making their payments?" The March 17, 2014 email cited in support of this contention, was sent before AT&L or Adams were aware Phoenix was refinancing the Jackson project with Providence (See Def. Facts, ¶ 74; Adams Dep., pp. 40; 105 – 106; 132; 167; 171 – 172; 176; 181; 194; 198 – 200; 203 – 204), and some eight months after Ascentium's last communication with anyone from AT&L about the Jackson project (Def. Facts, ¶ 76; Baccaro Dep., p. 83, Ex. 21). Considering AT&L and Adams believed Ascentium and Phoenix were communicating about the project (Def. Facts, ¶¶ 54, 75; Adams Dep., pp. 71 – 73, 77), Adams' response was not misleading.

Baccaro again contacted Adams on July 7, 2014 about Jackson.   In response, Adams simply said: "Most of it is done, if you want to pay then release the final funds." Clearly, Adams thought Ascentium was still involved with the project under its loan agreement with Phoenix despite the refinance with Providence then in progress. (See Davidson Aff. II, ¶ 5, Ex. B).

(10)    On page 9 of its brief, Ascentium stated:  "It is industry standard in the commercial equipment leasing/finance industry for funding to be returned to the lender in the event of the buyer/borrower cancels an order with a supplier after funding has occurred."  Ascentium's purported industry standard ignores the actual issue in this case: Whether AT&L or Adams should have notified Ascentium that Phoenix canceled the Jackson order in July 2013?[5]  (See Def. Facts, ¶¶ 83 & 84; Baccaro Dep., p. 46; Campi Dep., p. 33).  In support, it offered two raw opinions without factual support[6], and omitted actual evidence indicating there is no such industry standard for a vendor (like AT&L) to meddle in its customer's financial affairs and notify a lender of an order cancellation without authorization of the customer.  In response to subject number 13 of Defendant's 30(b)(6) Notice of Deposition of Ascentium Capital, LLC, Ascentium provided three examples of "unwound" deals.[7]  (Def. Facts, ¶¶ 85 – 87; Campi Dep., pp. 178 – 201, Ex. 6).  In each of those examples, the customer, and not the vendor (like AT&L), notified Ascentium about cancelling its order with the vendor and requested to unwind the loan agreement with Ascentium.  (Id.).  Thus, the actual evidence does not support this contention.

## III. ARGUMENT AND CITATIONS OF AUTHORITY

A.    Ascentium's Money Had and Received/Unjust Enrichment Claim.

        At the core of the analysis required for a money had and received claim is first an equitable principle (i.e. unjust enrichment) that must be applicable to the defendant's situation,

---

[5] Baccaro said: "we should have been notified by either the customer or Adams Tank that the project had been cancelled, and then we should have been refunded the monies that we had advanced, and we would have un – we call it unwinding or rebooking a project."  (Baccaro Dep., p. 46).
Campi said: "In my belief, the supplier should contact us, advise us that the customer has canceled the order, and he should refund the money that we had already paid him upfront, less whatever payments we might have received from the customer up until that time."  (Campi. Dep., p. 33).
[6] The only evidence offered in support of this contention is an unsubstantiated self-serving declaration of Tony Campi, who was not involved in the transactions at issue until it became in default, and was not qualified to testify regarding policies and procedures related to any topics other than collection.  (Campi Dep., pp. 60 – 61; 202 – 208).
[7] "13. The facts and circumstances of any transaction involving Ascentium, which may be used by Ascentium to show industry standards or customary business practices of an equipment supplier or vendor where a customer's order was delayed, changed or cancelled, and the customer's borrowed funds were returned to Ascentium instead of being returned to the customer or otherwise applied as directed or approved by the customer."

secondly, a further requirement for the defendant's retention to be deemed unlawful (i.e. in

equity and good conscience he ought not to retain the money) and lastly an ancillary condition

for the plaintiff to recover (i.e. in justice and fairness the money "belongs" to the plaintiff).

> "An action for money had and received is founded upon <u>the equitable principle</u>
> <u>that no one ought unjustly to enrich himself at the expense of another</u>, and is
> <u>maintainable</u> in all cases <u>where one has received money under such circumstances</u>
> <u>that in equity and good conscience he ought not to retain it, and</u> ex aequo et bono
> <u>it belongs to another</u>." (Emphasis added).

*Haugabook v. Crisler*, 297 Ga. App. 428, 431 (2009) (citing *Jasper School Dist. v. Gormley*, 184

Ga. 756, 758 (1937)).  Justice Weltner in his concurring opinion in *M. L. King, Jr. Center v.*

*American Heritage Products*, 250 Ga. 135, 150 (1982) approved an even simpler summary of the

requirements for a money had and received claim, to wit:

> " ' "An action for money had and received lies in all cases where another has
> received money <u>which the plaintiff, ex aequo et bono, is entitled to recover and</u>
> <u>which the defendant is not entitled in good conscience to retain</u>." ' " (Weltner, J.,
> concurring specially) (quoting *Fain v. Neal*, 97 Ga. App. 497, 498 (1958).
> (Emphasis added).

"Ex aequo et bono" simply means "in justice and fairness."  *Haugabook v. Crisler*, supra at 431.

Consequently, we must examine the propositions of (1) whether AT&L was unjustly

enriched, (2) whether AT&L received the money under such circumstances that in equity and

good conscience it should not be authorized to retain because it ex aequo et bono belongs to

another, and (3) whether Ascentium is entitled ex aequo et bono to recover the $216,000 it

claims.  Of course, the absence of evidence to support any of these necessary elements would

mean no valid claim for Ascentium and summary judgment for AT&L.

1.      <u>AT&L was not Unjustly Enriched</u>.

AT&L received $216,000 of loan proceeds.  There were no conditions, instructions,

directives or requirements attached to that transfer by Ascentium in its design and

implementation of the transaction.  (See Baccaro dep., pp. 29-30; Strach Dep., p. 47).  That occurred, at least in part, because the loan had been consummated, and apparently, Ascentium did not want to condition or risk its finality on what did or did not happen as to the ordering, delivery, receipt, and acceptability of the equipment.  That would all be governed by the terms of the agreement between the vendor and the borrower and their reciprocal performance. Furthermore, Ascentium created the loan transaction in such a way with required documented misrepresentations that conditions or restrictions on the funds would have been a contradiction.

Despite the absence of conditions or restrictions as to the wired funds, the question still remains, was AT&L unjustly enriched?  That necessarily invokes its dealings and agreements with its customer Phoenix, which had borrowed the $216,000 and was committed to making installment payments of principal and interest for five years.  What initially happened with the $216,000 is indisputable: (a) $161,128.09 was applied in payment of the Wayne fuel dispensers AT&L was on the verge of ordering for Phoenix for the Jackson site – the very equipment described in its invoice of June 27, 2013 (Ver. Int. Rsp, p. 25; Davidson Aff., ¶ 22, Ex. T); (b) $18,543.88 was applied in accordance with Phoenix's request to pay for 50% of the $46,279.02 (plus tax) cooler [minus labor] Phoenix just ordered from AT&L for Cairo on June 26, 2013 (Ver. Int. Rsp., pp. 24-25; Davidson Aff., ¶¶ 19, 21, Exs. R & S); and (c) the remaining $36,328.03 was refunded to Phoenix (Ver. Int. Rsp., pp. 25-26; Davidson Aff., ¶ 23, Ex. U).  As a matter of common sense and in reverse order, AT&L could hardly be unjustly enriched by giving $36,328.03 back to the party who borrowed the money.  Likewise, applying part of the loan proceeds to pay part of the cooler cost Phoenix ordered on June 26, 2013 for Cairo and which it was contractually obligated to supply and install could not be unjust enrichment.

Finally, also on the same logic, applying $161,128.09 of the funds to pay part of the dispenser cost could not be unjust enrichment.

However, on July 3, 2013, Ataollah, while acknowledging he received AT&L's controller's message about how she was applying the funds, he advised Adams, "I'm traveling do not order any pumps until I get back." (Ver. Int. Rsp., p. 26; Davidson Aff., ¶ 21, Ex. S). (Emphasis added). Ataollah was the customer, and Phoenix had not formally accepted AT&L's proposal of June 4, 2013. When Adams and Ataollah then spoke, Ataollah told Adams that he needed to put the Jackson dispensers "on hold" (Adams Dep., p. 72) because of "sewer issues at the site" (Id., p. 69), and Ataollah wanted to know if the dispenser supplier, Wayne, "could hold it in the factory" (Id., p. 69). Adams replied that Wayne "doesn't hold equipment [and that] what we can do is we can cancel the order . . ." and Ataollah could reorder it before the annual Wayne price increase in March of each year. (Id., p. 69). Ataollah then told Adams he wanted an additional refund of $100,000 of loan proceeds since the order for the equipment was not to proceed, and "There was no reason you [AT&L] should hold that [part of the money]." (Id., p. 72). Adams did raise the question at that point of whether Ascentium was aware of what was happening, but Ataollah, who then volunteered that he might have to return the loan proceeds, appeared to follow through and later told Adams that Ascentium knew what was going on. (Id.). Adams then authorized the $100,000 refund. (See Davidson Aff., ¶ 21. Ex. S). Otherwise, AT&L would have been holding Phoenix's money without permission.

As a result of the $136,328.03 in refunds to Phoenix, AT&L had a net of $79,671.97 out of the $216,000 received because a total of $18,543.88 of that had already been applied to the Cairo cooler costs. Work had begun on that cooler on July 10, 2013, and it was completed August 27, 2013. Therefore, in September 2013, with Phoenix's permission, the remaining

balance on the cooler of $32,761.81 was paid from the remaining $61,027.09. (Ver. Int. Rsp., pp. 26-27; Davidson Aff., ¶¶ 21, 27, Exs. S & Y).  Also, $22,454.20 was applied to the balance owing for the 2011 work at the Jackson site.  (Id.).  The remaining $5,912.08 was all applied to various debts Phoenix had incurred with AT&L primarily for service work at different Phoenix sites.  (Davidson Aff., ¶ 28, Ex. Z).  Logically, getting paid for what you are owed for equipment supplied and services rendered is no more unjust enrichment than giving money back to the party who borrowed it when you no longer had an overriding claim to it.

In *Time Insurance Company v. Fulton-DeKalb Hospital Authority*, 211 Ga. App. 34 (1993), the plaintiff insurance company was suing to recover from the defendant hospital on the basis of money had and received, $184,198.94 of insurance benefits it had paid for the treatment of the co-defendant insured.  The co-defendant, in order to obtain the health insurance, made misrepresentations to the insurer.  When the co-defendant was subsequently injured and needed treatment, he assigned his benefits under the policy to the hospital.  The Court noted in discussing the elements of a money had and received claim that even when the money is paid under a mistake of fact the rule still is that "'it can not be recovered unless the circumstances are such that the person to whom it was paid can not in good conscience retain it.' " *Id*. at 35.  The Court went on to point out that the plaintiff insurer "acknowledges that the mistaken payment to [the hospital] was <u>in compensation for services valued at $184,198.94</u> [and] [it was] clear that [the hospital] <u>would be prejudiced by refunding the payment</u> and [therefore] it in good conscience may retain the payment for medical <u>services rendered</u>." *Id*. at 36.  (Emphasis added).  The final conclusion was simply, "<u>Having received only those funds to which it was entitled,</u> [the hospital] <u>was not unjustly enriched</u>." *Id*. at 37.  (Emphasis added).

Of the loan funds not returned to Phoenix but retained by AT&L, i.e. $79,671.97, it was all applied to pay for services rendered and equipment supplied.  AT&L was not unjustly enriched, and would be severely prejudiced if made to refund to Ascentium the payments it received and retained.  It is one of the many peculiarities of this case, that $51,315.69 of the $216,000 was used to pay for the Cairo cooler that Ascentium, after Phoenix's default, sold along with the fuel dispensers and canopies for $123,000.  (Campi Dep., p. 80 – 81; Pl. Rsp. to Req. for Admission No. 1).  AT&L was simply not unjustly enriched.

2.  AT&L Also Did Not Receive the Money Under Such Circumstances That in Equity and Good Conscience it Should Not be Authorized to Retain It Because the Money Belonged to Phoenix.

(a)  The $216,000.00 Wired was Phoenix's Money, and it did not ex aequo et bono Belong to Ascentium.

The beginning point in the evidence that applies to all of the issues is the absolute reality that the $216,000 Ascentium wired to AT&L on July 1, 2013 was the proceeds of a $240,000 loan it had made to Phoenix and which had been fully consummated on June 27, 2013. (Campi Dep., Ex. 54, Comp. Ex. A). The $216,000 was no longer Ascentium's money because it loaned it to Phoenix in exchange for a commercial installment debt obligation.  When the loan was consummated what Phoenix was entitled to was the money loaned, and Ascentium, as creditor, was entitled to installment payments on the loan until the principal sum borrowed was repaid.

Phoenix, in fact, actually made a $24,000.00 principal payment to Ascentium on the day the loan was consummated.  (Id.).  Furthermore, Phoenix then paid and Ascentium received 16 installment payments of $4,632.53 per month ($3,661.01 for principal and $971.51 for interest) before Phoenix defaulted.  (Id.).  Not to be ignored on the question of whose money was it, is Ascentium is even now seeking in the present action to recover the remaining principal of that loan by a judgment against the defaulting defendants Phoenix Petroleum, LLC, Great American

Travel Center, LLC and Falcon Entity, LLC.  Ascentium further seeks the interest and penalties it contends are authorized by the terms of the loan.  (Amended Complaint, pp. 23-24). Ascentium has affirmed repeatedly the contract with Phoenix despite its bedrock contention that it was in effect defrauded into a loan for equipment Phoenix did not intend at that point to buy and that Phoenix, intentionally, failed to collateralize its loan.

(b)      <u>The $216,000 Loan Proceeds Were Not for a Special Purpose</u>.

AT&L was, of course, generally aware that Phoenix was borrowing money from Ascentium in part to purchase fuel dispensing equipment for the Jackson project.  AT&L was not aware of the details of the loan, specifically whether the equipment Phoenix was on the verge of again contracting to buy was to be used to collateralize the loan at some point in the future on delivery and acceptance by Phoenix of the equipment.  AT&L was not aware of the contractual misrepresentations that had been imposed by Ascentium on Phoenix and which Ascentium and Phoenix knew were untrue and which literally could never be made true.  (See Ver. Int. Rsp., p. 25).  Further, AT&L and Adams did understand, in a functional sense, that Phoenix and Ascentium were involved in an arm's length loan transaction that it was excluded from.  (See Adams Dep., p. 176).  However, these realities don't translate under Georgia law into the loan being for a special purpose with the consequence that the loan proceeds could be used for no other purpose.  The cases relied on by Ascentium in their brief involving loans for a special purpose each have distinct features that do not exist in this case.  Furthermore, the lenders involved are never guilty of having fostered misrepresentations onto the borrower and are innocent, at least corporately of any wrong doing.

The first case cited by Ascentium is *Federal Employees Credit Union v. Capital Automobile Company*, 124 Ga. App. 144 (1971).  This case involved a lender, the plaintiff credit

union, a borrower, Pierce, who had obtained a loan from the plaintiff to buy an automobile from the defendant dealer.  The plaintiff lender sued the defendant dealer for money had and received in the form of the loan proceeds it had provided to the dealer by check.  The check issued by the plaintiff, was jointly payable to the borrower Pierce and the defendant dealer.  The check was endorsed by Pierce and deposited in the dealer's bank account.  When the sale of the automobile didn't occur, the defendant dealer gave the money back to Pierce who absconded and defaulted on the loan.  The facts do have some parallels to the instant case, but the determinative feature was the check that was jointly payable to Pierce and the defendant dealer provided that:

> " 'The within named automobile dealer payee <u>certifies</u> that the <u>interest of The Federal Employees Credit Union</u>, P. O. Box 1544, Atlanta, Georgia 30311, <u>is recorded on the title issued to: Mr. Harry E. Pierce, 1967 Cadillac Convertible, 8 Cyls., Motor No: F7-182348</u>.' "  *Id*. at 144.  (Emphasis added).

The Court's reasoning for finding for the plaintiff lender was:

> "The check drawn by the plaintiff in the way above indicated <u>was an offer by it to accommodate the proposed purchase sale</u> between the defendant dealer and Pierce in the manner stated.  <u>By the act of endorsing and depositing the check to its account</u> the <u>defendant dealer accepted the offer</u> and it <u>retained the plaintiff's funds for a special purpose</u>, i.e., <u>to apply same as purchase money for the described automobile</u> on behalf of Pierce and to record the plaintiff's interest in the automobile on the title issued to Pierce.
> When the special purpose for which defendant held plaintiff's funds failed, it became defendant's duty to return same to plaintiff."  *Id*. at 144-145. (Emphasis added).

Thus, the determinative fact has no parallel with the instant case.  In writing, it was made clear to the dealer that the loan proceeds were only to be for the purchase of the "1967 Cadillac Convertible 8 Cyls., Motor No: F7-182348."  Of equal importance is that the dealer accepted the offer that the check represented, i.e. it knowingly acquiesced in the lender's proposal to it that the money would be used for that purpose and no other.

The second case cited by Ascentium's brief on the contention that the loan was for a

special purpose is *Bill Heard Chevrolet Company, Inc. v. Atlantic Discount Company, Inc.*, 120 Ga. App. 388 (1969).  In this case, it was the dealer's own salesman who had defrauded the loan company by creating fictitious sales that the lender financed.  The innocent lender under these circumstances was allowed to recover from the dealer whose salesman had defrauded the lender.

In the *Atlanta Motorcycle Sales, Inc. v. Fulton National Bank*, 147 Ga. App. 297 (1978) case cited by Ascentium, the lender, Fulton National Bank, was suing a dealer, Atlanta Motorcycle Sales, on a theory of money had and received to recover money it had loaned to finance the purchase of a vehicle.  The dealer failed in its application for the title to list the bank as having a first lien.  The purchaser of the car filed for bankruptcy, the loan was discharged, and the bank was left holding the bag with no lien on what was to be its collateral.  The bank's recovery of what it loaned was upheld for the distinct reason that when the bank sent the check for the purchase, it included as a restrictive endorsement the following:

> " 'The within check represents payment in full of purchase price of one 1976 Honda GL 1000, automobile, motor number F2021215 sold to James T. Carter. The undersigned seller has applied for title certificate in the name of this purchaser indicating first lien thereon in name of the Fulton National Bank, Atlanta, Georgia.' " *Id*. at 297.  (Emphasis added).

The Court reasoned exactly, as it had done before in the *Federal Employees Credit Union* and *Bill Heard Chevrolet Co.* cases, i.e. the innocent lender's endorsement demonstrated a special purpose for the funds which the dealer accepted by negotiating the check.

The specificity required for loan receipts to be for a special exclusive purpose is illustrated in *First Union National Bank of Newnan v. General Motors Acceptance Corporation*, 191 Ga. App. 323 (1989).  The plaintiff bank contended that it sent a check to the defendant GMAC to pay off GMAC's loan on a vehicle thereby releasing GMAC's lien and collateralizing the bank's loan and requiring GMAC to forward the title to the vehicle to the bank.  However,

the check contained no restrictive endorsement.  Rather the plaintiff bank wrote a letter enclosing the check that said nothing about collateralizing its loan or that GMAC should return the title to it, i.e. it only said:

> " 'To Whom It May Concern: Please find enclosed Cashier's Check # 35691 in the amount of $12,094.26 to payoff the loan in the name of Robert Head, Jr., on a 1985 Trans Am # 1G2FW87F6FL650657.  Please release your lien and forward to my attention.  Thank you for your help in this matter.' " *Id.* at 324.

What happened was GMAC paid its loan and forwarded the title to the owner of the vehicle.  The plaintiff bank contended its intention in paying off the loan was clear and that GMAC should have returned the check if GMAC was required by statute to forward the title to the owner.  The Court of Appeals upheld the directed verdict in GMAC's favor holding:

> "If plaintiff had paid the loan upon condition that GMAC deliver the certificate of title to plaintiff, we would be inclined to agree with plaintiff's contention.  The evidence adduced at trial, however, does not demonstrate that the payoff check was forwarded to GMAC conditionally.  Rather, the evidence demonstrates <u>that the payoff check was forwarded to GMAC unconditionally.</u>
>
> The check bore no restrictive endorsement.  Compare *Federal Employees Credit Union v. Capital Auto. Co.*, 124 Ga. App. 144, 183 S.E.2d, supra; *Atlanta Motorcycle Sales v. Fulton Nat. Bank*, 147 Ga. App. 297, 248 S.E.2d 558, supra; *Larry's Mobile Homes v. Robins Fed. Credit Union*, 161 Ga. App. 822, 288 S.E.2d 800, supra.  True, the check was accompanied by a letter.  But the letter imposed no condition upon GMAC.  It simply *requested* that the lien be released and forwarded.  <u>It did not establish a condition for the acceptance of the check.</u>
>
> Even when viewed favorably to plaintiff, <u>the evidence fails to demonstrate that GMAC accepted the payoff check in violation of a condition or a special purpose for which the check was delivered.</u>  Accordingly, the trial court did not err in granting GMAC's motion for a directed verdict." *Id.* at 324.  (Emphasis added).

As we have repeatedly pointed out, by design (a) the loan funds were wired by Ascentium with no conditions, restrictions, instructions or limitations on the use of the funds and (b) AT&L did not have access to the loan documents and the specifics of the transaction between Phoenix and Ascentium.  Furthermore, there was nothing, again by obvious design, in Ascentium's contract with Phoenix that required Ascentium to wire the loan funds and/or not to

impose conditions, restrictions on the use of the loan funds by a vendor if it wanted to do so.  In fact, Ascentium could have provided the loan's proceeds by check to AT&L with a restrictive endorsement.  Ascentium chose to do otherwise but is now trying to equate itself with innocent lenders, when imposed in writing clear restrictions on the money loaned, and which the dealer/ vendor accepted.  Ascentium cannot even measure up to the failed effort of the lender in the *First Union National Bank of Newnan* case.

   (c) The $136,328.06 of Refunds of Loan Proceeds to Phoenix by AT&L Cannot Constitute Unjust Enrichment.

  It is beyond rationality to contend that the $136,328.06 AT&L refunded to Phoenix from its loan proceeds could somehow represent unjust enrichment of AT&L.

   (d) The circumstances of AT&L's retention and application of the $79,671.97 were in good conscience.

  The flip side of AT&L's not being unjustly enriched by its retention of the $79,671.97 left after its refunds to Phoenix is that this money was applied to legitimate Phoenix contractual debts for services rendered and equipment supplied, and, therefore, the retention was in good conscience.  *See Time Insurance Company v. Fulton-DeKalb Hospital*, supra.

  3. Ascentium Is Not Entitled Ex Aequo et Bono to Recover $216,000 from AT&L OR even Phoenix.

  The Supreme Court of Georgia in *Fischesser v. Heard*, 42 Ga. 531, 533 (1871), while recognizing that property or money can be lent for a special purpose also observed if the case had involved "a general loan by the plaintiff to J. B. Fischesser, her rights are gone; she is only a creditor, and the title to the money was in J. B. Fischesser."  By design and contract, the $216,000 was no longer Ascentium's money in any sense.  By design and despite the patent misrepresentations it had imposed, Ascentium was simply an unsecured creditor.  "A claim for money had and received can only be asserted by the 'true owner' of money for a refund."  *The*

*Tolson Firm, LLC v. Sistrunk*, 338 Ga. App. 25, 26 (2016) citing *William N. Robbins, P.C. v. Burns*, 227 Ga. App. 262, 265 (1997).  The misrepresentations imposed on Phoenix by Ascentium, that the equipment had been delivered and accepted by Phoenix and that satisfactory evidence existed of such, means since that was not true, that the loan was unsecured at the point it was consummated and at the point the funds were wired.

The only way that Ascentium could be in a position to contend the $216,000 received by AT&L was not Phoenix's money would be to rescind the loan agreement to unwind the entire transaction based on Phoenix's purported fraudulent conduct in concealing that it had cancelled the order of the dispenser equipment for Jackson after the loan was complete and the funds transferred to AT&L.  Ascentium, however, elected to not pursue that course as to Phoenix.

Ascentium has to admit in the course of seeking summary judgment on its breach of contract claim against the defendants in default that it is not even out the $216,000 it loaned.  It immediately received a $24,000 principal payment and subsequently 16 principal and interest payments totaling $74,120.48 before Phoenix defaulted.  Ascentium has repeatedly affirmed its contract with Phoenix and cannot, in effect, now rescind that contract as of the point it wired the loan proceeds.  Ascentium had obtained, at that point, the benefit of its bargain, i.e. an unsecured loan that was to be repaid over 60 months with interest.  The collateral was a contractual fiction.

Under the undisputed circumstances, Ascentium also cannot meet the requirement that in ex aequo et bono, i.e. in justice and fairness that it should recover $216,000 from AT&L.

B.      Ascentium Has No Conversion Claim Against AT&L.

Ascentium alleged AT&L and Phoenix converted the Jackson funds.  (Am. Compl. ¶¶ 108 – 109).

"To make out a prima facie case, in an action for damages for conversion of personal property, the plaintiff must show title to the property, possession by the

- 26 -

defendant, demand for possession, and refusal to surrender the property, or an actual conversion prior to filing of the suit."

*Taylor v. Powertel, Inc.*, 250 Ga. App. 356, 358 (2001)[8].  The "title" element may be a "[r]ight to immediate possession, … [which] must be absolute, unconditional, and exist at the time the action is commenced."  *Id.  Gilbert v. Rafael*, 181 Ga. App. 460, 461 (1987).

> "[C]onversion involves an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, *in hostility to her rights*. The very essence of conversion is that the act of dominion is *wrongfully asserted*. Thus, if a party has a right to assert ownership, the act of dominion is not wrongful and does not constitute conversion." (emphasis added).

*Kline v. Atlanta Gas Light Co.*, 246 Ga. App. 172, 173 (2000).

1. Ascentium did not have title to or the immediate right of possession to the Jackson funds.

Of course, it is Ascentium asserting the conversion claim as to the Jackson loan proceeds, which were Phoenix's funds, and to which Ascentium had no title or unconditional right of immediate possession.  See *Gilbert*, 181 Ga. App. at 460.  Once borrowed, the funds became Phoenix's funds, and AT&L rationally proceeded according to that belief throughout the course of the two interrelated and overlapping Cairo and Jackson projects.  (See Adams Dep., p. 134).

Accordingly, AT&L made no unauthorized appropriations of the funds hostile to Phoenix's rights in the so-called Jackson funds.  Any decisions regarding the disbursement of the funds were legitimately governed by AT&L's and Phoenix's business relationship and Phoenix's authorization and approval.  Accordingly, AT&L used portions of the funds for the Cairo cooler (which Ascentium sold following Phoenix's default), refunded a portion to Phoenix, and applied the remainder to past due amounts of Phoenix, as authorized and approved by Phoenix. (Ver. Int.

---

[8] See also *In re Oxley Development Co., LLC*, 2013 WL 4787510, *4 (Bankr. N.D. Ga. June 26, 2013) (no conversion claim in addition to a contract claim where there is "no independent, non-contractual duty to release the funds").

Rsp., p. 25-27; Davidson Aff., Ex. S – AA).  AT&L also legitimately believed Ascentium was aware of and consented to Phoenix's authorized use of the Jackson fund.  (Adams Dep., p. 72).

No conversion claim exists because, when the funds were wired to AT&L, Ascentium no longer had the "right of immediate possession" to those funds,[9] and AT&L's subsequent possession and use of those funds was as authorized by their true owner - Phoenix.  (Adams Dep., p. 34, p. 72; p. 128, Ex. 13 ¶ 14; p. 131; p. 184; Ver. Int. Rsp., p. 25-27; Davidson Aff., Ex. S – AA).

  2. <u>Ascentium did not have a security interest in the Jackson equipment.</u>

As explained in detail above, the Jackson loan agreement was nothing more than an unsecured loan from its inception.  Nothing AT&L or Adams did or did not do could have changed that.  AT&L had no duty to perfect Ascentium's security interest or perfect its interests during these arm's length transactions.  Georgia law requires a "signed 'security agreement which contains a description of the collateral'" in order to create a valid security interest.  *ITT Financial Services v. Gibson*, 188 Ga. App. 188, 189 (1988) (citing O.C.G.A. § 11-9-203(1)(a)). If no collateral is described in the security agreement when executed by the parties, then a security interest in the unlisted collateral cannot exist.  *See id.*  In *ITT Financial Services*, the security agreement contained reference to a phantom "Collateral List and Valuation."  The Court affirmed a dismissal for the debtor because there was no valid description of collateral in the security agreement.  *Id.*  In our case, the Jackson loan agreement also referenced a phantom "Schedule A" as the purported description of collateral (i.e. the June 27, 2013 Jackson invoice). As in *ITT Financial Services,* the fully executed loan agreement did <u>not</u> contain a description of collateral. (See Campi Dep., Ex. 62).  "Schedule A" was a post-loan unilateral addition to the

---

[9] *Weldon v. Trust Co. Bank of Columbus*, 231 Ga. App. 458, 463 (1998) ("The rule is that once money is withdrawn from a bank customer's account and a cashier's check issued in the payee's name, the check becomes the payee's property").

agreement by Ascentium.  (Campi Dep., p. 86).  In fact, there is no evidence of when the phantom "Schedule A" was even added to the agreement!  Ascentium never acquired a security interest in the so-called Jackson equipment, and never could.

       3.    <u>Even if Ascentium had a security interest, AT&L did not know Ascentium was entitled to a return of the loan proceeds.</u>

If the Court finds an unperfected security interest was somehow created, "where [AT&L] lacked actual or constructive knowledge of [Ascentium's] alleged entitlement to the proceeds in [AT&L's] possession, [AT&L would be entitled to summary judgment on Ascentium's conversion claim]." *All Business Corp. v. Choi*, 280 Ga. App. 618, 625 (2006).  Choi was an attorney and escrow agent for the lender and borrower.  In our case, it is undisputed AT&L had no agency relationship, confidential or fiduciary, with Ascentium.  Even despite his agency relationship with the lender and borrower, the Court affirmed summary judgment for Defendant Choi because he did not know the lender had a security interest in the sales proceeds, which presumably would have entitled the lender to payment of the sales proceeds, when Choi instead disbursed the funds to the seller/borrower.  *Id.*

In affirming summary judgment for Choi, the Court acknowledged it was determinative whether the Defendant had "actual or constructive knowledge" that the lender had a security interest in the proceeds, as opposed to mere knowledge that the lender loaned money to the borrower because the Defendant had to know the lender was entitled to receipt of the proceeds.  *Id.*  The court found: "the correspondence between the parties constitutes direct evidence that <u>Choi was not aware of the precise nature of ABC's security interest.</u>"  Therefore, "[u]nder these circumstances, where Choi lacked actual or constructive knowledge of ABC's alleged entitlement to the proceeds in his possession, we hold that no genuine issue of fact remains on ABC's conversion claim." *Id.*

These facts have some similarity to the facts in our case.  AT&L and Adams were also not aware of Ascentium's intended security interest in the Jackson equipment at the time AT&L received the $216,000 from Ascentium, but were generally aware Ascentium loaned Phoenix money.  Moreover, Adams and AT&L knew "soon after" receiving the loan funds that Phoenix "might" have to refund money to Ascentium.  As Adams said: "… [Ataollah] came back with an e-mail that said, Hold up I might have to send the money back.  And he came back and said, Go ahead and send the money – wire the money to me."  (Adams Dep., p. 72; Davidson Aff., ¶ 24, Ex. V).  Of course, AT&L and Adams did not know the terms of the Jackson loan agreement, and did not know the Jackson invoice would be attempted to be used by Ascentium to supply the necessary description of collateral to secure the loan.  (Ver. Int. Rsp., p. 25; Davidson Aff., ¶ 20, Ex. R).  Thus, at the time it disbursed the loan funds as approved and authorized by Phoenix, AT&L and Adams "did not know the precise nature of [Ascentium's] security interest," and therefore did not know Ascentium was entitled to return of any portion of the loan funds.  *See Choi*, supra.  Therefore, even if Ascentium had a valid security interest in the Jackson equipment, a conversion action does not lie against AT&L as a matter of law.

## IV.  CONCLUSION

For the foregoing reasons, Ascentium's motion for partial summary judgment should be denied, and instead AT&L and Adams' motion for summary judgment should be granted.

Respectfully submitted this 17th day of January, 2017.

Jones Cork, LLP
5th Floor SunTrust Bank Bldg.
435 Second Street
Macon, Georgia 31201
Telephone:  (478) 745-2821
Facsimile:  (478) 743-9609
E-mail:  jerome.strickland@jonescork.com
Collier.mckenzie@jonescork.com

/s/ H. Jerome Strickland
H. Jerome Strickland, GA Bar No. 687700
/s/ Collier W. McKenzie
Collier W. McKenzie, GA Bar No. 672113

Counsel for Adams Tank & Lift, Inc. and
Andrew J. Adams

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

ASCENTIUM CAPITAL LLC,

                Plaintiff,

      v.

ADAMS TANK & LIFT, INC.; ANDREW J.
ADAMS; PHOENIX PETROLEUM, LLC;
GREAT AMERICAN TRAVEL CENTER,
LLC; FALCON ENTITY, LLC,

                Defendants

Civil Action No. 1:15-CV-123(LJA)

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of January 2017, a copy of the foregoing Defendants Adams Tank & Lift, Inc. and Andrew J. Adams' Response to Plaintiff's Partial Motion for Summary Judgment was filed electronically with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

      Kevin A. Stine – kstine@bakerdonelson.com
      Sabrina L. Atkins – satkins@bakerdonelson.com

                          s/H. Jerome Strickland
                          H. JEROME STRICKLAND
                          State Bar No. 687700
                          COLLIER W. MCKENZIE
                          State Bar No. 672113
                          JONES CORK, LLP
                          P.O. Box 6437
                          Macon, Georgia 31208-6437
                          (478) 745-2821
                          *Counsel for Defendants Adams Tank &*
                          *Lift, Inc. and Andrew J. Adams*